# EXHIBIT 1

William B. Gateman

1

1                                                   VOLUME    1

2                                                   PAGES     251

3                                                   EXHIBITS  1-19

4              UNITED STATES DISTRICT COURT

5              DISTRICT OF MASSACHUSETTS

6              CIVIL ACTION NO. 04-11730NG

7                      GEORTO, INC.

8                                     Plaintiff

9                          v.

10         WILLIAM GATEMAN, Individually and as

11      Trustee of 200 UNION STREET REALTY TRUST

12                                     Defendant/Third-Party

13                                     Plaintiff

14                          v.

15              ROBERTS CORPORATION

16                                     Third-Party Defendant

17      ------------------------------------

18      DEPOSITION OF:  WILLIAM B. GATEMAN

19   Tuesday, August 30, 2005  10:10 a.m. to 5:05 p.m.

20         Lynch, Brewer, Hoffman & Fink, LLP

21          101 Federal Street - 22nd Floor

22            Boston, Massachusetts 02110

23         Reporter:  Robert K. Maloney, RPR

24    Two Oliver Street, Boston, Massachusetts 02109

William B. Gateman

8

1          IT IS HEREBY STIPULATED AND AGREED

2     by and among counsel for the respective parties

3     hereto that the deponent will read and sign the

4     deposition under the pains and penalties of perjury

5     within thirty (30) days of receipt and that

6     signature before a notary public and the filing of

7     said deposition are hereby waived.

8          IT IS FURTHER STIPULATED that all

9     objections, except as to the form of the question,

10    and motions to strike are reserved for the time of

11    trial.

12          MR. KERESTER:  On the record.  Would

13    you swear the witness, please.

14    Whereupon,

15          WILLIAM B. GATEMAN

16    having been first satisfactorily identified by the

17    production of his Massachusetts driver's license

18    and duly sworn by the Notary Public, was examined

19    and testified as follows:

20          DIRECT EXAMINATION

21       BY MR. KERESTER:

22    Q.    Could you state your full name for the

23    record.

24    A.    William Brian Gateman.

William B. Gateman

38

1    today?

2        A.    When I was trying to sell the property.

3        Q.    When was that?

4        A.    It was after it was acquired.

5        Q.    Did you ever print any of the photographs

6    that you had taken other than the nine pictures

7    that you brought today?

8        A.    I am sure I did.

9        Q.    Did you look for those other pictures?

10       A.    Yes.

11       Q.    Do you believe that those pictures are no

12   longer in existence?

13       A.    I know I don't have them.

14       Q.    Do you think you may have given them to

15   somebody else?

16       A.    Yes.

17       Q.    Who?

18       A.    To anyone that wanted to see pictures of

19   the property.

20       Q.    Did you retain any of those pictures?

21       A.    I don't have any.

22       Q.    Did you at one point retain those

23   pictures?

24       A.    I don't remember.

William B. Gateman

39

1        Q.    Is it possible that you threw away some

2    of those pictures?

3        A.    It is possible.

4        Q.    When do you think you may have done that?

5        A.    I don't know.

6        Q.    Did you throw away any pictures of the

7    property after this lawsuit was filed?

8        A.    No.

9        Q.    Did you throw away any pictures after you

10    received a letter from plaintiff's counsel in the

11    spring of last year?

12        A.    No.

13        Q.    Did you in response to the document

14    production requests look for any e-mails that may

15    relate to the property?

16        A.    No.

17        Q.    Do you recall ever sending or receiving

18    any e-mails about the property at any time?

19        A.    Yes.

20        Q.    Did you retain electronic copies of those

21    e-mails?

22        A.    No.

23        Q.    Did you ever print any of the e-mails

24    out?

William B. Gateman

40

1    A.    I might have.

2    Q.    Did you look for printed copies of those

3  e-mails in response to the document requests?

4    A.    Whatever I had in my file is what I

5  have.

6    Q.    Did you determine whether you could

7  locate any of those e-mails in your computer hard

8  drive or any CDs?

9    A.    I am not very good with computers.  I

10  know that when I delete an e-mail as far as I know

11  it is gone.

12    Q.    Did you ever take any handwritten notes,

13  make any handwritten notes in connection with the

14  property at any time?

15    A.    No.

16    Q.    Did you look for copies of any telephone

17  bills that you have that would reflect any

18  telephone calls that you may have made in

19  connection with the property?

20    A.    I don't save any telephone records.

21    Q.    Is it your testimony that you have not

22  retained any copies of any telephone bills that you

23  ever received?

24    A.    Say that again.

William B. Gateman

41

1     Q.    Is it your testimony that you did not

2     retain any of the telephone bills that you ever

3     received?

4     A.    I may have retained copies.

5     Q.    Did you look for any telephone bills that

6     you may have for the time period from 2002 through

7     2004?

8     A.    Whatever I have in my files is what I

9     have.

10    Q.    But did you look for any telephone bills

11    for that time period?

12    A.    Not specifically, no.

13           MR. KERESTER:  I will ask counsel to

14    determine if there are any telephone bills for that

15    time period and, if so, to produce them according

16    to the request.

17    Q.    Did you ever make any tape recordings of

18    any meetings or phone conversations that related to

19    this property in any way?

20    A.    No.

21    Q.    Did you look for copies of any invoices

22    that you may have received from any contractors in

23    connection with work done on the property?

24    A.    Whatever invoices I have or whatever

William B. Gateman

42

1    documents I have pertaining to the property I have

2    given to my attorney.

3        Q.    Did you look for and produce any

4    cancelled checks that you may have made for payment

5    in connection with services rendered at the

6    property?

7        A.    No.

8              MR. KERESTER:  Jim, I would just

9    state for the record that the document production,

10   both the initial disclosure and the more recent

11   production, didn't contain any invoices from

12   Roberts or checks.  I believe there were some

13   produced in the Roberts production but I would ask

14   Mr. Gateman to review his documents and produce any

15   additional documents he may have in response to the

16   request.

17             MR. ROBBINS:  I will be glad to do

18   it.  I thought that invoices were in fact produced.

19             MR. KERESTER:  I don't believe there

20   were invoices from Roberts in Mr. Gateman's

21   production.  I have some other documents there were

22   in the Roberts production, invoices produced as

23   part of their initial disclosure, but I don't think

24   there were any as far as Mr. Gateman's production

William B. Gateman

47

1  Stores and, I believe, from 1999 to 2001 from River

2  of Life Church.

3      Q.   Since 2001 has the trust received any

4  rent payments?

5      A.   No.

6      Q.   Did the trust hold title to the real

7  property at 200 Union Street?

8      A.   Yes.

9      Q.   Did the trust purchase the property in or

10  about 1996 to the best of your understanding?

11      A.   Yes.

12      Q.   Does the trust continue to hold title to

13  any portion of that property?

14      A.   No.

15      Q.   Does the trust currently have any assets?

16      A.   No.

17      Q.   In your capacity as trustee have you ever

18  received instructions from your father about what

19  you should or shouldn't do with respect to the

20  property that was held by the trust?

21      A.   Could you repeat that.

22      Q.   Were you ever directed by your father to

23  do certain things in your capacity as the trustee?

24      A.   Yes, I am sure.

William B. Gateman

49

1    Q.    Did your father have any role in

2  connection with the management of the property

3  after it was purchased?

4    A.    What do you mean by role?

5    Q.    What, if anything, did your father do to

6  manage the property after it was purchased?

7    A.    I don't know what you mean.

8    Q.    Did your father do anything with respect

9  to dealing with the tenants of the property?

10   A.    I am sure he did.

11   Q.    And as between you and your father who

12 had the primary role in dealing with the tenants?

13   A.    It was a shared role.

14   Q.    Since 1996, generally what have been your

15 responsibilities as trustee of the trust?

16   A.    To collect the rent, to maintain the

17 property, to try to sell the property, secure

18 insurance for the property and ultimately demolish

19 the property and sell the property.

20   Q.    To your understanding is your father

21 authorized to act on behalf of the trust?

22   A.    I don't know.

23       MR. KERESTER:  Counsel, we have not

24 received a copy of any schedule of beneficial

William B. Gateman

50

1    interest which was requested in one of the initial

2    document requests for which there was no objection,

3    so I would ask if that document can be located and

4    produced.

5                    MR. ROBBINS:  Beneficial interest in

6    what?

7                    MR. KERESTER:  The trust.

8                    MR. ROBBINS:  The 200 Union Street

9    trust?

10                   MR. KERESTER:  Yes.

11                   MR. ROBBINS:  Actually, before today

12   I wasn't aware there was anyone else, but I will

13   agree to provide that.

14       Q.   Mr. Gateman, when did you first become

15   aware of the 200 Union Street property?

16       A.   Before the acquisition.

17       Q.   How did you become aware of it?

18       A.   I used to shop there.  It was a

19   department store.

20       Q.   Hoffman's?

21       A.   Yes.

22       Q.   At what point in time did you become

23   aware that the property was available for purchase?

24       A.   It was being auctioned.

William B. Gateman

60

1    Q.    Is it also fair to characterize the four

2    other properties that you testified about earlier,

3    the three in Revere and the fourth property in

4    Randolph as investment properties?

5    A.    Yes.

6    Q.    At a later point in time did you cause

7    the property to be sold in parcels?

8    A.    Yes.

9    Q.    You sold one of those parcels to Family

10   Dollar, is that correct?

11   A.    Yes.

12   Q.    And the consideration paid by Family

13   Dollar was $375,000, is that right?

14   A.    Approximately.

15   Q.    And the trust sold a second parcel to the

16   plaintiff in this litigation, Georto, Inc. for the

17   consideration of $300,000, correct?

18   A.    And I think he paid some additional money

19   because he delayed the closing.

20   Q.    Additional money referring to the

21   consideration for an extension on the purchase and

22   sale agreement, is that right?

23   A.    Yes.

24   Q.    To whom was the third parcel sold?

William B. Gateman

61

1    A.    It was sold to a Lance Belostock.

2    Q.    Was that sold for $110,000?

3    A.    I think so, yes.

4    Q.    Was it sold sometime in the summer of

5    2004?

6    A.    Approximately.

7    Q.    Is it fair to say then that the trust

8    received $785,000 as a result of the sale of the

9    three parcels that comprised the property?

10    A.    Approximately, yes.

11    Q.    In addition, the trust had received, I

12    believe, approximately $250,000 on the insurance

13    claim, is that right?

14    A.    Minus attorney fees.

15    Q.    Was there a contingency fee paid to the

16    trust's counsel for that?

17    A.    Yes, there was.  The other defendant paid

18    as well.

19    Q.    When you say the other defendant, are you

20    referring to the insurance agent?

21    A.    Yes.

22    Q.    Juliani?

23    A.    Yes.

24    Q.    When you say he paid, what do you mean?

William B. Gateman

62

1      A.     In the settlement he had to also pay a

2   portion.

3      Q.     In total the trust received a gross

4   consideration of $250,000, is that right, but some

5   portion was then paid to your counsel as a

6   contingency fee?

7      A.     Say that again.

8      Q.     Okay.  Did American Equity and Juliani

9   together pay the gross sum of $250,000 as part of

10   that settlement?

11      A.     No.

12      Q.     How much did American Equity pay?

13      A.     $255,000.

14      Q.     And how much did Juliani pay?

15      A.     I believe approximately $60,000.

16      Q.     With respect to the approximately

17   $785,000 that was paid for the sale of the three

18   parcels of the property were those funds

19   distributed to the holder of the beneficial

20   interest in the trust?

21      A.     I don't know.

22      Q.     Did you ever write any checks

23   distributing the proceeds from the sale?

24      A.     Yes.

William B. Gateman

63

1    Q.    To whom did you write those checks?

2    A.    To other businesses that were purchased.

3    Q.    Specifically to whom?

4    A.    I don't recall.

5    Q.    Are those other businesses in which you

6    have an interest?

7    A.    I may have an interest.

8    Q.    Did you cause the entire net sale

9    proceeds to be distributed out of the trust?

10   A.    No.

11   Q.    Did the trust retain any of the funds?

12   A.    Yes.

13   Q.    How much?

14   A.    I don't remember.

15   Q.    Approximately?

16   A.    $200,000, approximately.

17   Q.    Are those funds currently held in a bank

18   account in the trust's name?

19   A.    I don't know what the title of the bank

20   account is.

21   Q.    But they are held in a bank account?

22   A.    Yes.

23   Q.    Do you know whether that bank account is

24   in your name individually?

William B. Gateman

64

1      A.    I know my name is on it someplace.

2      Q.    You don't know whether it is in your

3   capacity as trustee or whether it is individually?

4      A.    No, I don't know.

5      Q.    With what bank are those funds held?

6      A.    Banknorth.

7      Q.    To the best of your recollection were the

8   remaining proceeds other than the $200,000

9   distributed out of the trust?

10     A.    Yes.

11     Q.    When were those distributions made?

12     A.    I don't know exact dates.

13     Q.    Were any of those distributions made

14   after the commencement of this lawsuit in August of

15   2004?

16     A.    Yes.

17     Q.    Approximately how much was distributed

18   after the filing of the lawsuit?

19     A.    $200,000.

20     Q.    To whom were those funds distributed?

21     A.    It was to purchase some stock with it.

22     Q.    In those name is the stock held?

23     A.    It is not held anymore.  It was sold.

24     Q.    At the time that the stock was held in

William B. Gateman

65

1    whose name was the stock held?

2        A.    I don't recall.

3        Q.    Was it in your name individually?

4        A.    No.

5        Q.    Was it in your father's name?

6        A.    I don't think so.

7        Q.    Was the stock held for the benefit of you

8    or your family?

9        A.    I don't think so.

10        Q.    For whose benefit was the stock held?

11        A.    I think a friend of my father's.

12        Q.    Who is that?

13        A.    I don't remember his name.

14        Q.    Who wrote the check for that

15    approximately $200,000?

16        A.    I believe the bank did.

17        Q.    Who requested the bank to issue that

18    check?

19        A.    I did.

20        Q.    Have you retained copies of any bank

21    accounts into which any of the funds from the sale

22    of the parcels were distributed?

23        A.    Yes.

24        Q.    Have you also kept copies of any checks

William B. Gateman

66

1  reflecting distribution of any of those funds?

2      A.    No.

3      Q.    Did you throw those checks away?

4      A.    The account is a savings account.  There

5  was no checks with it.

6      Q.    Do you have any records indicating the

7  name of your father's friend in whose name the

8  stock was held?

9      A.    No.

10     Q.    At some point was that stock sold?

11     A.    I think so, yes.

12     Q.    Was it your understanding that your

13  father's friend was holding that stock for the

14  benefit of you or your father?

15     A.    Yes.

16     Q.    Why?

17     A.    I don't know why.

18     Q.    Did you have any discussions with your

19  father about the subject of in whose name that

20  stock would be placed?

21     A.    No.

22     Q.    Did you have a discussion with anybody

23  about in whose name the stock would be held?

24     A.    No.

William B. Gateman

67

1    Q.    How did you know to whom to have the bank
2    issue the funds?

3    A.    I believe my father told me.

4    Q.    So you did have some discussion with your
5    father about that?

6    A.    You asked me about a name.

7    Q.    Okay.  So your father never gave you the
8    name of the individual in whose name the stock
9    would be held?

10   A.    He gave me the name of the brokerage
11   account or brokerage firm.

12   Q.    Did you cause the bank to make that
13   distribution at the direction of your father?

14   A.    Yes.

15   Q.    Is it fair to say that during the time
16   period from 1996 to the present that your father
17   controls the operations of the trust?

18   A.    I don't know.

19   Q.    Was it your understanding that the stock
20   would be held for the benefit of your father
21   specifically?

22   A.    I assumed so, yes.

23   Q.    What is the name of the brokerage firm?

24   A.    I don't recall.

William B. Gateman

68

1    MR. KERESTER:  Counsel, there were

2    certain document production requests with respect

3    to distribution made concerning the proceeds from

4    the sale of the property and I would ask that those

5    documents be produced.

6    MR. ROBBINS:  Was it a document

7    production request, a specific one?

8    MR. KERESTER:  We can address that

9    off the record if you would like, but I can point

10   your attention to the particular request.

11   MR. ROBBINS:  Let's go off the record

12   so I can make some notes here.

13   (Discussion held off the record.)

14   MR. KERESTER:  Back on the record.

15   Q.   Mr. Gateman, I believe you have indicated

16   that approximately $200,000 of the net proceeds

17   from the sale of any portion of the property has

18   been maintained in a bank account with Banknorth

19   that is either in your name as trustees or

20   individually, is that correct?

21   A.   That is right.

22   Q.   And I believe you indicated that an

23   additional sum of approximately $200,000 was

24   distributed to a brokerage firm in the name of a

William B. Gateman

92

1    about why they needed to include a line item of

2    $25,000 for the removal of brick and foundation

3    concrete if not acceptable to bury on site?

4         A.    Ask that again.

5         Q.    Did you have any discussion with Mr.

6    Stalker and Mr. Doherty about why they had

7    separately had a price of $25,000 for the removal

8    of brick and foundation concrete if not acceptable

9    to bury on the site?

10        A.    Not that I recall.

11        Q.    You testified earlier that you believe

12   that your father had spent approximately $200,000

13   in connection with the demolition of the property?

14        A.    Approximately, yes.

15        Q.    To whom did he make those payments?

16        A.    To whoever did work on the site.

17        Q.    Approximately how much was paid to

18   Roberts?

19        A.    Approximately a hundred thousand dollars.

20        Q.    It is your understanding that either the

21   trust or your father made payments to Roberts in

22   the total sum of approximately $100,000?

23        A.    Yes.

24        Q.    Were those payments made by check?

William B. Gateman

93

1    A.    I believe so.

2    Q.    Were any of the payments made by cash?

3    A.    They could have been.

4    Q.    Who received the additional $100,000 in

5    connection with the demolition?

6    A.    Turner received some money.

7    Q.    How much were they paid?

8    A.    Approximately $10,000.  Loveland

9    Trucking.

10    Q.    How much were they paid?

11    A.    Approximately $30,000.

12    Q.    What services did Loveland provide?

13    A.    They trucked in fill to the site.

14    Q.    Anybody else?

15    A.    Weatherbee Contracting, approximately

16    $20,000.

17    Q.    What work did Weatherbee do?

18    A.    They graded the site.  SCS Construction,

19    I believe, did the asbestos abatement.

20    Q.    How much were they paid?

21    A.    Approximately $30,000.  RIS was a few

22    thousand dollars, maybe.

23    Q.    Anybody else?

24    A.    The fence company, Wood Wire Fence,

William B. Gateman

94

1   approximately $10,000.  Goldman Engineering, they

2   did the reports.  I don't know how much they were

3   paid.  Maybe $5,000.  Envirotest, approximately

4   $15,000, maybe.

5        Q.   Do you recall anyone else?

6        A.   No, but I am sure there was other money

7   that was spent.

8        Q.   Was your father the source of those

9   funds?

10        A.   Yes.

11        Q.   In general, did your father provide the

12   funds that were used by the trust, for example, to

13   purchase the property in the first instance?

14        A.   Yes.

15        Q.   Similarly, your father was the source of

16   the approximately $200,000 that was paid in

17   connection with the demolition?

18        A.   Approximately, yes.

19        Q.   At some point in time did you sign a

20   demolition permit application or a notice?

21        A.   I might have signed it.  I am not sure.

22        Q.   Were you requested by Roberts to sign any

23   kind of a notification in connection with the

24   demolition work?

William B. Gateman

165

1    Q.    Do you have any understanding as to

2  whether Red Baron rendered any services at the

3  property?

4    A.    I imagine that they provided some trucks.

5    Q.    Did you ever receive any invoicing

6  documents from Weatherbee?

7    A.    I must have.

8    Q.    Did you retain copies of those?

9    A.    If you don't have them I don't have

10  them.

11    Q.    Did you enter into an agreement with

12  Loveland to perform work at the property?

13    A.    Yes.

14    Q.    What did you ask them to do?

15    A.    I asked them to get me fill to fill the

16  property.

17    Q.    Did you deal with Ronald Loveland?

18    A.    I think it is Don.

19    Q.    Don Loveland?

20    A.    Yes.

21    Q.    How did you first learn of Loveland?

22    A.    I knew him from a neighbor in town.

23    Q.    Is he in fact a resident of Swampscott?

24    A.    I don't know where he lives.

William B. Gateman

166

1      Q.    What did you ask Mr. Loveland
2  specifically to do?
3      A.    Actually, he came to me and told me that
4  he had some fill that was available for free and
5  all I had to do was to pay the trucking costs.
6      Q.    Did you enter into any kind of agreement
7  with him, written agreement?
8      A.    No, probably not.
9      Q.    Did you make any payment to Loveland?
10     A.    Yes.
11     Q.    How much?
12     A.    Approximately $30,000.
13     Q.    It was your understanding that you were
14 paying for the cost of the trucking, correct?
15     A.    Yes.
16     Q.    Where did the fill come from?
17     A.    Most of it came from a site in Revere.
18     Q.    What site?
19     A.    You have the documentation.  I don't know
20 offhand what the site is.
21     Q.    You are aware of some documentation that
22 has been produced in this litigation that
23 identifies where it came from?
24     A.    Yes.

William B. Gateman

167

1    Q.   What documents are those?

2    A.   It's a document that says where the fill

3    was from and what it contained.

4         MR. KERESTER:  Off the record for a

5    moment.

6         (Discussion held off the record.)

7         MR. KERESTER:  Back on the record.

8    Counsel had a discussion off the record regarding

9    the document that the witness was referring to and

10   I have indicated to Mr. Robbins that I don't

11   believe I received a copy of that document and I

12   would ask that it be produced.

13   Q.   Mr. Gateman, while we were off the record

14   you described that document.  Could you just state

15   that on the record?

16   A.   Sure.  The fill was from someplace in

17   Revere called something Heights where they were

18   building a development and they had a lot of excess

19   fill, virgin fill, and there was a letter attesting

20   to what the material was.

21        MR. KERESTER:  I would ask counsel

22   for that to be produced.

23        MR. ROBBINS:  That's not a problem.

24   Q.   It is your understanding that you were

William B. Gateman

168

1    provided with a copy of this letter at some point

2    in time?

3         A.    Yes.

4         Q.    By whom?

5         A.    By the owner of the property.

6         Q.    Is it your understanding that fill

7    typically is free?

8         A.    No.

9         Q.    Do you have any understanding as to why

10   this fill was free?

11        A.    My understanding, which might be wrong,

12   is that whoever has it and wants to get rid of it

13   has to just get rid of it.

14        Q.    Did you ever go to Revere and inspect the

15   material before it was brought to your site?

16        A.    I didn't, but Family Dollar did.

17        Q.    Who from Family Dollar went there?

18        A.    Their engineering firm.

19        Q.    Who was that?

20        A.    I am not sure of the name.

21        Q.    Did you have any personal knowledge as

22   what material was transported from Revere to your

23   site in Lynn?

24        A.    I was there every day.

William B. Gateman

182

1    to Georto?

2        A.    Yes.

3        Q.    Did you also sign a trustee's certificate

4    stating that you had been authorized by the

5    beneficiaries of the trust to sign any and all

6    documents in connection with the sale?

7        A.    I don't know.

8              MR. KERESTER:  Let's mark this as

9    Exhibit Number 13.

10             (The document was marked Deposition

11   Ex. No. 13.)

12       Q.    Can you identify Exhibit Number 13?

13       A.    Yes.

14       Q.    Does that document contain your

15   signature?

16       A.    Yes.

17       Q.    Had you in fact been authorized by the

18   beneficiaries of the trust to sign any and all

19   documents related to the sale of the property?

20       A.    Yes.

21       Q.    Did you receive that authorization from

22   your father?

23       A.    Probably not.

24       Q.    Do you know who the beneficiaries are

William B. Gateman

183

1    that are referenced in this exhibit?

2        A.    I don't.

3        Q.    Do you know today who the beneficiaries

4    of the trust are?

5        A.    No, I don't.

6        Q.    How do you know that you received

7    authorization if you don't know who the

8    beneficiaries are?

9        A.    Repeat your question.

10       Q.    How do you know that you received the

11   authorization of the beneficiaries if you don't

12   know who the beneficiaries are?

13       A.    I don't know how.

14            MR. KERESTER:  I would like to mark

15   next as Exhibit Number 14 this document entitled

16   Indemnification Agreement.

17            (The document was marked Deposition

18   Ex. No. 14.)

19       Q.    Can you identify Exhibit Number 14?

20       A.    Indemnification Agreement.

21       Q.    Does that document contain your

22   signature?

23       A.    Yes.

24       Q.    Is it your understanding that this

William B. Gateman

250

1         E R R A T A    S H E E T

2      I, WILLIAM B. GATEMAN, do hereby certify that

3 I have read the foregoing transcript of my

4 testimony, and further certify that it is a true

5 and accurate record of my testimony (with the

6 exception of the corrections listed below):

7 Page     Line        Correction

8 *69*    *18,19*    *THE PAYMENT WAS MADE BY THE Trus*

9 ___     ___      _____

10 ___     ___      _____

11 ___     ___      _____

12 ___     ___      _____

13 ___     ___      _____

14 ___     ___      _____

15 ___     ___      _____

16 ___     ___      _____

17 ___     ___      _____

18 ___     ___      _____

19

20 Signed under the pains and penalties of perjury

21 this *12* day of *Oct* , 2005.

22

23 _____

24       WILLIAM B. GATEMAN

William B. Gateman

251

1  COMMONWEALTH OF MASSACHUSETTS)

2                                      ) ss.

3  COUNTY OF SUFFOLK               )

4        I, Robert K. Maloney, Registered

5  Professional Reporter and Notary Public duly

6  commissioned and qualified in and for the

7  Commonwealth of Massachusetts, do hereby certify

8  that there came before me on Tuesday, August 30,

9  2005, at 10:10 o'clock a.m., the person

10 hereinbefore named, who was by me duly sworn, that

11 he was thereupon examined upon his oath, and his

12 examination was taken by me stenographically, and

13 that the deposition is a true record of the

14 testimony given by the witness.

15       I further certify that I am neither

16 attorney, counsel nor relative of any of the

17 parties to the action or financially interested in

18 the action.

19       I have hereunto set my hand and affixed

20 my seal this 13th day of September, 2005.

21

22       _____

23       ROBERT K. MALONEY, Notary Public

24       My Commission expires January 10, 2008

# EXHIBIT 2

12/24/96 02:44  Inst 371
BK 13905 PG 472

## DECLARATION OF TRUST
### ESTABLISHING
## 200 UNION STREET REALTY TRUST

I, William Gateman, of Swampscott, Essex County, Massachusetts, do hereby declare that I and my successor(s) in trust hereunder will hold any and all Trust Property that has been or hereafter may be acquired by or conveyed or transferred to me or to my successor(s), as Trustee(s) hereunder, IN TRUST, for the sole benefit of the Beneficiaries hereunder, from time-to-time, upon the terms, conditions, and provisions and subject to the limitations hereof:

1. **Trustees and Beneficiaries.** The term "Trustee", as used herein, shall mean the person or persons who, from time-to-time, shall be serving as Trustee or Trustees hereunder; and all of the rights, powers, authorities, privileges, and immunities provided for hereunder for the Trustee may be exercised by such person or by each and every person, if more than one (1), who shall appear, from the records of the Essex South County Registry of Deeds in which this Trust shall be recorded, to be the Trustee at such time. If more than one (1) person shall be serving as Trustee hereunder, the Trustees shall exercise the powers granted to them solely by unanimous action. The term "Registry of Deeds", as used herein, shall mean the Essex South County Registry of Deeds.

The Beneficiaries of this Trust are the persons listed as the Beneficiaries in the Schedule of Beneficiaries, as of this day executed by them and the Trustee, and filed with the Trustee as a part of the records of this Trust, and their successors and assigns as herein provided for. The beneficial interests of the

W. Gateman

EXHIBIT NO. 1
8-30-05
R. MALONEY

BK 13905 PG 473

Beneficiaries are as now or hereafter may be set forth on said Schedule of Beneficiaries, which shall be amended, from time-to-time, to reflect any change in the identity of the Beneficiaries or in their respective interests hereunder. Any Beneficiary may serve as a Trustee, but no Trustee need be a Beneficiary.

2. <u>Name of Trust</u>. The name of the Trust shall be the 200 Union Street Realty Trust.

3. <u>Trustee's Powers</u>. Except as hereinafter provided, the Trustee shall have no power or authority to deal in or with the property held hereunder unless the Trustee shall have first received directions in writing from the Beneficiary or Beneficiaries and, upon the receipt of such directions, as and to the extent specifically contained therein, the Trustee shall have full power and authority to: sell, convey, assign, mortgage, or otherwise dispose of all or any part of the Trust Property; execute and deliver leases and subleases, notwithstanding that the term of said leases or subleases may extend beyond the date of the possible termination of this Trust; borrow money and execute and deliver notes, mortgages or other evidence of such borrowing of money, for a period extending beyond the date of any possible termination of this Trust; lend money and receive notes or other evidence of such lending of money, for a period extending beyond the date of any possible termination of this Trust; grant or acquire rights or easements; construct, alter, add to, or demolish any real estate constituting a part of the Trust Property; and, generally, to enter into agreements,

BK 13905 PG 474

contracts, or arrangements with respect to the Trust Property, all as so directed, but not otherwise. No Trustee, however, shall be required to take any action, as so directed, which, in the opinion of such Trustee, will involve him in any personal liability unless he shall be first indemnified to his satisfaction.

4. <u>Trustee's Certificate</u>. No person dealing with the Trustee hereunder shall be under any obligation or liability to see to the application of any purchase money or to any other money or property lent or delivered or transferred to the Trustee or to see that the terms and conditions of this Trust have been complied with. Any person dealing with the Trust Property or with any Trustee may rely fully, and without further inquiry, on a certificate, which must be signed and acknowledged by each and every person appearing from the records of the Registry of Deeds to be a Trustee hereunder, as to who is the Trustee or who are the Trustees or the Beneficiaries hereunder, or as to the authority of the Trustee to act, or as to the existence or non-existence of any fact or facts which constitute or may constitute conditions precedent to any acts or action by the Trustee, or which are, in any other manner, germane to the affairs of this Trust, including, without limitation, the fact of whether or not directions authorizing the Trustee to so act, as provided in Article Three (3) herein, have been given by the Beneficiary or Beneficiaries.

5. <u>Termination of Trust</u>. This Trust may be terminated at any time by delivery to the Trustee of a notice of termination,

BK 13905 PG 475

signed and acknowledged by the holder(s) of not less than fifty-one (51%) percent of the beneficial interests in this Trust. Upon delivery of such notice of termination, the Trustee shall acknowledge receipt of the same and a Certificate of Termination, signed and acknowledged by each and every person appearing from the records of the Registry of Deeds to be a Trustee hereunder, shall be recorded in the Registry of Deeds, and this Trust shall thereupon be terminated as hereinafter set forth; and _provided, however_, that in the event of the death of any Beneficiary, the surviving Beneficiary or Beneficiaries and the successor in interest of a deceased Beneficiary may unanimously agree to continue this Trust, in which event no such notice of termination shall be delivered to the Trustee. Notwithstanding any of the foregoing provisions of this Article Five (5), this Trust shall terminate twenty (20) years from the date hereof. In case of termination of this Trust, either by expiration of time or otherwise, the Trustee shall thereupon transfer and convey, by proper deeds or other instruments, in writing, the specific assets constituting the Trust Property, subject to any leases, mortgages, contracts, or other liens or encumbrances on the Trust Property, to the Beneficiaries, as tenants-in-common, in proportion to their respective beneficial interests. All such deeds or other instruments shall refer to this Trust and shall be accompanied by a certificate, signed and acknowledged by the Trustee, that the grantees or transferees named in such deeds or other instruments are the Beneficiaries

BK 13905 PG 476

and that the beneficial interests of the respective Beneficiaries are as set forth in said deeds or other instruments.

6. **Resignation of Trustee**. Any Trustee hereunder may resign by a written instrument, signed and acknowledged by such resigning Trustee, which shall be recorded in the Registry of Deeds.

7. **Successor Trustee**. Succeeding or additional Trustees may be appointed, and any trustee may be removed, by a written instrument, signed and acknowledged by the holder(s) of not less than fifty-one (51%) percent of the beneficial interests in this Trust; _provided, however_, that, in each such case, a certificate signed and acknowledged by each and every person appearing from the records of the Registry of Deeds to be a Trustee hereunder, naming the Trustee or Trustees appointed or removed and, in the case of any appointment, the acceptance in writing by any Trustee or Trustees so appointed, shall be recorded in the Registry of Deeds. Upon the appointment of any succeeding or additional Trustee, title to the Trust Property shall thereupon, without necessity of any instrument of conveyance or transfer, be vested in such succeeding or additional Trustee jointly with the remaining Trustee, if any. Each succeeding or additional Trustee shall have all of the rights, powers, authorities, privileges, and immunities as the original Trustee hereunder. No Trustee shall be required to furnish any bond.

8. **Transfer of Beneficial Interest**. Other than by operation of law, including the laws of descent and distribution, no Beneficiary shall have the right to transfer his beneficial

BK 13905 PG 477

interest in this Trust, or any portion thereof, without the prior written consent of all of the other Beneficiaries. In the event that any Beneficiary wishes to transfer his beneficial interest in this Trust, he shall so notify the other Beneficiaries, by notice in writing. Within thirty (30) days of receipt of such notice, each Beneficiary who consents to the proposed transfer shall notify the transferring Beneficiary of his consent in writing. In the event that all of the Beneficiaries do not so notify the transferring Beneficiary, it is agreed that this Trust will be terminated, and the Beneficiaries shall deliver a notice of termination to the Trustee, signed and acknowledged by the holder(s) of not less than fifty-one (51%) percent of the beneficial interests in this Trust, directing the Trustee to sign, acknowledge, and record a Certificate of Termination in the Registry of Deeds, and this trust shall be terminated in accordance with Article Five (5) herein.

9. **Amendments**. This Trust may be amended, from time-to-time, by an instrument in writing, signed and acknowledged by the holder(s) of not less than fifty-one (51%) percent of the beneficial interests in this Trust. The Trustees shall then sign, acknowledge, and record said amendment or a Certificate of Amendment in the Registry of Deeds.

10. **Liability of Trustee to Beneficiaries**. No Trustee hereunder shall be liable for any error of judgment or for any loss arising out of any act or omission to act in good faith or for any act of any co-Trustee or preceding Trustee or Trustees, but he shall be responsible only for his own willful breach of

BK 13905 PG 478

trust.  No license of court shall be requisite to the validity of any transaction entered into by the Trustee.

11.  <u>Reliance on Legal Documents</u>.  Every agreement, lease, sublease, deed, mortgage, note, or other instrument executed by the Trustee or, if more than one (1), by each and every person appearing from the records of the Registry of Deeds to be a Trustee hereunder, shall be conclusive evidence in favor of every person relying thereon or claiming thereunder that, at the time of the delivery of such instrument, this Trust was in full force and effect and that the execution and delivery thereof was duly directed by the Beneficiary or Beneficiaries, pursuant to the provisions of this Trust.

EXECUTED as a sealed instrument this _____ day of December, 1996

_____
William Gateman, Trustee
as aforesaid, and not
individually

COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss.                                    December 18 , 1996

Then personally appeared the above-named William Gateman, Trustee as aforesaid, and acknowledged the foregoing instrument to be his free act and deed, before me.

_____
Notary Public
My commission expires: 4-22-99

**EXHIBIT 3**

41.
p6f

AO88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

United States District Court     **DISTRICT OF**     Massachusetts

Georto, Inc.

V.

William Gateman, Individually and as Trustee
of 200 Union Street Realty Trust

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]  04-11730 NG

TO:   Jackson D. Gateman
     3 Tip Top Road, Swampscott, Massachusetts 01907

☐   YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☑   YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION    Lynch, Brewer, Hoffman & Fink, LLP<br>101 Federal Street, Boston, Massachusetts 02110 | DATE AND TIME<br>9/26/2005 10:00 am |
|---|---|

☑   YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Schedule "A" attached hereto.

| PLACE    Lynch, Brewer, Hoffman & Fink, LLP<br>101 Federal Street, Boston, Massachusetts 02110 | DATE AND TIME<br>9/26/2005 10:00 am |
|---|---|

☐   YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

    Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| _Attorney for Plaintiff Georto, Inc._ | 9/20/2005 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Dale Kerester Esq., Lynch Brewer Hoffman Fink LLP, 101 Federal Street Boston MA 02110  (617) 951-0800

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

Please contact Dale C. Kerester, Esq. (617) 951-0800 upon receipt of this subpoena.

AO88 (Rev. 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

|  | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                        DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

_____

---

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend

trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the mmmdemanding party to contest the claim.

## SCHEDULE "A"

## DEFINITIONS AND INSTRUCTIONS

The following definitions and instructions shall apply:

1.      The term "Georto" shall mean Plaintiff Georto, Inc.

2.      The term "Gateman" shall mean Defendant and Third-Party Plaintiff William Gateman, individually and/or as Trustee of 200 Union Street Realty Trust.

3.      The term "Roberts" shall mean Third-Party Defendant Roberts Corporation.

4.      The terms "plaintiff," "defendant," and "third-party defendant" as well as a party's full or abbreviated name or a pronoun referring to a party shall mean the party and, where applicable, its officers, directors, employees, partners, corporate parent, subsidiaries, affiliates, trustees, beneficiaries, and attorneys.

5.      The term "Property" shall mean the property which is the subject of this action and which is located in Lynn, Essex County, Massachusetts and consisting of approximately 19,500 square feet located between Ellis Street and Union Street and being that property fronting approximately 83 feet on Union Street and approximately 80 feet on Ellis Street.

## REQUESTS

1.      Any and all documents evidencing or constituting schedule(s) of beneficial interests with respect to the 200 Union Street Realty Trust.

2.      Any and all documents concerning ownership of beneficial interests in the 200 Union Street Realty Trust and/or the issuance of distributions or disbursements by such trust, specifically including but not limited to distribution or disbursement of the proceeds from the sale of any portion of the property located at 190-200 Union Street, Lynn, Massachusetts (including the sales to Family Dollar, Georto, and Lance Belostock) and/or the settlement of any insurance claims and/or litigation regarding such property.  This request specifically requires the production of checks, bank statements, account statements, and documents regarding the

purchase and/or sale of stock or real property with the proceeds from the sale of any portion of the property or of the insurance settlement.

3.    Any and all documents evidencing directions provided by you to the trustee of the 200 Union Street Realty Trust after August 2001, pursuant to paragraph 3 of the Declaration of Trust Establishing 200 Union Street Realty Trust.

4.    Any and all photographs of any portion of the property located at 190-200 Union Street, Lynn, Massachusetts, taken after August, 2001.

5.    Any and all documents concerning the sale of the Property by Gateman to Georto.

6.    Any and all documents concerning the sale of real property by Gateman to Family Dollar Stores of Massachusetts, Inc..

7.    Any and all documents concerning the environmental condition of the Property.

8.    Any and all documents concerning demolition debris or solid waste located on the property located at 190-200 Union Street, Lynn, Massachusetts at any time after August 2001.

9.    Any and all documents concerning payments for removal of demolition debris and/or solid waste from the Property and/or for filling or grading activity at the Property.

10.    Any and all documents concerning communications with Roberts Demolition, Scott Wetherbee Contracting, Loveland Trucking, Red Baron Trucking, the City of Lynn, and/or the Massachusetts Department of Environmental Protection regarding the property located at 190-200 Union Street, Lynn, Massachusetts.

**IN HAND**    **JACKSON D. GATEMAN**    **RETURN OF SERVICE** (3)

| RECEIVED BY SERVER | DATE September 20, 2005 | PLACE Boston, Massachusetts |
|---|---|---|
| SERVED | DATE September 21, 2005 | PLACE 3 TIP TOP ROAD, SWAMPSCOTT , Massachusetts |

| SERVED ON (NAME) JACKSON D. GATEMAN | FEES TENDERED ☒ YES ☐ NO AMOUNT $ 47.00 ☒ Advanced By Attorney |
|---|---|
| SERVED BY JOHN MILANO | TITLE Process Server and a Disinterested Person |

## STATEMENT OF SERVICE FEES

| | SERVICE FEE $ 40.00 | _____ Trips | TOTAL $ 40.00 |
|---|---|---|---|

## DECLARATION OF SERVER (4)

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____ September 21, 2005 _____
**Date**

_John Milano_
**Signature of Server**

One Devonshire Place, Boston, Massachusetts
**Address of Server**

**ADDITIONAL INFORMATION**
PLEASE NOTE THAT IT WAS NECESSARY TO MAKE_____ATTEMPTS BEFORE MAKING PROPER SERVICE.

| Date | Time | Remarks | FEE |
|---|---|---|---|
| | | | $ _____ |
| | | | $ _____ |
| | | | $ _____ |
| | | | $ _____ |
| | | | $ _____ |
| | | | $ _____ |
| | | TOTAL | $ _____ |

(1) As to who may serve a subpoena and the manner of its service see Rule 17(d), Federal Rules of Criminal Procedure, or Rule 45(c), Federal Rules of Civil Procedure.
(4) "Fees and mileage need not be tendered to the deponent upon service of a subpoena issued on behalf of the United States or an officer or agency thereof (Rule 45(c), Federal Rules of Civil Procedure; Rule 17(d), Federal Rules of Criminal Procedure) or on behalf of certain indigent parties and criminal defendants who are unable to pay such costs (28 USC 1825, Rule 17(b) Federal Rules of Criminal Procedure)"

**Suvalle, Jodrey & Associates**    **One Devonshire Place**    **Telephone # (617) 720-5733**
**Massachusetts Constables since 1925**    **Boston, MA 02109**    **Fax #    (617) 720-5737**

**EXHIBIT 4**

AO 88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

| United States District Court | DISTRICT OF | Massachusetts |
| --- | --- | --- |

Georto, Inc.

V.

William Gateman, Individually and as Trustee
of 200 Union Street Realty Trust

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]

TO:  Jackson D. Gateman, 3 Tip Top Road, Swampscott,
Massachusets 01970

☐  YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
| --- | --- |
| | DATE AND TIME |

☑  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION  Lynch, Brewer, Hoffman & Fink, LLP, 101 Federal Street, Boston, MA 02110 | DATE AND TIME  11/30/2005 2:00 pm |
| --- | --- |

☑  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Schedule "A" attached hereto

| PLACE  Lynch, Brewer, Hoffman & Fink, LLP, 101 Federal Street, Boston, MA 02110 | DATE AND TIME  11/30/2005 2:00 pm |
| --- | --- |

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
| --- | --- |

   Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
| --- | --- |
| | 11/11/2005 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Dale C. Kerester, Esquire, Lynch, Brewer, Hoffman & Fink, LLP, 101 Federal Street, 22nd Floor, Boston, MA 02110
(617) 951-0800

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO88 (Rev. 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                           DATE

SIGNATURE OF SERVER

_____

ADDRESS OF SERVER

_____

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend

trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the mmmdemanding party to contest the claim.

## SCHEDULE "A"

## DEFINITIONS AND INSTRUCTIONS

The following definitions and instructions shall apply:

1.     The term "Georto" shall mean Plaintiff Georto, Inc.

2.     The term "Gateman" shall mean Defendant and Third-Party Plaintiff William Gateman, individually and/or as Trustee of 200 Union Street Realty Trust.

3.     The term "Roberts" shall mean Third-Party Defendant Roberts Corporation.

4.     The terms "plaintiff," "defendant," and "third-party defendant" as well as a party's full or abbreviated name or a pronoun referring to a party shall mean the party and, where applicable, its officers, directors, employees, partners, corporate parent, subsidiaries, affiliates, trustees, beneficiaries, and attorneys.

5.     The term "Property" shall mean the property which is the subject of this action and which is located in Lynn, Essex County, Massachusetts and consisting of approximately 19,500 square feet located between Ellis Street and Union Street and being that property fronting approximately 83 feet on Union Street and approximately 80 feet on Ellis Street.

## REQUESTS

1.     Any and all documents evidencing or constituting schedule(s) of beneficial interests with respect to the 200 Union Street Realty Trust.

2.     Any and all documents concerning ownership of beneficial interests in the 200 Union Street Realty Trust and/or the issuance of distributions or disbursements by such trust, specifically including but not limited to distribution or disbursement of the proceeds from the sale of any portion of the property located at 190-200 Union Street, Lynn, Massachusetts (including the sales to Family Dollar, Georto, and Lance Belostock) and/or the settlement of any insurance claims and/or litigation regarding such property.  This request specifically requires the production of checks, bank statements, account statements, and documents regarding the

purchase and/or sale of stock or real property with the proceeds from the sale of any portion of the property or of the insurance settlement.

3.      Any and all documents evidencing directions provided by you to the trustee of the 200 Union Street Realty Trust after August 2001, pursuant to paragraph 3 of the Declaration of Trust Establishing 200 Union Street Realty Trust.

4.      Any and all photographs of any portion of the property located at 190-200 Union Street, Lynn, Massachusetts, taken after August, 2001.

5.      Any and all documents concerning the sale of the Property by Gateman to Georto.

6.      Any and all documents concerning the sale of real property by Gateman to Family Dollar Stores of Massachusetts, Inc..

7.      Any and all documents concerning the environmental condition of the Property.

8.      Any and all documents concerning demolition debris or solid waste located on the property located at 190-200 Union Street, Lynn, Massachusetts at any time after August 2001.

9.      Any and all documents concerning payments for removal of demolition debris and/or solid waste from the Property and/or for filling or grading activity at the Property.

10.      Any and all documents concerning communications with Roberts Demolition, Scott Wetherbee Contracting, Loveland Trucking, Red Baron Trucking, the City of Lynn, and/or the Massachusetts Department of Environmental Protection regarding the property located at 190-200 Union Street, Lynn, Massachusetts.

**IN HAND** LAST AND USUAL PLACE OF ABODE    **RETURN OF SERVICE** (3)

| RECEIVED BY SERVER | DATE<br>November 11, 2005 | PLACE<br>Boston, Massachusetts |
|---|---|---|
| SERVED | DATE<br>November 12, 2005 | PLACE<br>3 TIP TOP ROAD, SWAMPSCOTT          , Massachusetts |

| SERVED ON (NAME)<br><br>JACKSON D. GATEMAN | FEES TENDERED<br>☒   YES   ☐   NO AMOUNT  $ ____47.00____<br>☐   Advanced By Attorney |
|---|---|
| SERVED BY<br><br>JOHN  MILANO | TITLE<br>Process Server and a Disinterested Person |

## STATEMENT OF SERVICE FEES

| | SERVICE FEE<br>$ ____51.00____ | _____ Trips | TOTAL<br>$ ____98.00____ |
|---|---|---|---|

## DECLARATION OF SERVER (4)

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____November 12, 2005_____
                                    **Date**

Signature of Server

One Devonshire Place, Boston, Massachusetts
**Address of Server**

**ADDITIONAL INFORMATION**
  PLEASE NOTE THAT IT WAS NECESSARY TO MAKE_____ ATTEMPTS BEFORE MAKING PROPER SERVICE.

| Date | Time | Remarks | FEE |
|---|---|---|---|
| | | | $ _____ |
| | | | $ _____ |
| | | | $ _____ |
| | | | $ _____ |
| | | | $ _____ |
| | | | $ _____ |
| | | TOTAL | $ _____ |

(3) As to who may serve a subpoena and the manner of its service see Rule 17(d), Federal Rules of Criminal Procedure, of Rule 45(c), Federal Rules of Civil Procedure.
(4) "fees and mileage need not be tendered to the deponent upon service of a subpoena issued on behalf of the United States or an officer or agency thereof (Rule 45(c), Federal Rules of Civil Procedure; Rule 17(d), Federal Rules of Criminal Procedure) or on behalf of certain indigent parties and criminal defendants who are unable to pay such costs (28 USC 1825, Rule 17(b) Federal Rules of Criminal Procedure)"

**Suvalle, Jodrey & Associates**          One Devonshire Place          Telephone # (617) 720-5733
**Massachusetts Constables since 1925**    Boston, MA 02109              Fax #       (617) 720-5737

# EXHIBIT 5

Scott Wetherbee

1

1    VOLUME    1 of 1

2    PAGES    125

3    EXHIBITS  38-42

4    UNITED STATES DISTRICT COURT

5    DISTRICT OF MASSACHUSETTS

6    CIVIL ACTION NO. 04-11730NG

7    GEORTO, INC.

8    Plaintiff

9    v.

10    WILLIAM GATEMAN, Individually and as

11    Trustee of 200 UNION STREET REALTY TRUST

12    Defendant/Third-Party

13    Plaintiff

14    v.

15    ROBERTS CORPORATION

16    Third-Party Defendant

17    ------------------------------------

18    30(b)(6) DEPOSITION OF:  SCOTT WETHERBEE

19    CONTRACTING (Scott Wetherbee, designee)

20    September 29, 2005 - 10:05 a.m. to 1:00 p.m.

21    Lynch, Brewer, Hoffman & Fink, LLP

22    101 Federal Street - 22nd Floor, Boston, MA

23    Reporter:  Robert K. Maloney, RPR

24    Two Oliver Street, Boston, Massachusetts 02109

Scott Wetherbee

7

1          MR. KERESTER:  On the record.  Would

2   you swear the witness, please.

3   Whereupon,

4              SCOTT WETHERBEE

5   having been first satisfactorily identified by the

6   production of his Massachusetts driver's license

7   and duly sworn by the Notary Public, was examined

8   and testified as follows:

9              DIRECT EXAMINATION

10       BY MR. KERESTER:

11       Q.   Mr. Wetherbee, my name is Dale Kerester

12   and I represent the plaintiff in this matter,

13   Georto, Inc.  I am the attorney who issued the

14   subpoena that brought you here today.

15          I am going to be asking you a series

16   of questions today.  If at any point you don't

17   understand one of my questions please let me know

18   and I will rephrase it for you.  Do you understand

19   that instruction?

20       A.   Yes.

21       Q.   You will also need to respond in an oral

22   fashion for the stenographer.  The stenographer

23   generally cannot record nods of the head and so

24   forth and so you will have to verbalize your

Scott Wetherbee

8

1  responses.  Similarly, I will try not to talk over

2  any of your answers and would also ask that you let

3  me finish my questions and we will have a clearer

4  record when we are finished.

5          Could you please state your name for

6  the record.

7      A.  Scott Wetherbee.

8      Q.  Where do you reside, Mr. Wetherbee?

9      A.  3 Robin Road, North Reading.

10     Q.  Do you have any plans to move from that

11  address in the near future?

12     A.  No.

13     Q.  Could you tell us what your educational

14  background is?

15     A.  High school.

16     Q.  Did you graduate from high school?

17     A.  Yes.

18     Q.  When was that?

19     A.  1971.

20     Q.  Since graduating from high school what

21  has your employment been?

22     A.  Construction.

23     Q.  Could you identify for whom you have

24  worked generally since you graduated from high

Scott Wetherbee

12

1          MR. KERESTER:  This document I will

2    represent to you is a copy of the subpoena that was

3    issued to you today.  I would like to have that

4    marked as Exhibit Number 38.

5              (The document was marked Deposition

6    Ex. No. 38.)

7      Q.   Mr. Wetherbee, let me show you the

8    document that has now been marked as Exhibit Number

9    38 which appears to be a copy of the subpoena.  Did

10   you receive the subpoena that caused you to appear

11   here and testify today?

12     A.   Yes.

13     Q.   All right.  Let me turn your attention to

14   Schedule "A" of the subpoena.  Did you undertake

15   any effort to look for documents that were

16   requested in Schedule "A" of the subpoena?

17     A.   Yes.

18     Q.   Did find any such documents?

19     A.   No.

20     Q.   Did you ever have in your possession, or

21   control any documents that would have been

22   responsive to the requests in Schedule "A"?

23     A.   Yes.

24     Q.   At what time did you have those

Scott Wetherbee

13

1   documents?

2       A.   I really don't recall.

3       Q.   What type of documents did you once have?

4       A.   It would just be the invoice for rental,

5   for the work that I did at the property.

6       Q.   Was that an invoice that you received and

7   then paid or was it an invoice that you issued?

8       A.   That I issued.

9       Q.   Was that an invoice issued to Mr.

10  Gateman?

11      A.   Correct.

12      Q.   Do you recall what that invoice was for?

13      A.   That invoice was for services rendered,

14  rental work.  He rented a bulldozer with an

15  operator.

16      Q.   Did that invoice include charges for the

17  rental of the bulldozer itself?

18      A.   Yes.

19      Q.   And did it also include separate charges

20  for labor?

21      A.   No.

22      Q.   Do you recall approximately what the

23  amount of the invoice was?

24      A.   I would say it was probably around $8500

Scott Wetherbee

14

1    to $10,000.

2        Q.    What period of time did that rental

3    cover?

4        A.    It was probably about three to four

5    weeks.

6        Q.    Was it one piece of equipment?

7        A.    Yes.

8        Q.    Did you ever invoice Mr. Gateman for any

9    other work or rental charges other than that single

10   invoice?

11       A.    No, not to my knowledge.

12       Q.    Do you know what you did with that

13   invoice?

14       A.    It was in my computer and it was lost.

15   We couldn't bring it up.

16       Q.    When did you last look for that?

17       A.    Well, it has been lost for probably quite

18   a while.  We lost a lot of our information.  I

19   don't know.

20            MR. KERESTER:  Jim, let me just state

21   on the record that I don't believe that Mr. Gateman

22   has produced a copy of that invoice.  If you could

23   make inquiry about that and then produce that

24   invoice, which is in one of the requests.  I would

Scott Wetherbee

15

1   also the stenographer just to note in the record

2   when I am asking for production of documents.

3                MR. ROBBINS:  Off the record for a

4   moment.

5                (Discussion held off the record.)

6                MR. KERESTER:  Back on the record.

7       Q.   Mr. Wetherbee, did you give a copy of

8   invoice to Mr. Gateman?

9       A.   Yes.

10      Q.   Did you receive payment in response to

11  that invoice?

12      A.   Yes.

13      Q.   Were you paid by check?

14      A.   No.

15      Q.   You were paid in cash?

16      A.   Yes.

17      Q.   Do you recall when you gave that invoice

18  to Mr. Gateman?

19      A.   No.

20      Q.   Other than that invoice did you at any

21  point in time have in your possession any documents

22  that were responsive to the requests set forth in

23  Schedule "A" of the subpoena?

24      A.   No.

Scott Wetherbee

16

1    Q.   Did you ever receive any documents from

2  Red Baron or Loveland Trucking including any

3  trucking slips or similar documents?

4    A.   I don't recall.

5    Q.   Is it possible that you may have?

6    A.   I might have, yes.  Maybe there were

7  rental slips at the end of the day.  I just don't

8  remember if I did or not.

9    Q.   Do you recall whether you had ever

10  received any documents from any other party that

11  may have performed services at the property located

12  at 190-200 Union Street in Lynn?

13    A.   No.

14    Q.   Did you ever take any photographs of the

15  property?

16    A.   I might have.

17    Q.   Did you keep those pictures?

18    A.   No.

19    Q.   Were those digital pictures?

20    A.   No.

21    Q.   Approximately how many pictures did you

22  take?

23    A.   I don't recall.

24    Q.   Would it have been less than ten?

Scott Wetherbee

17

1    A.    Yes.

2    Q.    When did you take those pictures?

3    A.    Sometime during the operation.  I don't

4  recall the date.

5    Q.    Did you take those pictures before such

6  time as you performed any services at the property?

7    A.    No.

8    Q.    Did you take those pictures during the

9  time period in which your company performed

10 services at the property?

11    A.    Yes.  I think the pictures just reflected

12 a picture of my equipment being there.

13    Q.    Where are those pictures now?

14    A.    I don't know.

15    Q.    Did you throw them away at some point?

16    A.    I would assume so.

17    Q.    Did you throw those pictures away

18 sometime in the last year?

19    A.    No, before.

20    Q.    Do you know whether you threw those

21 pictures away before August of 2004?

22    A.    I just haven't seen them.  I would say I

23 haven't seem them for years.  So, yes, it would be.

24    Q.    Did you look for the pictures in response

Scott Wetherbee

18

1    to the subpoena?

2         A.    Yes.

3         Q.    For what purpose did you take the

4    pictures?

5         A.    Just to take a picture of my equipment

6    being on the site.

7         Q.    Was there more than one photo taken?

8         A.    I don't know.  A couple, maybe.

9         Q.    Did the pictures reflect any demolition

10   debris on the property?

11        A.    Not that I recall.

12        Q.    Did you keep any time slips or other

13   records of the amount of time that you or other

14   employees of Wetherbee Contracting performed

15   services at the property?

16        A.    No.

17        Q.    Did you enter into any kind of a written

18   agreement with Mr. Gateman in connection with the

19   performance of services at the property?

20        A.    No.

21        Q.    Did Mr. Gateman ever provide you with any

22   documents regarding the property in Lynn?

23        A.    No.

24        Q.    Let me direct your attention to Addendum

Scott Wetherbee

125

1    COMMONWEALTH OF MASSACHUSETTS)

2                                ) ss.

3    COUNTY OF SUFFOLK            )

4            I, Robert K. Maloney, Registered

5    Professional Reporter and Notary Public duly

6    commissioned and qualified in and for the

7    Commonwealth of Massachusetts, do hereby certify

8    that there came before me on Thursday, September

9    29, 2005, at 10:05 o'clock a.m., the person

10   hereinbefore named, who was by me duly sworn, that

11   he was thereupon examined upon his oath, and his

12   examination was taken by me stenographically, and

13   that the deposition is a true record of the

14   testimony given by the witness.

15           I further certify that I am neither

16   attorney, counsel nor relative of any of the

17   parties to the action or financially interested in

18   the action.

19           I have hereunto set my hand and affixed

20   my seal this 12th day of October, 2005.

21

22           _Robert K. Maloney_____

23           ROBERT K. MALONEY, Notary Public

24           My Commission expires January 10, 2008