# United States District Court
## FOR THE
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| _____ )<br>GEORTO, INC.,                                                    )<br>          Plaintiff,                                                        )<br>                                                                                 )<br>     v.                                                                         )<br>                                                                                 )<br>WILLIAM GATEMAN, INDIVIDUALLY  )<br>and as TRUSTEE OF 200 UNION                    )<br>STREET REALTY TRUST                               )<br>                                                                                 )<br>          Defendant,                                                      )<br>          Third Party Plaintiff, and                             )<br>          Third Party Defendant-in-                           )<br>          Counterclaim                                                 )<br>                                                                                 )<br>     v.                                                                         )<br>                                                                                 )<br>ROBERTS CORPORATION                             )<br>                                                                                 )<br>          Third Party Defendant,                               )<br>          and Third Party Plaintiff-in-                      )<br>          Counterclaim                                                 )<br>_____ ) | CIVIL ACTION NO. 04-11730 NG |

### THIRD PARTY DEFENDANT ROBERTS CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Third Party Defendant, Roberts Corporation ("Roberts"), submits the following memorandum of law in support of its Motion for Summary Judgment.

### INTRODUCTION

This action arises out of a conveyance of real property from the Defendant William Gateman, Trustee of the 200 Union Street Realty Trust ("Gateman") to the Plaintiff Georto, Inc. ("Georto"). In its Complaint, Georto alleges that, after purchase of the real property located between Ellis Street and Union Street in Lynn, Massachusetts

("the Property"), and upon commencement of construction of a new commercial building, it discovered substantial demolition debris and solid waste that had been concealed below grade in contravention of Gateman's warranty and representations in a June 2003 purchase and sale agreement.  Georto further alleges that in Spring 2004 it was required to excavate, remove, and dispose of 167 truckloads of debris and to replace with acceptable fill in order to construct its building on the Property.

After Georto filed suit, Gateman filed a three paragraph Third Party Complaint against Roberts generally alleging breach of contact and indemnity with regard to Roberts' demolition of a condemned building on the Property in March-May 2002.  As demonstrated by the accompanying memorandum of law and supporting materials, Gateman's claims should be summarily dismissed.  The undisputed facts show that Roberts fully and completely performed its contractual obligations by May 2002 and had no involvement in the alleged misrepresentations subsequently made by Gateman in June 2003. During approximately four weeks of continuous demolition work, Roberts removed over 1178 tons – 2,356,000 pounds – of debris, in over 50 truckloads.  Gateman himself testified at his deposition that he was "satisfied" with Roberts' work, that Roberts had completed its services, and that their relationship was so "fantastic" that Gateman referred other work to Roberts.  Indeed, Roberts' work was clearly satisfactory because Gateman, subsequent to Roberts' work but prior to Georto's purchase, sold another portion of the Property that was undisputedly free from any such debris.  Moreover, the undisputed facts demonstrate that there was no contract for indemnification and that, because Gateman and his agents provided the fill to the Property and concealed the debris, no claim for common law indemnification can lie against Roberts, especially

where Roberts had no involvement with the concealment of the debris. Therefore, Roberts is entitled to summary judgment as a matter of law.

## STATEMENT OF FACTS

Gateman, an individual residing in Massachusetts, is the trustee of 200 Union Street Realty Trust. Complaint at ¶ 2 (Docket No. 1); Answer and Third Party Complaint at ¶ 2 (Docket No. 4). In his capacity as trustee, Gateman owned the Property. Complaint at ¶ 5; Answer and Third Party Counterclaim at ¶ 5. Prior to August of 2001, a large commercial building was situated on the Property until it was destroyed by fire. *Id.* at 6. Thereafter, Gateman contracted with Roberts for the demolition of the damaged structure and removal of the debris. Roberts-Gateman Contract (Attached as Exhibit 1 to Concise Statement of Facts). Gateman eventually partitioned the Property and sold one portion of the lot to Family Dollar Stores of Massachusetts, Inc. ("Family Dollar") and one portion to Georto. Family Dollar Contract for Purchase and Sale of Real Estate (Attached as Exhibit 2); and Georto Contract for Purchase and Sale of Real Estate (Attached as Exhibit 3).

Gateman and the Trust first acquired the Property in 1996 and held it as an investment prior to dividing it into separate lots. William B. Gateman Depo. at 51 (Attached as Exhibit 5). Several juveniles set the building on fire in August of 2001, which resulted in its total destruction. *Id.* at 58. The damage was so severe that the city's building inspector, Frank Kalman, directed Gateman to begin immediate demolition of at least the front portion of the five-story structure because it was unsafe. *Id.* at 79-80. Gateman contracted with Turner of Lynn, Massachusetts for the initial demolition and to prevent the building from falling, but soon entered into negotiations with various

demolition companies to take the remaining structure down and remove the remaining debris. *Id.* at 75-80.

In an effort to mitigate the cost of demolition, Gateman sought to have the building's brick and concrete remain on the Property to be used to fill. Gateman's *Id.* at 79-82. However, the approval of such use of the brick and concrete would ultimately rest with the building inspector and his application of various city codes. *See Id.*; *see also* Roberts-Gateman Contract. Consequently, because the city's approval was pending, Gateman called for bifurcated bids with one estimate to include the cost of removing the brick and concrete, and the other estimating only the cost of removing the debris, while leaving the brick and concrete in the former basement. *Id*; Roberts-Gateman Contract.

On or about March 12, 2002, Gateman entered into a written contract with Roberts, whereby Roberts agreed, among other things, to demolish the existing building, remove the demolition debris from the site, cover the site with fill and rough grade the site. Roberts Gateman Contract. The parties, however, only conditionally agreed upon Roberts' removing the brick and concrete because of the city's pending determination. *Id.;* Kevin J. Doherty Depo. at 35-42 (Attached as Exhibit 6). Thus, the written contract reflected two estimates: $90,000.00 for completing the demolition and removing the debris; *or* $90,000.00 plus an additional $25,000.00 for removing the brick and concrete. See Roberts-Gateman Contract.

Roberts commenced the demolition almost instantly. Doherty Depo. at 59. With the use of heavy equipment, Roberts demolished portions the of the building that remained standing and screened the debris in order to separate the brick and concrete

4

from the steel, iron and wood.[1]  Doherty Depo. at 70-73, Gateman Depo. at 113; Stalker Depo. at 47.  Among the debris and rubble were various items such as radiators, shelving and differing forms of trash.  Doherty Depo. at 77-79.

Roberts also separated what remained of the roofing material, which was contaminated with asbestos, and miscellaneous items such as trash and scrap metal.[2]  Doherty Depo. at 70-79.  Roberts placed all of the material into separate piles in the parking lot, which were segregated by the type of material.  Gateman Depo. p. 113-15.  After screening and segregating the debris, Roberts removed the debris and transported it to various facilities.  Id. at 69-72.  For instance, Roberts took the iron and steel to New England Polarizer for recycling, while disposing of the trash and debris in landfills.  *Id*.  In total, Roberts removed over 1178 tons – 2,356,000 pounds – of debris, in over 50 truckloads, during approximately four weeks of continuous work.  *See* Roberts Daily Tracking Report (Attached as Exhibit 4).

During Robert's performance under the contract, the parties clarified and modified the terms of the contract. Gateman ultimately received permission from the City of Lynn's Building Inspector to leave the brick and concrete on the site and to use it as fill.  Gateman Depo. at 79, 82.  Also, the brick and concrete was needed in the interim to prevent the adjacent sidewalk and utilities from failing.  Stalker Depo. at 50-52.  Thus, even though Roberts had already created piles of different debris in the parking lot and was prepared to dispose of it in its entirety, Gateman directed Roberts to move the brick

---

[1] A "Screener" is a machine that moves debris through various screens and shakes it to remove particles of debris ranging in size.  The machine loosens the dirt and segregates the larger pieces, returning the dirt and fill to the ground.  *See* Doherty Depo. at 115.
[2] The asbestos itself was removed by SCS Construction, whom Gateman hired as one of the various service providers for the demolition project.  Gateman Depo. at 93.

5

and concrete back into the hole and to position it against the foundation's walls. Doherty Depo. at 36-37, 93, 101-02; Gateman Depo. at 90, 97, 231, and 241; Stalker Depo. at 23.

Gateman also understood and accepted that small pieces of charred wood would remain with the brick and concrete used as fill. Gateman Depo. at 125-133. This was because small pieces of charred wood and ash were mixed in with the concrete and brick and Roberts could only remove it by hand or by crushing it. Gateman Depo. at 124-134; Stalker Depo. at 47-48.

Gateman also alleviated Roberts from any obligation to "Cover with Fill and Rough Grade the Site."[3] Indeed, Gateman contracted with two other entities to fill and grade the Property. The fill Gateman located and eventually used was from another building site in Revere, MA, where the owner was offering it at no cost. Gateman Depo. at 100; 165-69. Because Gateman was getting the fill for free, he contracted with Loveland Trucking ("Loveland") for approximately $30,000.00 to transport the fill from Revere to the Property, and he chose not to include Roberts in this process. *Id.* Additionally, Gateman contracted with Wetherbee Contracting for $20,000.00 to grade the site. *Id.* at 93.

When Roberts left the work site, both Roberts and Gateman agreed that Roberts had fully performed its obligation. Gateman Depo. at 231-34. Gateman had personally witnessed Roberts load "[m]any, many trucks" with debris and observed it being hauled away. *Id.* at 136-37. When Roberts departed, the company had successfully demolished the building and removed the debris, leaving only—at the express direction of Gateman--the brick and concrete sloped against the foundation walls as well as the debris that

---

[3] Indeed, despite the contract language, neither Gateman nor Roberts understood the contract between them to include Roberts providing fill over the site or bringing the property to street level. Doherty Depo. at 50; Gateman Depo. at 99.

6

constituted an access ramp. Doherty Depo. at 91; Gateman Depo. at 136-37, 231-34; Wetherbee Depo. at 66-67.

Additionally, Gateman had personally observed Roberts' work firsthand by being on the site daily, except for a ten-day break during the middle of the project. Gateman Depo. at 103. When Roberts departed, Gateman personally inspected the site and did not express any dissatisfaction with the company's performance. *Id.* at 231-35. At that juncture, Gateman believed his relationship with Roberts was "fantastic," and he referred additional business to the company. *Id.* at 237; Stalker Depo. at 49.

At the time Roberts was finishing its work, Loveland had begun delivering fill to the site and Wetherbee Construction was dispersing the fill in the hole. Doherty Depo. at 97; Gateman Depo. at 155. Gateman himself even participated filling the hole. Kevin Doherty, who had the majority of dealings with Gateman on behalf of Roberts, personally observed Gateman operating heavy equipment and pushing fill into the hole. Doherty Depo. at 109-10. Gateman and Wetherbee were covering the ramp, as well as the brick and concrete, with fill that Loveland delivered. *Id.*

Sometime after Roberts completed its work and left the site, Gateman contacted Roberts to remove some additional debris, which had been contained within the ramp. Doherty Depo. at 117. By then, Gateman had entered negotiations with Family Dollar and agreed to prepare one portion of the site to build. *Id.* at 117-18; *see also* Family Dollar Contract for Purchas and Sale of Real Estate, § 2A. Gateman would eventually warrant to Family Dollar, *inter alia*, that Gateman, as the seller, completed the demolition and removed the debris on the property, in preparation for construction. *Id.*

Roberts responded to Gateman's request by sending a screener, a loader and several trucks to sort and remove the debris just as Roberts had done during the initial

7

work.  Doherty Depo. at 117-118; Stalker Depo. at 60.  Neither Doherty nor Stalker understood that Roberts screening of the material from the ramp as falling within the original contract.  Doherty Depo. at 118; Stalker Depo. at 46-47.  Yet, Roberts returned and removed all of the debris as requested without seeking any additional compensation.[4]  Doherty Depo. at 117-118, 143.  Again, Roberts left the site having fully performed what both Gateman and Roberts proposed, without any objection from Gateman.  Doherty Depo. at 122, 125.

Gateman desired to have the brick and concrete that was originally located on Family Dollar's portion of the lot relocated it to the portion Georto would eventually purchase.  Gateman Depo. at 150-53.   Roberts, however, did not take part in this process.  Doherty Depo. at 131-35.  Kevin Doherty again observed both Gateman and Mr. Wetherbee using a front end loader to move the brick and concrete that remained from Roberts screening of the ramp material, and continue to cover the material with fill.  *Id.*  Gateman then ultimately consummated a Purchase and Sale Agreement with Family Dollar on April 26th, 2002.  *See* Family Dollar Contract for Purchase and Sale Agreement.  Gateman expressly warranted to Family Dollar on April 26, 2002 that "Seller has completed the demolition and removal of the debris on the property and on adjacent property owned by Seller." *Id.* at Section 2A.

On or about June 18, 2003, Gateman entered into a contract for the purchase and sale of the remaining portion of the site to Georto.  *See* Georto Contract for Purchase and Sale of Real Estate.  Gateman and Georto closed on the property in February of 2004.

---

[4] Roberts has asserted a Third Party Counterclaim, but based upon discovery, is satisfied it has been paid in full.  It has circulated a stipulation of dismissal regarding its claim, but the parties have not yet executed it.

8

Gateman Depo. at 186. Approximately two months later, Mr. Hawkins[5] of Georto contacted Gateman and informed him that the company's construction crew was prohibited from going forward because the site was unsuitable for building. Id. at 186-89. According to Hawkins, the site was filled with solid waste, including wire shelving, an air tank, a cash register, plastic and burnt wood. Hawkins Depo. at 178-82.

## ARGUMENT

Summary judgment is appropriate if the there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. In particular, summary judgment is proper if the record establishes that the plaintiff does not have sufficient evidence to establish an essential element of her case. *See Kelly v. Marcanfio*, 187 F.3d 192, 198 (1999) ("Summary judgment will be properly entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.") (citation omitted) The evidence will be construed in the light most favorable to the party opposing the summary judgment motion. *Merchants Insurance Company of New Hampshire, Inc. v. United States Fidelity and Guaranty Co.,* 143 F.3d 5 (1998).

In this case, summary judgment is appropriate on both claims against Roberts because the undisputed facts establish that Roberts fully performed under the contract, that there was no contract for indemnification and that no claim for common law indemnification can lie against Roberts.

---

[5] James M. Hawkins is the founder, president and sole shareholder of Georto, a corporation in the business of franchising Aaron's Sales and Lease Ownership retail stores. *See* Hawkins Depo. at 41.

9

I. **Roberts Corporation Fully Performed Under the Terms of the Contract Because the Company Demolished the Building, Removed All of the Debris it was Instructed to Remove, and Complied with Each Performance Requirement Gateman Requested**

Full performance of a contract occurs when the parties materially complete their obligations under the bargained for exchange. *See G.M. Abodeely Insurance Agency, Inc. v. Commerce Insurance Company*, 41 Mass.App.Ct. 274, 278 (1996); and Restatement 2nd of Contracts § 237 (1981). Courts determine parties' performance obligations from the contractual terms, which are derivatives of the parties' intent when bargaining. *Id. Cygan v. Megathlin*, 326 Mass. 732, 733 (1951). In order for courts to determine what two parties intended, the agreement must be evaluated as a whole, in light of the underlying transaction, coupled with the outcome. *Cygan v. Megathlin*, 326 Mass. at 733.

A breach occurs when one party fails to provide an "essential and inducing feature of the contract." *Lease-It Inc. v. Massachusetts Port Authority*, 33 Mass.App.Ct. 391, 396 (1991). And, it is the plaintiff's burden to prove that the defendant failed to perform without a legal excuse. *Realty Developing Co. v. Wakefield Ready-Mixed Concrete Co.*, 327 Mass. 535, 537 (1951). Therefore, when one party bargains for a rather broad performance and the other party performs to his or her satisfaction – satisfies the other's intent – the essential and inducing features of the contract have been met and no breach can occur. *See Cygan v. Megathlin*, 326 Mass. At 733; *see also Lease-It Inc.*, 33 Mass.App.Ct. 396.

Moreover, parties often deviate from their original bargain to more fully benefit from their exchange. *Finlan v. Winchendon Housing Authority*, 28 Mass.App.Ct. 977, 978 (1990). Certainly when parties contract with broader terms because the underlying

10

circumstances require, they may subsequently alter the terms to better conform to their objective. *Id.; see also Cambridge Savings Bank v. Boersner*, 413 Mass. 432, 439 (1992). Subsequent alterations, however, often manifest themselves through various behaviors. In fact, while courts would ideally address written modifications, both oral agreements and joint-conduct that result in a change to the terms are no less binding. *Finlan,* 28 Mass.App.Ct. at 978. When a party consents to such deviations, however, he or she is precluded from complaining "that the work was not performed to his entire satisfaction as the written contract provided." *Cueroni v. Cobrnville Garage*, 315 Mass. 135, 139 (1943).

      The Roberts-Gateman contract was negotiated in broad terms because of the circumstances. And as the project evolved, so too did Roberts' obligations. Gateman's expressed and implied intentions throughout the entire project was to have the building demolished and the debris removed for as little cost as possible. To do so, it was Gateman's choice to mitigate his costs by directing Roberts to leave the brick and concrete on the Property. Roberts thereby performed all of the "essential and inducing features of the contract," and likewise performed as Gateman had intended. *See Lease-It Inc.,* 33 Mass.App.Ct. 396; *see also Cygan,* 326 Mass. 733.

      It is undisputed that Roberts demolished the building, separated the debris into piles, returned the brick and concrete back into the foundation holes as Gateman directed, and disposed of the remaining material. It is also undisputed that Roberts was not responsible for providing fill for the Property as Gateman contracted with two separate entities to deliver the fill and grade the Property. Additionally, it is undisputed Roberts returned to screen and remove the ramp material from the Family Dollar portion of the Property without objection or additional charges. It is also undisputed that Gateman

11

understood and accepted that Roberts was unable to remove all of the smaller particles of wood from the brick and concrete without doing so by hand. By accepting such performance, Gateman bound himself with the result. *Finlan*, 28 Mass.App.Ct. 978.

Most importantly, it is undisputed that when Roberts left the site, Gateman personally walked the property and inspected and approved of the work. Without objection Gateman paid the remaining balance and agreed Roberts had fully performed its obligations. At the time Roberts had concluded its performance, Gateman believed their relationship was so "fantastic" that he referred other work to Roberts. Gateman's satisfaction is also confirmed by the fact on April 26, 2002 he expressly warranted to Family Dollar that, "Seller has completed the demolition and removal of the debris on the property and on adjacent property owned by Seller." In short, Roberts removed and properly disposed of over two million pounds of debris, and Gateman expressed his satisfaction with its performance.

Courts will not allow parties to deviate from a contract and then later complain about the results from the deviation, yet that is precisely what Gateman has done. *Cueroni*, 315 Mass 139. The tardiness of Gateman's claim of breach only underscores the fact Gateman had agreed that Roberts had fully performed under their contract.[6] As discussed above, when Roberts finished, Gateman expressly warranted to Family Dollar on April 26, 2002 that, "Seller has completed the demolition and removal of the debris on the property and on adjacent property owned by Seller." Had Roberts breached any of its obligations, not only would Gateman not have made such a representation, but any failure of performance would have been apparent long before Georto purchased its lot in

---

[6] So, too, does the manner of the complaint. Roberts' first notice of any complaint concerning its performance was service of the Third Party Complaint.

February 2004, as Family Dollar consummated the purchase of its portion of the Property and constructed its building in 2003. Indeed, it is only because Roberts fully performed that Gateman was able to consummate its $385,000 transaction with Family Dollar without incident.

Therefore, because Roberts performed to Gateman's full expectations and because the undisputed evidence demonstrates that Roberts' performance allowed the site to be developed by Family Dollar without any claim of breach, this Court should grant Roberts' motion for summary judgment on the breach of contract claim.

### II. Roberts is Not Liable for Indemnity Because the Gateman-Roberts Contract Contained No Indemnity Provisions and Circumstances do Not Support Indemnity by Operation of Law

In general, indemnity is the right of a party who has discharged the obligation of another party to reimbursement by that party. See generally 41 Am. Jur. 2d, Indemnity § 1; C.J.S., Indemnity § 2. Indemnity may be available to a party pursuant to a contract, or by operation of law based on equitable principles designed to prevent unjust enrichment. See generally Restatement (Third) of Torts: Apportionment Liab. § 22 (2000) (replacing Restatement Second, Torts, 886B). Most often, a party who wants the benefits of indemnity will contract for that protection. See e.g., *Hardy v Gulf Oil Corp*, 949 F2d 826 (5th Cir 1992) (Texas law; noting that availability of common-law indemnity may be limited). The primary benefit of an indemnity agreement is that it permits persons to allocate among themselves the risk of loss associated with the subject of their agreement. See e.g., *Jones v Vappi & Co*, 28 Mass App 77, 80 (1989) (in context of construction contract, primary purpose of indemnity clause is to allocate among subcontractors and suppliers insurance burdens which cover their respective areas of responsibility).

To enforce a contractual right of indemnification, a plaintiff must show that the parties entered into an indemnity agreement. *Kelly v Dimeo Inc*, 31 Mass App 626, 628 (1991) review denied, 412 Mass 1102 (1992). Even then, the agreement may not be found to apply. *Greater Boston Cable Corp v White Mountain Cable Construction Corp,* 414 Mass 76, 79-80 (1992) (contract containing indemnity clause was not reduced to writing or executed at time of worker's injury; contract was to take effect three days after accident and indemnity clause was not retroactive in effect).

"Massachusetts recognizes a right of common law indemnification only under limited circumstances." *Commonwealth of Massachusetts v. JEMS of New England, Inc.,* 15 Mass. L Rptr. 65, 2002 WL 1839253 (Mass. Superior Court (Fabricant, J.), July 25, 2004) (dismissing Third-Party Complaint for common law indemnification). "Those circumstances include where the party seeking indemnification incurs liability solely on a derivative or vicarious basis, without any fault of its own, and, in rare cases, where that party's fault is slight compared with that of party from whom indemnification is sought." *Id.,* citing, *Economy Engineering Co. v. Commonwealth*, 413 Mass. 791, 794 (1992); *Rathbun v. Western Massachusetts Electric Co*., 395 Mass. 361, 364 (1985); *Decker v. Black & Decker Mfg. Co.,* 389 Mass. 35, 40 (1983).

The contract between Roberts and Gateman does not contain an indemnity clause. In Massachusetts the parties must agree upon such a term, and it is the plaintiff's burden to prove the parties entered into an agreement. *Kelly,* 31 Mass.App.Ct. 628. The essence of Gateman's brief negotiations with Roberts focused on keeping the costs of demolition to a minimum. Gateman has neither produced nor developed any evidence to support that any indemnity agreement existed, and any claims to the contrary are bare assertions unsupported by the evidence.

Furthermore, in order for an indemnity clause to arise through an operation of law, there must be a showing by Gateman that his "fault" is non-existent or slight as compared to Roberts'. *Economy Engineering Co.*, 413 Mass. at 794. However, Gateman is entirely culpable under the circumstances. The undisputed facts show that Roberts fully and completely performed its contractual obligations by May 2002 and had no involvement in the alleged misrepresentations subsequently made by Gateman in June 2003. Moreover, the fundamental conduct at issue is that unacceptable debris was covered and concealed with fill. Yet, Roberts had no involvement with placement of the fill or concealment of debris. Gateman himself located the fill that that was placed on the Property and contracted with Loveland Trucking and Weatherbee Construction to supply the fill and grade the Property. Therefore, Gateman's claim for indemnity cannot survive either.

**CONCLUSION**

For the above stated reasons, summary judgment should be granted in favor of the Roberts Corporation on all claims asserted against it in the Third Party Complaint.

>Respectfully submitted,
>Roberts Corporation,
>By its Attorney,
>
> /s/ J. Mark Dickison_____
>J. Mark Dickison (BBO# 629170)
>LAWSON & WEITZEN, LLP
>88 Black Falcon Ave., Ste. 345
>Boston, MA  02210
>617-439-4990
>mdickison@lawson-weitzen.com

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on January 28, 2006.

> /s/ J. Mark Dickison_____
>J. Mark Dickison