# United States District Court
### FOR THE
### DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| GEORTO, INC., )<br>　　　　Plaintiff, )<br> )<br>　　　　v. )<br> )<br>WILLIAM GATEMAN, INDIVIDUALLY )<br>and as TRUSTEE OF 200 UNION )<br>STREET REALTY TRUST )<br> )<br>　　　　Defendant, )<br>　　　　Third Party Plaintiff, and )<br>　　　　Third Party Defendant-in- )<br>　　　　Counterclaim )<br> )<br>　　　　v. )<br> )<br>ROBERTS CORPORATION )<br> )<br>　　　　Third Party Defendant, )<br>　　　　and Third Party Plaintiff-in- )<br>　　　　Counterclaim )  | CIVIL ACTION NO. 04-11730 NG |

## CONCISE STATEMENT OF MATERIAL FACTS

　　　　Third Party Defendant, Roberts Corporation, ("Roberts"), submits the following statement of material facts in support of its Motion for Summary Judgment.

　　Attached hereto or incorporated by reference herein are the following pleadings, deposition transcripts, deposition exhibits, materials produced during discovery from which the statement of facts are drawn:

- Docket No. 1 — Complaint

- Docket No. 4 — Answer and Third Party Complaint

- Exhibit 1 – Contract between Roberts Corporation and William Gateman

- Exhibit 2 – Family Dollar Contract for Purchase and Sale of Real Estate

- Exhibit 3 – Georto, Inc. Contract for Purchase and Sale of Real Estate

- Exhibit 4 – Roberts' Corporation daily tracking and daily job reports

- Exhibit 5 – Deposition of William B. Gateman

- Exhibit 6 – Deposition of Kevin J. Doherty

- Exhibit 7 – Deposition of Robert B. Stalker

- Exhibit 8 – Deposition of Scott Wetherbee

- Exhibit 9 – Deposition of James M. Hawkins

## MATERIAL FACTS

1. Gateman, an individual residing in Massachusetts, is the trustee of 200 Union Street Realty Trust. Complaint at ¶ 2 (Docket No. 1); Answer at ¶ 2 (Docket No. 4). In his capacity as trustee, Gateman owned the Property. Complaint at ¶ 5; Answer at ¶ 5.

2. Prior to August of 2001, a large commercial building was situated on the Property until it was destroyed by fire. *Id.* at 6. Thereafter, Gateman contracted with Roberts, a New Hampshire corporation, Third Party Counterclaim at ¶ 2 (Docket No. 4), for the demolition of the damaged structure and removal of the debris. Roberts-Gateman Contract (Attached as Exhibit 1 to Concise Statement of Facts).

3. Gateman eventually partitioned the Property and sold one portion of the lot to Family Dollar Stores of Massachusetts, Inc. ("Family Dollar") and one portion to Georto.

Family Dollar Contract for Purchase and Sale of Real Estate (Attached as Exhibit 2); and Georto Contract for Purchase and Sale of Real Estate (Attached as Exhibit 3).

4. Gateman and the Trust first acquired the Property in 1996 and held it as an investment prior to dividing it into separate lots. William B. Gateman Depo. at 51 (Attached as Exhibit 5).

5. Several juveniles set the building on fire in August of 2001, which resulted in its total destruction. *Id.* at 58. The damage was so severe that the city's building inspector, Frank Kalman, directed Gateman to begin immediate demolition of at least the front portion of the five-story structure because it was unsafe. *Id.* at 79-80.

6. Gateman contracted with Turner of Lynn, Massachusetts for the initial demolition and to prevent the building from falling, but soon entered into negotiations with various demolition companies to take the remaining structure down and remove the remaining debris. *Id.* at 75-80.

7. In an effort to mitigate the cost of demolition, Gateman sought to have the building's brick and concrete remain on the Property to be used to fill. Gateman's *Id.* at 79-82. However, the approval of such use of the brick and concrete would ultimately rest with the building inspector and his application of various city codes. *See Id.*; *see also* Roberts-Gateman Contract.

8. Consequently, because the city's approval was pending, Gateman called for bifurcated bids with one estimate to include the cost of removing the brick and concrete, and the other estimating only the cost of removing the debris, while leaving the brick and concrete in the former basement. *Id*; Roberts-Gateman Contract.

9. On or about March 12, 2002, Gateman entered into a written contract with Roberts, whereby Roberts agreed, among other things, to demolish the existing building, remove the demolition debris from the site, cover the site with fill and rough grade the site. Roberts Gateman Contract. The parties, however, only conditionally agreed upon Roberts' removing the brick and concrete because of the city's pending determination. *Id.;* Kevin J. Doherty Depo. at 35-42 (Attached as Exhibit 6). Thus, the written contract reflected two estimates: $90,000.00 for completing the demolition and removing the debris; *or* $90,000.00 plus an additional $25,000.00 for removing the brick and concrete. See Roberts-Gateman Contract.

10. Roberts commenced the demolition almost instantly. Doherty Depo. at 59. With the use of heavy equipment, Roberts demolished portions the of the building that remained standing and screened the debris in order to separate the brick and concrete from the steel, iron and wood.[1] Doherty Depo. at 70-73, Gateman Depo. at 113; Stalker Depo. at 47. Among the debris and rubble were various items such as radiators, shelving and differing forms of trash. Doherty Depo. at 77-79.

11. Roberts also separated what remained of the roofing material, which was contaminated with asbestos, and miscellaneous items such as trash and scrap metal.[2] Doherty Depo. at 70-79. Roberts placed all of the material into separate piles in the parking lot, which were segregated by the type of material. Gateman Depo. p. 113-15. After screening and segregating the debris, Roberts removed the debris and transported it to various facilities.

---

[1] A "Screener" is a machine that moves debris through various screens and shakes it to remove particles of debris ranging in size. The machine loosens the dirt and segregates the larger pieces, returning the dirt and fill to the ground. *See* Doherty Depo. at 115.
[2] The asbestos itself was removed by SCS Construction, whom Gateman hired as one of the various service providers for the demolition project. Gateman Depo. at 93.

4

Id. at 69-72.  Roberts took the iron and steel to New England Polarizer for recycling, while disposing of the trash and debris in landfills.  *Id*.

12. In total, Roberts removed over 1178 tons – 2,356,000 pounds – of debris, in over 50 truckloads, during approximately four weeks of continuous work.  *See* Roberts Daily Tracking Report (Attached as Exhibit 4).

13. During Robert's performance under the contract, the parties clarified and modified the terms of the contract.

14. Gateman ultimately received permission from the City of Lynn's Building Inspector to leave the brick and concrete on the site and to use it as fill.  Gateman Depo. at 79, 82.  Also, the brick and concrete was needed in the interim to prevent the adjacent sidewalk and utilities from failing.  Stalker Depo. at 50-52.  Thus, even though Roberts had already created piles of different debris in the parking lot and was prepared to dispose of it in its entirety, Gateman directed Roberts to move the brick and concrete back into the hole and to position it against the foundation's walls.  Doherty Depo. at 36-37, 93, 101-02; Gateman Depo. at  90, 97, 231, and 241; Stalker Depo. at 23.

15. Gateman also understood and accepted that small pieces of charred wood would remain with the brick and concrete used as fill.  Gateman Depo. at 125-133.  This was because small pieces of charred wood and ash were mixed in with the concrete and brick and Roberts could only remove it by hand or by crushing it.  Gateman Depo. at 124-134; Stalker Depo. at 47-48.

16. Gateman also alleviated Roberts from any obligation to "Cover with Fill and Rough Grade the Site."[3]

17. Gateman contracted with two other entities to fill and grade the Property. The fill Gateman located and eventually used was from another building site in Revere, MA, where the owner was offering it at no cost. Gateman Depo. at 100; 165-69. Because Gateman was getting the fill for free, he contracted with Loveland Trucking ("Loveland") for approximately $30,000.00 to transport the fill from Revere to the Property, and he chose not to include Roberts in this process. *Id.* Additionally, Gateman contracted with Wetherbee Contracting for $20,000.00 to grade the site. *Id.* at 93.

18. When Roberts left the work site, both Roberts and Gateman agreed that Roberts had fully performed its obligation. Gateman Depo. at 231-34. Gateman had personally witnessed Roberts load "[m]any, many trucks" with debris and observed it being hauled away. *Id.* at 136-37. When Roberts departed, the company had successfully demolished the building and removed the debris, leaving only—at the express direction of Gateman-- the brick and concrete sloped against the foundation walls as well as the debris that constituted an access ramp. Doherty Depo. at 91; Gateman Depo. at 136-37, 231-34; Wetherbee Depo. at 66-67.

19. Additionally, Gateman had personally observed Roberts' work firsthand by being on the site daily, except for a ten-day break during the middle of the project. Gateman Depo. at 103. When Roberts departed, Gateman personally inspected the site and did not express any dissatisfaction with the company's performance. *Id.* at 231-35. At that juncture,

---

[3] Indeed, despite the contract language, neither Gateman nor Roberts understood the contract between them to include Roberts providing fill over the site or bringing the property to street level. Doherty Depo. at 50; Gateman Depo. at 99.

6

Gateman believed his relationship with Roberts was "fantastic," and he referred additional business to the company. *Id.* at 237; Stalker Depo. at 49.

20. At the time Roberts was finishing its work, Loveland had begun delivering fill to the site and Wetherbee Construction was dispersing the fill in the hole. Doherty Depo. at 97; Gateman Depo. at 155. Gateman himself even participated filling the hole. Kevin Doherty, who had the majority of dealings with Gateman on behalf of Roberts, personally observed Gateman operating heavy equipment and pushing fill into the hole. Doherty Depo. at 109-10. Gateman and Wetherbee were covering the ramp, as well as the brick and concrete, with fill that Loveland delivered. *Id.*

21. Sometime after Roberts completed its work and left the site, Gateman contacted Roberts to remove some additional debris, which had been contained within the ramp. Doherty Depo. at 117.

22. By then, Gateman had entered negotiations with Family Dollar and agreed to prepare one portion of the site to build. *Id.* at 117-18; *see also* Family Dollar Contract for Purchas and Sale of Real Estate, § 2A.

23. Gateman would eventually warrant to Family Dollar, *inter alia*, that Gateman, as the seller, completed the demolition and removed the debris on the property, in preparation for construction. *Id.*

24. Roberts responded to Gateman's request by sending a screener, a loader and several trucks to sort and remove the debris just as Roberts had done during the initial work. Doherty Depo. at 117-118; Stalker Depo. at 60.

25. Neither Doherty nor Stalker understood that Roberts screening of the material from the ramp as falling within the original contract. Doherty Depo. at 118; Stalker Depo. at 46-

47. Yet, Roberts returned and removed all of the debris as requested without seeking any additional compensation. Doherty Depo. at 117-118, 143.

26. Gateman desired to have the brick and concrete that was originally located on Family Dollar's portion of the lot relocated it to the portion Georto would eventually purchase. Gateman Depo. at 150-53. Roberts, however, did not take part in this process. Doherty Depo. at 131-35.

27. Kevin Doherty again observed both Gateman and Mr. Wetherbee using a front end loader to move the brick and concrete that remained from Roberts screening of the ramp material, and continue to cover the material with fill. *Id.*

28. Gateman ultimately consummated a Purchase and Sale Agreement with Family Dollar on April 26th, 2002. *See* Family Dollar Contract for Purchase and Sale Agreement. Gateman expressly warranted to Family Dollar on April 26, 2002 that "Seller has completed the demolition and removal of the debris on the property and on adjacent property owned by Seller." *Id*. at Section 2A.

29. On or about June 18, 2003, Gateman entered into a contract for the purchase and sale of the remaining portion of the site to Georto. *See* Georto Contract for Purchase and Sale of Real Estate. Gateman and Georto closed on the property in February of 2004. Gateman Depo. at 186.

30. Approximately two months later, Mr. Hawkins[4] of Georto contacted Gateman and informed him that the company's construction crew was prohibited from going forward because the site was unsuitable for building. Id. at 186-89. According to Hawkins, the

---

[4] James M. Hawkins is the founder, president and sole shareholder of Georto, a corporation in the business of franchising Aaron's Sales and Lease Ownership retail stores. *See* Hawkins Depo. at 41.

site was filled with solid waste, including wire shelving, an air tank, a cash register, plastic and burnt wood. Hawkins Depo. at 178-82.

        Respectfully submitted,
        Roberts Corporation,
        By its Attorney,


        _/s/ J. Mark Dickison_____
        J. Mark Dickison (BBO# 629170)
        LAWSON & WEITZEN, LLP
        88 Black Falcon Ave., Ste. 345
        Boston, MA  02210
        617-439-4990
        mdickison@lawson-weitzen.com

## CERTIFICATE OF SERVICE

 I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on January 28, 2006.

        _/s/ J. Mark Dickison_____
        J. Mark Dickison