UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GEORTO, INC.,<br>   Plaintiff,<br><br>v.<br><br>WILLIAM GATEMAN, INDIVIDUALLY<br>and as TRUSTEE OF 200 UNION<br>STREET REALTY TRUST,<br>   Defendant and<br>   Third Party Plaintiff,<br><br>v.<br><br>ROBERTS CORPORATION,<br>   Third Party<br>   Defendant. | CIVIL ACTION NO. 04-11730 NG |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF
MOTION FOR APPROVAL OF TRUSTEE PROCESS**

Plaintiff Georto, Inc. ("Georto") submits this memorandum in support of its motion for approval of attachment on trustee process and issuance of trustee defendant summonses to Eastern Bank, Citizens Bank, and TD Banknorth, NA in the amount of $300,000 with respect to accounts in the name of Defendant William Gateman, Individually and/or as Trustee of 200 Union Street Realty Trust ("Gateman").

**INTRODUCTION**

This action arises out of Georto's purchase of certain land in Lynn, Massachusetts (the "Property") from Gateman for $300,000 on February 19, 2004 pursuant to a Contract for the Sale of Real Estate (the "Contract") dated June 18, 2003.  The Property was one parcel of a larger site that Gateman had owned at 200 Union Street in Lynn.  Georto has asserted claims against Gateman for breach of

warranty, fraud, negligent misrepresentation, breach of the covenant of good faith and fair dealing, and violation of Chapter 93A of the Massachusetts General Laws arising from Gateman's conduct in deliberately dumping and concealing extensive amounts of solid waste / demolition debris on the Property in violation not only of his warranties and representations and the directives of the City of Lynn and the Massachusetts Department of Environmental Protection but also of Massachusetts statutes and Solid Waste regulations of the Massachusetts Department of Environmental Protection.

## **STANDARD**

Fed. R. Civ. P. 64 provides in part that "all remedies providing for seizure of person or property for the purpose of securing satisfaction the judgment ultimately to be entered in the action are available under the circumstances and in the manner provided by the law of the state in which the district court is held, existing at the time the remedy is sought."  Rule 64 further provides that such remedies include attachment and other corresponding or equivalent remedies.   Fed. R. Civ. P. 64.

Mass. R. Civ. P. 4.2(a) provides in part that trustee process may be used subsequent to the commencement of an action to secure satisfaction of the judgment for damages and costs which the plaintiff may recover.  Pursuant to Mass. R. Civ. P. 4.2(c), trustee process is available only "upon a finding by the court that there is a reasonable likelihood that the plaintiff will recover judgment, including interest and costs, in an amount equal to or greater than the amount of the trustee process over and above any liability insurance shown by the defendant to be available to satisfy the judgment."

**ARGUMENT**

I.  **THERE IS A REASONABLE LIKELIHOOD THAT GEORTO WILL RECOVER JUDGMENT IN AN AMOUNT EQUAL TO OR GREATER THAN THE AMOUNT OF TRUSTEE PROCESS OVER AND ABOVE ANY LIABILITY INSURANCE KNOWN OR REASONABLY BELIEVED TO BE AVAILABLE TO GATEMAN AS A MEANS OF SATISFYING THE ANTICIPATED JUDGMENT IN THIS MATTER.**

There is a reasonable likelihood that Georto will recover judgment on its claims against Gateman in an amount in excess of $249,000 plus costs and prejudgment interest, specifically including but not limited to the claim for breach of the warranty that there were no non-acceptable environmental conditions on the Property and the claims for misrepresentation and violation of Chapter 93A resulting from Gateman's misrepresentation that all of the solid waste / demolition debris had been removed from the Property.

The evidence demonstrates the following:[1]

Property / Fire

1. Gateman, who admits that he was engaged in trade or commerce in Massachusetts within the meaning of Mass. Gen. L. c. 93A, purchased certain commercial real property at 200 Union Street, Lynn, Massachusetts (the "site") in 1996 for $20,000 (plus payment of approximately $100,000 in back taxes) for

---

[1] Georto cites to and incorporates certain portions of the deposition transcripts previously filed by Third Party Defendant Roberts Corporation in connection with its motion for summary judgment as to the third party claims, specifically including the deposition transcripts of William Gateman (attached as Exhibit 5 to Roberts Corporation's Concise Statement of Material Facts), Kevin Doherty (Exhibit 6), Robert Stalker (Exhibit 7), Scott Wetherbee (Exhibit 8), and James Hawkins (Exhibit 9). Georto also cites to certain portions of the deposition transcripts of Lauren McKinlay and Stephen McIntyre, which, along with certain deposition exhibits, are attached to the

the purposes of renting the property for profit and holding the property as an investment.  The site included three buildings consisting of approximately 100,000 square feet.  Gateman Depo. at pp. 50-55, 59, 69; Gateman's Supplemental Answers to Interrogatories, attached to Gateman's Opposition and Response to Plaintiff's Motion to Compel Answers to Interrogatories, Docket No. 18, at p. 9.

2. Gateman listed the site for sale as of the spring and summer of 2001.  After a fire at the site in August, 2001, however, the City of Lynn building inspector told Gateman to demolish the buildings.  Turner Demolition performed initial demolition work the day after the fire.  Gateman Depo. at pp. 55, 58,59,79,80, 104.

Initial Demolition Work / Debris Ramp

3. During that initial demolition work, consisting of the destruction of the front of the building, a ramp or road of demolition debris was placed on that part of the property that was ultimately sold to Family Dollar.  The debris ramp was used to drive machinery from street level into the basement foundation during the demolition work and was built before any fill was brought onto the property.  Gateman Depo. at pp. 145-149;  Doherty Depo. at pp. 80-83.  The debris ramp, which was approximately sixty feet wide, forty feet long, and ten to twelve feet high at its highest point,  contained wood, burnt wood, ash, concrete, brick, trash, clothing, rugs, and substantial amounts of metal.  Doherty Depo. at pp. 80-83, 88-89; Stalker Depo at pp. 45-47; Wetherbee Depo. at 61,62.

---

Affidavit of Dale Kerester filed herewith.  The transcripts are identified in the following

Roberts Demolition Contract / Initial Dumping

4. As of March, 2002, the City of Lynn and the Massachusetts Department of Environmental Protection notified Gateman that he would be assessed fines if he didn't proceed with the demolition and debris removal. Doherty Depo. at pp. 53-54. Gateman then contracted with Roberts Corporation in March, 2002 to take down the remainder of the building (while leaving the basement foundation) and remove certain of the demolition debris from the site and dispose of it legally (meaning that the debris would be disposed of at a licensed landfill or disposal site).[2] Gateman Depo. at pp. 84,85, 219 and Depo. Ex. 3 (Roberts contract with Gateman, attached as Exhibit 1 to Roberts Corporation's Concise Statement of Material Facts). Doherty Depo at pp. 46-48. The contract also provided that Roberts Corporation would cover the site with fill and rough grade the site. Gateman Depo. at pp. 210, 211 and Depo. Ex. 3 (Roberts contract with Gateman, attached as Exhibit 1 to Roberts Corporation's Concise Statement of Material Facts).

---

manner: "_____ Depo. at p. ___".

[2] The Roberts Demolition contract provided that Roberts Demolition would also remove the brick and concrete debris from the property (for an additional $25,000) if the City of Lynn did not approve leaving that debris on the property. Gateman Depo. at pp. 198 and Depo. Ex. 3 (Roberts contract, attached as Exhibit 1 to Roberts Corporation's Concise Statement of Material Facts). At that time, Gateman told the representatives of Roberts Demolition that he wanted to leave the brick and concrete and would try to get approval from the City of Lynn to leave the brick and concrete. Stalker Depo. at p. 23. After entering into that contract, however, Gateman did not have any communications with anyone from the City of Lynn about the subject of approval for leaving brick and concrete on the property. Gateman Depo. at pp. 198,199. (While Gateman testified that he nonetheless believed he could leave brick and concrete on the property, he knew, as result of a prior meeting with the Lynn building inspector, that he was required at a minimum to remove all other demolition debris from the property. Gateman Depo. at pp. 101,102.

5. Roberts started work in March, 2002. At the time that it started work, the site contained "all kinds of debris", including wood, burnt wood, ash, brick, concrete, steel, iron, furniture, and general trash. Doherty Depo. at pp. 77-79.

6. Roberts Corporation created piles of demolition debris on the site, including piles of wood (including charred wood) and trash mixed together. The debris piles ranged up to fifty feet high. Gateman Depo. at pp. 113, 114, 134.

7. Gateman entered into a purchase and sale agreement dated April 26, 2002 to sell one of the parcels of the site to Family Dollar for $375,000. (Family Dollar had been renting part of the property prior to the fire.) Pursuant to the negotiations for that sale, which started shortly after the fire, Family Dollar required that Gateman remove all of the debris (including brick and concrete as well as other debris) not only from the parcel to be purchased by Family Dollar but also from the adjacent parcels (including the Property later sold to Georto). Gateman Depo. at pp. 138-145. Pursuant to the Family Dollar purchase and sale agreement, Gateman warranted that Gateman "had completed the demolition and removal of the debris on the property and on adjacent property owned by [Gateman]." Gateman Depo. at pp. 142-143 and at Depo. Ex. 7 (Family Dollar contract with Gateman, attached as Exhibit 2 to Roberts Corporation's Concise Statement of Material Facts).

8. Notwithstanding the foregoing requirement and warranty that Gateman remove the debris from the entire site and the directives from the City of Lynn and the Massachusetts Department of Environmental Protection, Gateman instead caused brick and concrete and other solid waste / demolition debris to be

6

dumped on the Property ultimately sold to Georto and thereby lowered his demolition and removal costs.  (During the demolition work, Roberts Demolition requested direction from Gateman as to where he wanted certain of the debris placed on the Property and Gateman in fact directed Roberts where the materials were to be placed.)  Gateman Depo. at 102, 148,149, 223, 231, 232, 234;  Gateman's Supplemental Answers to Interrogatories (Docket No. 18) at pp. 3-6.

9. More specifically, after Roberts Corporation started its work, Gateman told Kevin Doherty of Roberts Corporation that he (Gateman) "didn't want to haul the brick and concrete out, … didn't want to pay an additional charge and that we were going to separate it and leave it in piles in the hole."   Gateman didn't say anything indicating that he had received any approval from the City of Lynn to leave the brick and concrete on the site.  Doherty Depo. at p. 93, 101-102.

10. All of the brick and concrete from the 100,000 square foot buildings was dumped into the basement hole. Doherty Depo. at p. 93, 101-102.  The brick and concrete left in the hole was mixed with some wood.  Stalker Depo. at pp. 47-48.

11. Gateman knew that that the brick, concrete, and other demolition debris, specifically including the wood and charred wood that was mixed with trash, was not going to be removed.  Gateman testified that he did not understand that anyone would sort the wood and trash piles before leaving the wood on the property and in fact never observed anyone separating the wood from the trash.  Gateman Depo. at pp. 124, 125, 127, 129, 130, 137.

12. While Gateman testified that he generally did not walk the property during his daily visits to the site during the demolition work and instead viewed it from his car, other witnesses testified that Mr. Gateman not only regularly walked the site but in fact actively worked on the site – specifically including operating machinery to dump debris in the basement foundation.   Gateman Depo. at pp. 134; Doherty Depo. at pp. 84-87, 105-108.   Gateman (as well as Scott Wetherbee of Wetherbee Contracting)  actually operated a bulldozer at the site and used that equipment to initially cover with fill the debris ramp (which at that time was on the parcel to be sold to Family Dollar) and the brick and concrete.[3] Doherty Depo. at pp. 105-110.

### Debris Ramp / Additional Dumping

13. Roberts Corporation had initially finished its work at the site in late April or early May, 2002 but was called back later by Gateman, who explained that Family Dollar required that the debris ramp be removed before the parcel would be sold to Family Dollar.  While attempting in his testimony to minimize the amount of that additional debris from the debris ramp that was dumped into hole on the parcel later sold to Georto, Kevin Doherty of Roberts Corporation testified that Gateman said to leave some of that debris and "we will mix it in and push it in the hole."   Doherty also testified that it was possible that Gateman discussed with him reducing Roberts Corporation's price by $10,000 if additional debris

---

[3] Rather than have Roberts Demolition provide fill to bring the Property to grade, Gateman, with the limited exception of a load or two delivered to the site by Roberts Demolition as examples, obtained certain "free" fill material from Revere and worked with another contractor, Wetherbee Contracting, to cover the debris and grade the site. Gateman Depo. at pp. 232-235, 248.

was left on the site.  Doherty further acknowledged that Roberts Corporation left debris on the site and that he observed Scott Wetherbee using a front end loader (<u>for at least a couple of days</u>) to dump debris onto the parcel later sold to Georto and that he observed Gateman using the front end loader to cover the debris with fill.  Doherty Depo. at pp. 117-125, 132 – 137;  Stalker Depo. at pp. 48-49.

14. Gateman made a separate $10,000 cash payment to Kevin Doherty individually that was not paid to Roberts Corporation. Mr. Doherty did not disclose that payment to Roberts Corporation until after this lawsuit was filed.  Stalker Depo. at pp. 71-74.

<u>Georto Purchase and Sale Agreement / Written Representations</u>

15. Approximately one year later, in June, 2003 and after completion of the filling activity at the site, Gateman entered into a Purchase and Sale Agreement with Georto.  Gateman Depo. at pp. 173- and Depo. Ex. 11 (Gateman contract with Georto, attached as Exhibit 3 to Roberts Corporation's Concise Statement of Material Facts).   As was referenced in the Contract (and was therefore known to Gateman), Georto intended to use the Property for the construction of a new commercial building as a retail store.

16. Gateman did not at any time prior to selling the Property to Georto disclose to Georto that the Property contained demolition debris, notwithstanding that he knew that debris had been buried on the Property and that he understood that the debris could present problems for the construction of a building.  Gateman Depo. at pp. 153,154, 242.

17. To the contrary, pursuant to the Purchase and Sale Agreement, Gateman <u>warranted and represented</u> to Georto that "there are no hazardous materials as defined by state, federal, or local law, <u>or non-acceptable environmental conditions</u> on the property." (emphasis added) Gateman's warranties survived the closing. Depo. Ex. 11 (Gateman contract with Georto, attached as Exhibit 3 to Roberts Corporation's Concise Statement of Material Facts) at p. 2.

18. Pursuant to his obligations under the Purchase and Sale Agreement, and as part of the due diligence regarding the Property, Gateman, after the execution of the Contract and prior to the closing, also provided Georto with a May 29, 2002 Phase I Environmental Site Assessment written report prepared by Goldman Environmental Consultants, Inc. (the "Assessment") in connection with Gateman's sale of one parcel of the site to Family Dollar. <u>One of the purposes of the Assessment was to identify recognized environmental conditions, a term that is broader than the presence of oil or hazardous materials on the site and includes the burial of material not natural to the site</u>. McKinley Depo. at pp. 46-50. The Assessment set forth numerous material representations regarding the Property, specifically <u>including representations made by Gateman</u> to Goldman Environmental on May 2, 2002 (within one week of the date of the Family Dollar purchase and sale agreement in which Gateman warranted that all demolition debris had been removed from the site) <u>that all of the demolition debris had been or would be removed from the site and</u>

replaced with fill dirt.[4]  Gateman Depo. at p. 159, 210, 211 and at Depo. Ex. 8 (Assessment, pertinent portion of which is attached as Exhibit C to the Affidavit of Dale Kerester filed herewith) at pp. 2-4, 16, 17, 20, 24.

19. At Gateman's request, Goldman Environmental Consultants issued reliance letters to Georto (and to Georto's lender, Key Bank), acknowledging that Georto (and Key Bank) were relying upon the information contained in the Assessment for completion of due diligence activities and financing and stating that Georto and Key Bank could rely upon such information as if the information had been prepared for them.  Gateman Depo. at p. 212; Hawkins Depo. at pp. 122, 195, 214-217.

20. Among other uses, Georto provided the Assessment to its contractor for the purpose of obtaining an estimate of the costs of constructing a building on the Property and to its franchisor and bank for purposes of obtaining approval of the purchase of the site and financing for that purchase.  Hawkins Depo. at pp. 112-115.

21. In July, 2003, after entering the Purchase and Sale Agreement with Georto but prior to the closing, Gateman also provided Georto with a copy of the Family Dollar purchase and sale agreement (containing Gateman's warranty that all demolition debris had been removed from all of the property) prior to the sale to

---

[4] Gateman, while admitting that he discussed with Goldman Environmental representative the subject of the former building being demolished and removed from the property, testified that he does not remember what he said to the Goldman Environmental representative.  Gateman Depo. at pp. 160-163.  Ms. McKinley, the Goldman Environmental representative, testified based on her contemporaneous notes of her conversation with Gateman that he had indicated to her that all material would be removed.   McKinley Depo. at pp. 100,101, 115, 116, 120-124.

Georto. Gateman's Supplemental Answers to Interrogatories (Docket No. 18) at pp. 4, 8.

22. In reliance on Gateman's representations and warranties, Georto closed on the Property on February 19, 2004 by paying the balance of the $300,000 purchase price to Gateman. Hawkins Depo. at pp. 93-99, 112-117, 122, 158-164; Gateman Depo. at pp. 60, 175-176, 181; Deed, attached as Exhibit "D" to the Affidavit of Dale Kerester filed herewith.

<u>Discovery of Buried Solid Waste / Demolition Debris</u>

23. Upon commencement of the excavation for the construction of the retail building on the Property in early April, 2004, Georto's general contractor, PM Construction, discovered the extensive amounts of demolition debris and solid waste (consisting of wood timbers, wood, charred wood, ash, brick, concrete, metal, radiators, junk, and other solid waste materials) buried and concealed below other fill materials on the Property. Contrary to Gateman's efforts to minimize the nature of the wood debris dumped at the Property, the majority of the wood timbers and framing debris discovered buried at the site were more than three feet long. McIntryre Depo. at pp. 31-54, 67-70, 94-105, 111, 112.

24. Upon discovery of the demolition debris at the Property, PM Construction's project manger, Steve McIntyre, notified Georto that, based on the building code, he could not build on the debris and that it was more than likely that all of it would need to be removed. Mr. McIntyre invited a Lynn building code enforcement officer to investigate the demolition debris at the Property and to determine if it needed to removed. The <u>building inspector confirmed to PM</u>

<u>Construction that they could not build on the debris and also confirmed that the debris had to be properly disposed</u>.  McIntyre Depo. at pp. 58-67.  Georto then also retained a geotechnical engineer, who also advised Georto that all of the demolition debris material had to be removed.  Hawkins Depo. at pp. 195-199; S.W. Cole Report, attached as Exhibit "E" to the Affidavit of Dale Kerester filed herewith.

25. During a meeting at the Property to view the debris after its discovery by PM Construction, Robert Stalker of Roberts Corporation told Steve McIntyre of PM Construction that Roberts Corporation would not take care of the debris, that he "did exactly what he was told to do" by Gateman, that Gateman told him to move the debris ramp from the Family Dollar parcel and dump it onto the Property later sold to Georto, that whatever is in the hole he was told to leave, and that "anything in that hole is the prior owner's problem."  McIntyre Depo. at pp. 85-86, 110-111, 136-137; Stalker Depo. at pp. 89, 90.

26.  Georto contracted to have the debris removed and replaced with fill, which work was supervised by Steve McIntyre of PM Construction.  Mr. McIntyre, who monitored the removal process, observed that <u>the demolition debris was located throughout the Property</u> and was largely the same throughout.  Approximately 167 truckloads of demolition debris material was removed, and approximately 4,000 cubic yards of fill was delivered to the site.  McIntyre Depo. at pp. 114-131,135.

27. Georto paid $249,000 for the removal of the demolition debris and solid waste and replacement with fill and seeks to recover such costs, prejudgment interest

since the date of the breach of warranty[5], and multiple damages and attorney's fees under Chapter 93A.   Hawkins Depo. at pp. 186-189, 218-221.

The foregoing evidence demonstrates that Gateman had caused the demolition debris and solid waste to be deliberately dumped on the Property and concealed by varying depths of fill in violation not only of his warranties and representations and the directives of the City of Lynn and the Massachusetts Department of Environmental Protection but also of Massachusetts statutes and Solid Waste regulations of the Massachusetts Department of Environmental Protection.  M.G.L. c. 111, sec. 150A ("No person shall dispose or contract for the disposal of solid waste at any place which has not been approved by the department pursuant to the provisions of this section or other applicable law."); 310 CMR 16.00, et seq.,  and 310 CMR 19.000, et seq.. (relating to illegal dumping/landfills);[6]  McKinlay Depo. at pp. 49-50, 64, 120-127 (Ms. McKinlay, who was the individual at Goldman Environmental who prepared the Assessment provided by Gateman to Georto and expressly set forth in that report Gateman's representations that all of the demolition debris – <u>identified in the Assessment as solid waste</u> - had been or would be removed from the property, testified that the burial of material not natural to the property <u>constituted an environmental condition</u>, that "[t]he improper disposal of solid waste would constitute a recognized environmental condition regardless of if that solid waste contained oil or

---

[5] Georto expects to demonstrate that the warranty was breached no later than February 19, 2004, the date of the closing.  Accordingly, as of the trial date, Georto will seek more than two years prejudgment interest at the Massachusetts statutory default rate of 12%.

hazardous materials," and that, if she had understood that Gateman did not intend to remove the demolition debris, she would have recommended that the demolition debris be removed and disposed of because it would have been considered a recognized environmental condition.); Doherty Depo at pp. 153-154 (Mr. Doherty, who supervised the work on behalf of the Roberts Demolition, acknowledged that debris consisting of wood, metal, and trash should not be left on site and should instead be removed.); Stalker Depo at pp. 18-20, 29-30, 84, 85, 88 (Mr. Stalker, who is the sole officer, director, and shareholder of Roberts Corporation, acknowledged that Massachusetts solid waste regulations prohibit brick and concrete greater than six inches in size from being used as fill and that brick and concrete would have to be crushed before it could be approved to be used on site and further testified that Gateman did not ever obtain approval from the City of Lynn to leave brick and concrete at the site. He also observed the excavation of the buried debris, including doors, wood, steel, and other debris which appeared to him to be the ramp debris, after its discovery by Georto's contractor and testified that the applicable solid waste regulations required that the material be removed.)

## II.   TRUSTEE PROCESS SHOULD ISSUE.

Georto reasonably believes that Gateman has goods, effects and credits on deposit with Eastern Bank, Citizens Bank, and/or TD Banknorth, NA. If the trustee process does not issue, there is a clear danger that Gateman will withdraw, remove or

---

[6] Georto has served disclosures regarding expected expert testimony, including but not limited to a solid waste expert who is expected to testify regarding such statute and regulations and Gateman's violation thereof.

15

dissipate the funds believed to be on deposit in order to deprive Georto of security for payment of a judgment in this matter.

More specifically, Gateman has engaged in conduct to hinder his creditors. Of the $1,035,000 in sale and settlement proceeds[7], Gateman endorsed one of the sale checks (in the amount of either $375,000 or $300,000) to his father (Jackson Gateman), distributed $200,000 to a brokerage firm for the acquisition of stock <u>in the name of a friend of Jackson Gateman but for the benefit of Jackson Gateman</u>, issued certain checks "to other businesses that were purchased" (in which William Gateman "may have an interest") and put the remaining balance of $200,000 in a bank account. Gateman Depo. at pp. 62-73.   Stated otherwise, Gateman caused funds to be distributed so that such funds would not be held in his name such that such funds were less likely to be available to Gateman's creditors.

The remaining balance of $200,000 may not be in the name of the Trust.  More specifically, in response to a question of whether those funds are currently held in the Trust's name, Gateman testified that "I don't know what the title of the bank account is."  In response to a question as to whether the bank account was held in his name individually, Gateman testified "I know my name is on it someplace."   Gateman also testified that the Trust does not currently have any assets.   Gateman Depo. at pp. 47, 63, 64.

---

[7] Gateman sold the site as three parcels for a total price of $785,000.  More specifically, Gateman sold one parcel to Family Dollar for $375,000 in 2002, a second parcel to Georto for $300,000 in February, 2004, and a third parcel to individual purchaser for $110,000 in the summer of 2004.  Gateman also received approximately $315,000 (less attorney's fees) in settlement of a claim on an insurance policy on the property.  Gateman Depo. at pp. 60-61.  Gateman made a profit of approximately $600,000 in connection with the property.  Gateman Depo. at p. 244.

## CONCLUSION

For the foregoing reasons, the Plaintiff, Georto, Inc. respectfully requests approval of attachment on trustee process and issuance of a summons to Eastern Bank, Citizens Bank, and/or TD Banknorth, NA in the amount of $300,000 with respect to any accounts in the name of William Gateman, individually or as trustee of the 200 Union Street Realty Trust.

**PLAINTIFF GEORTO, INC.**
By its attorney,

/s/ Dale Kerester
Dale C. Kerester, BBO#548385
LYNCH, BREWER, HOFFMAN & FINK, LLP
101 Federal Street, 22nd Floor
Boston, MA  02110-1800
(617) 951-0800

Dated:  April 7, 2006

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I caused a true and accurate copy of the foregoing memorandum to be served upon the counsel listed below by electronic filing, this 7th day of April, 2006:

Mark P. McGrath, Esq., BBO #642913  (by first class mail)
9 West Broadway  #214
Boston, MA  02127
(617) 271-9009
mpgrath@aol.com

J. Mark Dickison, Esq., BBO# 629170
LAWSON & WEITZEN, LLP
88 Black Falcon Avenue, Suite 345
Boston, MA  02110

/s/ Dale C. Kerester

Dale C. Kerester