# O'BRIEN&LEVINE

## Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

# Georto, Inc. v. William Gateman, et al.

Transcript of the Testimony of:

# Stephen McIntyre

# December 1, 2005

www.court-reporting.com
mail@court-reporting.com

195 State Street
Boston, MA 02109
(617) 399-0130  888.825.DEPO(3376)

Elizabette M. Afonso   1-17536

Stephen McIntyre 12-1-2005
Georto, Inc. v. William Gateman, et al.

1              UNITED STATES DISTRICT COURT
2              DISTRICT OF MASSACHUSETTS
3                    CIVIL ACTION NO.:  04-11730 NG
4
5    * * * * * * * * * * * * * * * * *
6    GEORTO, INC.,
               Plaintiff,
7
     vs.
8
     WILLIAM GATEMAN, INDIVIDUALLY and as
9    TRUSTEE OF 200 UNION STREET REALTY
     TRUST,
10             Defendant,
               Third Party Plaintiff, and
11             Third Party Defendant-in-
               Counterclaim
12
     ROBERTS CORPORATION
13
               Third Party Defendant,
14             and Third Party Plaintiff-
               in-Counterclaim.
15   * * * * * * * * * * * * * * * * *
16             DEPOSITION OF STEVEN McINTYRE, taken on
17   behalf of the defendants, pursuant to the
18   Massachusetts Rules of Civil Procedure, before
19   Elizabette M. Afonso, Professional Shorthand
20   Reporter and Notary Public within and for the
21   Commonwealth of Massachusetts, at the law office of
22   James S. Robbins, Six Beacon Street, Boston,
23   Massachusetts, commencing at 10:40 a.m. on
24   Thursday, December 1, 2005.

Stephen McIntyre 12-1-2005
Georto, Inc. v. William Gateman, et al.

2

1  APPEARANCES:

2

3  LYNCH, BREWER, HOFFMAN & FINK, LLP

4  by Dale C. Kerester, Esquire

5  101 Federal Street

6  Boston, Massachusetts  02110

7  617.951.1821

8       On behalf of the plaintiff

9

10  LAW OFFICE OF JAMES S. ROBBINS

11  by James S. Robbins, Esquire

12  6 Beacon Street, Suite 1100

13  Boston, Massachusetts  02108

14  617.227.7541

15       On behalf of William Gateman

16

17  LAWSON & WEITZEN, LLP

18  by Kristina A. Engberg, Esquire

19  88 Black Falcon Avenue

20  Boston, Massachusetts  02210

21  617.439.4990

22       On behalf of Roberts Corporation

23

24

3

1             I N D E X

2

3  DEPONENT                    PAGE

4

5  STEVEN McINTYRE

6

7  EXAMINATION BY MR. ROBBINS      4, 132

8

9  EXAMINATION BY MR. KERESTER     91, 137

10

11          E X H I B I T S

12

13  NO.    DESCRIPTION           PAGE

14

15  58     Plans              4

16

17

18

19

20

21

22

23

24       (Exhibit retained by counsel.)

4

1       (Exhibit No. 1, Plans, marked for

2  identification.)

3

4         P R O C E E D I N G S

5

6       STEVEN McINTYRE, having been first duly

7  sworn, was examined and testified as follows:

8

9       MR. ROBBINS:  Counsel have agreed on

10  continuing the same stipulations that we have used

11  in other depositions to wit that we will reserve

12  all motions to strike and all objections except as

13  to the form of the question until the time of

14  trial.  Everyone in agreement?

15       MS. ENGBERG:  Yes.

16       MR. KERESTER:  YES.

17

18            EXAMINATION

19  BY MR. ROBBINS:

20  Q.   Would you please state your full name and address.

21  A.   Steven John McIntyre, 299 Long Cabin Road, Arundel,

22       Maine.

23  Q.   Is your first name spelled with a "V" or a "PH"?

24  A.   "V".

5

1  Q.   Mr. McIntyre, my name is James Robbins as I

2       indicated before to you.  I'm going to ask you some

3       questions today and perhaps the other lawyers will

4       also be asking you some questions today.

5            If you do not understand my question,

6       just say so, okay, and I'll rephrase it so that you

7       do understand it.

8            We all want, in terms of your answers,

9       that you speak them verbally, so that the

10       stenographer can type your words as opposed to a

11       head shake, and we want you to answer from what you

12       know of your own knowledge, what you saw, observed,

13       touched, et cetera; not what you guess, what you

14       would fill in with, assume, had to be.  We just

15       want to know what you saw and what you know, okay?

16  A.   Mm-hmm.

17  Q.   Okay.  If you need to a take a break, just let me

18       know.

19            What's your date of birth, please.

20  A.   9/10/71.

21  Q.   Are you married or single?

22  A.   Single.

23  Q.   Okay.  How far in formal school did you go?  Did

24       you complete high school?

2 (Pages 2 to 5)

Stephen McIntyre 12-1-2005
Georto, Inc. v. William Gateman, et al.

6

1   A.   The eleventh grade.
2   Q.   Eleventh grade. And where was that?
3   A.   Biddeford High School.
4   Q.   Biddeford?
5   A.   Yep.
6   Q.   Okay. And after leaving Biddeford High School, did
7        you begin some work?
8   A.   Yes.
9   Q.   Okay. Where was that, the first place? When I say
10       "first place," I'm interested in anything that you
11       were there, you know, more than a few weeks?
12  A.   I worked at A.L. Plourde Construction.
13  Q.   A.L. plug?
14  A.   Plourde, P-L-O-U-R-D-E.
15  Q.   Okay. Construction.
16            Where are they located?
17  A.   Guinea Road in Biddeford, Maine.
18  Q.   And what did you do for them?
19  A.   Construction laborer.
20  Q.   How long did you work for them?
21  A.   Maybe a year.
22  Q.   Okay. What was your next job?
23  A.   I worked at Spencer Press in Wells, Maine for a
24       period of about two years.

7

1   Q.   In Wells?
2   A.   Yes.
3   Q.   And what did you do for Spencer Press?
4   A.   I was a press packer.
5   Q.   Which means what? What kind of work did you do for
6        them?
7   A.   Pretty much took books off of an assembly line and
8        put them on a pallet.
9   Q.   Okay. After Spencer Press?
10  A.   I've been with PM Construction.
11  Q.   And when did you start with them? What year would
12       that have been?
13  A.   '87, '88.
14  Q.   What kind of work did you first start doing for
15       them?
16  A.   I was hired on as a carpenter.
17  Q.   Okay. And how long did you work as a carpenter for
18       them?
19  A.   Six or seven years.
20  Q.   And after that, what was the next position you had
21       with them?
22  A.   I was a foreman for a period of about three years.
23  Q.   And after that what did you do for them?
24  A.   A project superintendent since.

8

1   Q.   As a foreman -- let me back up, as a carpenter for
2        six or seven years, that would put you someplace in
3        the middle of the '90s when you would have started
4        as foreman for them; is that about right?
5   A.   Yeah.
6   Q.   If I add six or seven to those numbers, it would be
7        --
8   A.   I've been with PM Construction for a total of
9        16 years.
10  Q.   And as a foreman for them for the three years, what
11       were your duties as a foreman?
12  A.   Basically the same as a superintendent, just
13       smaller jobs. If there was a larger job, then you
14       would be under a superintendent.
15  Q.   Okay. So as a foreman, what were the things that
16       you did on a smaller job? What were your daily
17       activities that you would do, and who would you
18       supervise and so forth?
19  A.   Scheduling.
20  Q.   Scheduling.
21  A.   Pretty much anything, day-to-day operations on a
22       job. It would just be a smaller magnitude job,
23       maybe a remodel.
24  Q.   All right. Besides scheduling, in other words, you

9

1        would be supervising other people working on that
2        job?
3   A.   Yes. All subcontractors, yes. If there was not a
4        superintendent on site, then the foreman would take
5        care of all subcontractors, all of his general
6        labor in house.
7   Q.   Again, as foreman, when you were working there, PM
8        would hire subcontractors to come in and do
9        different aspects of the job?
10  A.   Yes.
11  Q.   Okay. Do they currently do that, still hire people
12       to come in and do other aspects of the job?
13  A.   Yes.
14  Q.   Okay. As you began as a superintendent, that would
15       have been approximately when?
16  A.   Six, seven years ago. I'm not sure of the exact
17       date.
18  Q.   All right. And as a superintendent, are you the
19       highest ranking person on site daily?
20  A.   Yes.
21  Q.   Okay. And what are the kinds of services that --
22       or people that PM provides on these jobs that
23       you're the superintendent of? What do they provide
24       themselves, and what do they outsource, where they

3 (Pages 6 to 9)

Stephen McIntyre 12-1-2005
Georto, Inc. v. William Gateman, et al.

**10**

1    bring somebody else in?

2    A    We generally do general carpentry, blocking, very

3    little framing. Mostly we subcontract framing,

4    foundations, excavation, basically about 90 percent

5    of the total work.

6    Q.    Is subbed out?

7    A.    Is subcontracted, yes.

8    Q.    Okay. But PM provides kind of overall management

9    and coordination of these services?

10    A.    Yes. As a general contractor basically would.

11    Q.    Would as a general contractor?

12    A.    Yes.

13    Q.    Okay. When you're on a particular site, are there

14    other PM employees who are on that site?

15    A.    Sometimes, not always.

16    Q.    Okay. When there are other PM employees, what

17    kinds of jobs do they do?

18    A.    Basically clean up whatever we cannot sub out

19    basically. Sometimes if the job's too small for

20    the carpentry part of the contract, which would be

21    the blocking or anything wood and the steel frame

22    they would take that. Very little basically.

23    Clean up a lot.

24    Q.    So it's kind of what's typically labor stuff?

**11**

1    A.    Yes.

2    Q.    Typically labor work?

3    A.    Yeah.

4    Q.    On how many jobs have you served as superintendent

5    for PM Construction? Your best memory, your best

6    estimate?

7    A.    Do between -- depending on the size of the project,

8    anywhere from two to four a year.

9    Q.    All right. And are there other employees of PM

10    Construction who also serve as superintendents?

11    A.    Yes.

12    Q.    How many other employees?

13    A.    I believe we have ten superintendents in all

14    including me.

15    Q.    Now, when you said "two to four jobs a year," you

16    were talking about your work was two to four jobs a

17    year?

18    A.    Yes.

19    Q.    Okay. So it's not obviously two or four jobs

20    spread over ten superintendents?

21    A.    Oh, no, no. That's each superintendent.

22    Q.    Each superintendent. Okay.

23    Are you currently working as a

24    superintendent for PM on a project?

**12**

1    A.    Yes.

2    Q.    Okay. What is the name of the project?

3    A.    I'm at a new Hannaford Brothers in Alton, New

4    Hampshire.

5    Q.    In Alton?

6    A.    Yeah. A-L-T-O-N.

7    Q.    Thank you.

8    And what's being built for new Hannaford

9    Brothers?

10    A.    It is a 38,000-square foot supermarket.

11    Q.    And what's the dollar value of that contract?

12    A.    I believe 2.1 million.

13    Q.    Are you superintending any other project currently?

14    A.    No.

15    Q.    Okay. Next before this Hannaford Brothers Store,

16    what was the project that you were superintendent?

17    A.    I was doing a -- I believe it was a Clipper Mart in

18    Saco, Maine.

19    Q.    Clipper?

20    A.    Yeah.

21    Q.    C-L-I-P-P-E-R?

22    A.    Yep.

23    Q.    And the second word is "Mark"?

24    A.    Mart.

**13**

1    Q.    Mart?

2    A.    M-A-R-T.

3    Q.    And, I'm sorry, where was that?

4    A.    Saco, Maine, Route 1 in Saco, Maine.

5    Q.    And this was like another supermarket?

6    A.    This was a convenient store/gas station.

7    Q.    Okay. And what was the approximate value of that

8    contract or project?

9    A.    1.5 million, I believe.

10    Q.    Okay. Prior to that one, where were you?

11    A.    Prior to that, I believe I was filling in on

12    another job with another superintendent in

13    Falmouth, Maine.

14    Q.    What was the project?

15    A.    It was a Shaw's Supermarket?

16    Q.    Now, when you say "filling in," were you working

17    together with another superintendent on that

18    project?

19    A.    Yes.

20    Q.    So the two of you were working kind of parallel

21    together?

22    A.    Yes.

23    Q.    What was the approximate value of that project?

24    A.    That one I believe was 4 million.

4 (Pages 10 to 13)

Stephen McIntyre 12-1-2005
Georto, Inc. v. William Gateman, et al.

14

1   Q.   Okay.  And prior to that?
2   A.   Prior to that I think I was at Wicks Lumber in
3        Portland, Maine doing a renovation.
4   Q.   And what was the value of that project?
5   A.   I believe around 300,000.
6   Q.   Okay.  Prior to that one -- and you were the
7        superintendent on that?
8   A.   Yes.
9   Q.   Okay.  And prior to Wicks?
10  A.   Prior to Wicks, I believe it was another Clipper
11       Mart in Brunswick, Maine.
12  Q.   Okay.  And the value of that project?
13  A.   Around one to 1.5 million.
14  Q.   Now, I haven't been asking you something I should
15       have been asking you, which is to give me some
16       sense of periods of time, dates.
17            The Hannaford Brothers Supermarket
18       project, when did that begin?
19  A.   That began, I believe, eight weeks ago.
20  Q.   So September-ish?
21  A.   Yes.
22  Q.   Of this year?
23  A.   Yes.
24  Q.   Do you recall the dates for the Clipper Mart in

15

1        Saco?
2   A.   I don't recall the dates.  It was summertime.
3   Q.   Roughly, how many months or years was that --
4   A.   Generally, the Clipper Marts they run anywhere from
5        16 to 18 weeks.
6   Q.   That's fast.
7            And that you believe was last summer of
8        '05 or of '04, did you say?
9   A.   It was towards the end of the summer.
10  Q.   Of which year -- this year or last year?
11  A.   It was this year.
12  Q.   '05?  That would have been, like, right before the
13       September start on the Hannaford if it was this
14       year.
15  A.   No.  It was last year then.  Generally, I really
16       don't know the date, you know what I mean?
17  Q.   But it was the end of a summer?
18  A.   Yes, it was.
19  Q.   Do you remember if it was much of a break between
20       it ending and Hannaford beginning?
21  A.   That Clipper Mart was done before the Wicks
22       building.
23  Q.   Okay.  That's the Saco one?
24  A.   Yeah.

16

1   Q.   All right.  So that's maybe a little out of order?
2   A.   Yes, it is.
3   Q.   Okay.  So which one do you think was before
4        Hannaford?  We have Shaw's Supermarket, Wicks
5        Lumber and then --
6   A.   Shaw's.
7   Q.   Shaw's?
8   A.   Shaw's was the last one.
9   Q   Okay.  The last one before?
10  A.   Yes.  Then it went Wicks, then Clipper Mart.
11  Q.   And then the Clipper Mart in Brunswick?
12  A.   The Clipper Mart in Saco, and then the Clipper Mart
13       in Brunswick.
14  Q.   Okay.  So when did the Shaw's project, what period
15       of time was that, the Falmouth?
16  A.   That was mid summer, this summer.
17  Q.   Mid summer of this year, 2005?
18  A.   Yes.
19  Q.   Some months ago?
20  A.   Yes.
21  Q.   And the Wicks Lumber was approximately when?
22  A.   That was the end of winter, the beginning of the
23       summer of this year.
24  Q.   2005?

17

1   A.   (No response.)
2   Q.   Yes?
3   A.   Around there, yes.
4   Q.   And then the Saco Clipper Mart?
5   A.   Saco Clipper Mart began in late summer and finished
6        in the beginning of winter.
7   Q.   And that would have been last year, 2004?
8   A.   Yes.
9   Q.   And then I take it the Brunswick, Maine Clipper
10       Mart would have happened even earlier than that.
11       So when was the Brunswick Clipper Mart?  You know
12       the Saco one was toward the end of the summer into
13       the winter of 2004.
14  A.   The Brunswick Clipper Mart, I believe, I did before
15       I went to Lynn for the Aaron's Furniture.  I did a
16       job before I went to Lynn, Mass to do Aaron's
17       Furniture.
18  Q.   Okay.  Before Lynn, Mass.  So we have another one
19       that will fit into the sequence.  The next
20       one would have been the Lynn project?
21  A.   Yes.
22  Q.   Okay.  And the Lynn project was what kind of
23       project?  What did you have to do?
24  A.   I forget the square footage.  It was a steel

Stephen McIntyre 12-1-2005
Georto, Inc. v. William Gateman, et al.

18

1    building package, retail store. I think it was
2    around 4,000 square feet, maybe a little bigger.
3  Q.  And that was in Lynn, Massachusetts?
4  A.  In Lynn, Mass., yes.
5  Q.  All right. Was that the address generally known as
6    200 Union Street in Lynn? Does that ring a bell?
7  A.  Yes. My plans, I believe, said 210 Union Street.
8    But I believe the town gave it an official address
9    of 200.
10  Q.  Okay. When you're talking about plans, I just want
11    to _____ talking about the same thing.
12    _____ s which we marked in Phil
13    _____ us Exhibit 51. I just want to
14    _____ — when you're referring to plans,
15    s this a copy of the plans? Take your time to
16    _____
17  A.  _____
18  Q.  _____ ibit 51, when you say "plans,"
19    that's what you were given to --
20  A.  Blueprints.
21  Q.  Blueprints to work on site.
22    All right. When did you first go to the
23    Lynn site?
24  A.  I don't remember the exact date.

19

1  Q.  Okay. When generally was the work that you did
2    done at the Lynn site? What was the period of
3    time?
4  A.  The period of time from start to finish?
5  Q.  Yes, please.
6  A.  I would say around 16 to 18 weeks.
7  Q.  Okay. That's the duration, I got you. But when
8    did that start and when did you finish?
9  A.  That started, I believe, right in the spring. It
10    would probably be '04. I'm not exactly sure. I
11    know it was around springtime.
12  Q.  Okay. But you're sure it was 2004, which would
13    have basically put it roughly two years ago?
14  A.  Yes. It's been about two years since I've been in
15    Lynn.
16  Q.  All right. And when did you finish?
17  A.  We finished late summer.
18  Q.  Okay. Did you ever go to the site before you
19    started work?
20  A.  I went to the site --
21  Q.  You start work proper?
22  A.  I went to the site to look at the site, I believe
23    it was three days before I had an excavating
24    contractor on site, where I had met with him on

20

1    site to discuss scheduling.
2  Q.  Okay. Who was the excavating contractor on that
3    project?
4  A.  It was Thomas Mattuchio, Incorporated, I believe it
5    was.
6  Q.  Okay. And do you know how come he was chosen as
7    the superintendent? Had you worked with him
8    before?
9  A.  I had not. All the hiring of subcontractors is
10    done through our project managers.
11  Q.  Okay. Who was the project manager on this project?
12  A.  George LaPlume.
13  Q.  And does he still work for PM?
14  A.  Yes.
15  Q.  Okay. So you were told Mattuchio was the
16    excavation person that you were going to be working
17    with on this?
18  A.  Yes.
19  Q.  And you met with him at the site?
20  A.  Yes.
21  Q.  Okay. And when you say "three days before," he
22    came to the site; is that what you're saying --
23  A.  Yes.
24  Q.  Would you have met with him then?

21

1  A.  We had both met on site.
2  Q.  Both met on site?
3  A.  Yes.
4  Q.  Was anybody else with you when you met on site with
5    him?
6  A.  No.
7  Q.  Okay. So you meet on site with him, what did you
8    discuss with him about the work that he needed to
9    do?
10  A.  We discussed site protection as far as fencing
11    around the site. His general plan on how he was
12    going to excavate, and when he could actually be on
13    site to excavate.
14  Q.  Okay. There were certain requirements that these
15    plans would have told you for what needed to be
16    excavated; is that right?
17  A.  Yes.
18  Q.  Okay. Could you find in these plans what it was
19    that told you what you needed to ask Mattuchio to
20    do, or was there something specific in these plans
21    that you can point to?
22  A.  Basically the -- now what was that question again?
23  Q.  Right. In order for you to talk to Mattuchio and,
24    for that matter getting a pricing out of Mattuchio,

6 (Pages 18 to 21)

Stephen McIntyre 12-1-2005
Georto, Inc. v. William Gateman, et al.

22

1  you had to tell him what work needed to be done?
2  A.  Yes.
3  Q.  You would have learned that from where on these
4  plans?
5  A.  That was already done and taken care of through our
6  project managers.  He had already been contracted
7  before he arrived on site.
8  Q.  Okay.  Do any of these plans that you have in front
9  of you, these blueprints, do any of them show what
10  the initial understanding was of what needed to be
11  excavated?
12  A.  Yes.
13  Q.  That's what I'm trying to find out.  You're more
14  familiar with reading these blueprints than I am.
15  A.  Basically, the footprint of the building would be
16  excavated.
17  Q.  Does that have a sheet page that I can remember to
18  look these up?  So there's a footprint page.
19  A.  Sheet S1.
20  Q.  Sheet S1.  Okay.  Great.  Anything else?
21  A.  This total footprint would be excavated.
22  Q.  So you're, again, talking about Sheet S1, and
23  you're in the upper left corner, and you're talking
24  about the rectangle that's there, and running your

23

1  finger around the parameter --
2  A.  Yes.  Basically the foundation of the basement
3  foundation.
4       And then also to be excavated would be
5  any parking lot areas, any poured concrete sidewalk
6  areas, any catch basins for storm drainage.
7  Q.  Okay.  At least with regard to the building itself,
8  what had to be excavated, would be shown on this
9  Sheet S1, this one here?
10  A.  For the general building, yes.
11  Q.  For the general building.
12  A.  For the foundation of the building --
13  Q.  Forgetting about the parking lot and forgetting
14  about those other items that you mentioned?
15  A.  Yeah.
16  Q.  Now, let me make sure I understand.  The foundation
17  for the building, as understood here, was going to
18  be -- how was that going to be excavated for this
19  building?  This is in the beginning.  I know things
20  may have changed, but in the beginning, what was
21  Mattuchio suppose to do with regard to the
22  foundation?
23  A.  Dig a big hole, dig a trench.
24  Q.  What did he have to do?

24

1  A.  Basically, he would have dug probably at least one
2  foot on either side of the dotted lines just for
3  the foundation.
4  Q.  Okay.  So these dotted lines that are -- what are
5  the dotted lines actually?
6  A.  Those are footings.
7  Q.  That's the footings?
8  A.  Yes.
9  Q.  And then what are the boxes?
10  A.  The boxes are an actual pier.  It's a wider spread
11  footing.
12  Q.  A wider spread footing.  Okay.
13  A.  It bears more weight.
14  Q.  Okay.  When it's not the box, the two dotted lines
15  that are on either side of the parameter of the
16  building, is my understanding correct that what
17  that's showing is that those foundation -- that
18  foundation wall has a foot at the bottom of it, a
19  widening at the bottom of it?
20  A.  Yes.  That's the dotted lines that you're seeing
21  right here.
22  Q.  Okay.  So it's the maximum width of this kind of
23  wide foot block at the bottom?
24  A.  Yes.  The wider parts is at the pier locations.

25

1  Q.  Okay.  And that's shown on Sheet S2, these
2  footings?
3  A.  Yes.
4  Q.  Okay.  Great.  Thank you.
5       Now back to what you were saying.  He
6  would have had to -- was the plan that he would dig
7  around -- he would dig, what, a trench or a hole?
8  Well, I guess it's not very technical.  He would
9  dig a trench?
10  A.  A wide trench, yes.
11  Q.  A wide trench.  Okay.  And you're saying that it
12  would have needed to have been at least a foot
13  wider than the dotted lines shown on page S1 in the
14  upper left corner around the building?
15  A.  Yes.  That would be at the minimum.
16  Q.  At the minimum?
17  A.  Yes.
18  Q.  Okay.  Is there anything that he had to dig within
19  the interior of the building?
20  A.  Yes.  Two interior column pads.
21  Q.  Those things that are marked F6?
22  A.  Yes.
23  Q.  Okay.  And what were they for?
24  A.  Those are for the interior columns.

Stephen McIntyre 12-1-2005
Georto, Inc. v. William Gateman, et al.

26

1  Q.  And so once the foundation -- once the concrete pad
2      was put in -- well, strike that.
3          There would be columns on those two pads
4      to help support the building itself?
5  A.  Yes.
6  Q.  Okay.  Are these the only two interior columns that
7      there were?
8  A.  Yes.  That were not connected to the foundation,
9      yes.
10 Q.  They were not connected to the foundation.
11         Okay.  At some point did he begin work?
12 A.  Yes.
13 Q.  Okay.  Were you there when he first began his work?
14 A.  Yes.
15 Q.  Okay.  Now, I premarked, and both lawyers have
16     copies of this, an exhibit that we marked as
17     Exhibit 58, and it's a plan -- I'll represent to
18     you it's a plan.  I'm just going to ask you if you
19     recognize what it shows?
20 A.  Yes, I do.
21 Q.  Okay.  Is that a plan of the property on which the
22     Aaron Store was ultimately built?
23 A.  That's a copy of the plan with -- it's a copy of
24     the plan with what was existing on site that I drew

27

1      in.
2  Q.  Okay.  So you've drawn in some shapes?
3  A.  I drew in existing foundation walls that were
4      buried on site.
5  Q.  Okay.  And you put the little crosshatch in there?
6  A.  Exactly.
7  Q.  So those are yours?
8  A.  Yes.
9  Q.  There are some handwritten notes on this otherwise
10     machine drawn plan.  Are those in your handwriting,
11     or are any of them in your handwriting?  Are those
12     any of your notes?
13 A.  Yes.
14 Q.  Okay.  Since I've asked you a sloppy question.
15     Which of those handwritings are yours?
16 A.  All of these detailed ones with any inch or foot
17     increments on the hashed outlines.
18 Q.  Okay.  How about the one with an arrow that says,
19     "foundation of new building"?
20 A.  That is not mine.
21 Q.  That is not yours.
22         Okay.  But the pieces that are basically
23     the notes that are basically pertained to those
24     foundation walls are yours?

28

1  A.  Yes.
2  Q.  Okay.  Do you know when you made this drawing or
3      added these foundation wall pieces to this plan?
4  A.  I don't have an exact date, no.
5  Q.  Okay.  Did you know that those foundation walls
6      were present when you first went to the site?
7  A.  No, I did not.
8  Q.  No one had told you about that, that they were
9      there?
10 A.  No.
11 Q.  Now, we have a variety of photographs that may or
12     may not -- well, we may or may not know the exact
13     date when they were taken, and I'm going to need to
14     ask you questions about the different photographs
15     to see what you may know about any of them, okay?
16     They have numbers, it may be a little laborious,
17     but bear with us.
18         I'm going to show you something that's
19     been marked as Exhibit 34.  Have you ever seen
20     either of those two photographs?  I'm not asking
21     have you seen what it shows, but just have you ever
22     seen either of those photographs?
23 A.  No.
24 Q.  Okay.  And you didn't take those pictures

29

1      obviously?
2  A.  No, I did not.
3  Q.  Okay.  Thank you.
4          Here is another set of three photographs
5      which were marked Exhibit 35.  Have you ever seen
6      those photographs before?
7  A.  No, I have not.
8  Q.  Okay.  And you didn't take those pictures?
9  A.  No, I did not.
10 Q.  Okay.  Let me go back to 34 for a second.  Have you
11     ever seen -- do you recognize what is shown in
12     Exhibit 34, which has writings at the bottom
13     saying, "Lynn, 200 Union, Front A."
14         Have you ever seen that property before?
15 A.  Yes, I have.
16 Q.  Okay.  Did you ever see it looking like that?
17 A.  Yes, I have.
18 Q.  Okay.  When did you see it looking like that?
19 A.  Right at the beginning of the project.
20 Q.  Okay.  So does that look like a fair representation
21     of what the piece of property looked like to you at
22     the beginning of the project?
23 A.  At the -- when we actually came back -- yes, that
24     does, because the railroad ties are in the back,

8 (Pages 26 to 29)

Stephen McIntyre 12-1-2005
Georto, Inc. v. William Gateman, et al.

**30**

1  so, yes, that is right at the beginning of the
2  project.
3  Q.    Okay. So kind of to anchor things, we know this is
4  what it looked like in the beginning; is that
5  right?
6  A.    Yes.
7  Q.    Okay. I'd like to show you another exhibit that's
8  marked as Exhibit 41, and ask if you've ever seen
9  that picture before?
10  A.    No, I haven't seen this picture. Pretty much you
11  just showed it to me but --
12  Q.    Okay. No. I mean, other than my giving it to you
13  right now?
14  A.    No, I haven't.
15  Q.    It wasn't a trick question.
16  A.    I have not seen that picture, no.
17  Q.    Okay. Have you ever seen the -- do you know what
18  it shows?
19  A.    Yes.
20  Q.    Okay. That's the 200 Union Street property?
21  A.    That looks as though you're taking a picture from
22  standing on the sidewalk.
23  Q.    Okay. And does that look like what it looked like
24  to you when you first got to the site?

**31**

1  A.    Yes.
2  Q.    Okay. That's fair and accurate --
3  A.    Yes.
4  Q.    -- as far as we're looking?
5        Okay. When Mattuchio first started doing
6  his excavating, do you know where he started
7  initially, and I'm going to ask you to look at this
8  Exhibit 58 if it is of help to you, because I'd
9  like to locate it.
10       Where did he start doing his digging?
11  A.    I'd like to say on the front wall, but I don't
12  remember exactly whether it was the side wall or
13  the front wall. I know it was not the back wall.
14  Q.    Okay. And the front wall would be the one closest
15  to Union Street?
16  A.    Union Street, yes.
17  Q.    And were you present when he first started?
18  A.    Yes.
19  Q.    Okay. And at some point, how far did he get in --
20  strike that.
21       At some point in his digging, did he
22  discover something that he needed to bring to your
23  attention?
24  A.    Yes.

**32**

1  Q.    All right. Roughly how long after he started doing
2  his work did that first happen?
3  A.    Maybe a day.
4  Q.    All right. But you don't remember exactly where he
5  was digging?
6  A.    I don't. I believe it was one of these front
7  corners.
8  Q.    One of the front corners on Union Street?
9  A.    Yes. I think it was closer to the Dollar Store
10  side, I believe.
11  Q.    Closer to the Dollar Store.
12       What was it that he brought to your
13  attention?
14  A.    He brought to my attention what looked like burnt
15  construction debris.
16  Q.    What did it look like? Did you look at it?
17  A.    Yes.
18  Q.    Okay. What did it look like?
19  A.    It had bricks, pipes, wiring, burnt jars, wood. It
20  looked like construction demo.
21  Q.    Okay. And this was within a day or so of --
22  A.    Yes.
23  Q.    -- him first starting his work?
24  A.    Yes.

**33**

1  Q.    Okay. And what happened after he brought this to
2  your attention and you looked at it, what then
3  happened? What did you then do?
4  A.    I told him to excavate the junk material out. Junk
5  material being the construction debris or demo.
6  Q.    When you say "the junk material," just so the
7  record's clear, you're talking about that stuff you
8  just named?
9  A.    Yes.
10  Q.    Okay. The junk material out, and do what with it?
11  A.    I had him stage it on site.
12  Q.    And when you say "stage it on site" --
13  A.    Pile it up.
14  Q.    Pile it up on a certain location?
15  A.    Yes.
16  Q.    Okay. And was he to continue digging this
17  parameter trench -- the foundation trench?
18  A.    He was to continue excavating where he was, where
19  he had found the debris, until he came into clean
20  material.
21  Q.    So you told him to stay in either the hole that he
22  had started, keep digging downward until he found
23  no more of this what you call "junk"?
24  A.    Yes.

9 (Pages 30 to 33)

Stephen McIntyre 12-1-2005
Georto, Inc. v. William Gateman, et al.

34

1  Q.   Okay.  He wasn't moving forward and continuing to
2        dig further --
3  A.   No.
4  Q.   -- he was just staying where he was?
5  A.   The site was too tight to do that.  You basically
6        had to dig your way out of the site.
7  Q.   Okay.  So he continued to dig down where he was.
8        You were there while he was doing this?
9  A.   Yes.
10  Q.   Okay.  And did he at some point come to where he
11       found none of this material?
12       MR. KERESTER:  Objection to form.
13  Q.   At some point did he stop digging down, because he
14       found no more of what you call "junk"?
15  A.   He stopped digging at approximately, I would say,
16       eight to ten feet from the existing grade that was
17       there.
18  Q.   When you say "the existing grade," you mean -- the
19       property was basically at a street level when you
20       began?
21  A.   Yes.
22  Q.   So you're saying eight to ten feet down from that
23       level?
24  A.   Yes.

35

1  Q.   Okay.  And at that point, he no longer saw any of
2        this material that you named before?
3  A.   I had him stop there and dig test holes around
4        numerous locations around the foundation.  There
5        was probably three or four spots, anyway.
6  Q.   Okay.  Had you spoken with anyone back at your
7        office --
8  A.   Yes.
9  Q.   -- about this problem?
10  A.   Yes.
11  Q.   Okay.  Who did you speak with?
12  A.   I spoke with George LaPlume.
13  Q.   Okay.  And what did you tell him?
14  A.   I told him I was encountering construction debris
15       during the excavation.
16  Q.   Okay.  And what did he tell you?  What did he say
17       in response?
18  A.   He told me in response if it was a little, to just
19       take care of it, throw it in the dumpster and keep
20       going.
21  Q.   Okay.  And when you kept digging down -- strike
22       that.
23           At some point you say you told Mattuchio
24       after he got down eight to ten feet, to stop

36

1        digging in that hole, that particular hole?
2  A.   Yes.
3  Q.   Okay.  What caused you to say, "Stop digging in
4        this particular hole," at that point?
5  A.   Well, there was no end insight of the junk in the
6        ground.  I didn't really want to open up a whole --
7        you know, it could be 50 feet deep for all I know.
8  Q.   Okay.  So it wasn't as if you were no longer seeing
9        any material that you had a problem with, it was
10       just that that was deep enough at that point, and
11       you wanted him to test other locations?
12  A.   Yes.
13  Q.   Okay.  And did he do other locations?
14  A.   Yes, he did.
15  Q.   Okay.  I'd like to ask you to look on this plan and
16       tell me what other locations generally, as best you
17       can remember, where he --
18  A.   Generally, it would have been around any of the
19       foundation wall lines.
20  Q.   Okay.  The foundation, was it stacked out with --
21  A.   Yes.
22  Q.   -- string and so forth or something?
23  A.   Yes.
24  Q.   Okay.  So you asked him to dig some other test

37

1        locations pretty much along that foundation?
2  A.   Yes.
3  Q.   Okay.  And what did he -- he did this, right?
4  A.   Yes, he did.
5  Q.   Okay.  What did he find?
6  A.   He found after about three and a half to four feet
7        of, I guess you could call it regular fill, he
8        started encountering the same material as he did:
9        Burnt jars, pipes, wires, bricks, cash draws,
10       radiators.
11  Q.   Okay.  So on these other locations -- did he find
12       this on each of the other three to four spots?
13  A.   Yes, he did.
14  Q.   Okay.  And in each of those locations, was this
15       debris material below the three to four feet level?
16  Q.   All right.  At that point I take this -- did
17       this activity take place within the next couple of
18       days of when you had started?
19       days of when you had started?
20  A.   Yes.
21  Q.   All right.  And at that point after you were able
22       to see what you saw from those test pits, did you
23       talk with your office about the problem?
24  A.   Yes, I did.

10 (Pages 34 to 37)

Stephen McIntyre 12-1-2005
Georto, Inc. v. William Gateman, et al.

38

1  Q.  Okay. Who did you speak with at that point?

2  A.  I had spoken with George LaPlume and Bill Nason.

3  Q.  Okay. Who is Bill Nason?

4  A.  Bill Nason is another owner of PM Construction.

5  Q.  And what did Mr. LaPlume say this time, this second

6     conversation?

7  A.  He told me to stop all digging, that my boss, Bill

8     Nason, was on his way down from Saco.

9  Q.  Anything else that you recall in the conversation?

10  A.  I don't.

11  Q.  Okay. Did you speak with Bill Nason before he got

12     on the road and was on his way down or from his

13     cell phone?

14         MR. KERESTER: Objection to form. You

15     can answer. I'll be stating objections

16     periodically, but you can still answer.

17         THE WITNESS: Okay.

18  A.  I believe it was a conference call between George

19     LaPlume, Bill Nason and myself.

20  Q.  Okay. So the three of you were in that call.

21         At some point then, did Bill Nason get

22     down there?

23  A.  Yes, he did.

24  Q.  Okay. Was it that same day, do you remember?

39

1  A.  I believe it was. I believe it was late in that

2     same day.

3  Q.  Okay. Do you remember anything -- I want to try to

4     pin down when this stuff was.

5         Do you remember -- we know it was in

6     2004; is that right?

7  A.  Yeah, I believe so.

8  Q.  Okay. Do you remember anything about the season or

9     the month that would help to locate when it was in

10     that period of time?

11  A.  I believe when we -- I don't really -- I don't

12     remember snow on the ground.

13  Q.  Okay. Do you remember if the temperature was hot

14     like the summer?

15  A.  It was hotter towards the end of the project, so it

16     may have been around springtime where we started.

17  Q.  Okay. So Bill Nason comes down; you show him

18     around; you show him the test pits?

19  A.  Yes.

20  Q.  Okay. What happens then?

21  A.  We had taken a bunch of pictures on site, and I

22     believe -- I can't remember the exact conversation,

23     but he was to get back to me on what to do. He was

24     going to speak with the owner, I believe.

40

1  Q.  Okay. Who took the pictures? Did you take the

2     pictures, or did Mr. Nason take pictures?

3  A.  I took some pictures, and he took some pictures.

4  Q.  All right. Same camera or you each had a camera?

5  A.  I don't know if he had -- I can't remember if his

6     was a digital. I believe mine was just a

7     disposable camera.

8  Q.  Okay. I'm going to show you some other

9     photographs, and ask if you can -- these are

10     photographs that we had marked in another

11     deposition as exhibits 40A through 40K, and I'm

12     going to ask you, are these the pictures that you

13     took at that time, this first time?

14  A.  I couldn't tell you for sure if I took these

15     pictures. I know either Bill Nason or myself did

16     take these pictures. Whether it physically was me,

17     I couldn't tell you.

18         Because I remember seeing all this debris

19     and everything else, but I don't remember seeing it

20     as me taking the picture of it.

21  Q.  Okay. All right.

22  A.  But it either would have been Bill or myself that

23     did do this.

24  Q.  Okay. Do these pictures look like how the site

41

1     looked right after you began to do work there and

2     Bill Nason came down from Saco?

3  A.  Yes.

4  Q.  Okay. Did PM Construction itself own any heavy

5     equipment that it had at the site?

6  A.  No.

7  Q.  Okay. I'm going to ask you to take a peak at

8     picture Exhibit 40I.

9  A.  (Witness complies.)

10  Q.  Do you recognize what that shows?

11  A.  Yes.

12  Q.  Okay. Is it a fair and accurate photograph as the

13     site looked at that moment?

14  A.  Yes.

15  Q.  Is that the Mattuchio heavy equipment?

16  A.  Yes.

17  Q.  The yellow --

18  A.  Excavator.

19  Q.  Excavator. Okay. And I take it that the -- what I

20     see toward the middle of the picture is one of the

21     preexisting foundation walls that were --

22  A.  That was one of the foundation walls --

23  Q.  -- there?

24  A.  Yes.

11 (Pages 38 to 41)

Stephen McIntyre 12-1-2005
Georto, Inc. v. William Gateman, et al.

**42**

1  Q.  Okay. And 40K, again, shows the Mattuchio
2      excavator?
3  A.  Yes.
4  Q.  Okay. Do you know who that might be in the yellow
5      jacket leaning against the wall or crouched down
6      near the wall?
7  A.  Yes, I do.
8  Q.  Who is that?
9  A.  That's Richard Pearl.
10  Q.  You can recognize him from that picture?
11  A.  Yes.
12  Q.  Which is 40J?
13  A.  Yes.
14  Q.  Do you see in any of these pictures, Exhibit 40
15      with their respective letters, where there is shown
16      -- I think you mentioned radiators?
17  A.  Yes.
18  Q.  And was it one or more than one radiator?
19  A.  It was at least one. I can't remember if it was
20      more.
21  Q.  Okay. And I think you mentioned something also
22      about a toilet, did you say that?
23  A.  No.
24          MR. KERESTER: Objection.

**43**

1  A.  No. It was a cash draw.
2  Q.  A cash draw, like from a cash register?
3  A.  Yeah.
4  Q.  Was it the whole register or just the draw that
5      pops out?
6  A.  I believe it was the whole register.
7  Q.  Okay. Can you find either of those objects in any
8      of these pictures and point them out to me?
9          MR. KERESTER: Off the record.
10          (Discussion held off the record.)
11  A.  I don't see the radiator.
12  Q.  Okay. Did you see the cash register in any of
13      those?
14  A.  I don't believe so. It's kind of like finding
15      Waldo.
16  Q.  What job did Richard Pearl have at the site?
17  A.  Richard was helping me layout on site.
18  Q.  What does that mean "layout"?
19  A.  Laying out building corners, clean up basically.
20  Q.  Okay. Showing you Exhibit 40J, the one that had
21      Richard Pearl bent over. What is this cement --
22      appears to be a cement piece coming in from the
23      right side?
24  A.  That's a foundation that was on the earth.

**44**

1  Q.  Okay. Can you show me on 58 here where that
2      foundation piece is on the plan; in other words,
3      locate the two pieces?
4  A.  I believe that's part of this wall.
5  Q.  Okay. The big gray building that goes across
6      there, is that the back of the Family Dollar Store?
7  A.  Yes. That's the side of it.
8  Q.  The side of it.
9          Okay. And if you look on back to 58,
10      that would be this side of the Family Dollar Store
11      that's toward the middle of the property that runs
12      from Union Street down to --
13          MR. KERESTER: I believe it's Ellis
14      Street.
15  Q.  Ellis Street at the bottom?
16  A.  Yes.
17  Q.  Okay. And what am I seeing at the end, am I
18      looking toward Union Street or am I looking at
19      Ellis?
20  A.  Across the street of Union Street.
21  Q.  So in the distance here in the upper part where the
22      kind of tower is, that's looking in the direction
23      of Union Street?
24  A.  Yes.

**45**

1  Q.  Okay. And, I'm sorry, you thought that this
2      concrete piece was where now?
3  A.  I believe it's in here somewhere.
4  Q.  Okay. All right. So I'm going to ask, if you
5      would use -- here's a pen, and if you could just
6      draw roughly a circle or a shape as to where you
7      believe that's located on this?
8  A.  I would say anywhere from --
9  Q.  We see the building here, right?
10  A.  Mm-hmm. It's anywhere from here to here.
11  Q.  Okay. Just draw a circle, and let's label that as
12      -- just put a number one next to it, please.
13  A.  (Witness complies.)
14  Q.  Great. Thank you. Now, I'd like to go back to
15      this 40I picture, and I think you identified that
16      there was a part of buried foundation wall shown in
17      that picture, too?
18  A.  Mm-hmm.
19  Q.  Yes?
20  A.  Yes.
21  Q.  Okay. Can you help me locate with your best
22      approximation as to where that is on -- where that
23      picture shows the foundation on this property?
24  A.  That's right around here (indicating).

12 (Pages 42 to 45)

Stephen McIntyre 12-1-2005
Georto, Inc. v. William Gateman, et al.

46

1  Q.  Okay. Again, if you could draw kind of a loop, and
2      then if you could some place, you know, over here
3      perhaps, put a number two?
4  A.  (Witness complies.)
5  Q.  Okay. Great. Thank you.
6          Would you locate for me again in the same
7      way we've been doing where 40D is on the property
8      as best you can?
9  A.  I would say probably right around in this area
10     (indicating).
11 Q.  Okay. If you could mark that as number three?
12 A.  (Witness complies.)
13 Q.  Okay. So am I correct in this picture that the
14     gray part up top is part of the side of the Family
15     Dollar Store?
16 A.  Yes.
17 Q.  Okay. And where I see a piece of -- looks like
18     foundation on the left side of the picture, is that
19     the Family Dollar Store building foundation, or is
20     that part of some buried foundation? Take your
21     time.
22 A.  I think that's part of an existing foundation found
23     on site. I don't believe the foundation for the
24     dollar store was that deep.

47

1  Q.  Okay. Where you thought it was located on
2      Exhibit 58, you don't have any drawing of a buried
3      foundation or a preexisting buried foundation?
4  A.  Mm-hmm.
5  Q.  Do you still think that's where it was though?
6  A.  I'm pretty sure. It could be the Family Dollar
7      foundation, but it just seems kind of deep for it.
8  Q.  Is what you see in this picture -- is this picture
9      a fair and accurate picture of what you saw when
10     Mattuchio dug these extra holes?
11 A.  Oh, yeah, yes.
12 Q.  Okay. So the material in the ground looked like
13     what is shown in this picture?
14 A.  Yes.
15 Q.  And this picture being 40D.
16         Okay. Is 40I a fair and accurate picture
17     of what you saw on the site also?
18 A.  Yes.
19 Q.  Just so I can be efficient here, are all of these
20     Exhibit 40 with their various letters, these were
21     pictures that were taken either by you or by
22     Mr. Nason when this problem first reared its head
23     and you became aware of it?
24 A.  Yes.

48

1  Q.  Okay. So they're all fair and accurate pictures
2      showing what you saw, you and Nason saw?
3  A.  Yes.
4  Q.  Okay. Thank you.
5          MR. ROBBINS: Can we just take a minute?
6          MR. KERESTER: Off the record for a
7      minute.
8          (Discussion held off the record.)
9          MR. ROBBINS: Counsel have looked through
10     photographs which have been marked collectively as
11     Exhibit 50 with letters and Exhibit 40 with various
12     letters, and have determined that the two piles are
13     identical photographs, except for photographs 50D,
14     50I and 50J, which are unique to Exhibit 50 and not
15     part of Exhibit 40. Everybody okay with this?
16     MR. KERESTER: Yes.
17     MS. ENGBERG: Yes.
18     MR. ROBBINS: Okay. Great.
19 BY MR. ROBBINS:
20 Q.  Now, can you look at this photograph, 50J, and tell
21     me if you recognize what it shows?
22 A.  Yes.
23 Q.  Does that appear to be one of the photographs that
24     was taken by either you or Mr. Nason on this first

49

1      visit of the discovery of this problem?
2  A.  Yes.
3  Q.  Where is this? Can you point with your finger to
4      where this picture is depicting on this plan?
5  A.  I believe it's right around number three area.
6  Q.  Where you marked the number three area?
7  A.  Yeah.
8  Q.  Okay. And that's 50J.
9          Okay. And I'd like to show you 50I. Do
10     you recognize what that shows?
11 A.  Yes.
12 Q.  Again, is that one of the pictures that you believe
13     either you or Mr. Nason took on this day?
14 A.  Yes.
15 Q.  Okay. And can you tell me what that shows -- where
16     that it is on the property?
17 A.  I don't know exactly where it is on the property.
18     It looks like one of the piles that was excavated
19     from one of the test holes.
20 Q.  Okay. And these were the test holes that Mattuchio
21     dug along the parameter?
22 A.  Around the foundation wall.
23 Q.  Foundation wall. Thank you.
24         Lastly 50D, do you recognize what it

50

1    shows?
2  A.  Yes.
3  Q   What does it show?
4  A.  It shows debris.
5  Q.  Okay.  I should back up.  Is that one of the
6      pictures that you believe either you or Mr. Nason
7      took on this first visit?
8  A.  Yes.
9  Q.  Okay.  From that picture, you can't locate where
10     that shows things?
11 A.  Not really.
12 Q.  Is it a fair and accurate representation of the
13     condition of the soil that you found?
14 A.  Yes.
15 Q.  On that day?
16 A.  Yes.
17 Q.  Now, I notice in some of these exhibits, and let me
18     go back to Exhibit 50D here, that I can see bricks
19     in this exhibit.  Do you see bricks there?
20 A.  Yes.
21 Q.  Okay.  Had you just found bricks, would this have
22     represented a problem to you in excavating this
23     project?
24     MR. KERESTER:  Objection to form.

51

1  A.  Probably not.  Depending on -- partially located
2      bricks, no.
3  Q.  Would it also not have been much of a problem
4      because bricks are not like compactible, they are
5      pretty solid?
6      MR. KERESTER:  Objection to form.
7  A.  Depending on how close they are together.
8  Q.  Okay.  You have to explain that a little more to
9      me:  Is it better if they're close or better if
10     they're far apart?
11 A.  It's better if they're far.
12 Q.  Okay.  And that there's something else in between
13     them?
14 A.  Yes.
15 Q.  And what would that be?
16 A.  Dirt, gravel.
17 Q.  Going to Exhibit 50A.  Did you ever see -- is this
18     -- I may have asked you this already.  Does this
19     appear to be a view that was photographed on this
20     first visit by either you or Nason?
21 A.  Yes.
22 Q.  Okay.  And is it a fair and accurate representation
23     of what you saw?
24 A.  Oh, yes.

52

1  Q.  Now, there is a -- okay.  Would you point out to me
2      what kind or kinds of debris you see one at a time
3      in this picture?
4  A.  I see wood.
5  Q.  Could you show me where you see the wood?
6  A.  (Witness complies.)
7  Q.  Okay.  So talking about down at the lower portion
8      of the dark area of the debris pile.
9  A.  And then in here, more wood.
10 Q.  Another piece toward the dead middle.  Okay.
11 A.  And it looks like a piece of wire.
12 Q.  That's the long silvery snakey things?
13 A.  Yeah.
14 Q.  Okay.
15 A.  Looks like a metal cabinet.
16 Q.  That's toward the middle left edge, that thing
17     appears a little blue gray?
18 A.  Yeah.
19 Q.  Anything else you see?
20 A.  Just total construction junk.
21 Q.  Okay.  Thank you.
22     MR. KERESTER:  Is that 50E?
23     MR. ROBBINS:  No, "A".
24     MR. KERESTER:  All right.  Thank you.

53

1  Q.  In Exhibit 50C, I would like to ask you to take a
2      look at that.  I would like you to do the same
3      thing, can you point out to me items of debris that
4      you recognize, if any?
5  A.  Bricks, wood.
6  Q.  Describe them to me?  Bricks you're talking about
7      towards -- where is the brick?
8  A.  There's a brick right there.
9  Q.  Okay.  That little silvery thing --
10 A.  Yeah.
11 Q.  -- or yellow, white thing?
12 A.  Yeah.  Wood right in here.
13 Q.  That's toward the center of this area, that's wood?
14 A.  Yeah.
15 Q.  Okay.
16 A.  It looks like a piece of steel.
17 Q.  And that's a brown-ish object that's sticking from
18     the ground up toward the gray of the Family Dollar
19     Store?
20 A.  Yeah.
21 Q.  Okay.  Do you see any cement in that picture or
22     concrete?
23 A.  Besides the wall?
24 Q.  Correct.  Besides the wall.  Thank you.

14 (Pages 50 to 53)

Stephen McIntyre 12-1-2005
Georto, Inc. v. William Gateman, et al.

54

1   A.   And it looks like that might be a junk.
2   Q.   Okay. The sort of whitish thing down about two
3        thirds of the way toward the left?
4   A.   Yes.
5   Q.   Okay. Is this picture, 50E, a similar view, but
6        from a different angle of that same pit?
7   A.   It looks it, yes.
8   Q.   Okay. What happened after you and Nason had the
9        meeting, and Nason said he has to talk to the
10       owner? What did you do next with regard to the
11       project?
12  A.   Not much. Not much at all. Basically, we had the
13       excavator stop, and we were waiting for James
14       Hawkins to arrive on site.
15  Q.   Had you ever met him before this moment at that
16       point?
17  A.   I don't believe so.
18  Q.   Had you guys ever done work for him before?
19            MR. KERESTER: Objection to form.
20  Q.   Had PM Construction ever done work for him before?
21  A.   I believe we have.
22  Q.   Had you ever supervised or foremaned or worked in
23       some way on a project for him before, you
24       personally?

55

1   A.   No, I don't believe so.
2   Q.   Okay. Did he eventually come to the site?
3   A.   Yes, he did.
4   Q.   Okay. Was that within a few days of these
5        photographs having been taken?
6   A.   Yes.
7   Q.   Okay. So within a few days of the taking of
8        Exhibits 40 and 50, you had a meeting with Hawkins
9        -- you were present?
10  A.   Yes, I was.
11  Q.   Okay. And who else was present?
12  A.   I think when he first arrived, I was the only one
13       present.
14  Q.   Okay. And what did you do when he got there?
15  A.   We walked the site.
16  Q.   Okay. And did you point out things to him?
17  A.   Yes.
18  Q.   Okay. What did he say?
19  A.   He asked me if we could -- if it could stay there.
20  Q.   Okay. And what did you tell him?
21  A.   I said I didn't think so.
22  Q.   Okay. And why was it that you didn't think it
23       could stay there?
24  A.   It didn't look stable at all to be building a

56

1        building on.
2   Q.   Okay. That was your opinion based on your
3        experience with PM Construction?
4   A.   Yes.
5             MR. KERESTER: Objection to form.
6   Q.   What happened next after this -- after this meeting
7        with him on site, what happened next?
8   A.   I believe he tried to call the prior owner.
9   Q.   Okay. And what was the next event that you
10       participated in in terms of this is what I'm trying
11       to get to?
12  A.   It wasn't very much.
13  Q.   Okay. Did you meet with him a second time at the
14       site?
15  A.   I did. I believe I met with him and the prior
16       owner of the lot.
17  Q.   Okay. Was that a Mr. Gateman?
18  A.   I believe so.
19  Q.   Okay. You didn't know Mr. Gateman beforehand?
20  A.   No.
21  Q.   You had never spoken with him before?
22  A.   No.
23  Q.   Okay. And at any point did Mr. Hawkins take any
24       photographs that you observed him take?

57

1   A.   I think he did.
2   Q.   Do you have a memory of that, or are you guessing?
3   A.   I'm guessing.
4   Q.   Okay. Well, you don't have to guess. None of us
5        want guesses.
6             This meeting with you and Hawkins and
7        Gateman, did this take place?
8   A.   Yeah. It was a very short meeting.
9   Q.   Roughly how long? How much time was spent when the
10       three of you were together?
11  A.   Maybe a half an hour tops.
12  Q.   Okay. Anybody else present besides the three of
13       you?
14  A.   I don't believe so.
15  Q.   Okay. What do you recall of the conversation by
16       Mr. Hawkins?
17  A.   I recall him -- I believe he was asking the prior
18       owner what he was going to do with all the debris
19       in the ground.
20  Q.   Okay.
21  A.   Or about what he was going to do about it.
22  Q.   Okay. And any other conversation that you recall
23       from him?
24  A.   I don't recall.

15 (Pages 54 to 57)

Stephen McIntyre 12-1-2005
Georto, Inc. v. William Gateman, et al.

58

1  Q.  Okay. Were you present when Mr. Gateman -- strike
2      that.
3          Did Mr. Gateman make any reply or
4      response to that inquiry?
5  A.  If he did, I don't remember it word for word.
6  Q.  All right. Do you remember if he responded at all?
7  A.  I remember a question coming up on why we couldn't
8      build on it.
9  Q.  Okay. The question coming up, was that a question
10     from Mr. Hawkins or Mr. Gateman?
11 A.  I believe it was asked right at first by James
12     Hawkins and through the prior owner.
13 Q.  That question was addressed to you to say, Well,
14     why can't we build on top of this?
15 A.  Yes.
16 Q.  Okay. And what did you respond?
17 A.  I told them that I could -- code wise, I could not
18     build a building on that.
19 Q.  Okay. When you're referring to code, what are you
20     talking about?
21 A.  I'm referring to before I could place any amount of
22     concrete for any footings, it would have needed to
23     be inspected through the building department, and
24     the building department would not let you place any

59

1      concrete on construction debris like that.
2  Q.  Okay. This last part of your response, "the
3      building department would not let you," that's your
4      opinion about what the building --
5  A.  Yes.
6  Q.  It's not based upon having talked with them?
7  A.  No. It's based upon generally knowing the codes.
8  Q.  The building codes?
9  A.  Yes.
10 Q.  Okay. Do you know if the building department, or
11     anyone from the building department, was ever
12     actually invited to the site to look at this?
13 A.  Yes.
14 Q.  Okay. When did that happen -- was it once or more
15     than once that you remember?
16 A.  To investigate the materials, was once.
17 Q.  Okay. And did this occur after this meeting that
18     we've been talking about --
19 A.  Yes.
20 Q.  -- between you and Gateman and Hawkins?
21 A.  Yes.
22 Q.  Okay. Who invited them to come to the property?
23 A.  I did.
24 Q.  You did. Do you know the name of the person who

60

1      came?
2  A.  I don't right offhand.
3  Q.  Was it a man or a woman?
4  A.  It was a man.
5  Q.  Okay. Young? Old? Tall? White? Black?
6      Mustache? Is there anything you can remember about
7      him?
8  A.  White male.
9  Q.  White male.
10         Okay. And how long was this between this
11     meeting among the three of you and when the
12     building department person came to the site?
13 A.  Maybe within that week.
14 Q.  All right. So within a few days of this time?
15 A.  Yes.
16 Q.  Okay. And were you present when the building
17     department guy came to the site?
18 A.  Yes.
19 Q.  Anybody else besides you present -- besides you and
20     the building department guy?
21 A.  I don't believe so.
22 Q.  Okay. He met you at the site?
23 A.  Yes.
24 Q.  And do you remember what time of day it was or

61

1      anything that pinpoints it?
2  A.  It would have been I believe after nine o'clock or
3      even before three.
4  Q.  Okay. And what happened when this building
5      department person came -- this is from the City of
6      Lynn, right?
7  A.  Yes.
8  Q.  Okay. What happened?
9  A.  I discussed if I needed any special permits, and
10     then if they needed any firm documentation on where
11     construction debris was going, and if all the junk
12     material did have to come out, what he would like
13     to see as far as all material being brought back
14     in; whether he would want a geotech report on the
15     material per pounds per square foot and associated
16     stuff like that.
17 Q.  Okay. And what did he -- do you know if he took
18     any pictures, by the way?
19 A.  I don't believe he did, not while I was there.
20 Q.  Okay. And what was his responses when you -- I
21     take it at some point you asked him, could you
22     build on this?
23 A.  Yes.
24 Q.  Okay. And what was his answer?

16 (Pages 58 to 61)

Stephen McIntyre 12-1-2005
Georto, Inc. v. William Gateman, et al.

**62**

1   A.   No.
2   Q.   Okay. And what were his answers to the rest of the
3        questions that you asked, Did you need a special
4        permit and so forth?
5   A.   I don't believe we needed a special permit. He did
6        want a general idea on where the material was
7        going, making sure it wasn't going into somebody's
8        backyard, and that I believe he would have wanted
9        before a CO was issued for the building.
10  Q.   When you say a CO, you mean --
11  A.   A certificate of occupancy.
12  Q.   Occupancy. Okay.
13            Any other responses to whether he needed
14       kind of a geotech report about pounds per square
15       foot?
16  A.   Yes.
17  Q.   He wanted that?
18  A.   Basically, what the building inspector wanted was
19       he wanted documentation from a geotech engineer
20       that the fill was brought up in compacted lifts.
21  Q.   Okay. Let me ask something about this, about
22       compacted lifts. Compacting when you fill a piece
23       of property, am I correct, is basically putting in
24       your fill in certain amounts, packing it down so

**63**

1        that it's nice and tight, perhaps taking a
2        measurement, and then putting the next layer down
3        on top of it; is that essentially correct?
4   A.   Yes.
5   Q.   Okay. And when data is needed, whoever needs the
6        data, could say, We want the fill compacted in
7        lifts of half a foot, one foot, two feet, whatever
8        depth of soil each time they want put in; is that
9        right?
10  A.   Yes.
11  Q.   Okay. Did he specify which he wanted?
12  A.   The building inspector?
13  Q.   Yes.
14  A.   No.
15  Q.   When a building is -- strike that.
16            How would you have known that the soil
17       was sufficiently -- if it had none of the debris in
18       it that you've talked about, how would you have
19       known as the builder whether the soil was
20       sufficiently compacted to support the building
21       properly?
22  A.   Through test bores done prior to my being on site.
23       Generally that is how they -- test bores on site
24       would be one of the first things that you would do

**64**

1        before you would even design a foundation. That's
2        how the foundation is designed.
3   Q.   And the test boring means digging a pit of some
4        kind?
5   A.   Sometimes they do it with digging a pit; sometimes
6        it's drilled.
7   Q.   With like a pipe, kind of a coarse sample?
8   A.   Yes.
9   Q.   Okay. Is that sample then tested for how compacted
10       the soil is?
11  A.   I believe so.
12  Q.   Okay. Was getting that test thing done something
13       that was done on this site other than after you
14       found the debris -- was it ever done before?
15  A.   I believe so.
16  Q.   Okay. So people were reassured as to the compacted
17       nature of the property before you started as far as
18       you understood?
19            MR. KERESTER: Objection to form.
20  A.   I believe so.
21  Q.   Okay. Do you remember anything else to help us
22       identify who this person was from the building
23       department? Can you give me any -- can you
24       remember generally a sense of how old he was? Was

**65**

1        he as old as me?
2   A.   Forties of fifties.
3   Q.   Do you know what his position was with the building
4        department?
5   A.   Code enforcement officer.
6   Q.   Code enforcement officer. Okay.
7   A.   I believe the City of Lynn has three of them.
8   Q.   How is it that you're aware of that? Have you done
9        other work in Lynn?
10  A.   Sometimes if one of them is on vacation, the other
11       one fills in when you need an inspection.
12  Q.   Okay. Did this code enforcement officer that came
13       to the site, do you recall him making any notes or
14       writing up any papers?
15  A.   I don't.
16  Q.   Okay. He didn't give you any papers?
17  A.   No.
18  Q.   Okay. Did anybody besides you meet with him?
19  A.   I don't believe so.
20  Q.   Okay. What happens next after this then? He comes
21       to the site; he's confirmed that, in his opinion,
22       you couldn't build on this; is that right?
23  A.   Yes.
24  Q.   Okay. What then happens?

17 (Pages 62 to 65)

Stephen McIntyre 12-1-2005
Georto, Inc. v. William Gateman, et al.

66

1   A.   I was sent to another job for a period of, I want
2        to say, at least four to six weeks.
3   Q.   Because no more construction was going to be
4        starting on this until this problem had been
5        resolved?
6   A.   Yes.
7   Q.   Okay. Do you remember what that other job was, or
8        where it was?
9   A.   I don't right offhand. It would have been another
10       one of our projects somewhere out in the big blue
11       marble. I don't know.
12  Q.   What was your understanding as to how this problem
13       was going to be fixed or solved?
14  A.   I didn't have an understanding at first as far as
15       how they were going to fix it.
16  Q.   Okay. Did you have -- after that, any
17       conversations with anyone as to coming up with a
18       plan on how to fix this?
19  A.   They asked me what I thought should be done on it.
20       I believe it was James asked me what I thought
21       needed to happen with it.
22  Q.   And what did you say?
23  A.   I said more than likely it would probably all have
24       to come out.

67

1   Q.   Did you have any conversation with anyone besides
2        Mr. Hawkins?
3   A.   No, I don't believe so.
4   Q.   Did you have any conversations with either
5        Mr. Nason or Mr. Moran, the owners?
6   A.   More than likely.
7   Q.   What was done? Are you aware of what was done to
8        solve this problem?
9   A.   Yes.
10  Q.   Okay. What was done?
11  A.   They excavated all of the material out.
12  Q.   Okay. Now, I'd like to ask you to look at
13       Exhibit 58, okay, and can you with your finger show
14       me the area that was excavated out?
15  A.   All of this area --
16  Q.   Please don't draw on it yet.
17  A.   All of, I would say, from this wall line right
18       across.
19  Q.   Okay. Back up to Union Street?
20  A.   All of that, and then, I believe, enough down in
21       here to get my subgrade cut for pavement.
22  Q.   For the parking lot?
23  A.   Yes.
24  Q.   Okay. So I'm taking it that you're saying that

68

1        what the depths to which the excavation occurred,
2        was deeper under the building footprints than it
3        was where you had to put the parking lot?
4   A.   Yes. Ninety percent of debris was in this area.
5   Q.   And by that you're showing basically the area where
6        the store ended up being?
7   A.   Yes.
8   Q.   And you're starting it roughly where the -- in sort
9        of the center of the property running from Union to
10       Ellis Street where you have drawn in the buried
11       foundation wall?
12  A.   Mm-hmm.
13  Q.   From approximately the buried foundation wall up
14       toward to the end of the property of Union Street?
15  A.   Yes. There was some on the other side.
16  Q.   Okay. Being toward Ellis?
17  A.   Being towards Ellis Street. Right in here there
18       was a great big pocket of it.
19  Q.   Okay. And by "right here," you're talking about
20       the area that adjoins numbers three and one that
21       you drew?
22  A.   Yes.
23  Q.   Okay. Go head.
24  A.   And it started to shallow out as it came on the

69

1        backside of the property.
2   Q.   Okay. You indicated that the property contained
3        brick?
4   A.   Yes.
5   Q.   Buried brick?
6   A.   Yes.
7   Q.   Are you able to give me your best estimate as to
8        how much of what was taken out constituted brick?
9   A.   No, I couldn't give you an estimate on that.
10  Q.   You weren't actually on site to see every day,
11       because you were on the other project?
12       MR. KERESTER: Objection to form.
13  A.   No. I was on -- when I left this job site, nothing
14       was done until I came back.
15  Q.   Well, maybe I got confused.
16  A.   Basically, they shut down the project for four to
17       six weeks.
18  Q.   Okay. Was there excavating going on during the
19       four to six weeks?
20  A.   No.
21  Q.   I misunderstood. Okay. So nothing was going on?
22  A.   Nothing was going.
23  Q.   Okay. And then you come back to the site?
24  A.   Yes.

18 (Pages 66 to 69)

Stephen McIntyre 12-1-2005
Georto, Inc. v. William Gateman, et al.

70

1  Q.  And then Mr. Mattuchio comes back to the site?
2  A.  Yes.
3  Q.  And he starts doing this excavation?
4  A.  Yes.
5  Q.  How deep from the street level downward was the
6     excavation in this area that you've indicated
7     basically surrounding and including the footprint
8     of the store?
9  A.  I believe we went in the range of 12 to 14 feet and
10     encountered a slab.
11 Q.  A slab of concrete?
12 A.  Yeah. A big slab. It looked like from an existing
13     building.
14 Q.  Okay. And did that slab have any relationship to
15     these foundation walls that you've drawn?
16 A.  That slab ended pretty much where this wall is.
17 Q.  Okay. Why don't we just, so we know what we're
18     talking about, could you just put a number four at
19     the end here of where that wall is?
20 A.  (Witness complies.)
21 Q.  Okay. So that's the foundation wall you're
22     referring to, is that one that's running side to
23     side in the picture?
24 A.  Yes.

71

1  Q.  Now, you said that the slab -- I don't remember
2     what you said.
3  A.  There was a slab after 12 to 14 feet of excavation.
4  Q.  Okay. And the slab ran -- approximate with your
5     finger, what was the size of the slab, do you know?
6  A.  That slab went basically from this wall.
7  Q.  Okay. Across the number four?
8  A.  Right across.
9  Q.  All the way across?
10 A.  Till there was another foundation here for this
11     existing building and another foundation here. It
12     was that entire area.
13 Q.  Okay. Fine. So you're saying the entire width of
14     the property that Mr. Hawkins had bought?
15 A.  Yes.
16 Q.  Running from what we've numbered as number four,
17     which is this drawn in foundation wall, from there
18     all the way toward Union Street up to the other
19     foundation wall of Union Street?
20 A.  Yes.
21 Q.  Okay. Do you know how thick that foundation was --
22     that slab? I'm sorry, not foundation, slab.
23 A.  I believe it was three to four inches.
24 Q.  Okay. So it was not like two or three feet or

72

1     something huge?
2  A.  No.
3  Q.  Was that slab intact or had it been cracked?
4  A.  It was intact.
5  Q.  Now, was there some reason -- was digging done
6     below the slab?
7  A.  No.
8  Q.  Why was it that the excavation went down 12 to
9     14 feet?
10 A.  We encountered the slab, and then I had a geotech
11     guy give us more info on what we should do with the
12     slab. He told us we should fracture the slab and
13     do testing, density testing, under the slab.
14 Q.  So fracture the slab, remove pieces, and do testing
15     of the compaction underneath it?
16 A.  Yeah. Basically, not remove it, just fracture it,
17     just crack it.
18 Q.  So you can get access though to the soil below it?
19 A.  Yes.
20 Q.  Okay. Who is this geotech guy?
21 A.  I believe it was -- I want to say S.W. Cole. I
22     can't nail it down, you know, and say exactly it
23     was him. I believe it was. I believe he did the
24     engineering of the soils at the beginning of the

73

1     project.
2  Q.  When you say "at the beginning of the project," you
3     mean those initial test borings that were done to
4     determine if it was okay?
5  A.  Yes.
6  Q.  Okay. Is there a reason you're not able to be more
7     specific about the depth of this; 12 to 14 feet is
8     a fair amount different?
9       MR. KERESTER: Objection to form.
10 A.  I just -- I can't. It was either 12 -- it was in
11     between 12 to 14. I want to say 14, but --
12 Q.  Okay. Let me show you Exhibit 52D and ask if you
13     recognize the man shown in that?
14 A.  Yes.
15 Q.  Is that Mr. Pearl?
16 A.  Yes.
17 Q.  He appears to be holding and have extended a yellow
18     tape measure?
19 A.  Yeah.
20 Q.  Okay. Does that help you feel more confident about
21     the 14 feet?
22 A.  Pretty much, yeah.
23 Q.  Okay. Now, I'd like to show you some other photos
24     that we have also marked as 52 with various letters

19 (Pages 70 to 73)

Stephen McIntyre 12-1-2005
Georto, Inc. v. William Gateman, et al.

74

1    in the same series, and ask if you would look at
2    them along with this one of Mr. Pearl, and tell me
3    if you recognize what they show?
4  A.   It looks like a pile of debris.
5  Q.   Firstly, if you'd just look over all of them, and
6        make sure that you can -- first of all, are these
7        pictures that you've ever seen before?
8  A.   I believe so, yes.
9  Q.   Okay. Do you know who took these pictures?
10 A.   No. It would either be Bill Nason or myself.
11 Q.   Okay. Were these pictures taken at the same time
12       as the pictures that we looked at before at
13       Exhibit 40 or 50, and you can feel free to look at
14       them if you need to refresh yourself?
15           MR. KERESTER: What exhibit number is he
16       looking at now?
17           MR. ROBBINS: These are Exhibits 52
18       letters.
19 A.   I believe they could have been around the same time
20       or not far after.
21 Q.   Do you know if these pictures would have been taken
22       after you returned from that six to eight weeks?
23           MR. KERESTER: I think he said four to
24       six.

75

1            MR. ROBBINS: Four to six is correct.
2  A.   I believe it was before.
3  Q.   You think this was before?
4  A.   Yeah.
5  Q.   Okay. Is there something about some of the
6        pictures that helps you to think that it was
7        before?
8  A.   I still see Richard in the same jacket in that, you
9        know. It tells me it's pretty close to the day he
10       was by the wall there.
11 Q.   Okay. Can I just take another look at these?
12 A.   (Witness complies.)
13 Q.   Thank you. In 52A and E, am I correct that they
14       both show an excavator?
15 A.   Yes.
16 Q.   In Exhibit 52B, do you recognize what it shows?
17 A.   Yes. That, I believe, is the front wall line on
18       Union Street.
19 Q.   Okay. Do you see any debris in that picture?
20 A.   Very, very little.
21 Q.   Okay.
22 A.   Some, but not much.
23 Q.   Okay. There is a silverish -- I'll point it out to
24       you, a silverish, whitish, grayish line running, it

76

1    looks like, along in front of the foundation wall
2    there. Do you know what that line is?
3  A.   I can't remember what that line represents, I
4        don't.
5  Q.   Is that a string?
6  A.   It could be. That might be the actual wall line
7        that the foundation was suppose to be on.
8  Q.   Okay. And what would the line at that particular
9        height represent?
10 A.   I don't know if it would represent anything height
11       wise. It's probably just location wise.
12 Q.   So to the best of your understanding, it was a line
13       to indicate where the front of the building went?
14 A.   Yes, I believe so.
15 Q.   Okay. Do you know if the excavator that
16       Mr. Mattuchio operated was a Kumatso manufacturer?
17 A.   No.
18 Q.   I'll show you another picture here that was 16E.
19 A.   Yes, I believe so.
20 Q.   I'd like to show you another group of pictures
21       which have been variously marked 16A through E, and
22       ask if you would look at them please, and then tell
23       me if you recognize what they show?
24 A.   They're pictures of the site.

77

1  Q.   Do these pictures appear to have been taken at the
2        same time that these other groups of Exhibit 40 and
3        50 were taken or at a different date?
4  A.   At a different date.
5  Q.   Do these pictures show how the site looked after
6        the excavation was done, was completed?
7            MR. KERESTER: Objection to form.
8  A.   It was fairly close to completed. I don't believe
9        it was done yet.
10 Q.   Do you see any debris in these pictures, if so,
11       would you point it out to me?
12 A.   It looks like concrete.
13 Q.   And you're talking about Exhibit 16B, as in boy,
14       and you see a pile of concrete to the left?
15 A.   Yes.
16 Q.   Okay.
17 A.   And it looks like wood and bricks again. It's
18       quite far though so --
19 Q.   Okay. Do any of these pictures show this
20       foundation slab that you indicated the excavation
21       went down to?
22 A.   These two.
23 Q.   Okay. All right. So the the two that you're
24       indicating are 16C and D. Can you point out to me

20 (Pages 74 to 77)

Stephen McIntyre 12-1-2005
Georto, Inc. v. William Gateman, et al.

**78**

1 where that slab is? By the way, is that the
2 correct term for this three to four-inch thick
3 concrete?
4 A. Yes.
5 Q. That's called slab, right?
6 A. Yes.
7 Q. Okay.
8 A. Looks to be right here and here.
9 Q. Okay. It almost looks like a circular piece. More
10 specifically, in 16D, you're talking about from the
11 picture, it looks like kind of an oval shape toward
12 the top of the picture; is that right?
13 A. Yes.
14 Q. Okay. And on 16C, you're referring to what looks
15 like the same oval site, except it's midway and on
16 the right side of the picture?
17 A. Yes.
18 Q. Okay. And right here we're looking, in both of
19 these pictures, we're looking toward Union Street?
20 A. No. This one it appears he's on Union Street
21 taking the picture.
22 Q. Looking toward Ellis?
23 A. Yes. This one also -- this one he appears he's
24 right at the corner of the dollar store on Union

**79**

1 Street?
2 Q. Okay. So you're saying that where the yellow
3 excavator machinery is located is near to Ellis
4 Street?
5 A. Yes.
6 Q. Okay. And on this 16D -- that was 16C. On 16D,
7 again, I see a ramp, what appears to be like a ramp
8 going up to ground level. Do you see that?
9 A. Yes.
10 Q. Okay. And that ramp fed from Ellis Street; is that
11 what you're saying?
12 A. Yes.
13 Q. And, again, you can see the ramp in the other one
14 too, in 16C, kind of middle of the picture up
15 toward on the right side there; is that right?
16 A. Yes.
17 Q. Okay. And the pile of concrete, what appears to be
18 concrete in that picture, is shown near that ramp;
19 is that right?
20 A. Yes.
21 Q. Okay. And does that concrete, was that the
22 foundation -- some of the foundation pieces that
23 you had drawn with the hash marks on 58, but broken
24 up and removed?

**80**

1 A. I believe so, yes.
2 Q. Okay. How long did it take Mr. Mattuchio after you
3 were -- strike that.
4     You returned back to the job on a certain
5 day, did Mr. Mattuchio come back to the site that
6 same day?
7 A. Yes.
8 Q. Okay. And did he start his work to do the
9 excavation?
10 A. Yes.
11 Q. Now, I'm a little bit confused here. If 16C and D
12 are looking toward Ellis Street, if we look at 58,
13 we've kind of agreed for the cut off word at the
14 bottom of this page is actually Ellis Street.
15     These two pictures would appear to be
16 showing an area that is near Ellis Street and not
17 an area near Union Street, am I correct in that? I
18 just want to make sure that we all are oriented
19 properly on this.
20 A. No. These pictures right here are generally right
21 in here.
22 Q. So you're saying 16C and D are showing the
23 excavation down to the slab, and where the slab is
24 shown in these sort of ovals, is the part of the

**81**

1 site that is near Union Street and is underneath or
2 would eventually become underneath the Aaron Store?
3 A. Yes.
4     MR. KERESTER: Go off the record for a
5 moment.
6     MR. ROBBINS: Sure.
7     (Discussion held off the record.)
8     MR. ROBBINS: We just had a little off
9 the record conversation.
10 Q. Exhibit 16B, okay, do you see in there a building
11 with a sign saying "Jimenez Plaza"?
12 A. Yes.
13 Q. Okay. And is that building located on Union
14 Street?
15 A. Yes.
16 Q. Okay. And Aaron's was finally built, the front of
17 Aaron's faced across the street more or less to the
18 Jimenez Plaza Store?
19 A. Yes.
20 Q. Okay. Thank you.
21     Now, there was a chain link fence that PM
22 Construction had erected around the property; is
23 that correct?
24 A. Yes.

21 (Pages 78 to 81)

Stephen McIntyre 12-1-2005
Georto, Inc. v. William Gateman, et al.

**82**

1   Q.   Okay. Would you with your finger show me where the
2       fence was located?
3   A.   Pretty much from the backside of the dollar store.
4   Q.   Okay. Going down toward Ellis Street, along Ellis
5       Street.
6   A.   Down Ellis. Across Ellis Street with like a
7       24-foot opening, and then back down to the other
8       chain link fence.
9   Q.   For the store on the left?
10   A.   Yes. And one piece across the front, about one
11      foot onto the sidewalk on Union Street.
12   Q.   Okay. On the left side of this Exhibit 58 plan
13      where it says N55-30-38W, there was another
14      building over there?
15   A.   Yes.
16   Q.   Okay. So in 16B, the one that had the Jimenez
17      building in it, the person -- you can see what
18      looks like a chain link fence right immediately
19      into the picture --
20   A.   Yes.
21   Q.   -- like you're looking through it, is that the
22      chain link fence that would have been along
23      parallel with and along Ellis Street?
24   A.   Yes.

**83**

1   Q.   And on 16C and D, there is also a chain link fence,
2      yes?
3   A.   Yes.
4   Q.   Okay. Which chain link fence was those two
5      pictures shot through?
6   A.   I believe, I didn't take the pictures, but I
7      believe it was shot from Union Street looking
8      towards Ellis Street.
9   Q.   Okay. Can I just see them for a second?
10   A.   (Witness complies.)
11   Q.   Looking toward Ellis Street. Okay. How far from
12      Ellis Street was the ramp -- strike that.
13          In 16C, in the middle here, do you see
14      what looks like a piece of foundation?
15   A.   Yes, I do.
16   Q.   Okay. Do you know which piece of foundation that
17      is on plan 58 or Exhibit 58?
18   A.   Yes.
19   Q.   Okay. Would you point to it with your finger?
20   A.   That's this section (indicating).
21   Q.   Okay. So what is being shown in this, I guess
22      you'd say just above the middle and kind of
23      centered, is the foundation in which of these walls
24      on the plan is it?

**84**

1   A.   This one appears to be this.
2   Q.   Okay. Is that the one that we marked before number
3      four?
4   A.   Yes.
5   Q.   And from this view in this picture, can you
6      determine if any excavation is shown from the
7      number four wall back toward Ellis Street which is
8      the direction we're looking?
9   A.   No, not from the picture.
10   Q.   Okay. How about from 16D, can you tell from there?
11   A.   No.
12   Q.   Okay. So what these 16C and D show really is the
13      slab portion that we identified before it really
14      appears to be adjoining wall number four; is that a
15      fair description?
16          MR. KERESTER: Objection to form.
17   A.   I believe so.
18   Q.   Okay. In 16A, on the other hand looking toward
19      Union Street, shows excavation toward Union Street;
20      is that right?
21   A.   Yes.
22   Q.   Okay. And that would also be true for 16B, would
23      it not?
24   A.   Yes.

**85**

1   Q.   Okay. Thank you for you patience.
2          Did you ever meet with someone named --
3      with any representative from a company called
4      Roberts Demo on this project?
5   A.   Yes, I did.
6   Q.   Okay. Was Mr. Pearl with you at the time, or were
7      you by yourself?
8   A.   I believe he was with me, but I don't believe he
9      was involved in the conversation.
10   Q.   Okay. And in terms of these other steps that we've
11      talked about, I take it happened after the four to
12      six week break when the site was shut down?
13          MR. KERESTER: Objection.
14   Q.   Or did that conversation occur before?
15   A.   I believe it was before.
16   Q.   Okay. So before that shutdown?
17   A.   Yeah. Well, I think we had shut it down, but I
18      believe it was within a couple of weeks after we
19      shut it down there was nobody working on site, but
20      I did have a meeting on site with Robert
21      Dismantling.
22   Q.   Okay. And do you know why you had a meeting with
23      Roberts Dismantling?
24   A.   I believe it was James Hawkins wanted us to have a

22 (Pages 82 to 85)

Stephen McIntyre 12-1-2005
Georto, Inc. v. William Gateman, et al.

**86**

1 meeting with Roberts Dismantling who the prior
2 owner had referred all the junk on site as Roberts
3 Dismantling's problem.
4 Q. Okay. And do you know who from Robert Dismantling
5 that you spoke with?
6 A. I don't recall his name.
7 Q. Do you remember what the man looked like at all?
8 A. Not really.
9 Q. Okay. Was it a very heavy man?
10 A. I don't believe he was a very heavy set man, no.
11 Q. So you had a conversation with him about this
12 problem?
13 A. Yes.
14 Q. What did you ask him and what did he say, or what
15 did you say and what did he say?
16 A. I asked him, and I can't remember word for word,
17 but it was along the lines of, Are you going to
18 take care of all of the debris in the hole?
19 Q. Okay. And what did he respond?
20 A. He said absolutely not.
21 Q. Did he say anything else?
22 A. He pretty much said that he was told exactly --
23 that he did exactly what he was told to do, and
24 anything in that hole is the prior owner's problem.

**87**

1 Q. Okay. Did he say anything else?
2 A. I can't recall. He may have.
3 Q. Did he talk about anyone else that was going to be
4 doing any work on the site or fixing this problem?
5 A. Did he?
6 Q. Yes.
7 A. I don't believe so.
8 Q. Okay. Did you ever meet with anyone else other
9 than the conversations we've talked about now,
10 Hawkins, Gateman, the code enforcement officer,
11 Roberts Demo, am I leaving out anybody?
12 Did you have any other conversations at
13 the site with anyone else involved in trying to
14 solve or explain this problem?
15 MR. KERESTER: Objection to form.
16 A. I don't recall.
17 Q. So you don't recall anybody else that I've
18 forgotten to ask you about is what I'm saying?
19 A. No.
20 Q. Do you keep personal notes or a log of your work?
21 A. Daily job reports.
22 Q. Daily job reports. Okay. And do you keep those
23 personally, or do you send them into the company or
24 both?

**88**

1 A. Those are sent into the company.
2 Q. Okay. Other than those daily reports that you send
3 into the company, do you have any personal notes or
4 logbooks or records that you keep yourself at your
5 personal residence?
6 A. No.
7 Q. Are you aware of -- strike that.
8 I'd like to show you another document
9 which was Exhibit 29, and ask if you'd look at it.
10 It consists of three sheets of paper. If you'd
11 look at it and tell me if you've ever seen it
12 before, or if you recognize what it is?
13 A. What was the question you asked about?
14 Q. Have you ever seen these pieces of paper before
15 right now?
16 A. I haven't seen them typed up like this, but I do
17 recall.
18 Q. Have you seen them in some other form?
19 A. They may have been handwritten, I believe.
20 Q. Did you write these notes up?
21 A. I believe I wrote one of them, yes.
22 Q. Which one did you write?
23 A. Some of these notes may be taken from my job
24 reports. I believe that's where they may have been

**89**

1 taken from.
2 Q. Okay. So am I correct in what you're saying is you
3 recognize some of the statements and information as
4 having originated with you, but you think it was
5 found in your job reports?
6 A. I believe so.
7 Q. Okay. These are some sort of summaries or
8 collections of what those --
9 A. Yes. In a note attached to my job report.
10 Q. Okay. If I could just see that for a minute?
11 A. (Witness complies.)
12 Q. Thanks. One of the pages has at the top page --
13 well, the second sheet in it says, "Notes of
14 Richard Pearl;" is that correct?
15 A. Yes.
16 Q. Okay. And then the third, the last of the three
17 sheets, just says "Steven McIntyre-Aaron's
18 Furniture"?
19 A. Yep.
20 Q. Okay. Are you saying that the notes on this page,
21 this third page, are the ones that may have been
22 drawn from your daily records, or are you saying
23 that the material on both pages was?
24 A. No. I believe this one right here I did not write.

23 (Pages 86 to 89)

Stephen McIntyre 12-1-2005
Georto, Inc. v. William Gateman, et al.

90

1  Q.  Okay. So on page two down through ten feet trash,
2      the words "but yes" beginning at 4/9/04, you think
3      was you?
4  A.  I believe so.
5  Q.  I don't know what you're trying to tell me, you
6      know, when you're saying "down to this point".
7  A.  I believe down to where it says 4/9/04 is mine.
8  Q.  And then down toward the bottom?
9  A.  Yes.
10 Q.  That's yours?
11 A.  I believe so.
12 Q.  Okay. So the material in 4/9/04, 4/14/04; is that
13     right, then onto the last page there's another
14     4/9/04 and 4/14/04, so you think that in both
15     instances of those two dates, those materials came
16     from you?
17 A.  Yes.
18 Q.  All right. And do you know when this stuff was
19     written up?
20 A.  I don't know the exact day. I don't.
21 Q.  And in this third page where under the note of
22     4/9/04, there's a statement, "Bill Gateman told me
23     he would have Roberts Dismantling contact me for
24     another site meeting, about removing the debris."

91

1      Did I read that right?
2  A.  Yes.
3  Q.  Okay. And was it after that that you had the
4      meeting with the individual from Robert
5      Dismantling?
6  A.  Yes.
7  Q.  And is the best of your recollection that that
8      meeting would have occurred on or about April 14th
9      from these notes? Does that help you remember?
10 A.  Yeah. I told you I couldn't give you a nail down
11     date.
12 Q.  Okay. That's fine. I have no other questions
13     right now.
14     MR. KERESTER: I'm going to have some
15     questions. It will probably take, like, a half an
16     hour. Did you want to take a short lunch break, or
17     would you like to keep going?
18     THE WITNESS: I'm all set.
19     (A short break was taken.)
20     EXAMINATION
21 BY MR. KERESTER:
22 Q.  Mr. McIntyre, my name is Dale Kerester. I
23     represent the plaintiff, Georto, in this matter.
24     I'd like to direct your attention again to the

92

1      typewritten notes that are contained in Exhibit No.
2      29.
3      Do you recall that Mr. Robbins was asking
4      you some questions about those notes?
5  A.  Yes.
6  Q.  Do those notes assist you in refreshing your
7      recollection as to what conversations you had at
8      the property on various dates?
9  A.  Yes.
10 Q.  And directing your attention in particular to the
11     note appearing on the third page of Exhibit No. 29,
12     there's a notation appearing under your name for
13     the date April 9th, 2004; is that correct?
14 A.  Yes.
15 Q.  And can you tell me generally what that note
16     reflects?
17 A.  Meaning what it reflects --
18 Q.  Do your notes appear to reflect your notes of a
19     conversation or a meeting that took place on or
20     about April 9th, 2004?
21 A.  Yeah.
22 Q.  And did you make some handwritten notations
23     reflecting the information contained in Exhibit 29?
24 A.  Yes. I believe that did come off of one of my job

93

1      reports.
2  Q.  Okay. And to the best of your understanding, is
3      the typewritten notation appearing on the
4      April 9th, 2004, a fair and accurate representation
5      of the handwritten notations that you made?
6  A.  Yes.
7  Q.  And have you had a chance to read through the
8      notation for April 9th, 2004?
9  A.  Yes.
10 Q.  Is April 9th the date on which you first had a
11     meeting with Mr. Hawkins at the site regarding the
12     subject of the demolition debris?
13 A.  Yes, I believe so.
14 Q.  Okay. Now that you've had an opportunity to
15     refresh your recollection by reading these notes,
16     what do you recall was said during that meeting?
17 A.  We were going over different ways on how we could
18     leave the material in the hole, and basically build
19     around it, whether it would be on pile caps or --
20 Q.  To the best of your recollection, did Mr. Hawkins
21     ask you if --
22     MR. ROBBINS: I'm sorry, could he finish
23     his answer? I don't think he was finished with his
24     answer.

24 (Pages 90 to 93)

Stephen McIntyre 12-1-2005
Georto, Inc. v. William Gateman, et al.

94

1   Q.   Did you finish?
2   A.   Yeah, I was -- you know, pile caps or any other way
3        possible to build on top of this.
4   Q.   Was that something that Mr. Hawkins said to you?
5   A.   That was his first question, yes, if we could keep
6        it.
7   Q.   And what was your response?
8   A.   It would have to go back to a structional engineer.
9   Q.   And what, if anything, did you say about the
10       subject of the building code at that time?
11  A.   That you could not build on that material.
12  Q.   Okay. Did you make some determination at that
13       point in time that PM Construction would be unable
14       to build the building on the material that you
15       discovered?
16  A.   Yes.
17  Q.   And what was the basis for that, or why did you
18       make that determination -- let me rephrase the
19       question, what determination did you make?
20  A.   I determined seeing the debris in the hole that
21       there was no way you would get the amount of pounds
22       per square foot out of that debris to hold up that
23       building; therefore, the building inspector
24       wouldn't let you even build it that way.

95

1   Q.   Did you make that determination on the basis of
2        your experience in the construction industry?
3   A.   Yes.
4   Q.   And how long have you been working in the
5        construction industry?
6   A.   I have been doing construction for 16 to 18 years.
7   Q.   And had you ever been involved in any project in
8        which you built a building on top of the kind of
9        debris that you found at the Lynn site?
10  A.   We have never built a building on top of debris
11       like that.
12  Q.   Approximately how long after you first started any
13       site work on the Lynn property did the meeting on
14       April 9th take place?
15  A.   I would say within a week to -- you're talking the
16       meeting with James Hawkins?
17  Q.   Correct.
18  A.   I would say within a week of starting the project.
19       Two weeks the absolute most.
20  Q.   Is it fair to state that to the best of your
21       recollection, PM started site work on the Lynn
22       property in or about early April 2004?
23  A.   Yes.
24  Q.   And when you first visited the site prior to the

96

1        time that any work took place, can you describe
2        what it looked like?
3   A.   It looked like a fairly cleaned lot, level, flat, a
4        few bricks, maybe some concrete chunks, but
5        generally in good condition.
6   Q.   Okay. And at that point in time, what, if any,
7        concerns did you have about your ability to build a
8        building on that site?
9   A.   The only concern I had about building that building
10       was being so close to the road and being so tight
11       to other buildings.
12  Q.   Did you make any observations as to whether there
13       had been any recent disturbance of the soil when
14       you first visited the site?
15  A.   There didn't appear to be.
16  Q.   Prior to April 9th, approximately how many days of
17       excavation work had Mattuchio done at the site?
18  A.   It's hard to tell. Not many. Less than a work
19       week. I would say probably two or three days tops.
20  Q.   And what did you observe of the site during those
21       first few days that Mattuchio did some work? What
22       work were they doing, and what observations did you
23       make?
24  A.   First day they pretty much did fencing around the

97

1        project. Probably, like, the second day, I believe
2        he was starting to take subgrade fill out of the
3        site in the building location.
4   Q.   So approximately what depth during that second day?
5   A.   I believe he was excavating around 12 inches. I
6        believe the plans called for 12 inches of gravel
7        underneath the slab.
8   Q.   And what did you observe was being excavated in
9        that twelve-inch space?
10  A.   It was kind of clay bricks in it and some concrete
11       junks, a little gravel.
12  Q.   And what, if any, concerns did you have at that
13       time about your ability to build on the site?
14  A.   I didn't have any concerns at that time.
15  Q.   And what did Mattuchio do next?
16  A.   He started excavating for the actual foundation.
17  Q.   By "foundation," are you referring to the exterior
18       parameter of the intended building?
19  A.   Yes.
20  Q.   Did he also start work on any footings for the
21       foundation?
22  A.   That's what he would have been excavating for.
23  Q.   Okay. Can you describe what you mean by that then
24       -- what in particular was he excavating for at that

25 (Pages 94 to 97)

Stephen McIntyre 12-1-2005
Georto, Inc. v. William Gateman, et al.

98

1   time?
2   A.  He would have been digging the ground to get to the
3       right depths or frost line for the spread footings
4       to actually hold the foundation walls which would
5       actually hold the building.
6   Q.  And what is the frost line -- how deep is that?
7   A.  Generally, it's minimal four feet.
8   Q.  And prior to his commencement of the work for the
9       spread footings, had he excavated below
10      approximately four feet, to your knowledge?
11  A.  No.
12  Q.  And prior to the time that he commenced the work on
13      these spread footings, what, if any, concerns did
14      you have about your ability to build a building on
15      the site?
16  A.  You're saying when he stopped the work?
17  Q.  No. Before he actually commenced doing any digging
18      for these spread footings below four feet.
19  A.  I didn't have any concerns.
20  Q.  And were you on the site each and every day that he
21      was doing work?
22  A.  Yes.
23  Q.  Who from Thomas Mattuchio was performing any
24      services at the site during this early April time

99

1   period?
2   A.  He had a superintendent on site. I believe his
3       name was Giovanni Rossi. They called him JR.
4   Q.  Anybody else?
5   A.  He had one operator of his excavator, and I don't
6       recall his name.
7   Q.  Is it fair to say there were two individuals from
8       Mattuchio on site?
9   A.  Yes.
10  Q.  Was Mr. Mattuchio, himself, on site?
11  A.  Mr. Mattuchio came on site one day for maybe 10,
12      15 minutes.
13  Q.  Do you know when that was?
14  A.  I don't remember the exact day.
15  Q.  Would that have been prior to the discovery of any
16      debris on the site?
17  A.  Yes.
18  Q.  What was Mr. Rossi's role? What did he do?
19  A.  He, I believe, was the superintendent from
20      Mattuchio Corporation.
21  Q.  Was he operating any equipment?
22  A.  No.
23  Q.  And there was another individual who actually
24      operated the excavator; is that right?

100

1   A.  Yes.
2   Q.  Was that individual operating the equipment at the
3       direction of Mr. Rossi, to your understanding?
4   A.  Yes.
5   Q.  Can you describe what the excavation work that you
6       observed by Mattuchio in connection with this
7       spread footing? What did you see?
8   A.  We were excavating down approximately four and a
9       half to five feet down from grade, which would be
10      around straight level. Not too bad in some areas,
11      and he got a little bit of the foundation excavated
12      and started running into construction debris.
13  Q.  Can you describe generally what you first saw of
14      any construction debris as Mattuchio was doing the
15      work?
16  A.  Started seeing more amounts of brick coming out and
17      ashes, splintered wood, pipes, wire.
18  Q.  What was your reaction at the time?
19  A.  My reaction at first was -- we had run into stuff
20      like that before. Dig it out and keep going.
21  Q.  And did you then place a phone call back to
22      somebody at PM after you made this initial
23      discovery?
24  A.  No.

101

1   Q.  And what did you do next?
2   A.  I had him continue to excavate where the
3       construction debris was hoping to find the bottom
4       of it.
5   Q.  What did he then do?
6   A.  Who's "he"?
7   Q.  The individual from Mattuchio.
8   A.  He continued to dig.
9   Q.  Directing your attention to Exhibit No. 58,
10      approximately where did he then continue to dig?
11  A.  He was on one of these wall lines right here. I
12      think he started in that corner. I believe he was
13      right around the middle of the Family Dollar and
14      here somewhere.
15  Q.  And what did you observe there?
16  A.  When he kept excavating?
17  Q.  Yes.
18  A.  More debris.
19  Q.  Can you describe that debris?
20  A.  That debris was getting worse. There was more wood
21      in it. A lot of ashes, charred remains, pieces of
22      cast iron pipe, radiators.
23  Q.  Why do you use the word "worse" to describe what
24      was discovered there?

26 (Pages 98 to 101)

Stephen McIntyre 12-1-2005
Georto, Inc. v. William Gateman, et al.

102

1  A.   Because on the top it was kind of mixed with dirt,
2       so it wasn't too, too bad.  Once we started getting
3       down, I want to say, below five feet from grade, it
4       looked like just continuous debris, no dirt mixed
5       in it at all.
6  Q.   And then what did you do next?
7  A.   Then I called my office.
8  Q.   And at some point in time, did you ask anyone from
9       Mattuchio to dig any other test pits or excavation
10      pits on the site?
11 A.   Yes, I did.
12 Q.   Okay.  And where did you ask him to do that?
13 A.   I had him do it generally on wall line, and I
14      believe I had him do two test pits on the interior
15      of the building --
16 Q.   Did you observe him do that work?  I'm sorry.  You
17      didn't finish your answer.
18 A.   I had them do, I believe, two test pits on the
19      interior of the proposed building.
20 Q.   Okay.  And if you can use the pen and identify by
21      the number five where those test pits were located,
22      the ones that you referred to as being in the
23      interior of the building?
24 A.   I know one of them was up in the front corner here.

103

1  Q.   So you've drawn a circle to indicate?
2  A.   Yeah.  And I believe I did another one around where
3       the interior pads and all the columns are for it.
4       So almost directly in the middle.
5  Q.   Okay.  And what was your purpose in asking him to
6       perform the excavation -- let me back up for just a
7       moment.
8            Can you indicate by another circle where
9       the location was of the second test pit?
10 A.   On the interior?
11 Q.   Yes.
12 A.   I believe it was right around in the middle.
13 Q.   Can you identify those by 5A and 5B, 5A can
14      indicate the first one that you identified?
15 A.   (Witness complies.)
16 Q.   Why did you ask him to dig in those areas?
17 A.   To get a firm grasp on exactly what was in the
18      ground, whether we could just excavate -- if we had
19      to take it out, if we could just excavate the
20      foundation, or if it would all have to come out.
21 Q.   Did he, in fact, excavate all those areas that you
22      identified?
23 A.   Yes, he did.
24 Q.   Did he excavate both in the interior of the

104

1       building as well as around the exterior of where
2       the building would be located?
3  A.   Yes.
4  Q.   Okay.  And what did you observe with respect to
5       that additional excavation?
6  A.   I observed a lot of debris coming out of the hole.
7  Q.   What kind of debris?
8  A.   Construction debris:  Wood, a lot of ashes, brick,
9       pipes.
10 Q.   Directing your attention to the brick, can you
11      describe what the appearance was of the bricks
12      generally; in other words, were they bricks that we
13      would ordinary think of them, or did they appear to
14      have been crushed or processed?
15 A.   No.  A lot of them were intact.  They don't look
16      like they had been processed.  To me, a processed
17      brick would be just a chip of a brick.
18 Q.   Do you have any understanding of whether brick or
19      concrete is ever processed in any way in connection
20      with construction projects?
21 A.   Yes.
22 Q.   What's your understanding?
23 A.   My understanding when it's processed for gravel,
24      it's usually ground.

105

1  Q.   Did it appear as if there was any grinding of the
2       brick or concrete that was discovered on the site?
3  A.   No.
4  Q.   And did you discover this construction debris in
5       each of the excavation areas performed by Mattuchio
6       on site?
7  A.   Yes.
8  Q.   What, if any, determination or decision did you
9       make at that time as a result of those
10      observations?
11 A.   I called my office, and it wouldn't be my
12      determination to shut down the job, or that would
13      be strictly up to my office.
14 Q.   And at that time, what, if any, concerns did you
15      have about your ability to build a building on the
16      site?
17 A.   My concerns were you're not going to build a
18      building like that on that material, not a spread
19      footing foundation building.
20 Q.   Why not?
21 A.   It wouldn't bear the weight that it needs to hold
22      the building.
23 Q.   Well, why wouldn't it bear the weight, to your
24      understanding?

27 (Pages 102 to 105)

Stephen McIntyre 12-1-2005
Georto, Inc. v. William Gateman, et al.

106

1  A.  Voids, voids mostly, air pockets, and where
2     everything is just thrown in there, you would have
3     a lot of voids.
4  Q.  To your knowledge, had the excavation that you now
5     described, had already taken place prior to the
6     meeting on April 9th at the site?
7  A.  Say that again.
8  Q.  As of the time that you had the meeting on April
9     9th, 2004 with Mr. Gateman and I believe with
10    Mr. Hawkins, had these excavation pits already been
11    dug?
12 A.  Oh, yes.
13 Q.  Can you describe what you did, if anything, with
14    Mr. Gateman while you were on the site on April 9th
15    -- did you walk the site with him?
16 A.  Yes, we did.
17 Q.  And what, if anything -- what areas of the site did
18    you walk?
19 A.  We walked pretty much where the building footprint,
20    where all the test holes were dug.
21 Q.  And what, if anything, was -- what did you do?
22    Were you pointing anything out?  What was your role
23    at this point?
24 A.  I basically was letting James discuss the problem

107

1     with the prior owner.  They asked me if there was
2     any other way to build it, could you build it on
3     that material?
4  Q.  And what was your response?
5  A.  No, not legally.
6  Q.  And did you see Mr. Gateman observe these
7     excavation pits?  Did he look at them with you?
8  A.  Yes.
9  Q.  And what was his reaction?
10 A.  He seemed surprised.
11 Q.  And what, if anything, did he say?
12 A.  I can't remember right off.  I know the question
13    did arise, I can't remember if it was either from
14    him or James, about, you know, maybe pounding piles
15    and pile caps to support the building, asking how
16    much of that we could leave.
17 Q.  Is that something you recall Mr. Gateman saying?
18 A.  Yes.
19 Q.  Okay.  And what was your response?
20 A.  I didn't believe any of it could stay.
21 Q.  Why?
22 A.  As far as building the building another way, then I
23    would have to go back to the design structural
24    engineers.

108

1  Q.  With respect to the building plans as they then
2     existed, why did you make any determinations if all
3     of the debris would have to be removed?
4  A.  We had basically all of the structural steel on
5     site for that building.  The building was bought.
6     I don't believe it would have been cheaper on
7     anybody's pocket to go to a pile cap and basically
8     trying to conceal this, capsulate it and build a
9     building on top of it.
10 Q.  And what, if anything, did you say to Mr. Hawkins
11    about that subject?
12 A.  I told him you could probably build a building on
13    it doing pile caps and everything like that, but
14    when it came down to doing all your plumbing and
15    all your electrical, anything like that, it would
16    all have to come out.  They would never let you run
17    pipes or anything like that in that kind of debris.
18 Q.  And what, if any, recommendation did you make to
19    Mr. Hawkins at that time about whether the debris
20    should or shouldn't come out?
21 A.  I don't remember making any to him about -- I think
22    -- I might have said that it should come out, but
23    that's not for me to decide.
24 Q.  Okay.  And then did you have a second meeting on

109

1     the site within a few days of the April 9th
2     meeting?
3  A.  I believe I did.
4  Q.  Do you recall who attended that meeting?
5  A.  I think it was with Robert Dismantling.
6  Q.  And I'd like to direct your attention to the third
7     page of Exhibit No. 29.  Can you identify what the
8     notes are that appear below the April 14th date?
9  A.  What was your question again?
10 Q.  Can you identify what the notes are that appear on
11    the third page of Exhibit 29 appearing below the
12    April 14th date?
13 A.  I believe that's from one of my job reports.
14 Q.  Does this appear to be a typewritten version of
15    notes that you made?
16 A.  Yes.
17 Q.  Okay.  Have you had a chance to read through -- I
18    believe it's three paragraphs that appear below the
19    April 14th date?
20 A.  Yes.
21 Q.  All right.  Can you tell me what took place on the
22    April 14th meeting?  Who was there, and what was
23    said to the best of your recollection?
24 A.  On April 14th?

28 (Pages 106 to 109)

Stephen McIntyre 12-1-2005
Georto, Inc. v. William Gateman, et al.

**110**

1 Q. Yes.

2 A. That was just me -- I don't quite remember the
3 guy's name. It was Roberts Dismantling's
4 representative.

5 Q. Do you recall whether the gentleman had blond hair?

6 A. I don't recall.

7 Q. What, if anything, did you do with the
8 representative from Roberts on the site on
9 April 14th?

10 A. We had discussed who was going to take out the
11 construction debris.

12 Q. Did you walk the site?

13 A. Yes.

14 Q. Did you show the representative from Roberts the
15 excavation pits that had been dug by Mr. Mattuchio?

16 A. Yes.

17 Q. Can you describe what his reaction was?

18 A. He wasn't surprised at all.

19 Q. And what caused you to form the conclusion that he
20 did not appear surprised?

21 A. He told me right out that whatever is left in
22 there, he was told to leave in there.

23 Q. Did he tell you who told him to leave it in there?

24 A. Bill Gateman, the prior owner.

**111**

1 Q. What, if any, discussion with the representative
2 from Roberts did you have about the extent or scope
3 of the demolition debris on the property?

4 A. He told me the ramp that was left -- I guess there
5 was a 60,000-square foot building that had burned.
6 The majority of it was taken out, but there was a
7 ramp that was left. That ramp he was told to
8 leave.

9 Q. Did he tell you who told him to leave it?

10 A. He said Bill Gateman said to leave the ramp which
11 he did, and he also said that that property had
12 been split up; the dollar store had bought a lot,
13 and that ramp did extend onto that lot, and then he
14 was told by Bill Gateman to remove the ramp from
15 that lot and put it onto this lot.

16 Q. Okay. And by "this lot," what are you referring
17 to?

18 A. Union Street, 200 Union Street.

19 Q. And are you referring to the lot on which you were
20 going to be building a building?

21 A. Yes.

22 Q. Okay. And what, if any, understanding did you have
23 as a result of that conversation about what the
24 source was of the debris that you were finding on

**112**

1 the site?

2 A. It lined right up with what Robert Dismantling was
3 saying. Apparently there was an old brick building
4 that had burned, a lot of brick, a lot of ashes, a
5 lot of pipes, wood.

6 Q. When you refer to "wood," can you describe
7 generally the type of wood that you saw?

8 A. Old timbers, old framing material.

9 Q. Approximately what were the dimensions of this wood
10 that you saw? What sizes are we talking about?

11 A. The majority of them went over three feet long,
12 maybe a four-inch by four-inch size.

13 Q. And what, if any, discussions did you have with a
14 gentleman from Roberts about whether they would
15 remove the demolition debris from the site?

16 A. They said absolutely not.

17 Q. Did you ever have any discussions with Mr. Gateman
18 about whether he would remove the demolition
19 debris?

20 A. Yes.

21 Q. And what did he say?

22 A. He told me it was Roberts Dismantling's problem.

23 Q. Did he say anything else with respect to that
24 subject?

**113**

1 A. Not that I recall.

2 Q. And did the individual from Roberts give you any
3 kind of a price quote on what it would cost for him
4 to remove the debris?

5 A. Yes. I think it was -- he gave us a tonnage fee
6 that didn't include excavation. I'm not even quite
7 sure if it included chalking. I think it was just
8 a per ton fee.

9 Q. Do you recall what per ton fee he gave you?

10 A. I think it was like 60 bucks.

11 Q. What did you then next do after April 14th in
12 connection with the site?

13 A. We had left the site. I believe after that meeting
14 I had with him, we were off site for probably at
15 least four to six weeks.

16 Q. Do you have any understanding why you were off site
17 during that time?

18 A. It was my understanding that James was trying to
19 work out how he was going to be able to build his
20 building with the prior owner.

21 Q. Okay. Do you recall approximately when in relation
22 to that April 14th meeting when you next came back
23 on the site?

24 A. I would say at least four to six weeks.

29 (Pages 110 to 113)

Stephen McIntyre 12-1-2005
Georto, Inc. v. William Gateman, et al.

114

1   Q.   And what did you then next do at that time?
2   A.   When we came back on site, we started excavating to
3        get all the rubble out.
4   Q.   And as of that time, had you ever met with an
5        individual by the name of Chad Michaud from S.W.
6        Cole?
7   A.   I think we did. I think we had a -- I can't
8        remember, to tell you the truth.
9   Q.   Do you have any recollection of having any meetings
10       with an individual from S.W. Cole to examine the
11       excavation pits before any debris was removed?
12  A.   I don't remember doing that with S.W. Cole. I
13       don't.
14  Q.   At some point in time, you returned to this -- let
15       me rephrase the question, I believe you testified
16       four to six weeks after the April 14th meeting, you
17       came back to the site for what purpose?
18  A.   We were going to start again on the site. We were
19       going to take all the materials out.
20  Q.   And at that point in time, who else from PM was on
21       site, if anybody?
22  A.   On the day we started again?
23  Q.   Yeah.
24  A.   It would have been Richard Pearl.

115

1   Q.   And did you stay on site for each of the days in
2        which demolition debris was removed from the site?
3   A.   Yes.
4   Q.   Was that work done on a daily basis during the
5        workweek?
6   A.   Yes.
7   Q.   This is, like, Monday through Friday generally?
8   A.   Five days a week, yeah, Monday through Friday.
9   Q.   And were you there during the entire time that the
10       excavation of the demolition debris was conducted
11       at the site?
12  A.   Yes.
13  Q.   Was Mr. Pearl also there during that time?
14  A.   Yes.
15  Q.   Okay. And what was your role with respect to the
16       removal of the demolition debris?
17  A.   I was monitoring trucks, making sure they were
18       full.
19  Q.   Can you describe generally what excavation work was
20       done with respect to the demolition debris at the
21       site?
22  A.   They basically took all the construction demo out
23       throughout the whole slab area, which was pretty
24       much a little bit bigger than the footprint of the

116

1        building.
2   Q.   When you say "the building," are you referring now
3        to the building that would be built?
4   A.   Yes.
5   Q.   And you're referring to the slab area being the
6        slab of the prior building?
7   A.   Yes.
8   Q.   And I believe you testified earlier that they did
9        not excavate below the slab; is that correct?
10  A.   No, we did not.
11  Q.   Directing your attention to the slab area portion
12       of the site?
13  A.   Mm-hmm.
14       MR. ROBBINS: Is that the buried part --
15       MR. KERESTER: It's the three to
16  four-inch --
17       MR. ROBBINS: Okay. The historical one,
18  if you will?.
19       MR. KERESTER: The three to four-inch
20  slab that was the need for the demolition debris.
21       MR. ROBBINS: Okay.
22  Q.   Can you describe generally what was the process by
23       which the debris was removed? How did it take
24       place? Where was the excavator located? Whatever

117

1        equipment was used?
2   A.   He basically used an excavator and a 30-yard
3        tractor-trailer dump truck.
4   Q.   And was this work performed by Mattuchio?
5   A.   Yes.
6        MR. ROBBINS: Do you mean the Mattuchio
7   Company or Mr. Mattuchio himself?
8        MR. KERESTER: We're referring to the
9   company.
10       THE WITNESS: Mattuchio Corporation.
11  Q.   Corporation. Okay. Thank you.
12       And who at Mattuchio was performing this
13       excavation work?
14  A.   I do not know the name of his operator. He had a
15       superintendent on site, which was Giovanni Rossi.
16  Q.   Was Mr. Rossi generally also on site during the
17       time that the demolition debris was removed?
18  A.   Yes.
19  Q.   Directing your attention to Exhibit No. 58. I give
20       you a yellow highlighter. Can you identify through
21       the use of the highlighter the area where the
22       demolition debris was removed?
23       MR. ROBBINS: Before he starts, is that
24       going to show up on the photocopy, do you think?

30 (Pages 114 to 117)

Stephen McIntyre 12-1-2005
Georto, Inc. v. William Gateman, et al.

118

1    If not, maybe I can find something else.
2         MR. KERESTER: Yeah. Why don't we go off
3    the record for a moment.
4         (Discussion held off the record.)
5    Q.   Using the red pen, can you identify the parameter
6         of the area from which the demolition debris was
7         removed?
8    A.   (Witness complies.)
9    Q.   And in addition, you've drawn a rectangle on
10        Exhibit 58, correct?
11   A.   Mm-hmm.
12   Q.   You'll have to say yes or no for the stenographer.
13   A.   Yes.
14   Q.   All right. In addition, was there any other areas
15        of the site where there also was some excavation of
16        demolition debris?
17   A.   There was a little bit of debris in here, but
18        nothing really to worry about.
19   Q.   Where are you identifying?
20   A.   Which would be the back side of the lot towards
21        Ellis Street.
22   Q.   Okay. I believe you testified earlier that the
23        excavation in the area now that you've identified
24        with a red rectangle was done with a depth of

119

1    between 12 to 14 feet; is that correct?
2    A.   I believe so, yes.
3    Q.   Is that 12 to 14 feet below the grade of this
4         street approximately?
5    A.   Yes.
6    Q.   Can you tell me what you observed with respect to
7         the removal of the debris? What did you see being
8         removed as this work was taking place?
9    A.   A lot of charred ashes, looked like wood, burnt
10        wood; lot of bricks; lot of cast iron piping; lot
11        of steel piping; lot of concrete. I remember
12        seeing one radiator and one cash draw, and there
13        was a file cabinet down in there.
14   Q.   And was this debris, as you've now described it,
15        located throughout the rectangle that you've now
16        identified in red pen on Exhibit 58?
17   A.   Yes.
18   Q.   Did you make any determination while the work was
19        taking place as to whether any of the existing
20        material within that rectangle could remain on site
21        and did not need to be removed?
22   A.   Say it again.
23   Q.   Did you make any determination as to whether any of
24        the material that you found within the red

120

1    rectangle could stay on site rather than be
2    removed?
3    A.   To me, it would all have to be removed, but that
4         wouldn't be for me to -
5    Q.   Do you know approximately how long it took for the
6         demolition debris to be removed?
7    A.   To be removed, I believe it was two to three weeks.
8    Q.   And approximately how many trucks were being used
9         as part of this process?
10   A.   If I recall, there was 167, 30-yard trailer dumps.
11   Q.   That's the number of truckloads of debris that was
12        removed?
13   A.   Yes.
14   Q.   Okay. And did you observe each of these truckloads
15        being filled?
16   A.   Yes.
17   Q.   And did you observe each of these truckloads being
18        removed?
19   A.   Yes.
20   Q.   Okay. To the best of your understanding, how many
21        truckloads of the demolition debris material was
22        removed from the site?
23   A.   I believe it was 167.
24   Q.   To your knowledge, of the 167 truckloads, did that

121

1    all generally come from the -- let me rephrase the
2    question, directing your attention to the 167
3    truckloads, did all of that material come from
4    within the red rectangle that you've drawn on
5    Exhibit 58?
6    A.   Yes. With the exception of maybe one truckload
7         right here on this concrete wall.
8    Q.   Okay. Can you draw with a red pen where that
9         additional material was removed from?
10   A.   (Witness complies.)
11   Q.   What happened next after the debris was removed?
12   A.   We started bringing in fill.
13   Q.   What type of fill was brought in?
14   A.   It was labeled as urban fill.
15   Q.   And can you describe what it looked like?
16   A.   A lot of gravel, concrete chunks, brick chunks,
17        smaller -- I wouldn't say any rock sizes bigger
18        than three quarters of an inch.
19   Q.   Okay. So when you say "concrete and brick," what
20        was the size of those materials that you saw?
21   A.   No bigger than three quarters of an inch.
22   Q.   And is it your understanding that that material had
23        been processed in some way?
24   A.   Yes.

31 (Pages 118 to 121)

Stephen McIntyre 12-1-2005
Georto, Inc. v. William Gateman, et al.

122

1  Q.  And what, if any, understanding do you have about
2      whether brick and concrete is required to be
3      processed in some way before it can be left on site
4      where a building can be constructed?
5          MR. ROBBINS:  Objection.
6  Q.  You can answer.
7  A.  As a general rule if -- I'd say if you stack bricks
8      in the ground, bury them, you'd probably be fine.
9      If you throw them in a heap, it makes voids.
10     Eventually the earth falls into those voids,
11     leaving a void up above.
12 Q.  And is that a problem?
13 A.  Yes.
14 Q.  And why's that?
15 A.  Then you wouldn't have the proper support for your
16     footings.  You basically wouldn't have any ground
17     under your footings.
18 Q.  And how and why is that a problem?
19 A.  That's basically what holds up your buildings if
20     you're on spread footings.
21 Q.  At some point in time, did you review any of the --
22     let me rephrase the question, did Mattuchio ever
23     provide you any paperwork with respect to the
24     removal of the demolition debris, trucking slips or

123

1      otherwise?
2  A.  Yes.  I had trucking slips every day.
3  Q.  Okay.  And did you review those?
4  A.  Yes.
5  Q.  Were those provided to you on a daily basis?
6  A.  Yes.
7  Q.  Okay.  What, if anything, did you do in connection
8      with those slips in relation to your monitoring of
9      the work that was being done?
10 A.  Those slips, I would give to my office weekly.
11 Q.  And did you do anything else in terms of review of
12     the slips in connection with your monitoring of the
13     work that they had done?
14 A.  I basically counted trucks and made sure they were
15     full when they left the site.
16 Q.  In fact, did you do that on a daily basis?
17 A.  Yes.
18 Q.  And I'm going to show you what's been marked as
19     Exhibit 49C, and ask if you can tell me whether any
20     of those slips are contained within Exhibit 49C?
21     And I'll represent that these are documents that
22     were produced by your office in response to a
23     subpoena issued by Mr. Robbins.
24 A.  What was the question again?

124

1  Q.  Does Exhibit 49C contain any copies of the slips
2      provided to you by Mattuchio?
3  A.  Yes.
4  Q.  And can you identify generally what those look
5      like?
6  A.  When I received them, they were pink copies.
7  Q.  Okay.  So you saw the originals of what's now
8      reflected in Exhibit 49C?
9  A.  Yes.
10 Q.  And did you review those on a daily basis?
11 A.  Yes.
12 Q.  And as a result of that review and your monitoring
13     of the number of trucks that were filled each day,
14     did you make a determination as to how many
15     truckloads of demolition debris material was
16     removed?
17 A.  A day?
18 Q.  No, in total.
19 A.  Yeah.  I thought it was around 165 to 179.  I
20     believe the number was 167.
21 Q.  And did you make that determination on the basis of
22     your personal observations and your review of the
23     trucking slips provided to you by Mattuchio?
24 A.  Yes.

125

1  Q.  All right.  Do the trucking slips that are
2      contained in Exhibit 49C, appear to be true and
3      accurate copies of the trucking slips that you
4      reviewed that was provided to you by Mattuchio?
5  A.  Yes.
6  Q.  Okay.  Can you tell me what you did in terms of
7      monitoring whether a truck load was or wasn't full
8      before it was removed?
9  A.  Generally, you could just count the bucket.  Sometimes
10     depending if you got into long pipes or -- but most
11     of the times, you could see it heaping from the
12     rails of the body of the truck.
13 Q.  And did you generally monitor -- what, if anything,
14     did you do in order to determine whether the trucks
15     were or were not full before they left?
16 A.  Say that again.
17 Q.  Yeah.  What, if anything, did you do to make sure
18     that the trucks were fully loaded before being
19     removed?
20 A.  I told Mattuchio Corporation we would not pay for
21     any trucks that weren't full when they left the
22     site.
23 Q.  Did you make any observations of the truckloads as
24     they were removed?

32 (Pages 122 to 125)

Stephen McIntyre 12-1-2005
Georto, Inc. v. William Gateman, et al.

**126**

1  A.  Yes. They were all full.

2  Q.  Do you have any understanding as to approximately

3  how many yards worth of material was of the

4  demolition debris was removed from the site?

5  A.  I don't. I want to say around 4,000.

6  Q.  When the material was removed from the site and

7  then placed into the truck, would you describe that

8  it was more or less compact than it had been when

9  it was in the site?

10  A.  Oh, yeah. No, it's less.

11  Q.  And why is that?

12  A.  It gets disturbed. It gets air in it. When you

13  dump it, if there's a pipe, you know, you're not

14  putting a compactor on it when it's in the back of

15  a truck. If there's a pipe leaning on the wall a

16  little bit, it's going to make a little void.

17  Q.  If you had made some determination about the cubic

18  yards of the area that would be the subject of the

19  debris removal, would you expect that the cubic

20  yards of the truckloads would be greater or less

21  than the cubic yards of the area from which the

22  debris was removed?

23       MR. ROBBINS: Objection.

24  A.  You would bring in more, I believe. Can you say

**127**

1  that again?

2  Q.  In other words, for example, let's say that the

3  area from which the debris material was being

4  removed was 3,000 cubic yards, would you expect

5  that you would have more or less than 130 cubic

6  yard truckloads in order to remove that material?

7  A.  If it had been there for a while?

8  Q.  Yes.

9  A.  You would have more.

10  Q.  And why is that?

11  A.  Overtime, water especially compacts. Even, you

12  know, it will take dirt, and it will fill the voids

13  basically.

14  Q.  What happened next after the debris was removed? I

15  believe you said fill was brought in?

16  A.  Yes.

17  Q.  Okay. What was your role in connection with the

18  fill being brought in?

19  A.  My role was to supervise the fill being brought in,

20  make sure it was being spread in 12-inch lifts and

21  compacted to at least 95 percent of its dry

22  density.

23  Q.  And did you in fact do that?

24  A.  Yes.

**128**

1  Q.  Was there any geotechnical engineer on site during

2  any of this process?

3  A.  Yes, there was.

4  Q.  Do you recall who that was?

5  A.  I believe it was S.W. Cole.

6  Q.  Is it possible it might have been a firm other than

7  S.W. Cole?

8  A.  It could have been.

9  Q.  Are you familiar with an entity by the name of

10  Geotechnical Services?

11  A.  Yes, I am.

12  Q.  Do you know whether they had any role in connection

13  with the site?

14  A.  Yeah. I believe that may have been who it was.

15  Q.  Okay. Is it your understanding there was somebody

16  from Geotechnical Services who performed some

17  geotechnical role in connection with the fill that

18  was being put back on the site?

19  A.  Yes.

20  Q.  And what, if any, role did they have in connection

21  with the cracking of the slab and any testing of

22  the material below the slab?

23  A.  Mattuchio Corporation fractured the slab, which was

24  advised through the Geotechnical Services just for

**129**

1  drainage properties of all most of all. When the slab was

2  fractured, to be on the safe side, we did a density

3  test under the slab.

4  Q.  And was it somebody from Geotechnical Services that

5  performed that density test?

6  A.  Yes.

7  Q.  And was there any of the material below the slab

8  that was removed, to your knowledge?

9  A.  No.

10  Q.  Did you make any determination as to how much of

11  the fill material was brought onto site?

12  A.  I believe it was around 4,000 yards.

13  Q.  Okay. And how did you arrive at that

14  determination?

15  A.  I just -- I think I remember seeing a change order

16  from Mattuchio Corporation.

17  Q.  And what, if anything, did you do in connection

18  with monitoring the delivery of fill onto the site?

19  A.  Again, looking for fill -- full trucks and keeping

20  a tab on how many yards were brought in, which I'm

21  not sure on the way they weighed it in, if they did

22  it by the ton or by the yard, that would have been

23  handled through my office.

24  Q.  Were you provided with any of the slips, daily

33 (Pages 126 to 129)

Stephen McIntyre 12-1-2005
Georto, Inc. v. William Gateman, et al.

130

1    slips, in connection with the delivery of the fill
2    to the site?
3    A.    Not when it was brought in, no.
4    Q.    Were you at some later point in time?
5    A.    No. That all went directly to the office.
6    Q.    Do you know if anybody else at PM had some role in
7    terms of the review of the slips for the delivery
8    of the fill?
9    A.    I don't know. If anybody, it would have been
10    George LaPlume.
11    Q.    He was the project manager?
12    A.    Yes.
13    Q.    Do you recall ever reviewing slips reflecting the
14    amount of fill material delivered to the site?
15    A.    The number 4,000 just keeps poping in my head for
16    some reason. I know I saw it somewhere. I don't
17    know if it was all invoiced on one slip, or if it
18    was a multiple number. I don't know. I'm not
19    sure.
20    Q.    Was it your understanding that approximately 4,000
21    cubic yards were delivered to the site?
22    A.    Yes.
23    Q.    And is that understanding consistent or
24    inconsistent with your observations of the trucks

131

1    bringing the fill in?
2    A.    Say that again now?
3    Q.    In other words, you monitored the trucks delivering
4    the fill, correct?
5    A.    Yes.
6    Q.    As a result of that monitoring work, did you form
7    any understanding as to whether in fact there was
8    4,000 or less than 4,000 cubic yards of fill
9    delivered to the site?
10    A.    I thought it was right around 4,000.
11    Q.    Did you have any roles in connection with the
12    solicitation of bids to do the excavation work --
13    A.    No.
14    Q.    -- of the debris?
15    A.    No.
16    Q.    Did you have any roles in determineing the price to
17    be paid for the removal of the demolition debris in
18    replacement of with the fill?
19    A.    No.
20    Q.    I believe you testified there was an individual
21    from Geotechnical Services on the site while the
22    filling was taking place; is that right?
23    A.    Yes.
24    Q.    Do you know approximately how many days on the site

132

1    that individual was present?
2    A.    He was there every day we were bringing the site up
3    to grade until we got to grade.
4    Q.    I don't have any further questions. Thank you very
5    much.
6        MS. ENGBERG: I don't have any questions.
7        MR. ROBBINS: I have a couple actually
8    that came to me that I think I didn't ask you.
9        EXAMINATION
10    BY MR. ROBBINS:
11    Q.    Have you ever supervised a construction project
12    where there was a basement installed in the
13    building or a basement was dug, and it was not a
14    slab on grade?
15    A.    Yes.
16    Q.    Okay. And I'm sure it's obvious, but in order to
17    put a basement underneath a building, you have to
18    dig a hole, right?
19    A.    Yes.
20    Q.    Okay. Had this building that you were suppose to
21    put on this site had a basement, okay?
22    A.    Mm-hmm.
23    Q.    You would have had to have dug out what you ended
24    up digging out in order to put the basement in; is

133

1    that right?
2    A.    Mm-hmm.
3    Q.    You have to say yes or no.
4    A.    Yes.
5    Q.    Were you able to from your test pits -- strike
6    that.
7        Let me go back to something over here,
8    this drawing, 58. You indicated that part of the
9    167, 30 cubic yard loads that were removed, one of
10    them you thought contained this portion of the
11    buried foundation wall that you've drawn this sort
12    of letter shape "L" around; is that right?
13    A.    Yes. It contained a certain part of it. I believe
14    it was at least -- it was around one foot on the
15    top to maybe a foot and a half down to here. We
16    did not take that whole foundation out.
17    Q.    Okay. That's where I'm going.
18        So part of this foundation that's in this
19    "L" shape was removed in that load?
20    A.    Yes.
21    Q.    Were any of the other foundation elements, which
22    you have these hash marks on them that you have
23    drawn, part of those 167 loads?
24        MR. KERESTER: Objection to form.

34 (Pages 130 to 133)

Stephen McIntyre 12-1-2005
Georto, Inc. v. William Gateman, et al.

134

1   A.   Yes, they were.  But they were separated.  They
2        were taken all as their own loads.  The concrete
3        was taken with the concrete.
4   Q.   Okay.  So while the demolition of those concrete
5        walls was accomplished, you're saying that the
6        disposal of that was not part of the 167 loads?
7   A.   I believe it was, but it was in its own truckload
8        forms.  It wasn't mixed with the brick or the
9        pipes.
10  Q.   Okay.  I'm a little confused.  Was it a load or a
11       few loads in addition to the 167?
12  A.   No.  It was included in that.
13  Q.   Included in there?
14  A.   Yes.  It was included in the whole package.  It was
15       just taken out in its own truck.
16  Q.   Okay.  And do you remember when that happened, it
17       was taken out in its own truck?
18  A.   That was -- I believe it was after the majority of
19       the construction debris inside this area was gone.
20  Q.   Okay.  And do you remember whether it was one or
21       more than one truck that it filled up on those
22       loads?
23  A.   I can't remember exactly how many trucks.
24  Q.   Was it more than one though?

135

1   A.   Probably, yeah.
2   Q.   Okay.  Was that, as far as you understood, concrete
3        removed because it somehow would have interfered
4        with the construction of this building?
5   A.   The concrete?
6   Q.   Mm-hmm.
7   A.   Yes.
8   Q.   So those concrete walls, would have interfered with
9        the solidity of the ground and the compactness of
10       the ground for purposes of putting up this
11       building?
12  A.   Yes.
13  Q.   Okay.  Were you ever able to understand that the
14       debris that you have referred to was distributed in
15       any particular pattern on this site?  Was it in a
16       row?  In a circle?  In a certain area evenly
17       distributed throughout or something else?
18  A.   Say that again now.
19  Q.   I'm trying to understand from you if you ever were
20       able to figure out was the debris that you found
21       located in certain piles in a row or in some other
22       organization?
23  A.   No.  It was throughout pretty good.  The only thing
24       that was probably different was there was more

136

1        ashes up in the front than there was in the back.
2   Q.   Okay.
3   A.   But, otherwise, the material was largely the same
4        throughout, yes.
5   Q.   Okay.  And when you spoke with the person from
6        Roberts, did they indicate what they meant by ramp,
7        or where this so called ramp was?
8   A.   He said the ramp was on the backside of this
9        foundation extending into the proposed building
10       area.
11  Q.   Okay.  And I'm trying to understand where you're
12       indicating.  So you're talking about from the -- it
13       would have included the part of the foundation you
14       labeled number four?
15  A.   Yes.
16  Q.   And that was to provide for vehicles doing what?
17  A.   I believe it was for equipment coming in and out of
18       the hole.
19  Q.   The hole being toward Union Street?
20  A.   Yes.
21  Q.   Towards where this Aaron Store eventually ended up
22       being built?
23  A.   Yes.
24  Q.   And did he indicate what part of it was removed

137

1        from the Family Dollar Store?
2   A.   He just said the ramp.  The ramp that was -- he was
3        instructed to leave.
4   Q.   I see.  I have no other questions.  Thank you.
5            MR. KERESTER:  I just have a couple of
6        quick follow-up questions.
7                    EXAMINATION
8   BY MR. KERESTER:
9   Q.   Directing your attention to Exhibit 58, what
10       portion of the existing foundation was removed?
11  A.   I believe we took on walls one, four.  This one we
12       took enough to get down to subgrade, which would
13       have been a foot.
14  Q.   You're referring to the one that's surrounded by a
15       red rectangle shape?
16  A.   Yes.
17  Q.   And that was removed down to approximately one
18       foot; is that right?
19  A.   One foot below whatever grade needed to be there.
20       So I think it ended up being about a foot on this
21       end, maybe a foot and a half on this end.
22  Q.   Approximately what's the length of that foundation
23       that was removed?
24  A.   It should be, like, 60, 70 feet anyway.

35 (Pages 134 to 137)

Stephen McIntyre 12-1-2005
Georto, Inc. v. William Gateman, et al.

138

1       And then the other foundations basically
2   we took down to -- I think we went a foot below
3   what bottom of footing would have been.
4   Q.   And the foundations were then broken up and then
5   removed; is that right?
6   A.   Yes.
7   Q.   Would that have been less than approximately ten
8   loads worth of trailer loads to remove them?
9   A.   Oh, yeah.
10  Q.   Would it have been less than five?
11  A.   Yeah.  It probably would have been around five,
12  five tops probably.
13  Q.   I have no further questions.
14       MR. ROBBINS:  I'm going to give him the
15  last word unless you --
16       MS. ENGBERG:  No.  I'm all set.
17       MR. KERESTER:  Thank you very much.
18  You're all set.
19       THE WITNESS:  Thanks.  I appreciate it.
20       MR. ROBBINS:  Counsel off the record with
21  the witness have discussed the requirements for
22  reviewing the deposition by the witness, and would
23  like to have it read and signed, but not in front
24  of a notary.

139

1       MS. ENGBERG:  Right.
2       MR. KERESTER:  That's fine.
3       MR. ROBBINS:  And if we do not receive
4   any changes before the expiration of 30 days after
5   Mr. McIntyre gets the deposition transcript, it
6   will be treated as if he signed it as being
7   correct.  Is that okay?
8       MR. KERESTER:  That's fine.
9       MS. ENGBERG:  Yes.
10
11       (Whereupon the Deposition of
12  Steven McIntyre concluded at 2:05 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24

140

1       ERRATA SHEET DISTRIBUTION INFORMATION
2       DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS
3
4       ERRATA SHEET DISTRIBUTION INFORMATION
5       The original of the Errata Sheet has been
6   delivered to James S. Robbins, Esquire.
7       When the Errata Sheet has been completed
8   by the deponent and signed, a copy thereof should
9   be delivered to each party of record.
10
11       INSTRUCTIONS TO DEPONENT
12       After reading this volume of your
13  deposition, please indicate any corrections or
14  changes to your testimony and the reasons therefor
15  on the Errata Sheet supplied to you and sign it.
16  DO NOT make marks or notations on the transcript
17  volume itself.  Add additional sheet if necessary.
18  Please refer to the above instructions for errata
19  sheet distribution information.
20
21
22
23
24

141

1   PLEASE ATTACH TO THE DEPOSITION OF STEVEN McINTYRE
2       DATE TAKEN: 12/01/2005
3       ERRATA SHEET
4   Please refer to page 140 for errata sheet
5   instructions and distribution instructions.
6   PAGE    LINE    CHANGE        REASON
7
8
9
10
11
12
13
14
15       I have read the foregoing transcript of
16  my deposition and except for any corrections or
17  changes noted above, I hereby subscribe to the
18  transcript as an accurate record of the statements
19  made by me.
20       Executed this    day of    , 2005.
21
22
23       Steven McIntyre
24

36 (Pages 138 to 141)

Stephen McIntyre 12-1-2005
Georto, Inc. v. William Gateman, et al.

142

```
 1
 2        C E R T I F I C A T E
 3
 4        COMMONWEALTH OF MASSACHUSETTS
 5
 6            I, Elizabette M. Afonso, a Professional
 7        Shorthand Reporter and Notary Public in and for the
 8        Commonwealth of Massachusetts, do hereby certify
 9        that the following transcript of the deposition of
10        Steven McIntyre, having been duly sworn, is true
11        and accurate to the best of my knowledge, skill,
12        and ability.
13            IN WITNESS WHEREOF, I have hereunto set
14        my hand and seal this 14th day of December, 2005.
15
16
17
                _____
                Elizabette M. Afonso
18              Notary Public
19
20        My commission expires:
          November 10, 2006
21
22
23
24
```

O'Brien & Levine Court Reporting Services
888.825.DEPO(3376) * www.court-reporting.com