# O'BRIEN & LEVINE

## Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

# Georto, Inc. v. William Gateman, et al.

### Transcript of the Testimony of:

# Lauren McKinlay

# November 18, 2005

www.court-reporting.com
mail@court-reporting.com

**195 State Street**
**Boston, MA 02109**
**(617) 399-0130  888.825.DEPO(3376)**

Tara Wosny  1-17364

Lauren McKinlay 11-18-2005
Georto, Inc. v. William Gateman, et al.

1

UNITED STATES DISTRICT COURT

2

3

DISTRICT OF MASSACHUSETTS

4

C.A. NO.:04-11730NG

5    GEORTO, INC.,

6             Plaintiff,

7    VS

8    WILLIAM GATEMAN, INDIVIDUALLY

9    And as TRUSTEE OF

10   200 UNION STREET REALTY TRUST

11            Defendant, Third Party Plaintiff, and

12            Third Party Defendandt

13            In counterclaim,

14   ROBERTS CORPORATION,

15            Third Party Defendant, and Third

16            Party Plaintiff in Counterclaim

17

18

19        DEPOSITION OF LAUREN McKINLAY

20        TAKEN ON NOVEMBER 18TH, 2005

21

22

23

24

Lauren McKinlay 11-18-2005
Georto, Inc. v. William Gateman, et al.

**4**

1    DEPOSITION OF Lauren McKinlay, taken
2   on behalf of the Defendant, pursuant to the
3   applicable provisions of the Massachusetts Rules
4   of Civil Procedure, before Tara L. Wosny, Notary
5   Public and Certified Shorthand Reporter within
6   and for the Commonwealth of Massachusetts, at
7   the Offices of James S. Robbins on November
8   18th, 2005, at 10:00 a.m., as follows:

**4 (right)**

1   ON BEHALF OF ROBERTS CORPORATION:
2   LAWSON & WEITZEN, LLP
3   BY: Kristina A. Engberg, Esquire
4   88 Black Falcon Avenue
5   Boston, Massachusetts 02210
6   617.439.4990

**3**

1   APPEARANCES:
2   ON BEHALF OF PLAINTIFF:
3   LYNCH, BREWER, HOFFMAN & FINK, LLP
4   By: Dale C. Kerester, Esquire
5   101 Federal Street, 22nd Floor
6   Boston, Massachusetts 02110-1800
7   617.951.0800
8
9   ON BEHALF OF GATEMAN:
10  LAW OFFICE OF JAMES ROBBINS
11  By: James S. Robbins, Esquire
12  6 Beacon Street
13  Boston, Massachusetts 02108
14  617.227.7541
15
16  ON BEHALF OF GOLDMAN ENVIRONMENTAL
17  BY: Jonathan Braverman, Esquire
18  50 Braintree Hill Park, Suite 108
19  Braintree, Massachusetts 02184-8724
20  781.848.9610

**5**

I N D E X
Deposition of:                          Page
Lauren McKinlay
  By Mr. Robbins                      6, 131
  By Mr. Kerester                        106
  By Miss Engberg                        129

E X H I B I T S
No.                              Page
55   Documents Produced           60
55A  Deponent's Notes             73
56   Original Certification       85
55B  Photographs                  86
55C  Phase 1 Report              105
55D  Building Department Document 119
57   Diagram                     137

2 (Pages 2 to 5)

O'Brien & Levine Court Reporting Services
888.825.DEPO(3376) * www.court-reporting.com

Lauren McKinlay 11-18-2005
Georto, Inc. v. William Gateman, et al.

6

**P R O C E E D I N G S**

* * *

LAUREN McKINLAY, the witness,
having been duly cautioned and sworn, testified
upon her oath as follows:

MR. ROBBINS: Counsel have
discussed and agreed to continue to use the
stipulations with regard to the deposition that
we have used previously; that is to say,
reserving all objections, except as to form and
any motions to strike, until the time of trial.

I would like the client to read and
sign the deposition.

Do you have any problem with that?

MR. BRAVERMAN: No.

MR. ROBBINS: Do you want to
waive the notary, but read and sign.

MR. BRAVERMAN: That's fine.

EXAMINATION BY MR. ROBBINS:

Q. Let me just briefly indicate to you
that, as I'm sure your counsel will have said,
that when I say I'd like you to read and sign,
that means that you will have an opportunity to
get a copy of the transcript of today's

7

questions and answers. And you will have an
opportunity to review it to help ensure that the
stenographer accurately took down what you
said.

A. Okay.

Q. So if you said red and she wrote
incorrectly bed, you have a chance to indicate
that on at a sheet and after reading it and
making such corrections as there may have been,
you sign that sheet and return it to me.

A. Okay.

MR. ROBBINS: Can we also
agree that if it's not done within 30 days of
receipt of this, that it will be treated --

MR. BRAVERMAN: It will be
deemed read and signed.

MR. ROBBINS: Deemed read and
signed.

MR. BRAVERMAN: That's fine.
Although I would like a copy of the transcript
sent to me so that we have a trail.

MR. ROBBINS: Okay. Do you
want me to send the copy to you, and then you'll
get it into her hands?

8

MR. BRAVERMAN: Because other
than that, I don't need a copy of it.

MR. ROBBINS: Okay. perfectly
fine.

Could all counsel introduce
themselves so that we have a party list.

MR. KERESTER: Dale Kerester
representing plaintiff, Georto, Inc.

MISS ENGBERG: Kristina
Engberg representing third-party defendants,
Roberts Corporation.

MR. BRAVERMAN: Jonathan
Braverman representing the witness and Goldman
Environmental Consultants.

MR. ROBBINS: Okay. Anything
I've left out that people want me to do?

MR. BRAVERMAN: No.

BY MR. ROBBINS:

Q. Okay. Would you please state your full
name?

A. Lauren McKinlay.

Q. How do you spell your last name?

A. M-C-K-I-N-L-A-Y.

Q. Okay. And at some point in time did

9

you go by the name of Lauren Maigret?

A. Yes.

Q. Is Maigret your maiden name or former
name?

A. Yes, it is.

Q. When did you start to use the name
McKinlay?

A. September 18th, 2004.

Q. Miss McKinlay, I'm going to ask you
some questions, and the other lawyers may ask
some when I'm finished, about subjects
concerning work that you did on behalf of
Goldman Environmental Consultants at a piece of
property in Lynn, generally referred to as 200
Union Ave.

MR. ROBBINS: Union Street, I
believe. Thank you.

Q. What I'm asking you is for what you
remember, what you know, not your guesses, not
your hunches, but what you know of your own
first-hand knowledge, okay?

A. Yes.

Q. None of us are served by guessing or
filling ins that we all sometimes do. If you

3 (Pages 6 to 9)

Lauren McKinlay 11-18-2005
Georto, Inc. v. William Gateman, et al.

10

1    don't understand a question that I ask, please
2    say so and I'll rephrase it. If you need to
3    take a break at any time, let me know and I'll
4    be happy to do that.
5         What is your current residence
6    address?
7         A.   148 Carol, C-A-R-O-L, Drive, Dedham,
8    Massachusetts.
9         Q.   And your telephone number?
10        A.   781 -461-0263.
11        Q.   Okay. Is that your home or work
12   number?
13        A.   That's home.
14        Q.   Are you currently employed?
15        A.   Yes.
16        Q.   By whom?
17        A.   Goldman Environmental Consultants.
18        Q.   What is your Social Security Number,
19   please?
20        A.   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.
21        Q.   And your date of birth?
22        A.   January 11th, 1976.
23        Q.   Are you currently married?
24        A.   Yes.

11

1         Q.   Can you give me beginning with when you
2    graduated with high school, your formal
3    education background? So beginning with where
4    did you go to high school?
5         A.   Torrington High School.
6         Q.   And where is that located?
7         A.   In Torringing, Connecticut.
8         Q.   Okay. Did you graduate?
9         A.   Yes.
10        Q.   What year?
11        A.   1994.
12        Q.   And have you had any further formal
13   education after your graduation from high
14   school?
15        A.   Yes.
16        Q.   Where was that?
17        A.   Hartwick College.
18        Q.   And where is Hartwick located?
19        A.   Oneida, New York.
20        Q.   And when were you there?
21        A.   I graduated in 1998.
22        Q.   And what was your field or fields of
23   study at Hartwick?
24        A.   I majored in geology.

12

1         Q.   And with what degree did you graduate?
2         A.   I believe it's a B.A.
3         Q.   A bachelor of arts?
4         A.   Yes.
5         Q.   Did you have any further formal
6    education after your graduation from Hartwick
7    College in 1998?
8         A.   No.
9         Q.   Do you hold any licenses from the
10   Commonwealth of Massachusetts other than your
11   motor vehicle license?
12        A.   No.
13        Q.   Are you certified by any organization
14   in any particular field of work or endeavor?
15        A.   Yes.
16        Q.   By which organization?
17        A.   Certified hazardous material --
18   actually, the institution would be, The
19   Institute of Hazardous Materials.
20        Q.   The Institute of Hazardous Materials.
21   Okay. And you have a certificate of some sort
22   from them?
23        A.   Yes.
24        Q.   And what does the certificate indicate?

13

1         A.   It's a certified hazardous materials
2    manager certificate.
3         Q.   Okay. And in order to get this
4    certificate, what did you have to do?
5         A.   You have to demonstrate through an
6    application that you meet certain requirements.
7    And if they accept your application, you sit for
8    an exam and you have to pass the exam.
9         Q.   This certificate indicates to the world
10   what about you?
11        A.   It indicates that I have a knowledge of
12   proper uses in handling of hazardous materials
13   in a very broad range. And within that range
14   every individual has a specialty; so you're not
15   necessarily knowledgeable in everything that the
16   certification covers.
17        Q.   Okay. What is the specific material or
18   materials that your certificate covers you?
19        A.   Could you clarify what you're asking?
20        Q.   Sure. I thought what you were asking
21   is having this certificate doesn't mean that
22   you're qualified for all hazardous materials,
23   but it indicates that you're at least qualified
24   for certain hazardous materials, or did I

4 (Pages 10 to 13)

Lauren McKinlay 11-18-2005
Gicorto, Inc. v. William Gateman, et al.

14

1  misunderstand you?
2      A.  It indicates that you are qualified for
3  a list of regulations that it covers.  It's up
4  to the individual -- it's up to an individual to
5  determine if, according to a certain oath that
6  you have to sign, if you have the knowledge to
7  sign off on something with that certificate.
8          You have to feel comfortable that
9  you have the knowledge to say this is -- I'm not
10  sure how to explain it definitively.
11     Q.  Do you want to give me an example?
12     A.  For instance, it covers OSHA regs, DOT
13  regs, a wide range of regulations.  If you're
14  principal -- if your job and experience only
15  deals with OSHA regs, you wouldn't be able to
16  sign off on, say, that these -- that you have
17  knowledge of the DOT regs?
18     Q.  And the decision as to whether you can,
19  quote, sign off that you know the DOT regs is
20  personal, it's based on your sense of what you
21  know?
22     A.  Exactly, your experience.
23     Q.  And your experience.  So but as far as
24  the Institute of Hazardous Materials, once they

16

1      Q.  When was the exam?
2      A.  Either April or May of 2005.  I don't
3  recall.
4      Q.  Okay.  Am I correct you haven't had a
5  deposition taken before?
6      A.  Correct.
7      Q.  Okay.  I don't want you to -- within
8  the limits of what is humanly possible, I don't
9  want you to feel nervous more than you need to.
10  Nobody is here to yell at you, jump at you or
11  anything.  Nobody is saying that you did
12  anything wrong or bad, okay?  We just want to
13  find out some information about what happened,
14  okay?
15     A.  That's fine.
16     Q.  All right.  How long is the exam that
17  you sat for?
18     A.  I believe it was a four-hour period.
19     Q.  Okay.  And is this a take-home exam or
20  did you have to go to some location to do this?
21     A.  It's a proctored exam.
22     Q.  So you went someplace and there was an
23  independent person monitoring your exam?  Is
24  that what you mean by proctored?

15

1  give you the certificate, they're saying that
2  you're familiar with certain sets of regulations
3  and it's up to you which types of regulations
4  you want to represent to the world that you're
5  qualified to deal with?
6      A.  Correct, more or less.
7      Q.  Okay.  Tell me what is the less?
8      A.  No, that would be a correct statement.
9      Q.  So the regs involves OSHA, right?  The
10  regulations that this Hazardous Materials
11  Institute of materials and the certificate
12  affirms your knowledge of the OSHA regulations;
13  is that correct, isn't that what you said?
14     A.  There's a broad range of regulations.
15  I wouldn't attempt to name them all because I
16  know I would miss some of the regulations that
17  it covers.
18     Q.  Well, you'll pardon me, but I do need
19  to know what your background is.  When did you
20  get the certificate?
21     A.  In June of 2005.
22     Q.  Okay.  And you sat for an exam before
23  you got it, right?
24     A.  Correct.

17

1      A.  Correct.
2      Q.  Okay.  Did you have some course of
3  study that led you to become ready to take this
4  exam?
5      A.  I took a review course.
6      Q.  What does a review course mean, or what
7  do you mean by a review course?
8      A.  There is a course offered that's
9  sponsored by the Academy of Hazardous Materials
10  Management that broadly covers all of the
11  regulations that encompass the CHMM
12  certification so that you can get a handle of
13  what regulations will be covered in the exam.
14     Q.  Okay.  And where is this Academy of
15  Hazardous Management located?
16     A.  I don't recall.
17     Q.  Did you go someplace for this case?
18     A.  I did but not to the academy.
19     Q.  Okay.  Where did you go for the course?
20     A.  I believe it's called the Safety
21  Building in Braintree, Massachusetts.
22     Q.  Who sponsored this particular course at
23  the Braintree building or the safety building in
24  Braintree?

5 (Pages 14 to 17)

Lauren McKinlay 11-18-2005
Georto, Inc. v. William Gateman, et al.

18

1       A.   I believe it was sponsored by the
2   Academy of Hazardous Management.
3       Q.   And the purpose of this course was to
4   familiarize you with the various kinds of
5   regulations that pertain to hazardous materials?
6       A.   Government regulations that pertain to
7   hazardous materials.  The purpose of it was to
8   basically outline what regulations are covered
9   under the CHMM certification.
10      Q.   Okay.  And so basically you took this
11  course when?  You sat for the exam you thought
12  in April or May, so approximately when did you
13  go to this review course?
14      A.   A couple of months before the exam.
15      Q.   Okay.  And what did the course -- how
16  many hours did the course consist of or how many
17  days if you were there for a period of days?
18      A.   I believe it was four, eight-hour days.
19      Q.   Okay.  And going back now to what were
20  the sets of regulations that you were reviewing
21  for purposes of taking the test, what were the
22  sets of regulations?  You mentioned something
23  with OSHA and DOT regulations?
24      A.   It's such a wide spectrum.  There's

19

1   numerous regulations that it covers.  They're
2   all federal regulations.
3       Q.   So first of all, these are all federal
4   regulations?
5       A.   Correct.
6       Q.   Okay.  In other words, there are no
7   state or Commonwealth or municipal regulations
8   included in this test?
9       A.   No, they're federal regulations.
10      Q.   Okay.  So among the groups of federal
11  regulations, what were the names, even if it's
12  not the entire set of that agency's regulations,
13  what are the names of the agencies who
14  propounded the regulations that you were
15  learning about?
16      A.   The ones that I recall are OSHA, DOT,
17  NPDES.  I don't recall the proper names of some
18  of them, but regulations that deal with nuclear
19  materials, hazardous -- like, transportation and
20  storage and proper labeling of hazardous
21  materials.  Those are only a few of them.  I
22  don't recall all of them.
23      Q.   Does getting this certificate require
24  you to have any experience in the field?

20

1       A.   Yes.
2       Q.   What is the requirement?
3       A.   There's two levels of certification.
4   One, I believe, requires five years of practical
5   experience and the other requires seven years of
6   practical experience.
7       Q.   And which level did you qualify for?
8       A.   The masters level, which is the seven
9   years.
10      Q.   Okay.  And which were the seven years
11  that you presented as your experience?
12      A.   From 1998 to 2005.
13      Q.   Okay.  Let me try to clarify something
14  that I'm a little confused by.  The certificate
15  indicates apparently that you've had in your
16  case seven years of some kind of field
17  experience working with hazardous materials, is
18  that it, or just you have been working for
19  someplace that sends you out in the field for
20  seven years?
21      A.   I don't recall the specific -- I don't
22  recall the specifics of the application where
23  you had to demonstrate -- I don't recall what
24  they deemed as practical experiences.

21

1       Q.   And the thing I was not clear earlier
2   about is, these various federal regulations says
3   that successfully getting the certificate says
4   to the world that you've demonstrated some level
5   of understanding of at least the OSHA, the DOT,
6   the NPDES, nuclear materials and the
7   transportation and labeling of hazardous
8   materials; is that right, that you have some
9   knowledge of those regulations?
10      A.   Correct.
11      Q.   Okay.  And it also indicates in your
12  case that you've had seven years of some kind of
13  practical experience, but you don't what the
14  practical experience is really supposed to
15  consist of.  As you sit here today, you don't
16  remember?
17      A.   Right, I don't recall.
18      Q.   Okay.  Then you said something about
19  what sounded to me like it was left up to your
20  own judgment as to whether to represent yourself
21  to the public as knowing certain of these
22  things, these regulations, and that's what I'm a
23  little confused about.
24      A.   You sign an oath basically stating that

6 (Pages 18 to 21)

Lauren McKinlay 11-18-2005
Georto, Inc. v. William Gateman, et al.

22

1  you won't certify certain regulations unless you
2  have what they deem the practical experience in
3  that particular field dealing with those
4  regulations.
5     Q.  Okay.  So it's not like you have to
6  take another test on the regulations.  It's that
7  you have to get practical experience with regard
8  to certain of these regulations that you named
9  in order to abide by your oath before
10  representing yourself to be knowledgeable?
11     A.  Correct.
12     Q.  Okay.  Following your graduation in --
13  let me backup.  Your study of geology at
14  Hartwick -- is Hartwick an engineering school by
15  any chance?
16     A.  No.
17     Q.  So it's a liberal arts college?
18     A.  Yes.
19     Q.  Four years?
20     A.  Yes.
21     Q.  And as a geology major, how many
22  courses did you take that pertained to your
23  geology major?
24     A.  I don't recall.

23

1     Q.  Was it more than five?
2     A.  Yes.
3     Q.  More than 10?
4     A.  Yes.
5     Q.  What type of geology was your study in?
6     A.  A general geology degree.
7     Q.  After college did you get some work?
8  Did you start working someplace?
9     A.  Yes.
10     Q.  Where did you first come to work?
11     A.  Fuss & O'Neill, Incorporated.
12     Q.  And where are they located?
13     A.  Their corporate office is in
14  Manchester, Connecticut.
15     Q.  And was that the office that you worked
16  out of?
17     A.  Yes.
18     Q.  And what kind of work is that, Fuss &
19  O'Neill?
20     A.  They're engineering and environmental
21  consultants.
22     Q.  And how long did you work for them?
23     A.  Just under two years.
24     Q.  And what kind of work did you do for

24

1  them?
2     A.  I oversaw assessment and investigations
3  of contaminated or potentially contaminated
4  properties.
5     Q.  Okay.  And where were these properties
6  located, was it in the state of Connecticut or
7  were they in other places?
8     A.  Mainly Connecticut.
9     Q.  Okay.  Now, when you started work for
10  them, did you have any specific training in the
11  investigation of contaminated properties and the
12  assessment of contaminated properties?
13     A.  No.
14     Q.  Okay.  Were you being supervised by
15  somebody at that company?
16     A.  Yes.
17     Q.  So my question would be, when you would
18  go out -- Strike that.
19        How did you go about doing those
20  duties on a typical work site in the
21  approximately two years you were at Fuss &
22  O'Neill?
23     A.  When I first started at Fuss & O'Neill,
24  I would mainly oversee field investigations.  So

25

1  I would be on site either conducting the
2  sampling or overseeing other companies that were
3  conducting the work.
4     Q.  Okay.  Did I get the company name
5  wrong, is it Fuss & O'Neill?
6     A.  That's correct.
7     Q.  How did you know what to do in terms of
8  going to the site and directing other people or
9  taking samplings yourself?
10     A.  Initially somebody else would be out on
11  the site with me training me.
12     Q.  Okay.
13     A.  Until the company felt that I was
14  knowledgeable enough to conduct the sampling on
15  my own.
16     Q.  And how long was it before they let you
17  conduct samplings on your own?
18     A.  Less than six months.
19     Q.  Okay.  And what types of hazardous
20  materials were you out there to assess and
21  investigate the work of?
22     A.  A large range, a very large range of
23  oil and hazardous materials.
24     Q.  Oil.  What else?  A large range doesn't

7 (Pages 22 to 25)

Lauren McKinlay 11-18-2005
Georto, Inc. v. William Gateman, et al.

26

1  help me a lot. I need to know specifically what
2  you were out there testing for and looking for
3  and supervising during the time that you were at
4  Fuss & O'Neill?
5      A. I could name the ones that I recall,
6  but they wouldn't be all of them.
7      Q. Okay. You don't get points off because
8  you can't remember all of them, but you get good
9  credit for giving me what you do remember.
10         So would you tell me which ones you
11  do remember even if there are some that you
12  can't remember?
13      A. Metals, volatiles, petroleum
14  constituents, solvents. That's what I recall.
15      Q. Okay. Was any of your work at that
16  time did it involve the demolition of buildings,
17  testing on sites on which buildings had been
18  recently demolished? And, again, I'm just
19  focusing on the two years that you were with the
20  Fuss & O'Neill people?
21      A. I don't recall.
22      Q. While you were at Fuss & O'Neill, were
23  you ever involved with the supervision of
24  asbestos removal?

27

1      A. No.
2      Q. Following the time you left Fuss &
3  O'Neill, I take it you left them sometime in
4  year 2000, 2001?
5      A. 2000.
6      Q. And did you obtain a new job?
7      A. Yes.
8      Q. Where was that?
9      A. Goldman Environmental Consultants.
10      Q. And what was your new job with them?
11      A. Project manager, slash, geologist.
12      Q. Let me make sure I've exhausted this.
13  The work that you did for the approximately two
14  years for Fuss & O'Neill was to oversee
15  assessments and investigations with regard to at
16  least the hazardous materials you mentioned as
17  they were examined on the site; is that right?
18      A. Correct.
19      Q. Okay. Did you do any geology work?
20      A. Yes.
21      Q. What did you do?
22      A. Rock soil strata and bedrock strata.
23      Q. And what was the purpose of doing that,
24  please?

28

1      A. To determine lithology at sites.
2      Q. What is lithology?
3      A. The types of soils and bedrocks.
4      Q. Okay. And how did that contribute to
5  the hazardous waste work on a particular site,
6  how was that involved with the hazardous waste
7  testing on the site?
8      A. Lithology will impact the way that
9  contaminants travel.
10      Q. When you started work for Goldman
11  Environmental Consultants in the year 2000, do
12  you know approximately when in 2000 you started?
13      A. July.
14      Q. Okay. What assignments were you given
15  initially?
16      A. Both overseeing assessment and
17  investigation and remediation of sites and
18  conducting the Phase 1 investigations, 21Es.
19      Q. Now, 21E refers to what, Phase 1, 21E
20  refers to what?
21      A. 21E refers to a Phase 1 based on ASTM
22  standards.
23      Q. 21E, do you know what that number and
24  letter refer to?

29

1      A. I don't.
2      Q. How do you know what is included in a
3  Phase 1, 21E examination?
4      A. There are standards, ASTM 1527.
5      Q. Standards for what? What is the
6  subject matter? What are we talking about?
7      A. They identify the components that make
8  up the Phase 1.
9      Q. You realize that since you haven't told
10  me what Phase 1 is we're in a little bit of a
11  circle here. ASTM stands for what?
12      A. I believe it's Association of Standard
13  Testing Lithology.
14      Q. Okay. Well, three of the letters —
15  the first letter of those words match, but the
16  last letter, lithology doesn't match up with the
17  letter "M."
18      A. Methodology.
19         MR. BRAVERMAN: Why don't I
20  confer with the witness.
21         MR. ROBBINS: I was going to
22  suggest that.
23         (Brief break taken).
24      BY MR. ROBBINS:

8 (Pages 26 to 29)

Lauren McKinlay 11-18-2005
Georto, Inc. v. William Gateman, et al.

30

1  Q.  Okay.  So I'd like to pick up where we
2  were.  We were talking about Phase 1, the Phase
3  1, 21E project.  What is your understanding of
4  what a -- Strike that.
5      Do you know if a Phase 1, 21E test
6  or project is related to requirements for the
7  Commonwealth of Massachusetts or for the federal
8  government or both?
9  A.  The 21E is related to Massachusetts
10  regulations.
11  Q.  Okay.  And what are the kinds of things
12  that you -- let me back up.  What are the things
13  that are tested for or looked for in a Phase 1,
14  21E project as far as you understand it?
15  A.  Typically a Phase 1 there's no
16  subsurface investigations conducted.  It's
17  typically only observations and review of files
18  pertinent to the site to determine current and
19  historic uses of the site.
20  Q.  Anything else as far as your
21  understanding to kind of flush out what these
22  are?
23  A.  Based on the current and historic uses
24  of the site you determine if there's the

31

1  presence or the potential to be presence of OHM
2  at the site.
3  Q.  Okay.  Anything else that you want to
4  describe right now?
5  A.  That's a broad description of what a
6  Phase 1 is.
7  Q.  Okay.  OHM, what do those letters stand
8  for?
9  A.  Oil and hazardous material.
10  Q.  Is it fair to say that a Phase 1, 21E
11  test -- would you call it a test or a program or
12  how would you describe it?  I need some words.
13  How do we describe what the job is?
14  A.  A report.
15  Q.  A report?
16  A.  A report which summarizes your
17  observations made.
18  Q.  Okay.  A report.  Am I correct in
19  understanding that the thrust of a 21E is to
20  make sure there's no hazardous materials or oil
21  buried in the soil at the site?
22      MR. KERESTER:  Objection to
23  form.
24      MR. BRAVERMAN:  I object,

32

1  also.
2  Q.  Okay.  What is the purpose of the 21E
3  report?
4  A.  To determine if OHM is present or could
5  potentially be present at the site?
6  Q.  So to determine OHM, which you've
7  said is oil and hazardous materials is or are
8  present or could potentially be present where,
9  in the soil, on the site?
10  A.  Either on the site or in the subsurface
11  of the site.
12  Q.  Now, you said before that no subsurface
13  investigations were part of a 21E report and
14  investigation?
15  A.  Correct.
16  Q.  And now you're saying, and I just don't
17  understand what you mean, that the oil and
18  hazardous materials could potentially be present
19  on the site or subsurface of the site.
20      I don't understand how if you're
21  not supposed to be doing subsurface
22  investigations as part of this, how do you
23  respond to the potential presence or actual
24  presence in the subsurface of the site?

33

1  A.  You come to a conclusion that the
2  potential exists based on historic uses or
3  current uses that may have used OHM in their
4  processes.
5  Q.  So if I understand you, there is no
6  actual, physical testing of a subsurface in a
7  Phase 1, but you examine historical uses of the
8  property and/or present uses of the property and
9  say there could be potential problems because
10  they had used these materials before?
11  A.  Correct.
12  Q.  Okay.  But the limit is, you're limited
13  to basically historical and surface
14  observational data as far as subsurface
15  conditions?
16  A.  And a review of any public records
17  pertinent to the site.
18  Q.  Okay.  Who buys a 21E report from
19  Goldman?
20      MR. BRAVERMAN:  I object.
21  Q.  Why does anyone request a 21E report
22  from Goldman typically?
23      MR. KERESTER:  Objection.
24  A.  A Phase 1 is typically conducted in

9 (Pages 30 to 33)

Lauren McKinlay 11-18-2005
Georto, Inc. v. William Gateman, et al.

**34**

1 conjunction with a real estate transaction.
2    Q.  Okay. In order to assure the parties
3 as to the condition or the presence of any OHM?
4        MR. BRAVERMAN: I object.
5    Q.  Is that right?
6        MR. KERESTER: Objection to
7 form.
8        MR. BRAVERMAN: I'll help
9 you. I'm objecting to the word, "assure."
10      MR. ROBBINS: Okay. Let's see
11 if I can be more careful.
12      MR. BRAVERMAN: I don't
13 normally like to do that.
14      MR. ROBBINS: You mean object.
15      MR. BRAVERMAN: Well, I don't
16 like to object if I don't have to, but I don't
17 usually like to state the clarification of my
18 objection.
19      MR. ROBBINS: It's nothing
20 toxic here. I'm just trying to get a handle on
21 this thing.
22   BY MR. ROBBINS:
23    Q.  So typically this occurs during or as
24 part of a real estate transaction. How are

**35**

1 these 21E tests conducted?
2      MR. KERESTER: Objection to
3 form.
4      MR. BRAVERMAN: I object.
5      MR. ROBBINS: I think if we're
6 reserving to the objection to form and you have
7 an objection, you owe it to tell me what the
8 objection is so that I can have a chance to
9 correct it.
10      MR. KERESTER: I don't think
11 I'm obligated to, but I'd be happy to tell you.
12 My objection to that question was to the
13 characterization of the use of the word "test."
14      (Brief break taken).
15   BY MR. ROBBINS:
16    Q.  Do you know where the term Phase 1
17 comes from?
18    A.  I don't recall.
19    Q.  Do you know if 21E -- your reference to
20 the term 21E refers to a Massachusetts, a
21 Commonwealth of Massachusetts regulation of some
22 sort or statute of some sort?
23    A.  The 21 -- the statute 21E refers to
24 Massachusetts regulations.

**36**

1    Q.  Okay. Do you perform Phase 1 tests on
2 behalf of Goldman Environmental?
3      MR. BRAVERMAN: I object.
4      MR. KERESTER: I also object.
5    Q.  Do you perform Phase 1 investigations
6 on behalf of Goldman Environmental?
7    A.  Yes.
8    Q.  What do you do? What are the steps
9 that you are required to take on -- per Goldman
10 to complete a 2 Phase 1 test?
11      MR. KERESTER: Objection.
12      MR. BRAVERMAN: Objection.
13    A.  A site inspection, review of state and
14 local files, a review of historical documents
15 related to the site, interviews with current
16 owners or operator's of the site. Those are the
17 major ones that I recall. There are many more.
18    Q.  What are the minor ones?
19    A.  Determining what appears to be the
20 hydrologic radiant of ground water, observing
21 abutting properties. There is many more. I'm
22 just -- I can't think of them off the top of my
23 head.
24    Q.  Are you currently conducting any Phase

**37**

1 1 studies?
2    A.  No.
3    Q.  When is the last time you did a Phase 1
4 study?
5    A.  Approximately three to five months ago.
6    Q.  Okay. Since coming to work for Goldman
7 in 2000, July of 2000, how many Phase 1 studies
8 have you either participated -- Strike that.
9      How many Phase 1 studies have you
10 conducted?
11    A.  I'd say over 100 probably.
12    Q.  Having conducted over 100, you're
13 telling me today that there are other steps
14 other than the six that you've listed, but you
15 don't remember them; is that right?
16    A.  I don't recall them.
17    Q.  But there are other steps besides the
18 six that you've given me?
19    A.  Yes.
20    Q.  Are the digging of test pits -- are you
21 familiar with that term by the way?
22    A.  Yes.
23    Q.  Is the digging of tests pits any part
24 of a Phase 1 study as you understand it?

10 (Pages 34 to 37)

Lauren McKinlay 11-18-2005
Georto, Inc. v. William Gateman, et al.

38

1    A.   No.
2    Q.   What state and local files do you
3    review when you conduct a Phase 1 test?
4         MR. KERESTER:  Objection.
5    Q.   I'm sorry, Phase 1 study.
6    A.   The local files depends upon the town.
7    Different towns have different names for
8    different agencies.  The Fire Department, Board
9    of Health, Building Department and a clerk's
10   office if the town has one.
11        As far as Massachusetts or state
12   files, there would be files maintained by the
13   Massachusetts Department of Environmental
14   Protection.
15   Q.   Is that it?
16   A.   Those are the typical offices.
17   Occasionally a flood map or something or some
18   other item that's specific to the Phase 1 might
19   be kept in a different office.
20   Q.   Okay.  You said review historical
21   documents.  What other historical documents are
22   there that you review in a Phase 1 study?
23   A.   If they're available, you'd review
24   Sanborn atlases and directories, historic

39

1    directories.
2    Q.   And the purpose of looking through the
3    Sanborn atlases or historic directories is what?
4    A.   To determine historic occupants of the
5    site.  If STs were formally used at the site,
6    they're sometimes shown on the Sanborn atlases.
7    Q.   Okay.  Again, the purposes to go back
8    to the state and local files that I asked you
9    about.  With regard to the Fire Department, what
10   is the purpose concerning a Phase 1 study of
11   reviewing Fire Department records or files?
12   A.   To determine if they have any records
13   of current or historic use of USTs or ASTs at
14   the site.
15   Q.   Okay.  I need you to explain what is a
16   UST?
17   A.   An underground storage tank.
18   Q.   Okay.  And an AST?
19   A.   An above ground storage tank.
20   Q.   And sometimes Fire Department records
21   would note these, is that what you're saying?
22   A.   Correct.  Some fire departments
23   maintain records.
24   Q.   The Board of Health, what is the

40

1    purpose of that relative to the Phase 1 study?
2    A.   To determine if they have on record any
3    incidents relating to oil or hazardous
4    materials.
5    Q.   Okay.  The Building Department records
6    or files?
7    A.   To determine the history of the site,
8    when buildings were constructed or demolished,
9    past owners, occupants.
10   Q.   The clerk's office records or files?
11   A.   To determine if they have any
12   documentation on underground storage tanks or
13   above ground storage tanks.
14   Q.   Massachusetts DEP files?
15   A.   If there's any spill incidents or state
16   sites either at the site or within a certain
17   distance of the site.  They would be assigned a
18   release tracking number, which you would then
19   review files pertinent to that release tracking
20   number.
21   Q.   And the release tracking number has to
22   do with what?
23   A.   It's a way for the state to track the
24   site through their system.

41

1    Q.   Do they track sites -- all properties
2    or just properties where there is a spill or a
3    hazardous waste problem?
4    A.   The release tracking number would be
5    assigned -- there's different instances that it
6    would be assigned.  If there's -- there's
7    different -- there's a two hour -- there's
8    criteria that constitutes the owner or operator
9    of the site.  It requires them to notify the DEP
10   of any release.
11        There are certain standards and if
12   they exceed those standards, they're obligated
13   to report to the state.
14   Q.   You also indicated in your Phase 1
15   study that you do interview the owners or
16   operators of the site; is that correct?
17   A.   That's correct.
18   Q.   What is the purpose of that?
19   A.   To determine the present use of the
20   site and determine any operations that are
21   currently conducted at the site, and sometimes
22   they can provide you with historic operations of
23   the site if they've been there for a while.
24   Q.   The interview, the purpose of the

Lauren McKinlay 11-18-2005
Georto, Inc. v. William Gateman, et al.

42

1  interview -- the ultimate purpose of the
2  interview is to try to glean information, am I
3  correct, from the owner or operator relative to
4  any OHM problems on the site?
5        MR. KERESTER:  Objection to
6  form.
7     A.  That would be only one of many purposes
8  for interviewing them.
9     Q.  Would you give me all of the purposes
10  that you understand for interviewing the owner
11  or operator of the property?
12     A.  To determine the current use and
13  operations of the site, if they have knowledge
14  of historic owners or operations conducted at
15  the site, to determine if they have any
16  knowledge of historic use of OHM at the site, to
17  determine how their water — how their water is
18  supplied, if it's through a portable well or a
19  public supply, what types of wastes are
20  currently historically generated at the side, if
21  they know or are aware of any improper disposal
22  or use of OHM at the site, to determine if they
23  know if there's any activity or use limitations
24  on the site.

43

1        To determine if there's ever been
2  any subsurface investigations conducted at the
3  site, to determine if there's other purposes.
4  Those are the key ones that come to the top of
5  my head at the moment.
6     Q.  I'd like to know of any other
7  purposes.  You've done 100 of these, or more
8  than a 100?
9     A.  I don't recall any other purposes.
10     Q.  But there are other purposes, you just
11  don't remember them?
12     A.  Correct.
13     Q.  Is one of the purposes to determine the
14  — Strike that.
15        What is your overall purpose with
16  regard to doing a Phase 1 study, the overall
17  goal is to identify what?
18     A.  Determine if there's any contamination
19  at the site or the potential for contamination
20  to be present at the site.
21     Q.  And contamination, is that a technical
22  word, do you know?  Contamination, does that
23  refer to certain specific things?
24     A.  Oil and hazardous materials.

44

1     Q.  Where would you look to determine what
2  the term "hazardous materials" consists of to
3  determine if a particular item was part of the
4  hazardous materials?
5     A.  I don't recall.
6     Q.  Do you understand my question?
7     A.  Are you looking for a particular
8  document that you would refer to?
9     A.  Yes, I would.
10     A.  I don't recall.
11     Q.  Okay.  Is there someplace that you go
12  to know what constitutes a hazardous material?
13     A.  Yes.
14     Q.  Okay.  Where would you go?
15     A.  I don't recall.
16     Q.  Are you aware of whether there's a
17  definition of hazardous materials in any
18  regulations or statutes of the Commonwealth of
19  Massachusetts?
20     A.  Can you repeat the question?
21     Q.  Do you know whether or not there is any
22  definition of hazardous materials contained in
23  any of the regulations or statutes of the
24  Commonwealth of Massachusetts?

45

1     A.  Yes.
2     Q.  Okay.  So someplace in those rules or
3  statutes, the Commonwealth has defined the term
4  hazardous materials?
5     A.  Yes.
6     Q.  Do you know if that same term is
7  defined by any federal documents, rules,
8  statutes or regulations?
9     A.  Yes.
10     Q.  Okay.  When you certify that a site is
11  free of oil and hazardous materials, that's part
12  of what you do at the end of your study if
13  that's the condition that you find it?
14        MR. BRAVERMAN:  I object.
15     Q.  Let me give you a better question.
16  Let's assume you find a site to be free of oil
17  and hazardous materials, and even accepting the
18  facts and understanding that you're not doing
19  any subsurface testing, do you make some sort of
20  a report to either Goldman or to the ultimate
21  client?
22     A.  Correct.
23     Q.  Okay.  And you say I found — I didn't
24  do any subsurface testing, but from the studying

12 (Pages 42 to 45)

Lauren McKinlay 11-18-2005
Georto, Inc. v. William Gateman, et al.

46

1  that I did do -- and you've described the
2  various things that you do -- I don't see any
3  oil or hazardous materials?
4      A.  And make a conclusion saying based on
5  our findings, it's likely that hazardous or oil
6  is not present, is not present at the site.
7      Q.  So your overall purpose is to ascertain
8  from your studies whether OHM exists on the site
9  or probably exists on the site?
10         MR. KERESTER:  Objection to
11  form.
12         MR. BRAVERMAN:  Objection.
13      A.  Can we go back to the question before
14  that?
15      Q.  Sure.
16      A.  In a Phase 1 it would be if there's any
17  recognized environmental conditions.
18      Q.  What does that mean, what are you
19  saying?
20      A.  It's a specific term used in the ASTM
21  standards specific to Phase 1.
22      Q.  And what is the phrase or term that
23  you're using?
24      A.  Recognized environmental condition.

47

1      Q.  And what does that phrase refer to, is
2  it recognize or recognized?
3      A.  I believe it's recognized, E-D.
4      Q.  And what is your understanding of that
5  term, what that means?
6      A.  Conditions either current or historic
7  that resulted in or potentially could have
8  resulted in contamination at the site.
9      Q.  Contamination by OHM?
10         MR. KERESTER:  Objection.
11      Q.  Contamination by what?
12      A.  Of hazardous materials.
13      Q.  And oil? And/or oil?
14      A.  And/or oil.
15      Q.  So that's OHM?
16      A.  Yes.
17      Q.  Okay.  What I'm trying to find out is,
18  is it your understanding of this phrase,
19  recognized environmental conditions, does that
20  include environmental conditions beyond the
21  presence of OHM?
22         MR. KERESTER:  Objection to
23  form.
24      Q.  Do you understand my question?

48

1      A.  I'm not sure that I do.
2      Q.  Okay.  You do a phrase 1 study to
3  determine the presence or absence, or potential
4  presence or absence of OHM.  Would you agree
5  with that?
6      A.  Yes.
7      Q.  Okay.  Then you said, can I expand my
8  answer, and you gave me a new answer called
9  recognized environmental conditions.
10      A.  Correct.
11      Q.  Okay.  I'm trying to understand whether
12  recognized environmental conditions is as you
13  understand it, a term broader than the presence
14  or -- the environmental conditions are broader
15  than OHM?
16         MR. KERESTER:  Objection to
17  form.
18         MR. BRAVERMAN:  I object.
19      Q.  So does recognized environmental
20  conditions that you're supposed to study when
21  you do the Phase 1 study, is that supposed to
22  include anything but OHM?
23         MR. KERESTER:  Objection.
24         MR. BRAVERMAN:  I object.

49

1      A.  An example of a recognized
2  environmental condition would be the historic
3  use of a site as a dry cleaners.  The historic
4  documents that you review wouldn't necessarily
5  say that trichloroethylene or
6  tetrachloroethylene were historically used at
7  the site, but those chemicals are typically
8  associated with a dry cleaners.  So the dry
9  cleaners itself would constitute a recognized
10  environmental condition.
11      Q.  And the condition, if you will, the
12  risk of the condition is the presence of in your
13  example the dry cleaners, the presence of
14  trichloroethylene?
15      A.  Correct, the potential for the historic
16  use or disposal of that at the site.
17      Q.  So if a dry cleaner was there, they
18  might have used trichloroethylene and stuck it
19  in the ground, right?
20      A.  Yes.
21      Q.  Okay.  Trichloroethylene is considered
22  a hazardous material under the definitions as
23  you understand OHM?
24      A.  Yes.

13 (Pages 46 to 49)

Lauren McKinlay 11-18-2005
Georto, Inc. v. William Gateman, et al.

50

1    Q.  So ultimately any of the environmental
2  conditions that you are reporting about in your
3  Phase 1 study boil down to their actual or
4  potential inclusion of oil or hazardous
5  materials on the site?
6         MR. KERESTER:  Objection to
7  form.
8    A.  I believe it would be a broader base
9  than simply OHM.
10    Q.  Okay.  What else is included besides
11  OHM?
12    A.  If there's been any filling activities
13  on the site, that would constitute an
14  environmental condition, a recognized
15  environmental condition.
16    Q.  What is a filling activity, what does
17  that mean?
18    A.  If material not natural to the site had
19  been brought on to the site and buried.
20    Q.  What kind of material?
21    A.  I would say any materials other than
22  clean fill material, clean dirt.
23    Q.  Well, I need -- what is --
24  interesting.  So you're saying that the Phase 1

51

1  study that you do goes beyond determining the
2  presence or potential of oil or hazardous
3  materials and also addresses the question of the
4  nature of the fill at the site beyond whether it
5  contains or potentially contains oil or
6  hazardous materials, is that what you're saying?
7    A.  It identifies if there's any known
8  historic fills at the site.
9    Q.  But what is the nature -- let's assume
10  there were some known fillings.  What are you
11  looking for to say, okay, there's a problem
12  here.  What would be the problem, or what would
13  be the thing that you would want to determine
14  about that fill that you'd want to comment about
15  in your study?
16    A.  Filling activities have occurred at the
17  site.  Whether you know the source of the fill
18  material or not, the potential exists that what
19  has been brought on the site could cause
20  contamination at the site.
21    Q.  Okay.  So your concern about the fill
22  would be that it could potentially cause
23  contamination at the site.  Did I quote you
24  right?

52

1    A.  Yes.
2    Q.  Contamination.  I thought that we
3  defined contamination an hour and a half ago as
4  oil and hazardous materials?
5    A.  Yes.
6    Q.  Okay.  So am I correct that the
7  contamination potential, the stuff in the fill
8  that could cause the potential problem would be
9  oil and hazardous materials?
10    A.  Correct.
11    Q.  Okay.  Phase 1 does not include, am I
12  correct, about understanding this from your
13  testimony, any soil testing per say?
14    A.  Correct.
15    Q.  Is there such a thing as a Phase 2
16  report?
17    A.  Yes.
18    Q.  Is there any physical testing done in a
19  Phase 2 report that you understand?
20    A.  Typically there is.
21    Q.  Yes?
22    A.  Yes, typically.
23    Q.  You also determine the hydrologic
24  radiant of ground water you indicated before in

53

1  a Phase 1 study; is that right?
2    A.  To the best that you can.  It won't be
3  definitive, but based on topography or USGS
4  maps, you can get a pretty good handle on which
5  way the direction of ground water is flowing.
6    Q.  But no physical testing is performed to
7  determine this?
8    A.  Correct.
9    Q.  Okay.  And you indicated that you
10  observe abutting properties.  What is it that
11  you are looking to observe for purposes of a
12  Phase 1 study?
13    A.  You would observe the abutting
14  properties to see if there's any evidence of OHM
15  at those sites that could potentially migrate on
16  the site that you're conducting the Phase 1 for.
17    Q.  Okay.  And your observations -- Strike
18  that.
19         Does the work that you do with
20  regard to abutting properties also include the
21  other items that you said you do on the primary
22  property, namely a site inspection or review of
23  state and local files or review of the
24  historical documents, interviews with owners,

14 (Pages 50 to 53)

Lauren McKinlay 11-18-2005
Georto, Inc. v. William Gateman, et al.

54

1  determination of hydrologic radiants and
2  observing the property itself?
3      A. No.
4      Q. Okay. So with regard to abutting
5  property, what are the steps that you take in
6  completing that part of your Phase 1 study?
7      A. You make observations of the abutting
8  properties from the site that you're conducting
9  the Phase 1 on from the public roadway, but you
10  don't actually, physically go onto the abutting
11  properties.
12      Q. Okay. So you're talking about visual
13  observations?
14      A. Of the grounds and of the abutting
15  property.
16      Q. What else?
17      A. If there is a state listed site, you
18  would review and have a release tracking
19  number. You would review that file at the
20  Massachusetts Department of Environmental
21  Protection.
22      Q. That's of this abutting property?
23      A. Correct.
24      Q. Okay.

55

1      A. And you would look at the Fire
2  Department and clerk's office to see if there's
3  any records of underground or above ground
4  storage tanks relative to those abutting
5  properties?
6      Q. Okay. Anything else?
7      A. No.
8      Q. So it's fair to say that the study of
9  the abutting property does a more limited study
10  than the one on the private property?
11      A. Yes, very much.
12      Q. Are you qualified -- Strike that.
13          Have you ever conducted or
14  supervised any asbestos removal work?
15      A. No.
16      Q. Does Goldman get involved in any way
17  with asbestos problems on a site?
18      A. Yes.
19      Q. How do they get involved when they do?
20      A. They'll contract a company certified
21  with the knowledge of asbestos to either collect
22  samples or conduct an abatement, if that's
23  required.
24      Q. Okay. And does Goldman perform any

56

1  supervisory or oversight functions when they
2  retained an abatement company to perform work on
3  a particular location?
4      A. Their involvement would be limited to
5  overseeing the company that conducts the work,
6  making arrangements for access to the site.
7  Those types of matters. They wouldn't
8  physically be involved in the testing or
9  abatement process.
10          Actually, just to clarify that, the
11  only time that we would analyze or potentially
12  analyze for asbestos would be through the
13  collection of ground water or soil samples. We
14  would send them to a certified lab, but we don't
15  collect building materials or anything of that
16  nature for asbestos analysis.
17      Q. So I'm a little confused. You collect
18  samples of what? If it's not building
19  materials, samples of what?
20      A. Soil or ground water.
21      Q. As opposed to a ceiling tile let's say?
22      A. Correct. Unless the ceiling tile would
23  be incorporated into a soil matrix, a film
24  matrix that you might be digging or drilling

57

1  through for subsurface activities.
2      Q. So not in a Phase 1 study, but
3  sometimes Goldman would do digging of test pits
4  on a particular site, subsurface digging in
5  other words?
6      A. Correct.
7      Q. And then it might take samples from
8  that and have them analyzed someplace?
9      A. By a certified laboratory.
10      Q. And doing that kind of digging of pits,
11  would that normally be part of any particular
12  kind of a study that Goldman does, or is it just
13  somebody says to Goldman, come on in. We want
14  you to dig some pits in the ground?
15      A. Typically you wouldn't sample for
16  asbestos unless somebody hired you to do so, or
17  there was reason to believe based on historic
18  use or operation of the site that asbestos could
19  potentially be present in the subsurface.
20      Q. But it's not part of a Phase 1 study?
21      A. No, it's not.
22      Q. Is it typically part of a Phase 2
23  study?
24      A. It could be part of a Phase 2 study.

15 (Pages 54 to 57)

Lauren McKinlay 11-18-2005
Georto, Inc. v. William Gateman, et al.

58

1    Q.  I should have asked you this earlier.
2  Have you ever conducted or participated in a
3  Phase 2 study?
4    A.  Yes.
5    Q.  Approximately how many times would that
6  be since you started work for Goldman?
7    A.  Over 100.
8    Q.  So you consider yourself pretty
9  familiar with that kind of work?
10   A.  Yes.
11   Q.  And with Phase 1 work, too?
12   A.  Correct.
13   Q.  Did you participate in a Phase 1 study
14  at a property in Lynn, Massachusetts called 200
15  Union Street?
16   A.  Yes.
17       MR. BRAVERMAN:  Before we move
18  into the specific project, would this be a good
19  time for a short break?
20       MR. ROBBINS:  Absolutely.
21       (Lunch Recess taken).
22       BY MR. ROBBINS:
23   Q.  I'm going to show you a pile of
24  documents that I'll represent are exactly how I

59

1  received them in this box from counsel, and
2  appear to have an affidavit on the front of
3  them.
4       And while we haven't numbered the
5  pages and so forth, I'd like to ask you is that
6  your signature on the sheet?
7    A.  Yes.
8    Q.  Okay.
9    A.  A copy of it.
10   Q.  Right.  And your intention in signing
11  your name on that sheet was what, why did you
12  sign it?
13   A.  To indicate that I had copied all of
14  the files pertinent to 200 Union Street in Lynn
15  and that they're copies of documents produced by
16  Goldman Consultants, Inc.
17   Q.  And these are true copies of the
18  business records of Goldman that you've selected
19  as relevant to or concerning the 200 Union
20  Street?
21   A.  Correct.
22   Q.  Okay.
23       MR. ROBBINS:  So why don't we
24  put a sticker on that.

60

1       (Exhibit No. 55 received and
2  Marked for identification).
3    Q.  I've taken some documents and photo
4  copied them from this Exhibit 55, and I'd like
5  to ask you some questions about some of them.
6       When did you first become aware of
7  a Phase 1 study to be done at what is called
8  190-200 Union Street?
9    A.  April or May of 2002.
10   Q.  How did you become aware of it?
11   A.  I don't recall.
12   Q.  Did somebody speak to you, did your
13  supervisor speak to you, did somebody hire up at
14  Goldman speak to you and say we have a project
15  that we want you to work on?
16   A.  I don't recall the exact details.
17   Q.  When was the first time that you went
18  to the site?
19   A.  May 2nd, 2002.
20   Q.  Okay.  And your intention of going to
21  the site was to conduct a Phase 1 study; is that
22  correct?
23   A.  To conduct a site inspection of the
24  property that I was doing a Phase 1 study on.

61

1    Q.  So the overall purpose was a Phase 1
2  study, the specific purpose was a site
3  inspection?
4    A.  Correct.
5    Q.  And the point of a Phase 1 study on
6  this property was to determine the presence of
7  oil or hazardous materials?
8       MR. KERESTER:  Objection to
9  form.
10       MR. BRAVERMAN:  I object.
11       MR. KERESTER:  I'm objecting
12  in part to the leading nature of the question.
13       MR. ROBBINS:  She already said
14  that -- okay.  I'll let that sit.
15   Q.  You can answer the question.
16   A.  Could you repeat the question?
17       MR. ROBBINS:  Thank you for
18  letting me know what your objection was.
19       (Last question read back).
20   Q.  I said the purpose -- I'm going to
21  amend the question slightly.
22       Your purpose and Goldman's purpose
23  for conducting a Phase 1 study on this property
24  was to determine, was it not, the presence or

16 (Pages 58 to 61)

Lauren McKinlay 11-18-2005
Georto, Inc. v. William Gateman, et al.

62

1  potential presence of oil and/or other hazardous
2  materials?
3        MR. KERESTER: Objection.
4        MR. BRAVERMAN: I object.
5     A.  The purpose of the Phase 1 was to
6  determine if there was any recognized
7  environmental conditions as defined by the ASDM
8  standard.
9     Q.  And did we not decide in discussing
10  this this morning that the recognized
11  environmental conditions phrase, in fact, means
12  under this, potential presence of oil and/or
13  hazardous materials?
14        MR. KERESTER: Objection.
15        MR. BRAVERMAN: I object.
16     Q.  I thought that's what you told me this
17  morning.
18        MR. KERESTER: Objection.
19        MR. BRAVERMAN: I object.
20     A.  Could you repeat the question?
21     Q.  Let me give you a different question.
22  We're going to go back over this until I get it
23  clear.
24        What is your understanding of the

63

1  phrase, recognized environmental conditions as
2  defined by ASM 1527? What does it mean to you?
3        MR. BRAVERMAN: I object.
4     A.  A condition past or present or an
5  activity that has occurred at the site, past or
6  present, that has the potential to contaminate
7  the site.
8     Q.  Contaminate the site with what?
9     A.  Oil and hazardous materials. It could
10  also encompass improper disposal of solid waste
11  or oil and hazardous materials.
12     Q.  Does that finish your answer? Have you
13  had enough time to finish it?
14     A.  Yes.
15     Q.  So your answer is finished?
16     A.  Yes.
17     Q.  So conditions past or present or an
18  activity past or present that actually has the
19  potential to contaminate the site with oil
20  and/or hazardous materials. Did I get that part
21  right so far? I'm not finished, but so far am I
22  right with that answer?
23     A.  Yes.
24     Q.  And in addition to oil and hazardous

64

1  materials, the improper disposal of solid
2  waste. Is that what you're adding?
3     A.  Correct.
4     Q.  And presumably by default, the improper
5  disposal of oil or hazardous materials?
6        MR. KERESTER: Objection to
7  form.
8     A.  Well, the improper disposal of solid
9  waste on its own, regardless of whether there's
10  contaminant present or not would constitute a
11  recognized environmental condition.
12     Q.  I'm sorry, would you say that again? I
13  didn't follow you.
14     A.  The improper disposal of solid waste
15  would constitute a recognized environmental
16  condition regardless of if that solid waste
17  contained oil or hazardous materials.
18     Q.  Okay. Now, I haven't heard you use the
19  term solid waste before right now; so would you
20  tell me what you mean by solid waste?
21     A.  Solid waste could include garbage,
22  trash, building materials. I believe it could
23  include asphalt and concrete, although I'm not a
24  specialist when it comes to solid waste

65

1  regulations.
2     Q.  Can solid waste include anything else?
3     A.  Yes.
4     Q.  What else?
5     A.  I don't recall.
6     Q.  Are there regulations or statutes in
7  the Commonwealth of Massachusetts that define
8  for you what solid waste consists of?
9     A.  Yes.
10     Q.  Where would you find those?
11     A.  In the Massachusetts Code of
12  Regulations. I don't recall the specific
13  portion of the regs that I would look to.
14     Q.  And the identification of solid waste
15  disposal is part of your Phase 1 study; is that
16  correct?
17     A.  How is it or is it?
18     Q.  Is it?
19     A.  Yes.
20     Q.  Is that part of a Phase 1 study?
21     A.  Yes.
22     Q.  Okay. What are the steps that you take
23  to identify when you do a Phase 1 study the
24  presence or absence of solid waste or the

17 (Pages 62 to 65)

Lauren McKinlay 11-18-2005
Georto, Inc. v. William Gateman, et al.

66

1  potential presence or absence of solid waste on
2  the site?
3      A.  Questioning people, either operators or
4  owners who are familiar with the site as to how
5  solid waste generated at the site is disposed,
6  walking over the site to see if there's any
7  unusual mounds that might be associated with
8  filling activities.  Also, reviewing files
9  maintained by Mass. DEP.  If the site had been a
10  solid waste landfill at one point, it would be
11  identified in those files.
12      Q.  Any other steps?
13      A.  Those would be the steps that I would
14  take.
15      Q.  Now, when you gave me a list of what
16  you understood or what you remembered as solid
17  waste items, you mentioned garbage.  When you
18  say garbage, what do you mean by garbage?
19      A.  Wrappers, boxes, things that you would
20  generate and throw out that you would no longer
21  have use for.
22      Q.  That could be anything from a car to a
23  piece of food or all sorts of things.  That's a
24  very broad definition, or is it your intention

67

1  to include garbage essentially as anything that
2  could be thrown out?
3      A.  I would say that garbage would be a
4  broad definition and would include anything that
5  could be thrown out.
6      Q.  So that's your understanding of what
7  garbage means under this definition of solid
8  waste in Massachusetts?
9      A.  Yes.
10      Q.  How about trash, what is your
11  understanding of the definition of trash under
12  the Massachusetts regulations?
13      A.  I would say it would be the same as
14  garbage.
15      Q.  Okay.  So trash and garbage is
16  essentially the same?
17      A.  Yes.
18      Q.  Building materials, what is that?  What
19  is your understanding of Massachusetts
20  definition for that?
21      A.  It could be wood, metal, plaster,
22  concrete, drywall, floor tiles, carpet, anything
23  that you would use in the construction of a
24  building.

68

1      Q.  Then you said asphalt and concrete, but
2  you said you weren't an expert in the area of
3  asphalt or concrete.  I didn't quite remember
4  what you said.
5      A.  I don't recall if asphalt and concrete
6  are included in the Massachusetts regulations.
7  I'd have to refer to the regulations.
8      Q.  So you don't know whether they're
9  included or not?
10      A.  Correct.
11      Q.  Okay.  And then you said there are
12  others that you don't remember?
13      A.  Correct.
14      Q.  Are there other types of items?
15      A.  Yes.
16      Q.  Do you know if bricks are among or
17  under Massachusetts regulations defined as solid
18  waste?
19      A.  I don't recall.
20      Q.  By whom was Goldman retained by this
21  project at this address?
22          MR. KERESTER:  Objection to
23  form.
24      A.  I believe the client was Envirotest.

69

1      Q.  And what is Envirotest?
2      A.  I'm not certain.
3      Q.  Is it a business?
4      A.  I believe it's a laboratory, but I'm
5  not 100 percent on that.  I know it's a
6  business, but I don't know.
7      Q.  Have you ever dealt with any
8  individuals from Envirotest in your work?
9      A.  Not other than on this project.
10      Q.  Okay.  But yes at this project?
11      A.  Yes.
12      Q.  Do you remember the names of any of the
13  people at this project from Envirotest with whom
14  you had any contact?
15      A.  I don't recall without looking at who
16  the report is addressed to.
17      Q.  Okay.  What were you told your
18  responsibilities were on this project?
19      A.  I don't recall.
20      Q.  Did someone tell you to do a Phase 1
21  study?
22      A.  I don't remember.
23      Q.  Do you know who the ultimate client
24  was?  In other words, the owner of the piece of

18 (Pages 66 to 69)

Lauren McKinlay 11-18-2005
Georto, Inc. v. William Gateman, et al.

**70**

1 property that you were doing the report on?
2    A. Bill Gateman was the owner of the site.
3    Q. Okay. Are you familiar with the name
4 of a business called Family Dollar?
5    A. Not in the context of this project.
6    Q. In what context?
7    A. As a business. I know there's a
8 business named Family Dollar.
9    Q. So someone whom you don't remember
10 gives you the assignment to do a Phase 1 study
11 at this 200 Union Street address in Lynn back in
12 approximately April or May of 2001. I think you
13 said?
14    MR. KERESTER: I believe she
15 said 2002.
16    A. Yes, 2002.
17    Q. Have I got the story right so far,
18 someone gave you an assignment to do a Phase 1?
19    A. Correct.
20    Q. Okay. The first time you went to the
21 site, were you by yourself or were you with
22 someone else?
23    A. I was by myself.
24    Q. What did you do when you got there?

**71**

1    A. I don't recall all of the things that I
2 did when I was there, but I recall walking the
3 site and interviewing Mr. Gateman based on my
4 field notes. I don't recall the actual
5 conversation itself.
6    Q. Okay. When you got there I was about
7 to ask you, what is it -- do you keep a notebook
8 of the work that you do in connection with the
9 Phase 1?
10    A. I would take notes, but not in a
11 specific notebook.
12    Q. You would take notes. You would write
13 notes down on a piece of paper?
14    A. Correct.
15    Q. Do I have those pieces of paper of the
16 notes that you wrote in Exhibit 55?
17    A. Yes.
18    Q. Would you find them for me?
19    A. (Witness complying).
20    Q. These sheets that you're handing me,
21 these are all of your notes?
22    A. Relative to the Phase 1.
23    Q. Right. And are there notes that you've
24 made relative to anything besides the Phase 1 at

**72**

1 this project or this location?
2    A. No. Those aren't just specific to the
3 site inspection. Those are notes that I took
4 during all aspects of the Phase 1.
5    Q. Were you there for any other purpose
6 other than a Phase 1?
7    A. Those include notes that I would have
8 taken from the town offices and things like
9 that.
10    Q. You would have because you were
11 conducting a Phase 1 study?
12    A. Yes.
13    Q. So whatever the source of the
14 information is that you put into these notes, it
15 was all part of the same project, a Phase 1
16 study; is that correct?
17    A. Yes.
18    Q. Okay. And subject to perhaps some
19 correction, this is all of them, subject to
20 finding a missing sheet or whatnot?
21    MR. BRAVERMAN: I don't know
22 whether you would consider those notes, anything
23 written in her hand pertaining to the Phase 1
24 study.

**73**

1    (Exhibit No. 55A received and
2 Marked for identification).
3    Q. This initial form on top of Exhibit
4 55A, is that a Goldman form that's used for
5 Phase 1s?
6    A. Yes.
7    Q. You've seen that form before?
8    A. Yes.
9    Q. And that's your handwriting on that
10 form, right?
11    A. Yes.
12    Q. In other words, your handwriting is
13 someplace on every document that's in this 55A,
14 right?
15    A. At some point, yes.
16    Q. Okay. I'd like to ask you -- actually,
17 let me pull this out so you can look at that.
18    This first form in 55A has at the
19 top the name of site inspection form. Do you
20 see that?
21    A. Yes.
22    Q. Inspected by LMM?
23    A. Correct.
24    Q. That's you?

19 (Pages 70 to 73)

Lauren McKinlay 11-18-2005
Georto, Inc. v. William Gateman, et al.

74

1  A.  Yes.
2  Q.  And this was done on May 2, '02?
3  A.  Yes.
4  Q.  Okay.  And it was raining I take it?
5  A.  Yes.
6  Q.  On this you've written various things,
7  including on site history.  You say, "Bill
8  Gateman stated commercial store different times
9  in the past 50 years."  A little line up to
10  "Gateman has owned property since 1997."
11      Did I read that right?
12  A.  It states, "Bill Gateman stated
13  commercial store approximately past 50 years."
14  Q.  Okay.
15  A.  "Has owned property since 1997."
16  Q.  Okay.  Now, I can't read this.  There's
17  some writing just below that.  On my copy it
18  doesn't show up.  Can you tell me what the
19  writing below that is?
20  A.  No.
21  Q.  Did you see there's some writing
22  there?  It's too faint.
23  A.  No.
24  Q.  So when you wrote that down there,

75

1  "Bill Gateman stated," that's your notes or are
2  you quoting him?  In other words, is that an
3  exact quote of the words that he said?
4  A.  I don't recall.
5  Q.  Okay.  But it's your notes summarizing
6  at least what he said?
7  A.  Yes.
8  Q.  Okay.  Now, down at the bottom it says
9  current use.  Do you see that?
10  A.  Yes.
11  Q.  Would you read what you've written in
12  there, please?
13  A.  "Vacant building has been demolished --
14  currently demolition debris piles at the site --
15  per Mr. Gateman, all will be removed/disposed.
16  Former basement areas currently being filled
17  in."
18  Q.  When you were there, were there any
19  other people besides you and Mr. Gateman working
20  at the property?
21  A.  Yes.
22  Q.  Were these the asbestos abatement
23  people?
24  A.  No.

76

1  Q.  Okay.  What other kind of people were
2  working there?  What was going on with these
3  other people?
4  A.  I don't recall.
5  Q.  So you recall there were some people
6  there, but you don't recall what they were
7  doing?
8  A.  I recall there was heavy equipment on
9  the site.  I recall that they were operating,
10  but I don't recall the exact activities that
11  they were doing.
12  Q.  And when you got there, would you
13  describe what the site looked like and in
14  particular -- describe what the site looked
15  like.
16  A.  I don't recall all the details, but I
17  remember there being no vegetation, debris
18  piles, a couple of pieces of heavy equipment on
19  the site.  That's what I recall.
20  Q.  Okay.  Did you see any trucks?
21  A.  I don't recall.
22  Q.  Was the building standing at all or had
23  it all been leveled down, knocked down?
24  A.  The basement foundation was remaining.

77

1  Q.  Did you see any building above the
2  basement foundation level?
3  A.  No.
4  Q.  So was the level of the site all
5  leveled up to the street level?
6      MR. KERESTER:  Objection to
7  form.
8  A.  No.
9  Q.  What was the topography or elevation on
10  the site when you got there on May 2 that you
11  observed?
12  A.  They were very irregular.  I mean,
13  there was a drop off into a basement area.
14  Q.  Anything else?
15  A.  That's what I recall.
16  Q.  Was any part of it at the level of the
17  street?
18  A.  Within a foot of the street I would
19  say.
20  Q.  Okay.  And there was some area that
21  went down to a basement level you said?
22  A.  Yes.
23  Q.  Okay.  And then when you said there
24  were debris piles, what do you mean by debris

20 (Pages 74 to 77)

Lauren McKinlay 11-18-2005
Georto, Inc. v. William Gateman, et al.

78

1  piles?
2      A.  I don't recall specifics of the debris
3  piles.
4      Q.  So do you remember any of the items
5  that composed these debris piles?
6      A.  Not unless I refer to the notes that I
7  took on that day.
8      Q.  Okay.  So I assume that those notes
9  would be part of 55A?
10      A.  Yes.
11      Q.  Okay.  Do you keep private notes or
12  personal notes with regard to your work
13  assignments?
14      A.  No.
15      Q.  Okay.  So no private diary or log with
16  notes?
17      A.  No.
18      Q.  So everything you've written in your
19  hand with regard to gathering information and in
20  general with regard to this project is in this
21  55A as far as you know?
22      A.  Yes.
23      Q.  So could you find notes in there?
24  Would you look through those and tell me if you

79

1  can refresh your memory as to what was in the
2  debris piles?
3      A.  (Witness viewing document.)  Demolition
4  debris and metal.
5      Q.  And where did you find that, please?
6      A.  The second page of the inspection, site
7  inspection form.
8      Q.  Okay.
9      A.  Under site exterior portion, debris
10  piles.
11      Q.  Does that answer what I asked you, do
12  you think?  I asked you if you could find
13  anything that would refresh your memory as to
14  what the debris piles were composed of, what is
15  in them?  Circle "Y" I assume means yes, and
16  then it says, demolition debris, but we knew
17  that from the first page that you said there was
18  demolition debris.
19          My question was, what was in the
20  pile, not whether or not there was a pile, and
21  if you could refresh your memory from looking at
22  your notes as to what the contents of the pile
23  was?
24          MR. KERESTER:  Objection.

80

1      A.  On the second page of the second
2  document in Exhibit 55A.  And just to orient me
3  -- I may have it.
4          There's some notes that look like
5  they're on lined paper with the date of 5/2/02
6  on the upper left.
7      A.  Yes, site inspection.
8      Q.  And this is, "12 o'clock meet Bill
9  Gateman."
10      A.  Correct, on the second page of that.
11      Q.  Thank you.
12      A.  About midway down it says, "current
13  conditions of site."
14      Q.  Okay.
15      A.  Indicates metal and debris piles.
16      Q.  Okay.  So that refreshes you that there
17  was some metal in the debris pile?
18      A.  Correct.
19      Q.  Anything else in your notes that would
20  tell you what else is in it, it being the debris
21  piles?
22      A.  No.
23      Q.  And you don't independently today
24  remember what was in the piles other than metal

81

1  which you were refreshed on?
2      A.  I recall wood.
3      Q.  Anything else that you remember?
4      A.  That's all that I recall.
5      Q.  And when you say metal, do you know
6  what kind of metal?  I don't mean the nature of
7  whether it was iron or steel, but what was the
8  shape or what was it used for, do you know any
9  details about the metal?
10      A.  I don't recall.
11      Q.  And with regard to the wood, was it
12  wood from roots or from trees, was it finished
13  wood and what size was this wood?
14      A.  I recall it was wood that you would use
15  as building materials, but I don't recall sizes.
16      Q.  Okay.  I understand.  Now, when you --
17          MR. ROBBINS:  I'm sorry?
18          MR. BRAVERMAN:  I'm not going
19  to interfere.  Go ahead.
20          MR. ROBBINS:  Did I do
21  something wrong?
22          MR. BRAVERMAN:  No, not at
23  all.
24          (Discussion held off

21 (Pages 78 to 81)

Lauren McKinlay 11-18-2005
Georto, Inc. v. William Gateman, et al.

82

1       the record).
2       Q.   "Per Mr. Gateman, all will be removed,
3  slash, disposed." End quote.  Do you see that?
4       A.   Yes.
5       Q.   Okay.  Is that a direct quote from him,
6  the exact words he said, all will be
7  removed/disposed, or is that your summary of
8  your conversation and understanding?
9       A.   I don't recall.
10      Q.   Okay.  Did you review these records
11  that have been produced today and marked as
12  Exhibit 55?  Did you review the records that
13  were produced as Exhibit 55 in total?
14      A.   I reviewed a portion of the records
15  that I was involved in.
16      Q.   And what portion was that?
17      A.   The Phase 1 activities.
18      Q.   So that would have included your notes?
19      A.   Yes.
20      Q.   And that would have included the report
21  that was created and had your signature on it?
22      A.   Yes.
23      Q.   Okay.  Did you look at any photographs
24  that were produced?

83

1       A.   Yes.
2       Q.   Did you take any photographs of that
3  scene of that site as part of your Phase 1
4  activities?
5       A.   Yes.
6       Q.   You did?
7       A.   Yes.
8       Q.   Can we pull out the set of color
9  photographs?
10          MR. BRAVERMAN:  I only saw the
11  black and white ones in this group.  I thought
12  we produced some color photographs.
13          MR. ROBBINS:  I thought I just
14  saw them.
15          (Discussion held off
16          the record).
17          MR. ROBBINS:  Through in
18  attention, defense counsel has in some cases put
19  photocopied copies of the original documents
20  provided by Goldman into the pile that was
21  identified collectively as Exhibit 55.
22          We've now determined that that
23  problem happened and have swapped the true
24  original production for the secondary photocopy

84

1  so that 55 should now be complete with all of
2  the originals, including some color photographs
3  and a large bound set of documents, which were
4  tabbed in gray and appear to consist of Phase 1
5  materials.
6          Did I state that clearly enough for
7  everybody's satisfaction, or does anybody want
8  to add anything?
9          MISS ENGBERG:  No, I think
10  that's fine.
11          MR. KERESTER:  As I understand
12  it now, Exhibit 55 contains the original package
13  that you received, the FedEx delivery from
14  Goldman in response to the subpoena?
15          MR. ROBBINS:  That's correct,
16  it now contains everything that I got.
17          MR. BRAVERMAN:  Well, not
18  quite because you still have the unmarked
19  original certification from Goldman of the
20  authenticity of the documents.
21          MR. ROBBINS:  Which previously
22  we decided was not an important --
23          MR. KERESTER:  Right, with the
24  limited exception that the single sheet

85

1  constituting the certification, Exhibit 55 does
2  now constitute the original of a package that
3  you received, and 55 also includes a copy of
4  that certification.
5          MR. ROBBINS:  Correct.  Is
6  counsel satisfied with that, or do we want to
7  remark the original Certification?
8          MR. KERESTER:  I'm satisfied.
9          MISS ENGBERG:  That's fine
10  with me.
11          MR. BRAVERMAN:  I have no
12  interest.
13          MR. KERESTER:  For clarity
14  purposes, why don't we mark that as 56 just so
15  there's no doubt about it.
16          MR. BRAVERMAN:  The original
17  certification.  You might need it later, so
18  that's not a bad idea.
19          MR. ROBBINS:  Works for me.
20          (Exhibit No. 56 received and
21          Marked for identification).
22  BY MR. ROBBINS:
23      Q.   Did you take any photographs yourself
24  of the Union Street property that you were doing

22 (Pages 82 to 85)

Lauren McKinlay 11-18-2005
Georto, Inc. v. William Gateman, et al.

86

1    the Phase 1 on?
2    A.  Yes.
3    Q.  Are these the photographs that you took
4    in front of you, or copies of them?
5    A.  Yes.
6    Q.  And did you take photographs other than
7    the six that are contained in those
8    reproductions?
9    A.  No.
10   Q.  Okay.
11       MR. ROBBINS:  Let's mark that as
12   55B, please.
13       (Exhibit No. 55B received and
14       Marked for identification).
15   Q.  Do the originals of these photographs
16   still exist someplace?
17   A.  They were digital photographs.
18   Q.  So is there -- do the digital files
19   representing these files exist someplace?
20   A.  Yes.
21   Q.  Where, on Goldman's server?
22       MR. KERESTER:  I think you
23   were provided digital copies of these files.
24       MR. ROBBINS:  I know I was.

87

1    Thank you.
2    Q.  The descriptions that are typewritten
3    underneath the photographs, who put those on
4    there?
5    A.  I did.
6    Q.  Okay.  So you wrote out those
7    descriptions?
8    A.  Yes.
9    Q.  Okay.  And what is the numbering
10   system?  At the beginning of the photograph
11   there is a number.
12   A.  That's the job number designated by
13   Goldman.
14   Q.  Which part of that is the job number?
15   A.  958-2080.
16   Q.  And these pictures were taken on May
17   2nd?
18   A.  Yes.
19   Q.  Did you look at these pictures before
20   coming here today?
21   A.  Yes.
22   Q.  The first words that you have after the
23   filing number says, "Envirotest Laboratories";
24   is that right?

88

1    A.  Yes.
2    Q.  Okay.  What was your intention of
3    putting that phrase in there?  Why is that
4    there?
5    A.  The client that had hired us to conduct
6    the Phase 1.
7    Q.  Okay.  So would you show me in these --
8    and I'll ask you to look at each one in turn --
9    the so-called debris piles, the demolition
10   debris piles that you were referring to?
11   A.  Yes.
12   Q.  Are the pictures numbered in any way to
13   distinguish them by a number?
14   A.  No.
15   Q.  Okay.  We'll see if we have to mark
16   anything, but on the first page do you see any
17   of the debris that you were referring to before?
18   A.  The second picture on the first page.
19   Q.  All right.  Does anybody have a problem
20   with her marking in the margin the letter "A,"
21   let's say?
22       MR. KERESTER:  No, that's
23   fine.
24   Q.  Just a capital Letter "A" would be

89

1    fine.
2    A.  (Witness complying).
3    Q.  So on Photograph A on this page you
4    were pointing to the sort of mound on the center
5    of the picture as the debris picture?
6    A.  Yes.
7    Q.  Do you see anything in the other
8    picture that represents any of the debris piles?
9    A.  No.
10   Q.  Okay.  would you go to Page 2 of the
11   sheets.  Would you look at each of the two
12   pictures on there and tell me if you see any
13   debris piles in either one?
14   A.  In both of the pictures.
15   Q.  Would you look at each picture.  For
16   each of the six pictures, would you identify any
17   debris pile that you find shown in the picture
18   when you said before when you talked about
19   debris with Mr. Gateman?
20   A.  In the top picture on Page 2.
21   Q.  Okay.  Would you point to where the
22   debris is?
23   A.  (Indicating).
24   Q.  So you're on the right-hand side of the

23 (Pages 86 to 89)

Lauren McKinlay 11-18-2005
Georto, Inc. v. William Gateman, et al.

90

1   picture, kind of midway up under some grayish,
2   block looking items?
3       A.   Correct.
4       Q.   And would you put a letter "B" next to
5   that picture?
6       A.   (Witness complying).
7       Q.   Thank you. And then the bottom picture
8   on that page?
9       A.   Right here (Indicating).
10      Q.   Just below the piece of heavy equipment
11  and to the left of the heavy equipment?
12      A.   Yes.
13      Q.   Okay. Would you put a letter "C"
14  there, please?
15      A.   (Witness complying).
16      Q.   And if we can go to the third page?
17      A.   I don't see any debris piles on the
18  pictures 5 or 6.
19      Q.   Okay. Thank you. So when you were
20  referring to debris piles when I was asking you
21  questions a little while ago on this, these
22  pictures, the ones that you've marked, show what
23  you were referring to as debris?
24           MR. KERESTER: Objection to

91

1   form.
2       A.   It shows a representation of what I
3   observed.
4       Q.   Okay. But are you saying that what is
5   shown on those pictures that you have marked may
6   not have been all of the debris that you saw?
7       A.   Correct.
8       Q.   But it's representative of what you
9   saw?
10      A.   I don't recall. I don't recall. There
11  might have been another debris pile of a
12  different material that's not shown in these
13  photos.
14      Q.   Okay. Thank you. Did you observe any
15  debris being removed from the site while you
16  were there on this first day, May 2nd, 2002?
17      A.   I don't recall. But in reviewing the
18  files maintained in either Exhibit 55 or 55A,
19  based on statements made in some of those
20  documents, it refers to the activity being
21  conducted.
22      Q.   Would you show me where you are
23  referring to?
24      A.   On the second page of Document 2 in

92

1   Exhibit 55A.
2       Q.   What are you reading from?
3       A.   It indicates basement foundation
4   remaining and whole being backfilled.
5       Q.   Would you point to where you're looking
6   at. Maybe I have the wrong page.
7       A.   I don't believe that's the right
8   document. It indicates site inspection.
9       Q.   Okay. This is on the May 2nd visit; is
10  that right?
11      A.   Yes.
12      Q.   Current conditions of site. That's the
13  metal debris sentence there. All debris --
14  you're talking about the phrase, "All debris
15  pulled out. Basement foundation remaining and
16  hole being backfilled"?
17      A.   Correct.
18      Q.   And from whom did you get the
19  information about all of the debris being
20  removed and the hole being backfilled? Where
21  did you get that information from? Was it from
22  observations or from a conversation?
23      A.   I don't recall.
24      Q.   Okay. How long were you at the site on

93

1   this first visit on May 2nd?
2       A.   I don't recall.
3       Q.   Okay. Did you go back to the site
4   after that first visit?
5       A.   No.
6       Q.   Have you been back to that site at
7   anytime after May 2, 2002?
8       A.   No.
9       Q.   Did you ever go back to the City of
10  Lynn in connection with your work at that time
11  to do other research?
12      A.   I may have. I don't recall.
13      Q.   Okay. Would you have been able to
14  check records of the Fire Department or the
15  Housing Department or any of the places that you
16  say you gathered records from in Lynn without
17  going back there? Is there a way to do that
18  without going back to the city?
19      A.   Over the phone, through faxing.
20      Q.   Okay. So you could call up some of
21  these city agencies and ask them questions and
22  they would give you the information?
23      A.   Correct.
24      Q.   So to best of your recollection, the

24 (Pages 90 to 93)

94

1  only time you were up to the site was May 2nd of
2  2002?
3      A.  To the actual site itself, yes.
4      Q.  Are you distinguishing the actual site
5  itself to something else?
6      A.  No.  When you were referring to Lynn as
7  the city.
8      Q.  What I was saying was the site.
9      A.  Yes.
10     Q.  How long were you at the site on May
11 2nd?
12     A.  I don't recall.
13     Q.  Well, was it an hour, more than an
14 hour?
15     A.  I don't recall.
16     Q.  Was it a whole day?
17     A.  I don't believe it was a whole day.
18     Q.  Okay.  How long did you spend with
19 Mr. Gateman and his company?
20     A.  I don't recall.
21     Q.  An hour, more than an hour, the whole
22 day or as much as the day you stayed up there,
23 were you with him the whole time?
24     A.  I don't recall.

95

1      Q.  Did you have anybody else with you --
2      A.  No.
3      Q.  -- from Goldman or any friend or any
4  companion or assistant or whatever?
5      A.  No.
6      Q.  As a result of that visit on May 2nd
7  and your observations and research, did you
8  issue or write a report dated May 29, 2002?  And
9  I'll show you this pile of papers, which was
10 55.
11     A.  Yes.
12     Q.  And you know it's your report because
13 your signature is at the end; is that right?
14     A.  Yes.
15     Q.  Did you find any OHM contamination at
16 the site?
17     A.  I identified the potential for OHM
18 material to be at the site.
19     Q.  Okay.  So my question was, did you
20 identify any actual present OHM contamination at
21 the site?
22     A.  No.
23     Q.  But you did identify, I think you were
24 saying, some conditions that could have the

96

1  potential of having contamination?
2      A.  Yes.
3      Q.  If you would look at Page 10 of this
4  report.  And before I get to Page 10 -- I'm
5  sorry.  I have to ask you if this copy that I
6  have in front of you complete and full as far as
7  the report that was sent to the people at
8  Envirotest?  It has different materials
9  throughout it, drawings, field notes.  I want to
10 make sure that they all belong to this report?
11     A.  Yes.
12     Q.  Okay.  And that includes the field
13 notes in the back of this report, which are on
14 the Envirotest Laboratory heading.  Those are
15 part of it, too?
16     A.  Correct.
17     Q.  I actually put a flag where they
18 started.
19     A.  Those are part of it.
20     Q.  So what I have here is a complete
21 package?
22     A.  Yes.
23     Q.  Okay.  Thank you.  Were you aware at
24 the time that you started your study on May 2,

97

1  '02, that an asbestos abatement had occurred on
2  the property?
3      A.  Yes.
4      Q.  And that Envirotest had supervised that
5  abatement process?
6      A.  Yes.
7      Q.  And was part of the work -- Strike
8  that.
9          Before writing your report, did you
10 review all of the field notes that are part of
11 this?  I guess you would say it's Appendix E,
12 before writing your report?
13     A.  I don't recall.
14     Q.  Would that have been your practice to
15 have done that?
16     A.  I likely would have looked through
17 them.
18     Q.  The abatement work was done sometime
19 between March and April of 2002, right?
20     A.  Yes, based on their field notes
21 completed by Envirotest, that's when it was
22 done.
23     Q.  Okay.  Now, if we could go to Page 10.
24 On Page 10 you have what looks like you created

25 (Pages 94 to 97)

Lauren McKinlay 11-18-2005
Georto, Inc. v. William Gateman, et al.

98

1  a kind of a chart toward the lower half of the
2  page. Do you see that chart?
3      A.  Yes.
4      Q.  It's under Section 2.9.
5      A.  Yes.
6      Q.  And you have a building exterior, yes,
7  no and comments columns. Now, under the first
8  column where it says building exterior, there's
9  the words where there are soil piles or evidence
10 of filling activities. Do you see that?
11     A.  Yes.
12     Q.  And your answer was yes, there were.
13     A.  Yes.
14     Q.  And then you have some comments,
15 right?
16     A.  Yes.
17     Q.  Okay. What is the source of these
18 comments or sources of these comments?
19     A.  The City of Lynn Building Department
20 and conversations with Mr. Gateman.
21     Q.  And, again, are these quotations from
22 Mr. Gateman; so you're using his actual words,
23 or is this a summary of your understanding of a
24 particular conversation?

99

1      A.  I don't recall.
2      Q.  So you could have quoted him. If you
3  quoted him do you think you would have put it in
4  quotes?
5      A.  I don't recall.
6      Q.  All right. At the time that you were
7  there, May 2nd, was all of the demolition debris
8  that at least was pictured in 55B, was all of
9  that demolition debris as you pointed out in
10 that picture, had that been removed from the
11 scene?
12         Let me start the question again.
13 That was a bad question. Is it fair to say that
14 any demolition debris that was on that property
15 when you saw it on May 2nd, not all of it had
16 been removed from the property at that time?
17         MR. KERESTER:  Objection to
18 form.
19         MR. BRAVERMAN:  I object.
20     A.  During my site inspection I observed
21 piles of demolition debris.
22     Q.  Ergo, it wasn't all removed?
23     A.  Yes.
24     Q.  Okay. So you actually never saw the

100

1  site with no debris -- Strike that. Forget it.
2         Let me ask you to look at Page 16.
3  Again, you have that chart, and then you say
4  with regard to storage tanks, "Interview with
5  site contact." And your site contact then was
6  Mr. Gateman?
7      A.  Yes.
8      Q.  Okay. Page 24, please?
9      A.  (Witness viewing document.)
10     Q.  This appears to be part of your
11 findings beginning on 23 under solid waste. Do
12 you see that?
13     A.  Yes.
14     Q.  Okay. Would you read what you've
15 written there, please?
16     A.  "Piles of solid waste. (Demolition
17 debris) were observed throughout the site.
18 Based on conversations with Mr. Gateman,
19 observed piles are scheduled to be removed and
20 properly disposed off site by Roberts
21 Dismantling and recycling."
22     Q.  Did Mr. Gateman ever indicate to you
23 exactly which materials in any observed piles
24 that were scheduled to be removed and disposed

101

1  of? Did he specify which materials were being
2  taken out of?
3      A.  Not that I recall.
4      Q.  You don't have any notes to refresh
5  yourself with?
6      A.  No.
7      Q.  Had he indicated which specific
8  materials were being removed, would it have been
9  your practice to have included the names of
10 those materials that he said?
11     A.  Based on my notes I believe it
12 indicated all material. He indicated all
13 material.
14     Q.  But he didn't specify what the
15 materials were that would constitute the all is
16 my question?
17     A.  I don't recall.
18     Q.  Okay. Had he done that, would it have
19 been your practice to record the specifics of
20 what he told you?
21         MR. KERESTER:  Objection to
22 form.
23     A.  I likely would have noted it if he
24 specified on specific piles rather than all. I

26 (Pages 98 to 101)

Lauren McKinlay 11-18-2005
Georto, Inc. v. William Gateman, et al.

102

1 would have noted the specific piles.
2    Q.  And if he had noted specific kinds of
3 debris, would you have noted that?
4    A.  Likely.
5    Q.  Okay.  During your site visit did you
6 have occasion to walk throughout the site
7 itself?
8    A.  Yes.
9    Q.  Did you do that?
10    A.  Yes.
11    Q.  Did you walk down into the basement,
12 for instance?
13    A.  I don't recall.
14    Q.  So do you recall any places on the site
15 that you walked?
16    A.  I don't recall.
17    Q.  Now, on Page 1 of this -- actually,
18 it's the cover letter that accompanies the
19 report, that May 29, 2002 letter.
20    A.  Yes.
21    Q.  Okay.
22       (Brief break taken.)
23    BY MR. ROBBINS:
24    Q.  After the May 2nd, 2002 visit, did you

103

1 ever have any other contact with Mr. Gateman
2 either live or by telephone or by e-mail or any
3 other means?
4    A.  Not that I recall.
5    Q.  Okay.  I'd like to move for a moment to
6 what is in the back, and I actually had put a
7 little blue tab where the field notes are.
8       What is your understanding of the
9 authorship of these fields notes generally
10 speaking?
11    MR. BRAVERMAN:  I object.
12    MR. KERESTER:  What are you
13 referring to specifically?
14    MR. ROBBINS:  There is a bunch
15 of field notes by Envirotest people.
16    MR. KERESTER:  This is
17 appendix E?
18    MR. ROBBINS:  Yes.
19    Q.  Was it your understanding these were
20 field notes written by Envirotest people who
21 were supervising the asbestos removal?
22    A.  Yes.
23    Q.  Okay.  I'd like to draw your attention
24 to a field note that's a few pages in marked

104

1 March 29 '02.  It says field notes on the page.
2    A.  (Witness viewing document.)
3    Q.  You've read these field notes, I think
4 you indicated, or you thought you had before
5 writing this report?
6       MR. BRAVERMAN:  I object.
7    A.  I don't recall.
8    Q.  You don't recall whether you read them
9 or not?
10    A.  I don't recall the timing of when I
11 read them.
12    Q.  Have you ever read them?
13    A.  I've looked through them.
14    Q.  Okay.  Is that different than reading
15 them?  I don't know what you mean.
16    A.  I've scanned them.  I don't know if I
17 would say I read them word for word.
18    Q.  Okay.  Let me back up then and see if I
19 can get at it this way.
20       Did whatever contacts you had with
21 these notes, whether you scanned them or perused
22 them or whatever, did anything contained in
23 these field notes from any of the Envirotest
24 people form any part of the basis to your May

105

1 29, 2002 report, Phase 1 report?
2    MR. KERESTER:  Objection to
3 form.
4    MR. BRAVERMAN:  I object.
5    A.  I don't recall.
6    Q.  So you don't recall whether anything
7 that is in your report came from anything in
8 these field notes?
9    A.  Correct, I don't recall.
10    Q.  Is there any way you would be able to
11 determine this other than your memory, your
12 recollection?
13    A.  I don't believe so.
14    Q.  Okay.
15    MR. ROBBINS:  I'd like to mark
16 this as 55C.
17       (Exhibit No. 55C received and
18       Marked for identification).
19    Q.  We have previously marked as Exhibit 26
20 a report with a cover letter dated February 2,
21 2004 to James Hawkins from Goldman
22 Environmental.  It's referred to as a limited
23 subsurface investigation.  I'd like to show that
24 to you now, and ask you if you'd take a look at

27 (Pages 102 to 105)

Lauren McKinlay 11-18-2005
Georto, Inc. v. William Gateman, et al.

106

1    it.
2          I'd like to know, did you have any
3    participation in any facet of the creation of
4    data conclusions or drafting of the report?
5      A.  No.
6      Q.  Okay.  So while you have done -- what
7    is this limited subsurfacing investigation, is
8    this a Phase 2 report or a different report yet?
9      A.  You could consider it a Phase 2.
10     Q.  How do you know that?  What is it that
11   tells you that it's a Phase 2?
12     A.  There's subsurface work involved.
13     Q.  So Phase 1, no digging of holes; phase
14   2, dig some holes?
15     A.  Typically, yes.
16     Q.  Okay.
17          MR. ROBBINS:  I have no other
18   questions then.  Thank you.
19               * * *
20          EXAMINATION BY MR. KERESTER:
21     Q.  Miss Maigret, I believe as you know my
22   name is Dale Kerester, and I represent the
23   plaintiff Georto in this case.
24          My understanding from your

107

1    testimony is that you made a site visit to the
2    Lynn property on or about May 2nd, 2002; is that
3    correct?
4      A.  Yes.
5      Q.  And while you were at the property did
6    you meet with Mr. William Gateman?
7      A.  Yes.
8      Q.  And what was your purpose in meeting
9    with him at that time?
10     A.  To conduct a site walk over and an
11   interview with him.
12     Q.  Did you, in fact, interview Mr. Gateman
13   while you were at the property on that day?
14     A.  Yes.
15     Q.  What was purpose in doing so?
16     A.  To determine his knowledge of the site
17   in regards to current and historic operations at
18   the site, if any subsurface investigations had
19   previously been conducted at the site, if there
20   had been any activity and use limitations placed
21   on the site.  Basically, to get an understanding
22   of historic and current activities that had and
23   were currently occurring at the site.
24     Q.  And did the purpose in so far as it

108

1    related to historical and present activity in
2    the site include the issue of solid waste?
3      A.  Yes.
4          MR. ROBBINS:  Objection.
5      Q.  And did you take handwritten notes of
6    your interview with Mr. Gateman?
7      A.  Yes.
8      Q.  And are those notes contained in
9    Exhibit 55A?
10     A.  Yes.
11     Q.  And can you specifically identify
12   within Exhibit 55A which handwritten notes
13   related to your interview with Mr. Gateman?
14     A.  The document indicated by site
15   inspection form on Page 1 dated 5/2/02.
16     Q.  How many pages does that document
17   consist of?
18     A.  Five.
19     Q.  And does that document reflect
20   information provided to you by Mr. Gateman?
21     A.  Yes.
22     Q.  And are there any other documents that
23   reflect your interview with Mr. Gateman?
24     A.  Yes.

109

1      Q.  And what, if any, are those?
2      A.  The document dated 5/2/02 indicated by
3    site inspection. 12 o'clock, meet Bill Gateman.
4      Q.  And is that document two pages?
5      A.  It's three.
6      Q.  Three pages?
7      A.  Yes.
8      Q.  And does that include a diagram as
9    well?
10     A.  Yes.
11     Q.  And this three-page document that you
12   identified that has a date of 5/2/02 on the
13   first page, does that document reflect your
14   notes based on your interview of Mr. Gateman?
15          MR. ROBBINS:  I object to the
16   form.
17     Q.  Let me rephrase the question.  What
18   does the three-page document reflect?
19     A.  It reflects observations I made at the
20   time of the site inspection and conversations
21   that I had with Mr. Gateman.
22     Q.  Okay.  And when did you make those
23   notes?
24     A.  At the time of the site inspection.

28 (Pages 106 to 109)

Lauren McKinlay 11-18-2005
Georto, Inc. v. William Gateman, et al.

110

1  Q.  Okay.  Did you do that during the
2  course of your interview with Mr. Gateman?
3      MR. ROBBINS:  Objection.
4  A.  Yes.
5  Q.  And the three-page document that is
6  contained within Exhibit 55A, is that a true and
7  accurate copy of the notes that you made on that
8  day?
9  A.  Yes.
10 Q.  Okay.  To the best of your knowledge,
11 did you accurately set forth your observations
12 and the statements made to you by Mr. Gateman in
13 those notes?
14 A.  Yes.
15 Q.  I'd like to direct your attention to
16 the second page of those notes.  At the top of
17 that page there's a statement that indicates,
18 quote, "Robert's Dismantling and Recycling is
19 removing debris off site and filling in hole,
20 end quote."
21     Have I accurately read your notes?
22 A.  Yes.
23 Q.  Did you make that statement based on
24 your observations or based on your interview

111

1  with Mr. Gateman?
2      MR. ROBBINS:  Object to the
3  form.
4  A.  I don't recall.
5  Q.  What, if any, notes on Page 2 were made
6  by you on the basis of your conversation with
7  Mr. Gateman on May 2nd?
8  A.  Could you repeat that question?
9  Q.  Yes.  What, if any, of the notes that
10 are contained on Page 2 of the three-page
11 document did you make on May 2nd based on your
12 interview with Mr. Gateman?
13 A.  I don't recall.  But based on the
14 statement, "to Mr. Gateman's knowledge no wells
15 of any kind on site," that would be based on a
16 conversation with him.  I don't recall the
17 remaining statements, if they were based on
18 observations or conversations With Mr. Gateman.
19 Q.  Okay.  Let me direct your attention to
20 the words, "current conditions of site."
21 A.  Yes.
22 Q.  What, if any, conversations did you
23 have with Mr. Gateman regarding that subject?
24 A.  Mr. Gateman indicated that the debris

112

1  piles would be removed from the site.
2  Q.  And did you make the statement to that
3  effect in your notes based on a statement made
4  to you by Mr. Gateman?
5      MR. ROBBINS:  Objection.
6  A.  I don't recall, but I wouldn't have
7  formed that opinion without having conversations
8  with him about that because I wouldn't have
9  known what the ultimate plans with the debris
10 piles would be.
11 Q.  Did you interview anyone other than
12 Mr. Gateman on the site on May 2nd?
13 A.  No.
14 Q.  Directing your attention to the notes
15 that appear immediately below the reference to
16 the metal, slash, debris piles, what was the
17 source of the information that caused you to
18 make those notations?
19 A.  I don't recall.  I believe a portion of
20 it would have been observations.
21 Q.  And would any portion of that have been
22 based on observations with Mr. Gateman to the
23 best of your recollection?
24 A.  I don't recall.

113

1  Q.  Directing your attention to the first
2  five pages of Exhibit 55A.  It's a document
3  entitled, "Site inspection form;" is that
4  correct?
5  A.  Yes.
6  Q.  And can you tell me what this document
7  -- what this form is and how it's used?
8  A.  It's a form used when conducting Phase
9  1 investigations.  That acts as a reminder of
10 important questions to ask relevant to a Phase
11 1.
12 Q.  And did you have this form with you on
13 May 2nd when you interviewed Mr. Gateman?
14 A.  Yes.
15 Q.  And how, if at all, did you use that
16 form in connection with your interview with
17 Mr. Gateman?
18 A.  I don't recall.
19 Q.  What would have been your ordinary
20 practice with respect to the use of this form in
21 conducting a site interview in connection with a
22 21E, Phase 1 report?
23     MR. ROBBINS:  Objection.
24 A.  Typically interview the site contact.

29 (Pages 110 to 113)

Lauren McKinlay 11-18-2005
Georto, Inc. v. William Gateman, et al.

114

1    And as I'm interviewing them, go through the
2    site inspection form to make sure I'm asking all
3    of the key questions relevant to a Phase 1.
4       Q.  It's your handwriting that appears on
5    the site inspection form as part of Exhibit 55A;
6    is that right?
7       A.  Yes.
8       Q.  And do you recall when you made those
9    notations on that site inspection form?
10      A.  I don't recall.
11      Q.  What was your standard practice at that
12   time with respect to the preparation of the site
13   inspection form?
14      A.  I typically take notes as I'm
15   interviewing the site contact.
16      Q.  Was that your ordinary practice at the
17   time?
18      A.  Yes.
19      Q.  Do you have any understanding as to
20   whether you deviated from that ordinary practice
21   on the day that you interviewed Mr. Gateman?
22          MR. ROBBINS:  Objection.
23      A.  Can you repeat the question?
24      Q.  Let me rephrase the question.

116

1    as contained in 55A, is that a true and accurate
2    copy of the notations that you made on that day?
3       A.  Yes.
4       Q.  Okay.  What, was your purpose in
5    indicating that information as reflected in that
6    handwritten notation under the heading current
7    use?  Why did you set forth that use on the site
8    inspection report?
9       A.  Part of a Phase 1 is determining how
10   solid waste is disposed of at a site.
11      Q.  And how does what you just said relate
12   to the purpose for indicating the notes that you
13   did under the heading current use?
14      A.  The demolition debris piles observed at
15   the site would have constituted solid waste, and
16   therefore I would have asked him how are these
17   piles disposed of.
18      Q.  Do you have any understanding as to
19   whether the existence of solid waste is an
20   environmental condition?
21          MR. ROBBINS:  Objection.
22          MR. BRAVERMAN:  I object.
23      A.  I'm not sure of what you're asking.
24      Q.  Let me move on.  Directing your

115

1    Actually, let me just move on.
2          Directing your attention to the
3    first page of the site inspection form,
4    specifically to the heading of, "current use."
5    Can you identify, did you make a handwritten
6    notation indicating, "Quote, per Mr. Gateman,
7    all will be removed, slash, disposed."
8       A.  Yes.
9       Q.  And to the best of your recollection,
10   did you make that notation on or about May 2nd,
11   2002?
12      A.  Yes.
13      Q.  And what, if any, significance to you
14   as you testify today to the words "per
15   Mr. Gateman" have to do with respect to whether
16   that was a statement that Mr. Gateman had made
17   to you or not?
18      A.  It would indicate to me that he had
19   made that statement.
20      Q.  To the best of your knowledge, did you
21   accurately set forth the statement that he had
22   made to you under the heading current use?
23      A.  Yes.
24      Q.  And the five page site inspection form

117

1    attention to Page 2, and specifically to the
2    section entitled, "site exterior."
3          How does the information that's
4    reflected under the heading site exterior relate
5    to the Phase 1 — let me rephrase the question.
6    What is your purpose with respect to setting
7    forth the information that is reflected in the
8    heading site exterior?
9       A.  Part of the Phase 1 is describing how
10   the site is currently used.  Part of that is a
11   site description of how the site currently
12   appears.
13      Q.  And if I could direct your attention to
14   the line item, "Debris piles."  It has a "Y" and
15   an "N" next to it; is that correct?
16      A.  Yes.
17      Q.  And is that to indicate whether or not
18   there are debris piles present on a site?
19      A.  Yes.
20      Q.  Why is that information relevant, if at
21   all, to the preparation of the Phase 1 report?
22      A.  Materials contained in a debris pile if
23   they were present at the site could be
24   constituted as a recognized environmental

30 (Pages 114 to 117)

Lauren McKinlay 11-18-2005
Gicorto, Inc. v. William Gateman, et al.

118

1  condition.
2      Q.  As part of the process of preparing the
3  21E report for the Lynn property, did you
4  contact any officials from the City of Lynn?
5      A.  Yes.
6      Q.  And what was your purpose in doing so?
7      A.  To determine if they had any files
8  relating to the site.
9      Q.  Did you, in fact, request that some
10  files be provided to you?
11      A.  I don't recall, but that would be the
12  standard practice.
13      Q.  Okay.  Directing your attention to
14  Exhibit 55, does that exhibit contain any
15  information that you received or any files that
16  you received from the City of Lynn?  I don't
17  believe it was 55A, but rather the remainder of
18  55.
19      A.  Yes.
20      Q.  And where are you pointing to?
21      A.  Within Appendix D.
22      Q.  Which is part of the environmental
23  report?
24      A.  Yes.

119

1      Q.  Okay.  Aside from the environmental
2  report, do the documents that consist of Exhibit
3  55 contain any other files that you received
4  from the City of Lynn?  I'll direct your
5  attention to the original file materials.
6      A.  Yes.
7      Q.  And what are you pointing to now?
8      A.  The documentation from the Lynn Fire
9  Department.
10      Q.  And are there any other documents in
11  addition to that?
12      A.  I think it's the same document.  A
13  document on Building Department letterhead.
14      Q.  What is the date of that document?
15      A.  March 4th, 2002.
16      Q.  And is that the document that you're
17  referring to now, is that a copy of the document
18  that you received from the City of Lynn to the
19  best of your recollection?
20      A.  To the best of my recollection.
21      MR. KERESTER:  I'd like to
22  mark that page as Exhibit 55D.
23      (Exhibit No. 55D received and
24  Marked for identification).

120

1      Q.  To the best of your recollection,
2  Exhibit 55D, is that a true and accurate copy of
3  a document that you received from the City of
4  Lynn in response to a request for files or
5  information that you made to them?
6      A.  It was either a copy that they provided
7  or that I made a copy when I went in to review
8  their files.
9      Q.  I'd like to direct your attention to
10  the Phase 1 report, which I believe has been
11  marked as Exhibit 55C.
12      A.  (Witness viewing document.)
13      Q.  Specifically if I direct your attention
14  to Page 4.  I'd like to direct your attention to
15  the Paragraph 2.41, and the second to last
16  sentence of that first paragraph that begins
17  with, "Based on."  Could you read that into the
18  record, please.
19      A.  Based on conversations with
20  Mr. Gateman, all demolition, debris, has been or
21  will be hauled off site by Roberts Dismantling
22  and Recycling."
23      Q.  To the best of your recollection, does
24  that statement accurately reflect statements

121

1  made to you by Mr. Gateman?
2      MR. ROBBINS:  I object to the
3  form.
4      A.  Yes, based on my filed notes.
5      Q.  Directing your attention to Page 10,
6  and in particular to the lower right-hand corner
7  of the chart that appears at the bottom of that
8  page, can you read the sentence into the record
9  that begins with, "Based on"?
10      A.  The second one?
11      Q.  Correct.
12      A.  "Based on conversations with
13  Mr. Gateman, during the demolition of the site
14  building, asbestos abatement activities were
15  conducted."
16      Q.  Can you read the follow-up sentence,
17  too?
18      A.  "Mr. Gateman stated that all building
19  materials containing asbestos were removed from
20  the site and disposed of off site."
21      Q.  The following sentence as well?
22      A.  "Additionally, all demolition debris
23  was hauled off site or is in the process of
24  being hauled off site for proper disposal."

31 (Pages 118 to 121)

Lauren McKinlay 11-18-2005
Georto, Inc. v. William Gateman, et al.

122

1    Q.  And what was your purpose in setting
2  forth that information in the 21E report?
3    A.  To indicate how the demolition debris,
4  which would be considered solid waste, was going
5  to be disposed of from the site.
6    Q.  And in the event that it was your
7  understanding that the demolition debris would
8  remain on the site, how would that impact your
9  findings that you set forth in the 21E, Phase 1
10  report?
11    A.  We would have recommended that the
12  demolition debris piles be removed and properly
13  disposed of off site.
14    Q.  And why is that?
15    A.  It would have been considered an
16  environmentally recognized condition.
17    Q.  Directing your attention to Page 23.
18  At the top of the page there's a heading,
19  "Findings;" is that correct?
20    A.  Yes.
21    Q.  And can you read the last sentence of
22  the paragraph before we get to the bulleted
23  items?
24    A.  "Following is a summary of known or

123

1  suspect environmental conditions associated with
2  the property".
3    Q.  Okay.  did you, in fact, then on Page
4  23 and Page 24 set forth a known or suspect
5  environmental condition associated with the
6  property?
7    A.  Yes.
8    Q.  Okay.  Directing your attention to Page
9  24 what, if any, findings did you make regarding
10  known or suspect environmental conditions at the
11  property in connection with the issue of solid
12  waste?
13    A.  We stated -- the report states, "Piles
14  of solid waste (demolition debris) were observed
15  throughout the site.  Based on conversations
16  with Mr. Gateman, observed piles are scheduled
17  to be removed and properly disposed off site by
18  Robert's Dismantling and Recycling."
19    Q.  What was your purpose in using the
20  words, quote, "based on conversations with
21  Mr. Gateman." End quote.
22    A.  To indicate where the knowledge of how
23  the solid waste would be disposed of come from.
24    Q.  So with respect to the second sentence

124

1  that appears under the heading, "solid waste,"
2  what was that source of that information?
3    A.  Conversations with Mr. Gateman.
4    Q.  And to the best of your knowledge, does
5  that sentence accurately reflect statements made
6  to you by Mr. Gateman on or about May 2nd, 2002?
7      MR. ROBBINS:  Objection.
8    A.  Yes, based on my field notes.
9    Q.  Okay.  Have you had the opportunity to
10  review the 21E, Phase 1 report that's been
11  marked as Exhibit 55C since the date that you
12  prepared it?
13    A.  Yes.
14    Q.  And, in fact, did you prepare it on or
15  about -- let me rephrase.
16      Did you complete the report on or
17  about May 29, 2002?
18    A.  Yes.
19    Q.  And based on your subsequent review of
20  the report, have you identified whether you
21  inaccurately set forth any information provided
22  to you by Mr. Gateman?
23      MR. ROBBINS:  Objection.
24    Q.  Let me rephrase the question.  To the

125

1  best of your knowledge, did you accurately set
2  forth -- Strike that.
3      Approximately how many times have
4  you reviewed the reports since you completed the
5  preparation on or about May 29, 2002?
6    A.  Two or three.
7    Q.  And based on those reviews, have you
8  made any determination as to whether you
9  erroneously set forth any information in the
10  report?
11      MR. ROBBINS:  Objection.
12    A.  No.
13    Q.  No, you haven't made any determination,
14  or, no, you're not aware of having made any
15  erroneous --
16    A.  I'm not aware of having made any
17  erroneous statements.
18    Q.  Directing your attention to Page 20 of
19  the report.  Approximately in the middle of the
20  page in the lower right-hand corner of that
21  chart under the heading, "Description."  Can you
22  read that entry.  This is on the lower right-
23  hand corner.
24    A.  "The site is currently undergoing

32 (Pages 122 to 125)

Lauren McKinlay 11-18-2005
Georto, Inc. v. William Gateman, et al.

126

1  filling and regrading. Robert's Dismantling and
2  Recycling is currently transporting fill dirt
3  onto the site to fill in the former basement
4  areas to even out the grade of the site."
5      Q. What was your understanding at the time
6  that you completed this report in terms of what,
7  if anything, was going to be filled into the
8  former basement area of the -- what, if
9  anything, was your understanding as to what
10 would be filled into the former basement area on
11 the site?
12     A. Clean fill.
13     Q. And what was the source of that
14 understanding?
15     A. Conversations with Mr. Gateman and
16 observations made at the site.
17     Q. At the time that you completed the
18 report, what was your understanding as to
19 whether the demolition debris would or would not
20 be removed?
21     A. My understanding is that the demolition
22 debris would be removed.
23     Q. Did you have any understanding at that
24 time that any demolition debris would remain on

127

1  the site?
2      A. Based on my notes, no.
3      Q. Would you have indicated that type of
4  information in your Reports if that, in fact,
5  had been your understanding?
6      A. Yes.
7      Q. Did Mr. Gateman make any statement to
8  you that any of the demolition debris would
9  remain on the site?
10     A. I don't recall.
11     Q. To the extent that he had made any such
12 statement, what would your ordinary practice
13 have been with respect to setting forth such
14 information in your notes?
15     A. I would have indicated in my notes what
16 debris piles were slated to remain on the site
17 versus what piles were slated to be disposed off
18 the site.
19     Q. And did you make any notations in your
20 notes indicating that any of the demolition
21 debris was going to remain on the site?
22     A. No.
23     Q. I believe you were questioned earlier
24 by Mr. Robbins concerning the subject of

128

1  hazardous waste; is that correct?
2      A. Yes.
3      Q. I believe you were also questioned
4  about the existence of regulations concerning
5  the regulations of hazardous waste; is that
6  correct?
7      A. Yes.
8      Q. Is it your understanding that, in fact,
9  there are regulations set forth by the
10 Massachusetts Department of Environmental
11 Protection regarding hazardous waste?
12     A. Yes.
13     Q. And that's your area of specialization
14 and expertise; is that correct, at least some
15 portion of that?
16         MR. ROBBINS: Objection.
17     A. Yes.
18     Q. Are you aware of whether there are also
19 regulations promulgated by the Massachusetts
20 Department of Environmental Protection regarding
21 solid waste?
22     A. Yes.
23     Q. And is it your understanding that those
24 are different sets of regulations?

129

1      A. Yes.
2          MR. KERESTER: I have no
3  further questions. Thank you.
4                  * * *
5      EXAMINATION BY MISS ENGBERG:
6      Q. Hi, my name is Kristina Engberg, and I
7  represent Robert's Dismantling and Recycling.
8      A. Hi.
9      Q. During your work at Goldman, or as part
10 of your work at Goldman, do you asses soil
11 borings?
12     A. Yes.
13     Q. During the soil boring process,
14 sometimes are those borings refused?
15     A. Yes.
16     Q. And what does that mean?
17         MR. BRAVERMAN: I object.
18 Answer it if you can.
19     A. It could mean many different things.
20 It all depends on the type of drilling apparatus
21 that you're using. You could be hitting a
22 cobble. You could be hitting bedrock. You
23 could be in tight fill and the drilling
24 equipment that you're using just doesn't have

33 (Pages 126 to 129)

Lauren McKinlay 11-18-2005
Georto, Inc. v. William Gateman, et al.

130

1   the power to go through it. It could mean
2   numerous things.
3       Q. And how would you go about determining
4   why a particular boring was refused?
5       A. You could attempt to install additional
6   borings in the general vicinity of where you
7   encountered refusal to see if you get deeper
8   than the depth where you had hit refusal.
9           You might infer that you had hit a
10  cobble. If you continue to hit refusal at the
11  same depth, you could be hitting bedrock or you
12  could just be in a tight material that the drill
13  apparatus doesn't have the capability of
14  drilling through.
15      Q. Is that something that's typically done
16  in installing other borings in the vicinity?
17      A. It depends on the scope of work.
18      Q. And you've referred to cobble. What is
19  that?
20      A. A large rock.
21      Q. During the course of your Phase 1
22  investigation, did you ever have any
23  conversations with anybody from Robert's
24  Trucking?

131

1       A. Not that I recall.
2           MISS ENGBERG: That's all I
3   have. Thank you.
4           MR. ROBBINS: I actually have a
5   couple of follow ups.
6               * * *
7       EXAMINATION BY MR. ROBBINS:
8       Q. I'd like to show you a map or a plan,
9   and ask you if you recognize what it shows?
10      A. I believe it's the site of 190 to 200
11  Union Street.
12      Q. Okay. I believe you're right. When
13  you were there, were there any buildings on the
14  property?
15      A. No.
16      Q. Do you know from the photographs,
17  Exhibit 55B, can you by looking at each of these
18  photographs, can you -- actually, by looking at
19  the ones that you've marked, the A, B, C
20  photographs, can you look at each one in turn
21  and tell me in reference to this plan what your
22  memory is or the description. if it helps you,
23  of what that photograph depicts on the plan?
24      A. (Witness viewing document.) In

132

1   Photograph A, based on the description, it
2   indicates in the middle portion of the site;  so
3   I would say that.
4       Q. Is that the determinant used, middle
5   portion?
6       A. Middle portion.
7       Q. Does that identify the area for you?
8       A. Based on that description, I would say
9   it would be in the middle of the property.
10      Q. Okay. I understand. But independently
11  you don't recognize what you see and say, oh,
12  yeah, I remember that, that was here?
13      A. I don't recall where I was standing
14  when I took the photo, no.
15      Q. And you don't recall -- actually, I
16  wasn't asking you so much where you were
17  standing as what you're seeing.
18      A. Right. I don't recall that either.
19      Q. Okay. Could we look at the next
20  letter, please?
21      A. Can I refer to a different figure just
22  to make sure that I'm orienting this correctly?
23      Q. Whatever you need to refer to.
24      A. (Witness viewing document).

133

1       Q. You're looking at something in Exhibit
2   55 to help orient you south to north?
3       A. Yes.
4       Q. Okay.
5       A. Picture B is looking in this general
6   vicinity of the site.
7       Q. Okay. And what makes you say that? Is
8   that based on memory or based on some
9   reasoning?
10      A. Indicating the south west portion of
11  the site.
12      Q. And by what you've looked at, you feel
13  that the area of this plan that represents the
14  south west portion of the site is up in the --
15  as you're standing on Union Street and facing
16  the property, it would be the lower right corner
17  where Lot C is written?
18      A. Yes.
19      Q. In a moment I'll ask you to draw a
20  circle. Could you look at the next photograph
21  that you had marked a letter on.
22      A. Letter C. Somewhere in this area of
23  the site.
24      Q. Okay. And you put your finger in a

34 (Pages 130 to 133)

Lauren McKinlay 11-18-2005
Georto, Inc. v. William Gateman, et al.

134

1  certain area. How come you're focused on that
2  area? Is that because you remember that's where
3  the stuff was, or are you reasoning it out?
4      A.  I'm mostly reasoning it out.
5      Q.  Based on what then?
6      A.  In Picture C behind the large piece of
7  equipment a building wall is visible, which is
8  also visible in Picture B; so based on that and
9  the description that indicates looking west from
10  the east boundary.
11      Q.  Which would be the east boundary?
12      A.  This would be the east boundary, and
13  that would be the west boundary (Indicating).
14      Q.  In other words, Union Street would be
15  on the western side of the property, and I don't
16  know what this other street is. It's cut off.
17      A.  It's cut off.
18      Q.  But the other one where it says "S
19  Street," not the name, but that would be the
20  eastern boundary of the property?
21      A.  Correct.
22      Q.  So School Street up at the top would be
23  the northern edge?
24      A.  Correct.

135

1      Q.  So this Photograph C description, is it
2  saying it's located where now?
3      A.  Looking west from the east boundary.
4      Q.  So it's looking from the sort of S
5  Street that we're calling towards Union Street?
6      A.  Toward Union Street.
7      Q.  Okay. I understand that.
8      A.  Just by reasoning it out and looking at
9  the photos, it looks like I was on the northern
10  portion of the east side of the site.
11      Q.  Okay. And photographing looking in the
12  direction of Union Street?
13      A.  Correct.
14      Q.  And so where on here would you put your
15  finger again as to where you feel Picture C
16  shows?
17      A.  A large portion. It would show this
18  whole vicinity of the site.
19      Q.  Okay. May I just see it for a second,
20  please? We're talking about the same picture.
21  Picture C shows a big machine, a big yellow
22  machine?
23      A.  Yes.
24      Q.  So what of the ground are you actually

136

1  seeing? I'm not asking what direction you're
2  looking. I'm asking what portion is visible in
3  the picture?
4      A.  Maybe from -- it's hard to tell, but
5  from somewhere from here to there.
6      Q.  Okay. Would you put your best estimate
7  as to what that is showing?
8      A.  Okay.
9      Q.  Again, in the portion of the ground.
10  I'm not talking about the direction.
11      A.  Right. (Witness complying).
12      Q.  Okay. And would you write in there
13  Photo C?
14      A.  (Witness complying).
15      Q.  And then would you draw another shape
16  to represent the area of the ground depicted in
17  Photo B, which we talked about before but we
18  didn't draw?
19      A.  (Witness complying).
20      Q.  And if you'd label that Photo B,
21  please?
22      A.  (Witness complying).
23      Q.  Can you sign this and date this today
24  as the 18th so we know it's yours?

137

1      A.  (Witness complying).
2          (Exhibit No. 57 received and
3          Marked for identification).
4      Q.  Do you have any memory other than the
5  pictures that you've indicated A, B and C that
6  we have here, and we further plotted on the map
7  here on this plan, do you have any independent
8  memory of seeing any other debris piles on the
9  property?
10      A.  I don't recall.
11      Q.  Okay. So you don't recall whether you
12  saw any debris piles or not?
13      A.  Correct.
14      Q.  Did Mr. Gateman at any point say that
15  he was removing the leftover brick from the
16  building off property, specifically talking
17  about brick?
18      A.  I don't recall.
19      Q.  Okay. Did he ever say he was removing
20  any leftover concrete from the building that was
21  demolished?
22      A.  I don't recall.
23          MR. KERESTER: Objection to form.
24      Q.  Had he told you I'm removing

35 (Pages 134 to 137)

Lauren McKinlay 11-18-2005
Georto, Inc. v. William Gateman, et al.

138

1  everything, but I'm leaving the brick and I'm
2  leaving the concrete, do you think you would
3  have noted that in your report?
4      A.  Yes.
5      Q.  Okay.  And why would you have noted it?
6      A.  To indicate clearly which demolition
7  would be removed from the site and which would
8  be remaining at the site.
9      Q.  Okay.  Brick and concrete would not --
10  as your understanding of these regulations,
11  would not be considered hazardous waste; is that
12  correct, just plain brick and concrete not
13  contaminated with anything else; is that right?
14      A.  Yes.
15      Q.  Do you know if it is considered, quote,
16  "solid waste" under Massachusetts regulations?
17      A.  I don't recall.
18      Q.  Okay.
19          MR. ROBBINS:  I'm done.
20          MR. KERESTER:  I don't have
21  any questions.
22          MISS ENGBERG:  I don't have
23  any questions.
24          (The deposition concluded at

139

1          Four o'clock p.m.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

140

1          C E R T I F I C A T E
2          I, LAUREN McKINLAY, do hereby certify
3  that I have read the foregoing transcript of my
4  testimony, and further certify that it is a true
5  and accurate record of my testimony (with the
6  exception of the corrections listed below):
7  Page    Line      Correction
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  Signed under the pains and penalties of perjury
20  this
21  _____day of _____, 2005.
22
23  _____
24  LAUREN McKINLAY

141

1          COMMONWEALTH OF MASSACHUSETTS
2          SUFFOLK, SS.
3
4      I, Tara L. Wosny, Certified Shorthand
5  Reporter and Notary Public in and for the
6  Commonwealth of Massachusetts, do hereby certify
7  that LAUREN McKINLAY, the witness whose
8  deposition is herein before set forth, was duly
9  sworn by me and that such deposition is a true
10  record, to the best of my ability, of the
11  testimony given by the witness.
12      I further certify that I am neither related
13  to or employed by any of the parties in or
14  counsel to this action, nor am I financially
15  interested in the outcome of this action.
16      In witness whereof, I have hereunto set my
17  hand and seal this 23rd day of November, 2005.
18
19  Notary Public
20  My commission expires:
21  June 10, 2009

36 (Pages 138 to 141)