UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| GEORTO, INC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WILLIAM GATEMAN, INDIVIDUALLY | ) | CIVIL ACTION NO. 04-11730 NG |
| and as TRUSTEE OF 200 UNION | ) | |
| STREET REALTY TRUST, | ) | |
| Defendant and | ) | |
| Third Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ROBERTS CORPORATION, | ) | |
| Third Party | ) | |
| Defendant. | ) | |

**PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO
MOTION FOR APPROVAL OF TRUSTEE PROCESS
[Pursuant to Order Granting Assented to Motion for Leave to File]**

Plaintiff Georto, Inc. ("Georto") submits this memorandum in reply to

Defendant William Gateman's Opposition to Georto's Motion for Trustee

Process.

**I.    GATEMAN DOES NOT REFUTE THAT HE BREACHED HIS
CONTRACTUAL WARRANTY OR THAT HE MISREPRESENTED THAT
ALL DEMOLITION DEBRIS HAD BEEN REMOVED.**

Gateman offers no facts or arguments refuting Georto's claim that Gateman

breached his warranty in the purchase and sale agreement that there were no non-

acceptable environmental conditions on the Property or refuting Georto's claims for

misrepresentation and violation of Chapter 93A resulting from Gateman's written

misrepresentation that all of the demolition debris had been removed from the

Property.    More specifically, Gateman does not refute that demolition debris was not

removed from the Property and that there were non-acceptable environmental conditions on the Property.  To the contrary, Gateman concedes in his Opposition that demolition debris was not removed - consisting not only of brick and concrete but also the debris ramp.  See Opposition at page 6 (item no. 12).

Instead, Gateman asserts at page 6 of his Opposition that he relied upon third-party defendant Roberts Corporation's "contractual and personal representations that all necessary demolition debris would be removed on the adjoining parcel purchased by Georto." (emphasis added).  Notwithstanding whatever Roberts' contractual obligations to Gateman may have been at the outset of that work, Gateman ignores that he actively participated in the dumping and burying of the demolition debris / solid waste and nonetheless subsequently represented in writing to Georto that all demolition debris had been removed and warranted that there were no non-acceptable environmental conditions on the Property:

- Gateman told Roberts Corporation to move the debris ramp from the Family Dollar parcel and dump it onto the Property later sold to Georto, McIntyre Depo. at pp. 85-86, 110-111, 136-137; Stalker Depo. at pp. 89, 90.

- During the demolition work, Roberts Demolition requested direction from Gateman as to where he wanted certain of the debris placed on the Property and Gateman in fact directed Roberts where the materials were to be placed.  Gateman Depo. at 102, 148,149, 223, 231, 232, 234;  Gateman's Supplemental Answers to Interrogatories (Docket No. 18) at pp. 3-6.

2

- All of the brick and concrete from the 100,000 square foot buildings was dumped into the basement hole. Doherty Depo. at p. 93, 101-102. The brick and concrete left in the hole was mixed with wood. Stalker Depo. at pp. 47-48.[1]

- Gateman knew that that the brick, concrete, and other demolition debris, specifically including the wood and charred wood that was mixed with trash, was not going to be removed: Gateman testified that he did not understand that anyone would sort the wood and trash piles before leaving the wood on the property and in fact never observed anyone separating the wood from the trash. Gateman Depo. at pp. 124, 125, 127, 129, 130, 137.

- Gateman not only regularly walked the site but in fact actively worked on the site – specifically including operating machinery to dump debris in

---

[1] After Roberts Corporation started its work, Gateman told Kevin Doherty of Roberts Corporation that he (Gateman) "didn't want to haul the brick and concrete out, … didn't want to pay an additional charge and that we were going to separate it and leave it in piles in the hole."  Gateman didn't say anything indicating that he had received any approval from the City of Lynn to leave the brick and concrete on the site.  Doherty Depo. at p. 93, 101-102. The Roberts Demolition contract provided that Roberts Demolition would also remove the brick and concrete debris from the property (for an additional $25,000) if the City of Lynn did not approve leaving that debris on the property.  Gateman Depo. at pp. 198 and Depo. Ex. 3 (Roberts contract, attached as Exhibit 1 to Roberts Corporation's Concise Statement of Material Facts).   At that time, Gateman told the representatives of Roberts Demolition that he wanted to leave the brick and concrete and would try to get approval from the City of Lynn to leave the brick and concrete.  Stalker Depo. at p. 23.  After entering into that contract, however, Gateman did not have any communications with anyone from the City of Lynn about the subject of approval for leaving brick and concrete on the property.  Gateman Depo. at pp. 198,199.   While Gateman testified that he nonetheless believed he could leave brick and concrete on the property, he knew, as result of a prior meeting with the Lynn building inspector, that he was required at a minimum to remove all other demolition debris from the property.   Gateman Depo. at pp. 101,102.

the basement foundation.   Gateman Depo. at pp. 134; Doherty Depo. at

pp. 84-87, 105-108.   Gateman (as well as Scott Wetherbee of

Wetherbee Contracting)  actually operated a bulldozer at the site and

used that equipment to initially cover with fill the debris ramp (which at

that time was on the parcel to be sold to Family Dollar) and the brick

and concrete.  Doherty Depo. at pp. 105-110.

- Gateman told Kevin Doherty of Roberts Corporation to leave some of

   that debris and "we will mix it in and push it in the hole."  Doherty further

   acknowledged that Roberts Corporation left debris on the site and that

   he observed Scott Wetherbee using a front end loader (for at least a

   couple of days) to dump debris onto the parcel later sold to Georto and

   that he observed Gateman using the front end loader to cover the debris

   with fill.  Doherty also testified that it was possible that Gateman

   discussed with him reducing Roberts Corporation's price by $10,000 if

   additional debris was left on the site.  Doherty Depo. at pp. 117-125,

   132 – 137;  Stalker Depo. at pp. 48-49.

- Gateman did not at any time prior to selling the Property to Georto

   disclose to Georto that the Property contained demolition debris but

   instead represented in writing that all of the demolition debris had been

   removed and warranted that there were no non-acceptable conditions

   on the Property, notwithstanding that: he knew that demolition debris /

   solid waste had been buried on the Property; he knew (from the

Georto/Gateman purchase and sale agreement) that Georto intended to construct a building on the site; and he understood that the debris could present problems for the construction of a building.  Gateman Depo. at pp. 153,154, 242.

Contrary to Gateman's characterization at item 17 on page 7 of his Opposition Memorandum, Robert Stalker of Roberts Corporation did not indicate that there was "nothing objectionable" upon his return to the site after Georto's discovery of the buried debris.  To the contrary, Mr. Stalker, who is the sole officer, director, and shareholder of Roberts Corporation, observed the excavation of the buried debris after its discovery by Georto's contractor, including doors, wood, steel, and other debris which appeared to him to be the ramp debris, and acknowledged that the applicable solid waste regulations required that the material be removed.  He also acknowledged that Massachusetts solid waste regulations prohibit brick and concrete greater than six inches in size from being used as fill and that brick and concrete would have to be crushed before it could be approved to be used on site.  He further testified that Gateman did not ever obtain approval from the City of Lynn to leave brick and concrete at the site.  Stalker Depo at pp. 18-20, 29-30, 84, 85, 88.   Mr. Doherty, who supervised the work on behalf of the Roberts Demolition, also acknowledged that debris consisting of wood, metal, and trash should not be left on site and should instead be removed.  Doherty Depo at pp. 153-154.

Gateman tries to avoid responsibility for his own misconduct by hinting at items 16 and 17 on pages 6 and 7 of his Opposition Memorandum that Georto should have discovered as part of its due diligence that Gateman had buried the debris.  The law imposes no obligation on Georto to look for and discover Gateman's fraud and deceptive conduct, and Georto was entitled to, and did, rely

upon Gateman's written warranty and written representations (which such written representations were provided by Gateman to Georto <u>after</u> execution of the purchase and sale agreement in accordance with Gateman's contractual obligation to provide such information as part of the due diligence).

Georto first learned of the buried demolition debris when PM Construction commenced construction on the Property in April, 2004, a few months after the closing in February, 2004, and then caused PM Construction to dig test pits to investigate the scope of the buried debris. Hawkins Depo. at pp. 150, 151, 179, 180.[2] Upon learning of the problem, Georto immediately notified Gateman. Hawkins Depo. at pp. 179-181.

## II.    GEORTO HAS A REASONABLE LIKELIHOOD OF RECOVERING THE $249,000 OUT OF POCKET COST IT INCURRED TO REMOVE THE BURIED DEBRIS / SOLID WASTE, PLUS PREJUDGMENT INTEREST.[3]

Notwithstanding that the cost of the work was originally estimated (prior to discovery of the full scope and extent of the buried debris) to be approximately $150,000 based on competitive written bids submitted by three different contractors (including the contractor, Scott Wetherbee,[4] who had previously

---

[2] While Goldman Environmental in any event conducted certain test borings at the Property as part of the due diligence, those borings were intended to determine the existence of hazardous materials and did not discover the buried demolition debris. Hawkins Depo. at pp. 153-154.

[3] Georto further submits that the evidence to be introduced at trial will warrant entry of judgment against Gateman for multiple damages and attorneys fees pursuant to M.G.L. c.93A.

[4] Contrary to Gateman's mischaracterization, Wetherbee's bid was substantially more than $85,000, as he bid $85,000 <u>plus</u> a per unit amount for the removal of any demolition debris over a certain amount. As Mr. Wetherbee acknowledged at his deposition, he understood that additional material might need to be removed over and above the assumed amount. Wetherbee never provided a copy of the quote to Gateman and apparently didn't tell Gateman that the quote included additional per unit pricing over the $85,000 lump sum amount. Wetherbee Depo. at pp. 114 – 121. (PM Construction determined that Wetherbee's bid, after adjustment, was actually $155,000.)

worked for Gateman) based on the assumption that 2,000 yards of demolition debris material needed to be removed, the actual cost of removal and replacement (of over 4,000 yards of demolition debris material, after consultation with an expert about what amount needed to be removed) was $249,000. Contrary to Gateman's assertion, the removal work did not commence until at least four weeks after Gateman was notified of Georto's discovery of the buried debris / solid waste. All of that work was monitored by PM's Project Manager, Steve McIntyre. Hawkins Depo. at pp. 186-189, 218-221; McIntyre Depo. at pp. 100 – 114; Stalker Depo. at pp. 85 – 88; and Wetherbee Depo. at 114 – 117. Gateman failed to avail himself of the opportunity to cause the debris / Property to be examined by an expert prior to removal and instead now complains after the fact (without any support or even a proffer of any expert opinion) that the costs of removal were higher than he would have expected. The costs to remove and replace the solid waste / debris material were incurred as a result of Gateman's conduct, and Georto fully expects that jury will determine that the full amount of such costs are recoverable as damages.

## III.    GATEMAN HAS ENGAGED IN CONDUCT TO DEPRIVE GEORTO OF PREJUDGMENT SECURITY.

Notwithstanding Gateman's deposition testimony that he had placed and maintained $200,000 of the $1,035,000 in sale and settlement proceeds (from the Trust's sales of the three parcels) into a bank account, he now asserts that he "does not possess the funds alluded to in Georto's Motion for Trustee Process." Gateman's Opposition Memorandum at p. 7. Thus, it appears that the danger that Gateman would withdraw, remove or dissipate the funds believed to be on deposit in order to deprive Georto of security for payment of a judgment in this matter has been realized. Moreover, Gateman still has failed and refused

to produce any documents regarding ownership of the beneficial interest in the 200 Union Street Realty Trust (which is a nominee trust).[5]

Given Gateman's conduct to hinder his creditors (including distributing $200,000 to a brokerage firm for the acquisition of stock <u>in the name of a friend of Jackson Gateman but for the benefit of his father, Jackson Gateman</u>, endorsement of a sale check to Jackson Gateman, and issuance of certain checks "to other businesses that were purchased" in which William Gateman "may have an interest," Gateman Depo. at pp. 62-73), Georto submits that Gateman should provide a full and complete accounting for those proceeds. Similarly, given that Gateman suggests at page 7 of his Opposition Memorandum that he would not deprive Georto of security in the event of a judgment, Georto submits that Gateman should provide such security by placing such funds into an appropriate escrow account or by depositing such funds into court.

## <u>CONCLUSION</u>

For the foregoing reasons, the Plaintiff, Georto, Inc. respectfully requests approval of attachment on trustee process and issuance of a summons to Eastern Bank, Citizens Bank, and/or TD Banknorth, NA in the amount of $300,000 with respect to any accounts in the name of William Gateman, individually or as trustee of the 200 Union Street Realty Trust.  Georto further requests that the Court enter such further relief as is just and appropriate.

---

[5] Georto's motion to compel production of such documents (as well as other documents) is pending.  Gateman has not filed any opposition to that motion, and the deadline for any such opposition has expired.

**PLAINTIFF GEORTO, INC.**

By its attorney,

/s/ Dale Kerester

Dale C. Kerester, BBO#548385
LYNCH, BREWER, HOFFMAN & FINK, LLP
101 Federal Street, 22nd Floor
Boston, MA  02110-1800
(617) 951-0800

Dated:  May 10, 2006

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I caused a true and accurate copy of the foregoing memorandum to be served upon the counsel listed below by electronic filing, this 10th day of May, 2006:

Mark P. McGrath, Esq., BBO #642913
9 West Broadway  #214
Boston, MA  02127
(617) 271-9009
mpgrath@aol.com

J. Mark Dickison, Esq., BBO# 629170
LAWSON & WEITZEN, LLP
88 Black Falcon Avenue, Suite 345
Boston, MA  02110

/s/ Dale C. Kerester

Dale C. Kerester

9