# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____     CIVIL ACTION NO. 04-11730 NG
)
GEORTO, INC.,                                )
        Plaintiff,                          )
                                             )
        v.                                 )
                                             )
WILLIAM GATEMAN, INDIVIDUALLY   )
and as TRUSTEE OF 200 UNION             )
STREET REALTY TRUST                   )
                                             )
        Defendant,                          )
        Third Party Plaintiff, and          )
        Third Party Defendant-in-           )
        Counterclaim                        )
                                             )
ROBERTS CORPORATION                    )
                                             )
        Third Party Defendant,              )
        and Third Party Plaintiff-in-       )
        Counterclaim                        )
_____)

## WILLIAM GATEMAN'S PROPOSED RULINGS OF LAW AND FINDINGS OF FACT ON COMPLAINT FILED BY PLAINTIFF AND COMPLAINT FILED BY THIRD PARTY PLAINTIFF

      Now comes the Defendant, William Gateman (hereinafter "Gateman"),

individually and as trustee of the 200 Union Street Realty Trust, requests that this

Court enter the following Requests for Rulings of Law and Findings of Fact[1].  For

the purposes of focus, Gateman has structured his document by relevance to the

Counts of the Complaint.  However, all requests are directed to all common

_____

[1] Requests for Findings of Fact have been phrased "[Witness] testified or testifies".  The defendant requests that the testimony set forth therein be deemed credible.

issues to the Counts of the Plaintiff's Complaint and Gateman's Third Party

Complaint against Roberts Corporation ("Roberts").


I.    **PROCEDURAL HISTORY**

1.    Plaintiff Georto, Inc. ("Georto"), through its President/Owner

and sole Officer and member, James Hawkins ("Hawkins"),

filed a Complaint against Gateman with this Court, on

August 5, 2004, alleging Breach of Warranty, Fraud,

Negligent Misrepresentation, Breach of the Implied

Covenant of Good Faith and Fair Dealing, and Violation of

Mass. Gen. L. ch. 93A §11 in association with a certain

parcel of land at 200 Union Street in Lynn, MA ("the

Property").

2.    Gateman filed his Answer and Third Party Complaint on

August 31, 2005, alleging breach of contract against Third

Party Defendant Roberts Corporation ("Roberts") and that

Roberts was obliged to remove demolition debris from the

Property, and that Roberts is liable to Gateman in the event

that Gateman is held liable to Georto, and is further

obligated to defend and indemnify Gateman against Georto's

claims.

3.    Roberts filed its Answer to Third Party Complaint,

Counterclaim Against Third Party Plaintiff, and Jury Demand

on December 20, 2004 and filed its Amended Answer to
Third Party Complaint, Counterclaim Against Third Party
Plaintiff, and Jury Demand on December 28, 2004.

4.      The case was then tried before this Court, jury-waived, for
eight (8) days in September, 2006.

## II.    GEORTO'S COMPLAINT DATED AUGUST 5, 2004 – COUNT ONE

5.      Georto alleges a Breach of Warranty in Count One of the
Complaint, claiming that Gateman, as Trustee, warranted
and represented that "there are no hazardous materials as
defined by state, federal, or local law, or non-acceptable
environmental conditions on the property."

6.      In reviewing Exhibit 3C-2, Gateman testifies that he
observed the ramp and that it looked only like brick and
concrete.  The debris, if any, was covered by the ramp and
only brick and concrete were visible, Transcript, Vol. VI, p. 7,
10-20.

7.      Gateman testified that he simply did not know the dimension
of the ramp, where it started and where it ended, and further
testified, when asked to comment on Exhibit 3C-5, that the
photo reinforces his perspective.  Transcript, Vol. VI, p. 9, 5-
18.

8.      In April, 2002, Gateman was aware of ramp and saw it then
and sees it subsequently in photos that the ramp looks like

brick and concrete and just sloped in so Roberts could get machinery in and out. Transcript, Vol. VI, p. 11, 3-10.

9.      At no point in time did Gateman ever see the ramp being constructed or built.  Transcript, Vol. VI, p. 39, 19-21.

10.     Every photo of the ramp that Gateman has ever seen appears to be brick and concrete; nothing below the ramp is ever visible.  Transcript, Vol. VI, p. 40, 7-10.

11.     Hawkins testified that he expected Gateman and/or his transactional counsel to have "apprehension" about the warranty language.  He further testified that he would not sign an agreement with such language in it if he were the Seller.  Transcript, Vol. II, p. 57, lines 18-23.

12.     Hawkins testified that he would not have altered his decision in any way had he known that bricks and concrete only were on the Property.  Transcript, Vol. II, p. 94, 1-3.

13.     Hawkins testified that he reviewed the Phase I Report as part of his due diligence; as part of that report, he saw and knew about photos that illustrated bricks and concrete on the premises.  Transcript, Vol. II, p. 109, 18-25, p. 110, 2.

14.     Hawkins testifies that Gateman was never credited $102,000.00 for the "site work" that Hawkins had already budgeted as part of his plan, even if the property had not encountered any problems.  Transcript, Vol. II, p. 68, 6-14.

15.        Hawkins testified that Gateman offered him the full purchase

            price of $300,000.00 back after discovery of the debris on

            the Property.  Transcript, Vol. II, p. 79, 12-17.

16.        Hawkins testified that the only documents he relied upon

            were the Purchase and Sale Agreement from Family Dollar,

            the Phase I and Phase II Reports and the Purchase and

            Sale Agreement he signed with Gateman.  Transcript, Vol. II,

            p. 83, 2-17.

17.        Gateman obtained permission from Frank Calnan, City of

            Lynn Building Inspector, that he could leave brick and

            concrete on the Property.  Vol. VII, p. 15, 10-16.

18.        Gateman contracts with Roberts Corporation to take away all

            demolition debris, other than brick and concrete, for

            $90,000.00.  Exhibit 9

19.        19, 3-10 Calnan told Gateman that brick and concrete could

            remain and that he wanted fill covered with brick and

            concrete and have it sloped so that someone walking by

            would not fall in property.  Vol. VII, p. 19, 3-10.

20.        Phil Morin of PM Construction testified that screening and

            crushing, and recycling in general, were nor considered as a

            possibility on the site, nor even discussed.  Transcript, Vol.

            IVa, p. 7, 17-22.

21.     Morin testified that PM Construction never even asked for a
proposal or estimate as to the costs of estimating for
screening and crushing and/or recycling brick and concrete.
Vol. IVa, p. 9, 3-6.

22.     Morin testified that PM Construction never asked Mattuchio,
who conducted the removal of material from the site,
whether material was going to a recycling center or a landfill.
Vol. IVa, p. 11, 14-18.

23.     PM Construction never asked Mattuchio what the costs
would be to remove debris and bring in new fill.  Vol. IVa, p.
12, 5-12.

24.     Morin testified that there were no representations in Phase I
or Phase II as to whether soil under the surface at the
Property could support a building.  Vol. IVa, p. 16, 20-25, p.
17, 1.

25.     Morin testified that no one from PM ever asked anyone from
Roberts whether Roberts had removed all debris from the
site.  Vol. IVa, p. 17, 11-17.

26.     At the time that PM Construction and Georto ordered the
building in December 2003 the only information they had
about soil was from the Phase I Report.  No engineering
tests had been done to determine whether soil was suitable
to build upon.  Vol. IVa, p.  22, 23-25, p. 23, 1-6.

27.    As late as April, 2004, no soil testing or engineering tests had been done when construction began.  Moreover, the purpose of the Phase II had nothing to do with whether or not soil was suitable to be built upon.  Vol. IVa, p. 23, 7-22.

28.    Morin affirmed that H28, 5-13, Hawkins relied on 2 year old Phase I Report.  Vol. IVa, p. 28, 5-13.

29.    Morin testified that Hawkins and PM Construction knew there was a risk that soil was not suitable and/or properly compacted.  Vol. IVa, p. 29, 7-12.

30.    Morin testified that he could not dispute that the removal work could have been done for $125 per load, rather than the $950 as charged, since most of what was removed was brick.  Vol. IVa, p. 38, 22-25, p. 39, 1-11.

31.    Expert Greg Wirsen testified that even mixed debris can be recycled and that crushers could have been brought on site. Vol. IVa, p. 87, 4-15.

32.    Express warranties promise that a specific result will be achieved. *Coca-Cola Bottling Co. of Cape Cod v. Weston & Sampson Eng'rs, Inc.*, 45 Mass. App. Ct. 120, 128 (1998). Thus, under an express warranty, the standard of performance is set by a defendant's statements, rather than imposed by law. *Anthony's Pier Four, Inc. v. Crandall Dry Dock Eng'rs, Inc.*, 396 Mass. 818, 822(1986).

33.     Although transactions involving real estate fall outside the Uniform Commercial Code, analogy to its policies and principles is not precluded. *Mary Anne Brewer, et al v. Poole Construction Co., et al.*13 Mass. L. Rep. 97 (2001).

34.     "Express" warranties rest on "dickered" aspects of the individual bargain. M.G.L. c. 106, §2-313, Comment 1.

35.     For an affirmation to comprise a warranty, it must become part of the "basis of the bargain" between the parties. *Stuto v. Corning Glass Works,* Prod. Liab. Rep. para. 12,585 at 37,582 (USDCMA) (CCH 1990).

36.     Some minimum of reliance is a required element of a breach of express warranty claim in Massachusetts. *Stuto v. Corning Glass Works,* Prod. Liab. Rep. para. 12,585 at 37,582 (USDCMA) (CCH 1990).

37.     "Under Massachusetts law, a contract term is ambiguous when its language is "reasonably prone to different interpretations" or "susceptible to differing, but nonetheless plausible, constructions." *Alison H. v. Byard*, 163 F.3d 2, 6 (1st Cir. 1998); see also *Bercume v. Bercume,* 428 Mass. 635, (Mass. 1999). Whether a term is ambiguous is a question of law. See *Alison H.*, 163 F.3d at 6." Lanier Professional Servs. v. Ricci, 192 F.3d 1, 4 (1st Cir. 1999).

38.    "When contractual language is ambiguous, its meaning is a question of fact. See *Den norske Bank AS v. First National Bank*, 75 F.3d 49, 52 (1st Cir. 1996). The resolution of the ambiguity turns on the parties' intent, as "discerned by the factfinder from the circumstances surrounding the ambiguity and from such reasonable inferences as may be available." *Colasanto v. Life Ins. Co. of N. Am.*, 100 F.3d 203, 211 (1st Cir. 1996). Extrinsic evidence is admissible to assist the factfinder in resolving the ambiguity, including evidence of, in descending order of importance: (1) the parties' negotiations concerning the contract at issue; (2) their course of performance; and (3) trade usage in the relevant industry. See *Den norske*, 75 F.3d at 52-53; see also *Keating v. Stadium Management Corp.*, 24 Mass. App. Ct. 246, (Mass. App. Ct. 1987)."  *Lanier Professional Servs. v. Ricci*, 192 F.3d 1, 4 (1st Cir. 1999).

39.    Given that the purpose of judicial interpretation is to ascertain the parties' intentions, the parties' own practical interpretation of the contract – how they actually acted, thereby giving meaning to the contract during the course of performing it – is to be given great weight by the Court. *Williston on Contracts*, §32:14 (Fourth Edition, 1999)

40.     The term "non-acceptable environmental conditions on the property" contained in paragraph 2(f) of the parties' purchase and sale agreement (Exhibit  ) is ambiguous as a matter of law because it is subject to different interpretations as to whether recyclable materials, such as brick and concrete, constitute environmental conditions within the meaning of said paragraph.

41.     The warranty that "there are no hazardous materials as defined by state, federal or local law, or non-acceptable environmental conditions on the property" was not, as a matter of law, a guarantee that the property at issue was suitable for building a commercial retail establishment as contemplated by plaintiff.

42.     A plaintiff in a contract action is obliged to take all reasonable steps that do not entail undue risk, expense or inconvenience in order to minimize damages. Burnham v. Mark IV Homes, Inc., 387 Mass. 575, 586, 441 N.E.2d 1027 (1982), Krasne v. Tedeschi & Grasso, 436 Mass. 103, 109, 762 N.E.2d 841 (2002).

43.     The duty to mitigate its damages obligated  Georto to be willing to expend such sums as would reasonably be necessary to reduce the amount of its damages which would otherwise be incurred. See *Burnham v. Mark IV Homes, Inc.*,

387 Mass. 575, 586 (1982), citing *Warren v. Stoddart*, 105

U.S. 224, 229, 26 L. Ed. 1117 (1881).

44.     The party in breach bears the burden of demonstrating that

the plaintiff did not make reasonable efforts to mitigate its

damages and that the plaintiff would have been able to

mitigate its damages if it had undertaken such efforts. See

*American Mechanical Corp. v. Union Machine Co. of Lynn,*

*Inc.*, 21 Mass. App. Ct. 97, 103, 485 N.E.2d 680 (1985).

## III.    GEORTO'S COMPLAINT DATED AUGUST 5, 2004 – COUNT TWO

45.     Georto alleges in Count Two of the Complaint that Gateman

made false statements of material fact to Georto and knew,

or should have known, that the statements were false.

46.     Gateman never read the Family Dollar Purchase and Sale

Agreement and relied solely on his counsel's

recommendation.  Transcript, Vol. VI, p. 53, 21-25, p. 54, 1-

6.

47.     In early May, 2002, Roberts leaves site for the first time and

the site looks completely clean, except for bricks and

concrete and screened material.  Vol. VI, p. 55, 20-25, p. 56,

1-7.

48.     Gateman hired Turner to do the initial demolition work, ie to

knock down front of the building to comply with City of Lynn

demands to make the property safe.  Vol. VII, p. 9, 13-15.

49.    Gateman testified that Turner could not have built the ramp because Turner was never actually on the site; did all of their work from Union Street.  Vol. VII, p. 9.

50.    Gateman contracted with Roberts specifically to remove all debris, Vol. VII, p. 19, 1-6.

51.    Gateman never saw ramp being built and testified that the only possible origin could have been Roberts, who needed it to access the Property.  Vol. VII, p. 19, 17-23.

52.    Roberts brought screener onto site, specifically to sift out debris.  Remaining material, screened and sifted and known as "fines" was to be used as acceptable fill.  Vol. VII, p. 27, 16-21.

53.    On or about May 17, 2002, Family Dollar officials discover presence of a ramp and ask Gateman to have it excavated. Since Wetherbee is already on site doing filling work, Wetherbee is asked by the geotech with Family Dollar to excavate the ramp to see what is there.  Vol. VII, p. 33, 3-20.

54.    As soon as Gateman became aware of the ramp, in May, 2002, he immediately contacted Roberts Corporation to have them return to the site to remove the ramp and any remaining debris.  Vol. VII, p. 34, 10-14.

55.    Roberts indicated they would return to the site and take care of any and all debris.  Vol. VII, p. 34, 19-21.

56.      Scott Wetherbee was already at the site, working on filling the site, and so in the interests of expediency, Wetherbee began removing the ramp until Roberts could return to the site. Wetherbee was already on site and FD wanted it done as soon as possible. Vol. VII, p. 35, 10-16.

57.      Gateman was pleased with Roberts because he made one phone call, they agreed to return to the site and assured him that all debris would be removed. Vol. VII, 36, 4-14.

58.      Gateman never reviewed the Purchase and Sale Agreement with Georto; he relied on Attorney Paul Yasi, who he hired specifically for the purpose of reviewing and negotiating the Agreement with Hawkins. Vol. VII, p. 39, 16-18.

59.      Gateman was satisfied that land he sold to Hawkins was free of debris, because he contracted with Roberts to take away all debris and to the best of Gateman's knowledge all that remained was brick and concrete and fines. Vol. VII, p. 43, 8-15.

60.      Gateman was under the reasonable belief that Hawkins was conducting his own soil investigations. Vol. VII, p. 43, 20-23.

61.      Gateman receives a letter from Attorney Kerester asking for $148,000.00 for site remediation costs incurred by Hawkins. Gateman calls Hawkins and offers to return to Hawkins his purchase price of $300,000.00. Vol. VII, p. 47, 3-15.

62.          Gateman called Attorney Kerester to register his displeasure that he is being threatened with a lawsuit after Gateman twice extended the time for closing on the Purchase and Sale Agreement and offered Hawkins his money back.  Vol. VII, p. 49, 8-15.

63.          Gateman testified that he observed in Exhibit 3C-70, taken May 1, 2002, that Roberts is on site covering the ramp with clean dirt.  Vol. VII, p. 50, 22-25.

64.          Gateman expressed satisfaction with Roberts because to the best of his knowledge Roberts had performed the work per the contract and removed all debris from the site.  Vol. VII, p. 64, 16-22.

65.          Roberts leaves site initially in May, 2002, leaving behind only brick and concrete, per the Order and knowledge of the Lynn Building Inspector, and the "fines" that had been screened. Vol. VII, p. 72, 19-25.

66.          Roberts leaves the site initially on or about May 9, 2002, and return to the site on or about May 19, 2002, after the ramp is discovered on or about May 17, 2002.  Vol. VII, p. 79, 7-13.

67.          Once the excavation of the ramp began, it was obvious that the entire ramp and all the debris needed to be removed.  So Gateman called Roberts and instructed them to return to the site and take away all debris.  Vol. VII, p. 118, 1-4.

68.     Removal of the ramp was directed at least in part, if not entirely, by a geotech engineer affiliated with Family Dollar. Vol. VII, p. 118, 18-21.

69.     In reviewing a photo taken on April 19, 2002, Exhibit 3C-13, Gateman testifies that he observes the ramp, with only brick and concrete on top. Gateman assumed at all times that only dirt/fill was underneath the brick and concrete ramp. Vol. VIII, p. 4, 19-25, p. 5, 1-8.

70.     Gateman observed FD geotech directing Wetherbee and removal of the ramp. 10-11, 13-3

71.     Both Hawkins and Phil Morin, President and Owner of PM Construction ("Morin"), who was hired by Hawkins as the project manager for the Property, acknowledge that by the time of construction beginning in April, 2004, the Phase I Report that they were relying on was nearly two years old. Transcript, Vol. IV, p. 23, 14-17.

72.     After reviewing Phase II, which Hawkins and PM Construction commissioned, they were satisfied that there were no unacceptable environmental conditions and proceeded with construction of the building, Transcript, Vol. IV, p. 26, 17-25, p. 27, 1-3.

73.     Morin testifies that although the final Phase II report was not completed until February, 2004 (note: the trial transcript

records this in error as February, 2006; there is no dispute
that the report was completed in February, 2004), the
decision had already been made to order the building.

74.     Gateman was aware of a ramp that was used to bring
machinery up and down the site but thought it was only brick
and concrete because that is all that was visible from the
surface.  He was not aware of any debris beneath the ramp
until debris was discovered in May, 2004.  Transcript, Vol. V,
p. 78, 13-20.

75.     To prove fraud, the plaintiff must show 1) that the defendant
made a false statement of a material fact; 2) which the
defendant knew was false; 3) for the purpose of inducing the
plaintiff to rely upon it; and 4) that the plaintiff did in fact rely
upon it to its detriment. *Commonwealth v. Ravosa*, 40 Mass.
App. Ct. 47, 52 (1996); *VMark Software, Inc. v. EMC Corp.,
Inc.*, 37 Mass. App. Ct. 610, 617 & n. 9, 642 N.E.2d 587
(1994).

76.     Proof of negligence does not establish wilfulness to fulfill the
"intent" element of fraud.  *Macoviak v. Chase Home Mortg.
Corp.*, 40 Mass. App. Ct. 755, 760 (Mass. App. Ct. 1996).

77.     It is a question for the jury or other trier of fact to determine
whether a material fact has been concealed. *Campbell v.
New England Mut. Life Ins.* Co., 98 Mass. 381, 395-396

(1867).  *In-Towne Restaurant Corp. v. Aetna Casualty & Surety Co.*, 9 Mass. App. Ct. 534, 538 (Mass. App. Ct. 1980).

78.     In all cases, a plaintiff's reliance upon the statements of the defendant must be reasonable or justifiable.  *Town & Country Fine Jewelry Group v. Hirsch*, 875 F. Supp. 872, 876 (D. Mass. 1994).

## IV.     GEORTO'S COMPLAINT DATED AUGUST 5, 2004 – COUNT THREE

79.     In Count Three of the Complaint, Georto asserts that Gateman negligently failed to determine whether statements he made were true or false.

80.     In order to prove negligent misrepresentation, the plaintiff must establish that the defendant, (1) in the course of his business; (2) supplied false information for the guidance of others in their business transactions; (3) is subject to liability for pecuniary loss caused to it by their justifiable reliance upon the information; (4) failed to exercise reasonable care or competence in obtaining or communicating the information. Restatement (Second) of Torts, § 522; see *NYCAL v. KPMG Peat Marwick LLP*, 426 Mass. 491, 496 (1998).

81.     To maintain a claim for negligent misrepresentation, there must be justifiable reliance and detriment suffered on

account of the reliance. See *Nota Construction Corp. v. Keyes Associates, Inc.,* 45 Mass.App.Ct. 15, 19-20 (1998). (D. Mass. 1994).

## V.    GEORTO'S COMPLAINT DATED AUGUST 5, 2004 – COUNT FOUR

82.    In Count Four of its Complaint, Georto claims that Gateman breached the implied covenant of good faith and fair dealing.

83.    Steve McIntyre was hired by Hawkins, despite not being a licensed construction supervisor in Massachusetts, and had the responsibility of supervising the construction work at the Property.  Vol. III, p. 41, 8-10.

84.    McIntyre testified that brick and concrete were standard fill. Vol. III, p. 45, 5-8.

85.    In reviewing the slips from Pacella (Exhibit 44), McIntyre testified that he saw no slips other than for brick and concrete.  Vol. III, p. 48, 20-25, p. 49, 1-7/

86.    McIntyre testified that using a screener and crusher and recycling could save considerable fees.  Vol. III, p. 50, 18-24.

87.    McIntyre testified that it was his understanding that the material was taken from the Property to a recycling center, not a landfill.  Vol. III, p. 56, 23-25, p. 57, 1-2.

88.    McIntyre testified that at least 108 of 165 truckloads were ticketed for a landfill and described as brick only.  Vol. III, p. 59, 6-11.

89.    McIntyre testified that neither a crusher nor a screener was ever considered.  Vol. III, p. 72, 21-23.

90.    McIntyre acknowledges that a 73-74, 9-3, screener was used for the Family Dollar site, as illustrated in Exhibit 3C-153, and that a screener and/or crusher could have been brought on site purchased by Georto but was not.  Vol. III, p. 73, 9-25, p. 74, 1-3.

91.    A duty of good faith and fair dealing is implicit in the performance of a party's contractual obligations." *Lafayette Place Associates v. BRA*, 427 Mass. 509, 525, 694 N.E.2d 820 (1998).

92.    The covenant of good faith and fair dealing requires "that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the full fruits of the contract." *Anthony's Pier Four, Inc. v. HBC Associates*, 411 Mass. 451, 471-72, (1991).

93.    New or independent rights or duties separate from those already in a contract cannot be added by a judge in the cloak of the implied covenant of good faith and fair dealing. See, e.g, *Bateman v. FDIC*, 112 F. Supp. 2d 89, 97 (D.Mass. 2002).

94.    The requirement of good-faith performance, under the implied covenant of good faith and fair dealing, ultimately is

circumscribed by the obligations actually contained in the agreement. *AccuSoft Corp. v. Palo*, 237 F.3d 31 (1st Cir. 2001).

## VI.    GEORTO'S COMPLAINT DATED AUGUST 5, 2004 – COUNT FIVE

95.        Georto alleges in Count Five of the Complaint that Gateman willfully and knowingly engaged in unfair and deceptive practices in violation of Mass. Gen. L. ch. 93A § 11.

96.        Hawkins testified that he sold the property in March, 2005 for $1,150,000, after purchased the property in 2004 for $300,000.00 in February, 2004.  Transcript, Vol. II, p. 49, 12-15.

97.        Hawkins testified that his planned business use for the Property, the construction of an Aaron's Store, adds "value to society" by targeting credit impaired, low to moderate income individuals. Transcript, Vol. II, p. 49, 21-25.

98.        Hawkins testified that the down payment he made on the purchase of the property was less than 2% and that such a small down payment was "atypical" in a Purchase and Sale Agreement.  Transcript, Vol. II, p. 53, 9-12.

99.        Hawkins testified that he paid $3,000.00 to extend the closing date for the sale of the Property so that it could conduct "further due diligence." Transcript, Vol. II, p.54, 10-14.

100.    Scott Wetherbee testifies that he was directed in his activities by the geotech engineer affiliated with Family Dollar and never by Gateman.  Vol. VIII, p. 139, 10-17.

101.    Whether the conduct evidence by the record rises to the level of a violation of  c.93A is a question of law.  *See R.W. Granter & Sons, Inc. v. J&S Insulation, Inc.* 435 Mass. 66, 73 (2001); *Ahern v. Scholz*, 85 F. 3d. 774, 800 (1st Cir. 1996).

102.    To trigger liability under G.L. 93A, § 11, the conduct in question "must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble world of commerce*"; Quaker State Oil Ref. Corp., v. Garrity Oil Co.*, 884 F.2d 1510, 1513 (1st Cir. 1989); have "an extraordinary quality that gives it the rancid flavor of unfairness"; *Atkinson v. Rosenthal*, 33 Mass.App.Ct. 219, 225-26 (1992); or falls "within 'at least the penumbra of some common-law, statutory, or other established concept of unfairness . . . [or] is immoral, unethical, oppressive, or unscrupulous.' " *Cambridge Plating Co. v. Napco, Inc.*, 85 F.3d 752, 769 (1st Cir. 1996),.

103.    Often, an act might be unfair if practiced upon a commercial innocent yet would be common practice between two people engaged in business.  *Spence v. Boston Edison Co.*, 390 Mass. 604, 616 (Mass. 1983).

104.    Mere breaches of contract, without more, do not violate

Chapter 93A. *Pepsi-Cola Metro. Bottling Co. v. Checkers,*

*Inc.,* 754 F.2d 10, 18 (1st Cir. 1985).

105.    Conduct in disregard of  known contractual arrangements'

and intended to secure benefits for the breaching party

constitutes an unfair act or practice for c. 93A purposes.

*Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451,

474 (1991).

106.    Breach of the implied covenant of good faith and fair dealing

may be found to be a violation of G.L. c.93A, but only where

the conduct complained of is undertaken as leverage to

destroy the rights of another party to the agreement while

the agreement is still in effect. *Massachusetts Employers*

*Ins. Exch. v. Propac-Mass, Inc.*, 420 Mass. 39, 43 (1995)

107.    Massachusetts courts have recognized 93A liability in the

context of a breach of contract only where the defendant's

conduct displays particular self-interest or oppression..  As

stated by the Court in *Atkinson v. Rosenthal*, 33 Mass. App.

Ct. 219, 225-226 (Mass. App. Ct. 1992):  Examination of the

facts in the *Pier Four* case and the cases there cited

discloses an additional factor. There is in those decisions a

consistent pattern of the use of a breach of contract as a

lever to obtain advantage for the party committing the breach

in relation to the other party; i.e., the breach of contract has an extortionate quality that gives it the rancid flavor of unfairness. Cf. Piccicuto v. Dwyer, 32 Mass. App. Ct. 137, 139 (1992). In the absence of conduct having that quality, a failure to perform obligations under a written [contract], even though deliberate and for reasons of self-interest, does not present an occasion for invocation of c. 93A remedies.

108.        "'[N]ot every negligent act is unfair or deceptive and thus unlawful under G. L. c. 93A, § 2.' *Swanson v. Bankers Life Co.*, 389 Mass. 345, 349 (1983*)." Walsh v. Chestnut Hill Bank & Trust Co.*, 414 Mass. 283, 288 (Mass. 1993).

109.        Ineptitude, although negligent, does not rise to level of a 93A violation. *Churgin v. Hobbie*, 39 Mass. App. Ct. 302, 308 (Mass. App. Ct. 1995).

110.        "A duty exists under c. 93A to disclose material facts known to a party at the time of a transaction.  See *Nei v. Burley*, 388 Mass. 307, 316-317 (1983); *Sheehy v. Lipton Indus.*, 24 Mass. App. Ct. 188, 195 (1987); *Lawton v. Dracousis*, 14 Mass. App. Ct. 164, 170 (1982). There is no liability for failing to disclose what a person does not know. *Sheehy v. Lipton, Indus.*, supra at 196." *Underwood v. Risman*, 414 Mass. 96, 99-100 (Mass. 1993).

111.   Reason to suspect or likelihood that a certain condition may exist is not an adequate predicate for the imposition of liability under G.L. c.93A.  *Underwood v. Risman*, 414 Mass. 96, 100-101 (Mass. 1993).

112.   The notion of disclosure necessarily implies that the fact in question is known to the person expected to disclose it. Lawton v. Dracousis, 14 Mass. App. Ct. 164, 170 (1982).

113.   Knowing requires more than negligence. *Underwood v. Risman*, 414 Mass. 96, 100 (Mass. 1993).

114.   Punitive damages are awarded only for "willful or knowing" violations of section 2 of Chapter 93A.  Cambridge Plating Co. v. Napco, Inc., 85 F.3d 752, 770 (1st Cir. 1996)

115.   Shades of culpability are supposed to matter in applying the punitive damages provision of the statute. See *Kansallis Fin. Ltd. v. Fern*, 421 Mass. 659, (1996) ("The Legislature envisaged multiple damage awards against those defendants with a higher degree of culpability than that sufficient to ground simple liability."); *Heller v. Silverbranch Constr. Corp.*, 376 Mass. 621 (1978) (only "callous and intentional violations" merit multiple damages); *VMark Software v. EMC, Corp.*, 37 Mass. App. Ct. 10 (1994) (court refused to multiply damages in intentional misrepresentation case stating that section 11 multiple damages are an

"extraordinary remedy" not applicable to a case of "dogged bumbling"); cf. *International Fidelity Ins. Co. v. Wilson*, 387 Mass. 841 (1983) ("The Massachusetts legislature consciously enacted a rule whereby defendant's [Chapter 93A] liability is measured by the degree of his culpability.").

116.    Liability under Chapter 93A for conduct amounting to intentional misrepresentation (or breach of warranty like that here) does not automatically trigger punitive damages. There must be something more. See *VMark Software*, 642 N.E.2d at 595 (liability for intentional misrepresentation supported Chapter 93A liability, but misrepresentations were not "made so 'knowingly' as to warrant the punitive sanctions of double damages under Chapter 93A"); *International Totalizing Sys., Inc. v. Pepsico, Inc.*, 29 Mass. App. Ct. 424, 560 N.E.2d 749, 757 (Mass. App. Ct. 1990) (defendant liable for "knowing" misrepresentation and failure to disclose also violated Chapter 93A, but was not liable for multiple damages because of the absence of "willful or intentional conduct within the purview of [Chapter 93A]" (internal quotation omitted)). *Cambridge Plating Co. v. Napco, Inc.*, 85 F.3d 752, 770 (1st Cir. 1996).

## VI.    GATEMAN'S COMPLAINT AGAINST THIRD PARTY DEFENDANT ROBERTS CORPORATION DATED AUGUST 31, 2004

117.        Gateman has filed a Third Party Complaint against Roberts and alleges that Roberts breached its contract with Gateman to remove all demolition debris from the Property and that, if Gateman is found liable to the Plaintiff, that Roberts be found liable for Gateman's damages.

118.        Gateman testifies that he had a contract with Roberts to remove all demolition debris and that Roberts simply failed to do so.  A ramp of debris was left behind, in violation of the Gateman-Roberts contract. Transcript, Vol. V, p. 74, 15-25, p. 75, 1-8.

119.        Gateman acknowledges that debris material on the parcel eventually purchased by Mr. Hawkins was not removed by Roberts.  Transcript, Vol. V, p. 79, 21-25, p. 80, 1-2.

120.        Gateman testifies that he typically was at the site for 25 minutes a day or so and would simply confer with Roberts officials or other site workers.  He did not have intimate knowledge of what was happening at the site, nor was he "directing" the site.  Transcript, Vol. V, p. 99, 20-24.

121.        Gateman asserted that other than bricks and concrete, there was nothing other than an "inconsequential amount of debris" left on site because he relied on the Roberts contract that all debris, other than bricks and concrete had been removed.  Transcript, Vol. V, p. 104, 17-25, p. 105, 1-6.

122.    In May, 2002, the ramp and debris were discovered and Mr. Gateman assumed that Roberts, after agreeing to return to the site and remove any debris, removed all the ramp and debris.  Transcript, Vol. V, p. 107, 20-25, p. 108, 1-2.

123.    At the time Gateman entered into a Purchase and Sale Agreement of the Property with Hawkins, he assumed that Roberts, per its contract with Gateman, had taken away any and all debris from the site that had been discovered in May, 2002.  Transcript, Vol. V, p. 111, 5-15.

124.    Gateman instructed both Roberts and Scott Wetherbee to remove all debris from the entire site, not just Family Dollar. He owned the entire site at 200 Union Street and his contract with Roberts provided that Roberts would take away all debris.  Transcript, Vol. V, p. 111 16-21.

125.    Gateman observed debris being taken away from the site in May, 2002 and assumed that Roberts was taking away all debris from the site, as contracted.  Transcript, Vol. V, p. 124, 24-5, p. 125, 1-7.

126.    Gateman immediately called Roberts after discovery of the debris ramp in May, 2002 and instructed them to take everything away.  Gateman never instructed them to take away some debris but yet leave other debris on the site. Transcript, Vol. V, p. 128, 8-12.

127.    In answering questions about how he knew debris was being removed, Gateman asserts that he had Scott Wetherbee there, Roberts' officials, and a geotech engingeer directing the operation, and justifiably assumed that all the debris was being removed.  Transcript, Vol. V, p. 128, 21-25.

128.    Kevin Doherty of Roberts Corporation ("Doherty"), who was unavailable at trial, testified at his deposition that in most of his work, a substantial amount of material is recycled. Doherty Deposition Transcript, p. 32, 1-7.

129.    Doherty testified that trucking away brick and concrete would cost approximately $600 per load, as opposed to $1400 for typical demolition debris, because brick and concrete are taken to recycling centers.  P. 33, 1-14.

130.    Doherty testified that brick and concrete can remain on site and he has done many jobs in Lynn in which he has left brick and concrete on site.  P. 35, 17-25, p. 36, 1-5.

131.    Doherty testified that he recalls City of Lynn officials telling him that brick and concrete can remain on site on other jobs he has had in Lynn.  P. 37, 2-5.

132.    Doherty testified that he could not observe any debris beneath the ramp of brick and concrete. P. 87, 8-14.

133.        When Roberts left the site for the first time, all that remained
            were brick and concrete and the access ramp, which
            appeared to be brick and concrete on top of fill.  P. 94, 9-14.

134.        A geotech official affiliated with Family Dollar was
            overseeing the whole site, confirmed to Doherty by
            Gateman.  P. 96, 16-25.

135.        Doherty testified that Gateman asked Roberts to remove the
            debris from the dug up ramp from the entire property and
            reiterates that brick and concrete can remain.  All other
            debris needs to be taken away.  P. 121, 14-23.

136.        Robert Stalker of Roberts Corporation testified that he was
            well aware that Roberts was hired to take away all debris
            other than brick and concrete.  Vol. VIII, p. 105, 4-8.

137.        Stalker agrees that ramp appears to be just brick and
            concrete with good fill underneath it.  Vol. VIII, p. 105, 18-20.

138.        A party to a commercial transaction is bound by the contract
            he executes. *Mayflower Sea Foods, Inc. v. Integrity Credit
            Corp.*, 25 Mass. App. Ct. 453 (1988).

139.        To establish breach of contract**,** the plaintiffs must
            demonstrate that there was a valid contract**,** that the
            defendants failed to perform the terms of the agreement
            without legal excuse, and that the defendants' breach
            caused the plaintiffs damage. *Loranger Constr. Corp. v. E.F.*

_____

(1973); *Guckenberger v. Boston Univ.*, 957 F. Supp. 306,

316 (D.Mass. 1997).

140.    It is elementary that an unambiguous contract must be

enforced according to its terms. *Schwanbeck v. Federal-*

*Mogul Corp.*, 412 Mass. 703, 706 (1992).

141.    A contract is not to be struck down because one of its

material provisions is stated in broad and general terms if,

when applied to the transaction and construed in the light of

the attending circumstances, the meaning to be attributed to

it can be interpreted with reasonable certainty so that the

rights and obligations of the parties can be fixed and

determined. *Cygan v. Megathlin*, 326 Mass. 732, 734 (Mass.

1951).

142.    "[T]he mode of performance required by a written contract

may be varied by a subsequent oral agreement based upon

a valid consideration." *Siegel v. Knott*, 316 Mass. 526, 528

(1944). *First Pa. Mortgage Trust v. Dorchester Sav. Bank*,

395 Mass. 614, 625 (1985). *Wesley v. Marsman*, 393 Mass.

1003, 1004 (1984). *Schinkel v. Maxi-Holding, Inc.*, 30 Mass.

App. Ct. 41, 47 (1991)." *Cambridgeport Sav. Bank v.*

*Boersner*, 413 Mass. 432, 439 (Mass. 1992).

143.    Consideration required to support a promise is a detriment

incurred by the promise or a benefit received by the promisor

at his request.  *Williston on Contracts*, §7:4 (Fourth Edition,

1999).

144.    Mutual agreement on modification of the requirement of a

writing may be inferred from the conduct of the parties and

from the attendant circumstances' of the instant case.

*Cambridgeport Sav. Bank v. Boersner*, 413 Mass. 432, 439

(Mass. 1992).


Respectfully submitted,
William Gateman,
Individually and as Trustee
By his Attorney,


_____
Mark P. McGrath, BBO
#642913
9 West Broadway  #214
Boston, MA  02127
(617) 271-9009
mpgrath@aol.com

## CERTIFICATE OF SERVICE

I hereby certify that this document was this day served upon all counsel of record by filing a true and exact copy of same, via the ECF system.

SIGNED under the pains and penalties of perjury.

Dated: October 15, 2006                    _____
                                           Mark P. McGrath