# United States District Court

FOR THE

## DISTRICT OF MASSACHUSETTS

_____          CIVIL ACTION NO. 04-11730 NG
                                    )
GEORTO, INC.,                       )
            Plaintiff,              )
                                    )
     v.                             )
                                    )
WILLIAM GATEMAN, INDIVIDUALLY       )
and as TRUSTEE OF 200 UNION         )
STREET REALTY TRUST                 )
                                    )
            Defendant,              )
            Third Party Plaintiff, and )
            Third Party Defendant-in- )
            Counterclaim            )
                                    )
ROBERTS CORPORATION                 )
                                    )
            Third Party Defendant,  )
            and Third Party Plaintiff-in- )
            Counterclaim            )
_____   )

### THIRD PARTY DEFENDANT ROBERTS CORPORATION'S
### REQUESTS FOR FINDINGS OF FACT AND RULINGS OF LAW

Third Party Defendant, Roberts Corporation ("Roberts"), submits the following

requests for findings of fact and rulings of law:

### INTRODUCTION

This action arises out of a June 2003 conveyance from the Defendant William

Gateman, Trustee of the 200 Union Street Realty Trust ("Gateman") to the Plaintiff

Georto, Inc. ("Georto") of real property located between Ellis Street and Union Street in

Lynn, Essex County, Massachusetts ("the Property"). Georto alleges that, after purchase

of the Property and upon commencement of construction of a new commercial building,

it discovered substantial demolition debris and solid waste that had been concealed below grade in contravention of Gateman's express warranty and representations.  Georto further alleges that it was required to excavate, remove, and dispose of 167 truckloads of the debris and to replace with acceptable fill in order to construct its building on the Property.

After Georto filed suit, Gateman filed a three paragraph Third Party Complaint against Roberts generally alleging breach of contact and indemnity[1] with regard to Roberts' demolition of a condemned building on the Property in March-June 2002.  As demonstrated by the evidence adduced at trial, there is no basis for Gateman's claim and judgment should be entered in favor of Roberts and against Gateman.


## REQUESTS FOR FINDINGS

1.    Gateman, an individual residing in Massachusetts, is the trustee of 200 Union Street Realty Trust.  See Exhibit 4 and Transcript Volume VI, pp. 24-25.

2.     In his capacity as trustee, Gateman owned real property consisting of 19,500 square feet located between Ellis and Union Street in Lynn, Massachusetts. See Exhibit 5 and Transcript Volume VI, pp. 24-25.

3.    Prior to August of 2001, a large commercial building was situated on the property until it was destroyed by fire.  Exhibit 1. Thereafter, Gateman, acting as his own general contractor, subcontracted with three different demolition companies, Turner Demolition, RIS, and Roberts for the demolition of the damaged structure and removal of the debris.  See Transcript Volume VII, p. 12 (13-15); 67 (12-16); 99 (4-25) – 100 (1-9); and Exhibit 9, Roberts-

---

[1] The claim for indemnity was dismissed on Roberts' motion for summary judgment.

Gateman Contract. Then, he subcontracted with Loveland Trucking to deliver fill to the Property, and ultimately subcontracted with Scott Wetherbee contracting to compact and grade the fill on the Property. Transcript Volume V, p. 87 (19-25); 96 (19-21).

4.   Gateman eventually partitioned the parcel and sold one portion of the lot to Family Dollar Stores of Massachusetts, Inc. ("Family Dollar"), one portion to Georto, and a third portion to an individual. See Exhibits 16 and 19, Family Dollar Contract for Purchase and Sale of Real Estate and Georto Contract for Purchase and Sale of Real Estate

5.   Following Georto's purchase, however, Georto was allegedly prevented from building because its contractor allegedly located varying masses of debris in the ground, which would not support a structure. See generally Georto Complaint and Transcript Volume I, p. 129 (19-25) and Volume II, p. 24 (22-25) – 25 (1-4).

6.   Thereafter, Georto brought this action against Gateman as the seller of the property, and Gateman, in turn, impleaded Roberts for breach of contract.

7.   Gateman and the Trust first acquired the Property in 1996 and held it as investment property in order to make a profit. See Exhibit 5 and Transcript VI, p. 29 (1-13). Several juveniles set the building on fire in August of 2001, which resulted in its total destruction. See Transcript Volume VII, p. 7 (16-21).

8.   The damage was so severe that the city's building inspector, Frank Kalman, directed Gateman to begin immediate demolition of at least the front portion

3

of the five-story structure because it was unsafe.  See Exhibit 6 and Transcript Volume VII, p. 9 (6-11).

9.    Gateman first subcontracted with Turner Demolition of Lynn, Massachusetts for the initial demolition and to prevent the façade of the building from falling into Union Street. Exhibit 1, ¶ 2-3 and Transcript Volume VII, p. 9 (2-15). Turner Demolition, using debris and materials from its demolition work, constructed a large debris ramp to allow access to the Property.  *Id.*   Gateman then subcontracted with RIS to perform further demolition and RIS mainly constructed a fence, and moved debris while aiding law enforcement authorities investigating the cause of the fire. *Id.*

10.    As Gateman desired to maximize his profits and minimize his costs, he acted as his own general contractor and made decisions largely based on minimizing costs without regard to their legality.  For instance, in an effort to mitigate the Trust's cost of demolition, Gateman sought to have the building's brick and concrete remain on the Property to be used to fill.  See Exhibit 9.

11.    The legality of the decision use the brick and concrete for such purposes rested with the building inspector and department of health for the City of Lynn,  and also with the Massachusetts Department of Environmental Protection.  Exhibit 9 and Transcript Volume IV, pp. 66-70.

12.    In any event, Gateman called for bifurcated bids with one estimate to include the cost of removing the brick and concrete, and the other estimating only the cost of removing the debris, while leaving the brick and concrete in the former basement.  See Exhibit 9, Roberts-Gateman Contract.

4

13.     On or about March 12, 2002, Gateman entered into a written contract with
        Roberts, whereby Roberts agreed, among other things, to demolish the
        existing building, remove the demolition debris from the site, cover the site
        with fill and rough grade the site. See Exhibit 9, Roberts Gateman Contract.

14.     The parties, however, only conditionally agreed upon Roberts' removing the
        brick and concrete pending further instruction from Gateman. See Exhibit 9;
        and Exhibit 52, Kevin J. Doherty Depo. at 35-42

15.     Thus, the written contract reflected two estimates: $90,000.00 for completing
        the demolition and removing the debris; or $90,000.00 plus an additional
        $25,000.00 for removing the brick and concrete. See Exhibit 9, Roberts-
        Gateman Contract.

16.     Roberts commenced the demolition almost instantly. Transcript Volume VIII,
        p. 34 (21-25) – 35 (1); and Exhibit 52, Doherty Depo. at 59. With the use of
        heavy equipment, Roberts demolished portions the of the buildings that
        remained standing and screened the debris in order to separate the brick and
        concrete from the steel, iron and wood. [2] Exhibit 52, Doherty Depo. at 70-
        73.Among the debris and rubble were various items such as radiators,
        shelving and differing forms of trash. Exhibit 52, Doherty Depo. at 77-79.

17.     Roberts also separated what remained of the roofing material, which was
        contaminated with asbestos, and miscellaneous items such as trash and scrap
        metal. Exhibit 52, Doherty Depo. at 70-79. Roberts placed all of the material

---

[2] A "Screener" is a machine that moves debris through various screens and shakes it to remove particles of
debris ranging in size. The machine loosens the dirt and segregates the larger pieces, returning the dirt and
fill to the ground. See Exhibit 52, Doherty Depo. at 115.

into separate piles in the parking lot, which were segregated by the type of

material.  Exhibit 1¶ 6

18.    After screening and segregating the debris, Roberts removed the debris and

transported it to various facilities.  Exhibit 52 at 69-72.  For instance, Roberts

took the iron and steel to New England Polarizer for recycling, while

disposing of the trash and debris in landfills.  *Id*. and See Exhibit 12.  In total,

Roberts removed over 1178 tons – or over 2,356,000 pounds – of debris, in

over 50 truckloads, during approximately four weeks of continuous work.  *See*

Exhibit 12, Roberts Daily Tracking Report.

19.    Other than Gateman's self-serving testimony, there is no evidence that

Gateman ever received permission from the City of Lynn's Building Inspector

to leave the brick and concrete on the Property and to use it as fill.  In fact, the

only evidence concerning the City of Lynn's position with regard to filling the

site is Exhibit 8, consisting of notices to Gateman, by which the City of Lynn

commanded that Gateman fill the site with "clean sanitary fill."  The notices

from the City of Lynn  make no mention of allowing brick or concrete to

remain on site.  In any event Gateman never received any written permission

from the City of Lynn to leave the brick and concrete on the Property and to

use it as fill. See Transcript Volume VII, p. 91 (9-13).

20.    Nor did Gateman ever receive the permission of the Massachusetts

Department of Environmental Protection to leave the brick and concrete on

the site and to use it as fill. See Transcript Volume VII, p. 91 (9-13).

21.     It can be reasonably inferred from the absence of any evidence other than
        Gateman's self-serving testimony that Gateman never received any
        authorization from any state or local authority allowing him to fill the
        Property with brick or concrete.

22.     As the owner of the Property and by virtue of acting as a general contractor
        operating the Property, Gateman was solely responsible for obtaining any
        legal authorization allowing him to fill the Property with brick or concrete.
        See Transcript Volume IV, p. 104-105.  Conversely, Roberts, as a
        subcontractor, had no obligation to obtain any such authorization.  *Id.*

23.     Despite the lack of any written permission to leave the brick and concrete at
        the site, Gateman instructed and authorized Roberts to leave the brick and
        concrete.  Even though Roberts had already created piles of different debris in
        the parking lot and was prepared to dispose of it in its entirety, to comply with
        Gateman's direction, Roberts placed the brick and concrete material back into
        the hole and positioned it against the foundation's walls.  Exhibit 52, Doherty
        Depo. at 36-37, 93, 101-02 and Transcript Volume VII, p. 17 (12-15).

24.     Within the brick and concrete, however, there did remain some debris – small
        pieces of charred wood and ash – that Roberts could not have removed with
        the use of its mechanical equipment.  Transcript Vol. VI, p. 17 (22-25).

25.     When Roberts commenced its work, much of the wood present on the site
        consisted of four-by-eight and eight-by-ten timbers, which were mixed in with
        the concrete and brick, as was the rest of the debris.  Exhibit 52, Doherty
        Depo. at 77-78.  While that wood was separated into piles and removed, small

pieces of charred wood were entangled with the brick and concrete.

Transcript Vol. VI, p. 17 (22-25).

26.    Roberts notified Gateman the material had been screened; yet the wood could not be separated from the brick and concrete unless done so by hand or crushed.  Consequently, the small pieces would remain with the material when Gateman used the brick and concrete as fill.  Transcript Vol. VI, p. 17 (22-25).

27.    While Item 7 of Roberts contract did include a term to "Cover with Fill and Rough Grade the Site," neither Gateman nor Roberts understood the contract between them to include Roberts providing fill over the site or bringing the property to street level.  Exhibit 52, Doherty Depo. at 50.

28.    In fact, Gateman subcontracted with two other entities to fill and grade the site.  The fill Gateman located and eventually used was from another building site in Revere, MA, where the owner was offering it at no cost.  Transcript Volume VI, p. 52, (13-20); and Volume VII, p. 26 (10-22).  Because Gateman was getting the fill for free, he subcontracted with Loveland Trucking ("Loveland") for approximately $30,000.00 to transport the fill from Revere to the Property, and he chose not to include Roberts in this process.  See Transcript Volume V, p. 87 (19-25).

29.    Additionally, Gateman subcontracted with Scott Wetherbee Contracting to grade and fill the site. Transcript Volume VII, 82 (1-3).

30.    Additionally, prior to Roberts' arrival on the site, Turner Demolition constructed a large ramp, approximately forty feet long, in what remained of the building's basement.  The ramp was used as a road to move heavy

equipment in and out of the foundation area in order to remove and sort debris. Exhibit 1, ¶ 3; and Transcript Volume VIII, p. 27 (6-22), 51 (7-12).

31.    The ramp was constructed of demolition debris, including wood, steel, scarp metal, trash, and clothes in addition to concrete, brick and fill. Exhibit 1.

32.    Constructing such a ramp, or road, on a demolition site for this use is common in the industry. This specific ramp was large enough to accommodate Roberts' excavator and was built on the portion of the parcel Gateman would eventually sell to Georto and Family Dollar. Exhibit 5E.

33.    The ramp was in substantially the same condition it had been in when Roberts arrived on the site, and both Loveland and Scott Wetherbee used the ramp to deliver fill to the low-lying areas of the site. Exhibit 52, Doherty Depo. at 97, 103. Other than the debris Scott Wetherbee eventually uncovered within the ramp, there was no debris left on the site by Roberts except the brick, concrete, and ash. *See* Exhibit 52, Doherty Depo. at 91

34.    When Roberts had completed its demolition work, separated the debris and transported the different materials to the various facilities, only the brick, concrete, and ramp remained at the Property. Exhibit 1; Exhibit 52, Doherty Depo. at 89; and transcript Volume VIII, p. 147.

35.    When Roberts left the work site, both Roberts and Gateman agreed that Roberts had fully performed its obligation. Transcript Volume VII, p. 63 (1-15).

36. Gateman had personally witnessed Roberts load "[m]any, many trucks" with debris and observed it being hauled away. Transcript Volume VII, p. 66 (1-4).

37. When Roberts departed the site, the company had successfully demolished the building and removed the debris as instructed, leaving only the brick and concrete sloped against the foundation walls. Transcript Volume VII, pp. 72-73; and Volume VIII, p. 46 (14-25) – 47 (1).

38. Additionally, throughout the project Gateman observed Roberts work firsthand by being on the site daily, aside from a ten-day break during the middle of the project. Transcript Volume V, p. 94 (3-25).

39. When Roberts departed, Gateman personally inspected the site, did not experience any problems with Roberts, and Gateman never expressed any dissatisfaction with the Roberts' performance. Transcript Volume VII, pp. 78 (22-25) – 79 (1-6).

40. At the time of completion of Roberts' work, Gateman described Roberts' performance as "fantastic." He also described his relationship with Roberts as "fantastic," made his final payment, and referred additional business to Roberts. Transcript Volume VII, p. 21 (5-12).

41. At the time of completion of Roberts' work, Loveland had begun delivering fill to the site and Wetherbee Construction began dispersing the fill while Roberts was still in the finishing process. Exhibit 52, Doherty Depo. at 97

42. Roberts had absolutely no role with delivering fill to the Property or with actually filling the Property. Transcript Volume VII, p. 88.

43.     Gateman himself even participated filling the Property.  Kevin Doherty, who had the majority of dealings with Gateman on behalf of Roberts, personally observed Gateman operating heavy equipment and pushing fill into the hole. Transcript Volume V, p. 96 (5-10), 101 (12-21); and Volume VI, pp. 61-62. Gateman and Wetherbee were covering the ramp, as well as the brick and concrete, with fill that Loveland delivered.  *Id.*  and Transcript Volume VI, p. 11 (11-23).

44.      Sometime after Roberts completed its work and left the site, Gateman contacted Roberts to remove some additional debris, which had been concealed within the ramp.  Exhibit 52, Doherty Depo. at 117 and Transcript Volume VII, p. 120 (4-10).

45.     By then, Gateman had entered negotiations with Family Dollar and agreed to prepare one portion of the site to build.  Exhibit 52 at 117-18; *see also* Exhibit 16, Family Dollar Contract for Purchase and Sale of Real Estate, § 2A. Gateman would eventually warrant to Family Dollar, *inter alia*, that Gateman, as the seller, completed the demolition and removed the debris on the property, in preparation for construction.  *Id.*

46.     Roberts responded to Gateman's request by once more sending a screener, a loader and several trucks to sort and remove the debris just as Roberts had done during the initial work.  Exhibit 52, Doherty Depo. at 117-118 and Transcript Volume VII, p. 110 (9-16).

47.     Neither Doherty nor Stalker understood that Roberts screening of the material from the ramp as falling within the original contract.  Exhibit 52, Doherty

11

Depo. at 118; Yet, Roberts returned and removed all of the debris as requested without seeking any additional compensation. Exhibit 52, Doherty Depo. at 117-118, 143. Again, Roberts left the site having fully performed what both Gateman and Roberts proposed, without any objection or complaint from Gateman. Exhibit 52, Doherty Depo. at 122, 125.

48. Pursuant to Family Dollar's bargain of having Gateman prepare their portion of the site for construction, Gateman agreed to have the brick and concrete that was originally located on their portion of the lot, relocated it to the portion Georto would eventually purchase. Transcript Volume VII, p. 23 (22-25) 24 (1-3)

49. Roberts, however, did not take part in this process. Exhibit 52, Doherty Depo. at 131-35. Kevin Doherty again observed both Gateman and Mr. Wetherbee using a front end loader to move the brick and concrete that remained from Roberts screening of the ramp material, and continue to cover the material with fill. *Id.*

50. Gateman consummated a Purchase and Sale Agreement with Family Dollar on April 26th, 2002. *See* Exhibit 16, Family Dollar Contract for Purchase and Sale of Real Estate.

51. Roberts was not a party to, or even aware of, the purchase and sale of the Property to Family Dollar. Roberts never made any representations either directly or indirectly to Family Dollar regarding the Property. *See* Exhibit 16, Gateman and Family Dollar for Purchase and Sale of Real Estate; and Transcript Volume II, p. 84 (1-8).

52.    On or about June 18, 2003, Gateman entered into a contract for the purchase and sale of the remaining portion of the site to Georto.  *See* Exhibit 19, Georto Contract for Purchase and Sale of Real Estate.  The agreement Gateman reached with Georto, however, had no such clause requiring Gateman to prepare the site for construction.  *Id.*

53.    Roberts was not a party to, or even aware of, the purchase and sale of the Property to Georto.  Roberts never made any representations either directly or indirectly to Georto regarding the Property.  Indeed, Roberts had completed all of its work on the Property more than a year prior to Georto entering into a purchase and sale. Transcript Volume VIII p. 82 (1-18).

54.    Section 2A of the Georto contract excluded any language regarding "Soil Testing and Backfill" as did Family Dollar's, and provided merely for the seller giving the buyer notice of any zoning noncompliance or assessments.  *See* Exhibit 19, Georto Contract for Purchase and Sale of Real Estate.

55.    Gateman and Georto closed on the property in February of 2004.  See Exhibits 29 and 30.

56.    Approximately two months later, Mr. Hawkins of Georto contacted Gateman and informed him that the company's construction crew was prohibited from going forward because the site was unsuitable for building. Transcript Volume II p. 7 (21-15) 8 (1-3).

57.    According to Georto and its soil expert, test borings demonstrated that the site was filled throughout with solid waste, mainly consisting of brick and other

13

waste, at all depths throughout the site. Transcript Volume IV pp. 111-119; and Volume V, p. 30 (11-21).

58.     Of the 167 truck loads of solid waste removed from the site by Georto and its contractors, 112 of the truckloads were described as solely containing "brick" and the remaining 55 truckloads were described as fill and all were processed at recycling plants.  Exhibit 44.  It can reasonably be inferred from the evidence that the majority of the solid waste complained of by Georto consisted of brick.

59.     As it is undisputed that Gateman authorized Roberts to leave the brick at the site, and the gravamen of Georto's claim concerns the failure to remove the brick, it can reasonably be inferred that any activity by Roberts had no role in causing the harm Georto complains of in this matter. Transcript Volume VIII p. 16 (7-11), Transcript Volume VII p. 23 (22-25) 24 (1-3).

60.     It is undisputed that Roberts had no role in creating the debris ramp (Exhibit 1 ¶ 2-3), in covering the debris ramp, or in filling any portion of the site. Transcript Volume VIII p. 112 (8-11).  It is undisputed that Gateman and Scott Wetherbee filled the entire site. *Id.* It is also undisputed that debris found by Georto and its agents was mixed at all depths throughout the site. Transcript Volume IV pp. 111-119. It can reasonably be inferred that Roberts had no responsibility for the disposal of the solid waste later discovered thoughout the Property, that Gateman knew or should have known that solid waste was left at the Property as he was the one who filled the entire site.

61.   Gateman's claim that Roberts breached the contract by leaving the debris ramp at the Property is unsupported by the evidence.  It is undisputed that Roberts did not create the debris ramp and had no knowledge that it contained any solid waste and it is also undisputed Loveland Trucking and Scott Wetherbee required the debris ramp to remain on the Property so they could deliver fill to the site and engage in compacting and grading the Property once Roberts left.

62.   It can be reasonably inferred from the evidence that Gateman requested that Roberts leave the debris ramp and waived any claim that Roberts failed to remove it.

63.   Gateman's claim that Roberts, due to its omission in leaving the debris ramp, is responsible for the condition of the Property complained of by Georto is unsupported by the evidence. It is undisputed that the debris ramp was located in a discrete area of the Property; that after Roberts had completed its work the remainder of the Property (other than the debris ramp) was an empty hole that was cleaned down to the original slab foundation and only had piles of brick, concrete, and ash within it; that Roberts had no role in filling the Property; and that Roberts had no role in excavating or moving the debris ramp.  However, years after Roberts left the Property, solid waste (mainly consisting of bricks mixed with various other materials)  was "readily apparent" throughout the entirety of the Property, and this solid waste was not located in a discrete area, but was strewn throughout the Property at various depths.  Due to the condition of the Property at the time Roberts completed its

work (i.e. the debris ramp was left intact and in one discrete spot), and the condition of the Property at the time Georto acquired it (i.e. solid waste was strewn throughout the Property), it can be reasonably inferred that the cause of Georto's harm was not that Roberts had left the debris ramp at the Property, but rather that the cause of Georto's harm was that Gateman and Scott Whetherbee moved the debris ramp and then mixed it with fill, brick, concrete, and ash, and then filled the Property with this mixture of solid waste.

64.    It can reasonably be inferred from the evidence that Gateman and Scott Wetherbee were the responsible parties for filling the Property with solid waste by their actions of moving the debris ramp and then mixing it with fill, brick, concrete, and ash, and then filling the Property with this mixture of solid waste.  Gateman and Scott Wetherbee were solely responsible for filling the Property and were alone at the Property for a period of at least one week and possibly up to two-three weeks.  Neither Gateman nor Scott Wetherbee retained any business records of their activities at the Property, nor any payment records.  Indeed, Scott Wetherbee admits to having destroyed his business records, and Gateman refused to produce payment records relating to Wetherbee's activities.

## REQUEST FOR RULINGS

1.  Full performance of a contract occurs when the parties materially complete their obligations under the bargained for exchange.  *See G.M. Abodeely Insurance Agency, Inc. v. Commerce Insurance Company*, 41 Mass.App.Ct. 274, 278 (1996); *and* Restatement 2nd of Contracts § 237 (1981).

16

2.  There can be no breach of contract where the defendant has fully performed. *Threlfall v. Coffee Roasters Prods.,* 306 Mass. 378, 380, 28 N.E.2d 445, 447 (1940); *First Nat'l Bank of Boston v. Cartoni*, 295 Mass. 75, 78–79, 3 N.E.2d 177, 178–79 (1936). *See Cygan v. Megathlin,* 326 Mass. 732, 735, 96 N.E.2d 702, 703–04 (1951) (stating that "when a contract has been executed on one side, the law will not permit the injustice of the other party retaining the benefit without paying unless compelled by some inexorable rule"); *Realty Developing Co. v. Wakefield Ready-Mixed Concrete Co.,* 327 Mass. 535, 537, 100 N.E.2d 28, 30 (1951) (plaintiff must prove that defendant failed to perform without a legal excuse to prove breach of contract).

3.  Where a plaintiff has accepted the benefit of the defendant's full performance, the plaintiff cannot then be heard to complain about the performance. *See Church of God in Christ, Inc. v. Congregation Kehillath Jacob,* 370 Mass. 828, 834–35, 353 N.E.2d 669, 672–73 (1976) (holding that where defendant accepted performance under the contract, the defendant waived the condition stating that time was of the essence and therefore could not use breach of the condition as a defense); *Providence Washington Ins. Co. v. Beck,* 356 Mass. 739, 740, 255 N.E.2d 600, 601 (1970) (concluding that the defendant had waived the plaintiff's repeated breaches by accepting payment under the contract and continuing to perform); *Cueroni v. Coburnville Garage, Inc.,* 315 Mass. 135, 139, 52 N.E.2d 16, 18–19 (1943) (stating that where a party has consented to the deviation from a contract, he cannot claim a breach of contract).

4. Courts determine parties' performance obligations from the contractual terms, which are derivatives of the parties' intent when bargaining. *Id. Cygan v. Megathlin*, 326 Mass. 732, 733 (1951). In order for courts to determine what two parties intended, the agreement must be evaluated as a whole, in light of the underlying transaction, coupled with the outcome. *Cygan v. Megathlin*, 326 Mass. at 733.

5. A breach occurs when one party fails to provide an "essential and inducing feature of the contract." *Lease-It Inc. v. Massachusetts Port Authority*, 33 Mass.App.Ct. 391, 396 (1991).

6. And, it is the plaintiff's burden to prove that the defendant failed to perform without a legal excuse. *Realty Developing Co. v. Wakefield Ready-Mixed Concrete Co.*, 327 Mass. 535, 537 (1951). Therefore, when one party bargains for a rather broad performance and the other party performs to his or her satisfaction – satisfies the other's intent – the essential and inducing features of the contract have been met and no breach can occur. *See Cygan v. Megathlin*, 326 Mass. At 733; *see also Lease-It Inc.,* 33 Mass.App.Ct. 396.

7. Moreover, parties often deviate from their original bargain to more fully benefit from their exchange. *Finlan v. Winchendon Housing Authority*, 28 Mass.App.Ct. 977, 978 (1990). Certainly when parties contract with broader terms because the underlying circumstances require, they may subsequently alter the terms to better conform to their objective. *Id.; see also Cambridge Savings Bank v. Boersner,* 413 Mass. 432, 439 (1992).

8. Subsequent alterations, however, often manifest themselves through various behaviors.  In fact, while courts would ideally address written modifications, both oral agreements and joint-conduct that result in a change to the terms are no less binding.  *Finlan,* 28 Mass.App.Ct. at 978.

9. When a party consents to such deviations, however, he or she is precluded from complaining "that the work was not performed to his entire satisfaction as the written contract provided." *Cueroni v. Cobrnville Garage*, 315 Mass. 135, 139 (1943).

10. A party cannot sue for breach of contract where it has waived the breach. *Steranko v. Inforex, Inc.,* 5 Mass.App.Ct. 253, 263, 362 N.E.2d 222, 230 (1977).

11. Where a party has unconditionally accepted the benefit of a contract in lieu of demanding substitute performance, it cannot later seek additional performance or claim that there has been a breach of contract. A party may be prevented by its own acts from claiming a right to the detriment of the other party when that other party was entitled to rely on, and did rely on, that conduct.  *See Cueroni v. Coburnville Garage,* 315 Mass. 135, 139, 52 N.E.2d 16, 18–19 (1943).

12. In order to recover damages against Roberts, Gateman must demonstrate that the damages complained of were caused by Roberts' conduct. If the damages were caused by Gateman or by someone other than the Roberts, then Gateman is not entitled to damages from the Roberts. *Kobayashi v. Orion Ventures, Inc*., 42 Mass.App.Ct. 492, 678 N.E.2d 180, *further app. rev. denied*, 425 Mass. 1102, 680 N.E.2d 101 (1997). *Fernandes v. Union Bookbinding Co.,* 400 Mass. 27, 37–38, 507 N.E.2d 728, 734–35 (1987); *Sackett v. St. Mary's Church Soc'y*, 18

Mass.App.Ct. 186, 464 N.E.2d 956 (1984); *John Hetherington & Sons, Ltd. v. William Firth Co.,* 210 Mass. 8, 95 N.E. 961 (1911).

13. Gateman is only entitled to recover damages sufficient to give him the benefit of his contractual bargain, as long as such damages are reasonably proved. In other words, he is entitled to those damages that would put him in a position to obtain that which he has bargained to obtain, so far as compensation in money can be computed by rational methods upon a firm basis in fact. *Productora E Importadora De Papel v. Fleming,* 376 Mass. 826, 837–38, 383 N.E.2d 1129, 1136 (1978); *White Spot Constr. Co. v. Jetspray Cooler, Inc.*, 344 Mass. 632, 635, 183 N.E.2d 719, 721–22 (1962); *John Hetherington & Sons, Ltd. v. William Firth Co.,* 210 Mass. 8, 95 N.E. 961 (1911).

14. The doctrine of *in pari delicto* bars a plaintiff who has participated in wrongdoing from recovering damages for a loss resulting from the wrongdoing. *Choquette v. Isacoff,* 65 Mass.App.Ct. 1, 3-4 (2005). The doctrine stands for the theory that courts will not lend aid to parties who base their cause of action on their own immoral or illegal acts. *See Atwood v. Fisk,* 101 Mass. 363, 364 (1869). "When two parties, acting together, commit an illegal or wrongful act, the party who is held responsible in damages for the act cannot have indemnity or contribution from the other, because both are equally culpable, … and the damage results from their joint defense." *Stewart v. Roy Bros.,* 358 Mass. 446, 458-459 (1970).

15. "In Massachusetts, the rule has its usual application with respect to the attempted enforcement of illegal contracts, and in equitable proceedings where both parties come before the court with unclean hands." *Choquette v. Isacoff,* 65 Mass.App.Ct.

1, 4 (2005). Massachusetts courts would not allow primary wrongdoer to sue a secondary accomplice for helping in the wrong. *Baena v. KPMG LLP,* 2006 WL 1703822 (1st Cir. 2006).

16. In pari delicto, which literally means "in equal fault," is a doctrine commonly applied to prevent a deliberate wrongdoer from recovering from a co-conspirator or accomplice. *Baena v. KPMG LLP,* 2006 WL 1703822 (1st Cir. 2006) (Where company falsified financial reports and submitted to accounting firm, company was barred from recovering against accounting firm because company was the primary wrongdoer.)

17. A person who has been damaged by the wrongful act of another is bound to exercise reasonable care and diligence to avoid loss and to minimize damages. Gateman may not recover for losses that could have been prevented by reasonable efforts on his part. *Burnham v. Mark IV Homes, Inc.,* 387 Mass. 575, 441 N.E.2d 1027 (1982); Restatement (Second) of Contracts § 350(1) (1981).

18. The Roberts-Gateman contract was negotiated in broad terms because of the circumstances.  And as the project evolved, so too did Roberts obligations. Gateman's expressed and implied intentions throughout the entire project was to have the building demolished and the debris removed for as little cost as possible. To do so, it was Gateman's choice to mitigate his costs by directing Roberts to leave the brick and concrete, and the debris ramp on the Property.  Roberts thereby performed all of the "essential and inducing features of the contract," and likewise performed as Gateman had intended. See *Lease-It Inc.,* 33 Mass.App.Ct. 396; see also *Cygan,*326 Mass. 733.

19. It is undisputed that Roberts demolished the building, separated the debris into piles, returned the brick and concrete back into the foundations' hole as Gateman directed, and disposed of the remaining material.  It is also undisputed that Roberts was not responsible for filling the site.  Gateman contracted with two separate entities to deliver the fill and grade the Property.  What remained of the site upon Roberts' completion was an empty hole with only the brick and concrete placed along the foundation and the ramp to move equipment into the hole. Additionally, it is undisputed Roberts returned to screen and remove the ramp material without objection or additional charges.

20. It is also undisputed that when Roberts screened the material and was unable to remove all of the smaller particles of wood from the brick and concrete, Roberts so notified Gateman.  Roberts explained that the material was too entangled with the brick and concrete to simply screen away, that it could only be removed by removing all of the brick and concrete or by hand, and the accompanied costs. Gateman, however, continued with his plan to leave the material as fill to reduce his costs and by his decision, bound himself with the result.  *Finlan*, 28 Mass.App.Ct. 978.

21. Before Roberts left the site, Gateman personally walked the Property and inspected the work.  He had already observed Roberts clear the site of all of the debris, and the only material that remained on the Property was the brick and concrete, which Roberts placed in the exact manner Gateman dictated. Without objection Gateman paid the remaining balance and agreed Roberts had fully

performed its obligations. Gateman has described Roberts' performance as fantastic and Gateman expressed his satisfaction with their performance.

22. Likewise, Gateman supplied all of the additional fill that would be placed in the hole, from a different source. Instead of paying Roberts to supply and place the fill, Gateman refused Roberts' offer, continuing to limit his costs. Gateman subcontracted with Loveland Trucking and Wetherbee Construction to supply fill and grade the site, respectively. Therefore, parties other than Roberts filled the Property.

23. Courts will not allow parties to deviate from a contract and then later complain about the results from the deviation, yet that is precisely what Gateman has done. *Cueroni*, 315 Mass 139.

24. In fact, when Roberts finished, Wetherbee was able to prepare the Family Dollar portion of the site for immediate construction. Had Roberts breached any of its obligations, the breach would have been apparent long before Georto purchased its lot. Conversely, it is only because Roberts fully performed that Gateman was able to prepare the Family Dollar plot as he alone warranted. The site was free of material and the hole was fully exposed, which allowed Wetherbee construction to fill and grade the site as Family Dollar commanded – a process in which Roberts Corporation took no part.

25. Roberts performed to Gateman's full expectations, demolished the building and removed the resulting debris as instructed, and because the evidence demonstrates that Roberts performance allowed the site to be developed by Family Dollar without any claim of breach, this Court should enter judgment in favor of Roberts.

26. Roberts is entitled to at least an adverse inference, and possibly the sanction of

dismissal, as to Gateman's allegation that Gateman was unaware of any debris,

particularly from the ramp, being left on the Property. Gateman refused to

produce documents pertaining to his retention and payment of Scott Wetherbee,

the contractor who filled the site, buried the debris ramp, then uncovered it and

moved parts of it. Indeed, Wetherbee similarly destroyed any documents and

photographs. The destruction and/or failure to produce documents of such a

relevant nature warrant dismissal of Gateman's claim. *Plasse v. Tyco Electronics*

*Corp.,* --- F.Supp.2d ----, 2006 WL 2623441(D.Mass.,2006) (dismissing claims of

plaintiff who destroyed documents), citing, *Nation-Wide Check Corp. v. Forest*

*Hills,* 692 F.2d 214, 217- 18 (1st Cir.1982) (Breyer, J.) (loss or destruction of

documents "is sufficient by itself to support an adverse inference even if no other

evidence for the inference exists," so long as a "party had notice that the

documents were relevant at the time he failed to produce them or destroyed

them.").

27. Even if Roberts could be found to have breached its contract with Gateman by

leaving the debris ramp on the Property, Gateman waived the breach by

acquiescing in Roberts leaving the debris ramp so that subsequent subcontractors

could later use the ramp to fill the Property. *Steranko v. Inforex, Inc.,* 5

Mass.App.Ct. 253, 263, 362 N.E.2d 222, 230 (1977).

28. Even if Roberts could be found to have breached its contract with Gateman by

leaving the debris ramp on the Property, Gateman's acceptance of Roberts' return

to the Property to screen and remove the portion of the debris ramp uncovered by

Whetherbee prevents Gateman from now claiming a breach of contract.  *See*

*Cueroni v. Coburnville Garage,* 315 Mass. 135, 139, 52 N.E.2d 16, 18–19 (1943).

29. Even if Roberts could be found to have breached its contract with Gateman by leaving the debris ramp on the Property, Gateman may not recover for losses that could have been prevented by reasonable efforts on Gateman's part. *Burnham v. Mark IV Homes, Inc.,* 387 Mass. 575, 441 N.E.2d 1027 (1982); Restatement (Second) of Contracts § 350(1) (1981).  Gateman could have prevented all of the losses at issue in this matter if Gateman had made truthful representations about the condition of the Property he sold to Georto.

30. Even if Roberts could be found to have breached its contract with Gateman by leaving the debris ramp on the Property, Gateman may not recover against Roberts due to Gateman's own wrongdoing in directing that brick and concrete be left at the Property without having secured any legal authorization from the City of Lynn or Department of Environmental Protection. *Choquette v. Isacoff,* 65 Mass.App.Ct. 1, 4 (2005); *Baena v. KPMG LLP,* 2006 WL 1703822 (1st Cir. 2006).

31. Gateman's claim against Roberts and his defense that Roberts was responsible for the harm Georto alleges was frivolous, not advanced in good faith, and interposed merely for delay.  The evidence adduced at trial demonstrated that Roberts had absolutely no role in filling the Property and that Gateman, as the general contractor who was personally involved in filling the Property knew or should have known that Roberts had no liability in this matter.

## **CONCLUSION**

For the above stated reasons, judgment should be granted in favor of the Roberts Corporation on all claims asserted against it in the Third Party action.  Additionally, Roberts should be entitled to recover its costs and attorney fees associated with defense of Gateman's claims.


Respectfully submitted,
Roberts Corporation,
By its Attorney,


  /s/ J. Mark Dickison_____
J. Mark Dickison (BBO# 629170)
LAWSON & WEITZEN, LLP
88 Black Falcon Ave., Ste. 345
Boston, MA  02210
617-439-4990
mdickison@lawson-weitzen.com

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 16, 2006.

  /s/ J. Mark Dickison_____
J. Mark Dickison