UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| GEORTO, INC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WILLIAM GATEMAN, INDIVIDUALLY | ) | CIVIL ACTION NO. 04-11730 NG |
| and as TRUSTEE OF 200 UNION | ) | |
| STREET REALTY TRUST, | ) | |
| Defendant and | ) | |
| Third Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ROBERTS CORPORATION, | ) | |
| Third Party | ) | |
| Defendant. | ) | |

**PLAINTIFF'S REQUESTS FOR FINDINGS OF FACT**

The Plaintiff, Georto, Inc., hereby requests that this Honorable Court make the

following findings of fact in connection with the bench trial of this matter on September 11-14,

18-20, and 25, 2006:

**Table of Contents**

| Fact # | Description | Page # |
|---|---|---|
| 1. | Plaintiff, Georto, Inc. | 1 |
| 2. | Defendant William Gateman, Individually and as Trustee of the 200 Union Street Realty Trust | 1 |
| 3. | Gateman Purchase and Operation of Property | 1 |
| 4. | Sales of Property; $600,000 Profit | 2 |
| 5. | City of Lynn Orders to Demolish | 2 |
| 6. | Roberts/Gateman Contract | 3 |
| 7. | Roberts' Demolition Work - General | 4 |
| 8. | Gateman Operated as the General Contractor | 4 |
| 9. | "Brick and Concrete" (Brick, Concrete, Wood, and Ash) | 5 |

i

| | | |
|---|---|---|
| 10. | Debris Ramp – Creation / Visibility of Debris | 7 |
| 11. | Debris Ramp - Location | 8 |
| 12. | Debris Ramp – Gateman's Knowledge of Debris Ramp and its Contents | 8 |
| 13. | Gateman's Request and Direction that the Ramp Be Covered with Fill Delivered by Loveland Trucking | 9 |
| 14. | Debris Ramp – Gateman Caught by Family Dollar | 10 |
| 15. | Debris Ramp - Excavation from Family Dollar Side Only | 10 |
| 16. | Debris Ramp - Gateman's Knowledge that the Debris Ramp on the "Georto Side" Was Not Removed | 11 |
| 17. | Debris Ramp - Gateman's Knowledge of the Contents and Extent of Debris | 12 |
| 18. | Debris Ramp - Dumping of Ramp Debris from Family Dollar Side onto Georto Side | 13 |
| 19. | Over 960 Cubic Yards of Debris from Just the Family Dollar Portion of the Debris Ramp Was Buried on the Property Sold to Georto | 14 |
| 20. | Debris Ramp – Gateman Knowledge of Dumping of Ramp Debris onto "Georto Side" | 14 |
| 21. | $10,000 Credit Issued to Gateman to Leave Debris | 15 |
| 22. | Covering of Debris; Efforts to Make Georto Side Look Identical to Family Dollar Side | 15 |
| 23. | Gateman Knowledge as to Site Work; Daily Visits to Site/Operation of Machinery | 16 |
| 24. | Selected Key Gateman Admissions as to Debris | 17 |
| 25. | Georto Initial Interest in Property | 18 |
| 26. | $1,000,000 Cap for Acquisition/Construction | 18 |
| 27. | Georto/Gateman Purchase and Sale Agreement | 19 |
| 28. | Gateman Warranted and Represented That There Were No Non-Acceptable Environmental Conditions on the Property | 20 |
| 29. | Gateman's Contractual Obligation to Provide Phase I Report for Georto's Use in Due Diligence | 20 |
| 30. | Phase I Reports; Recognized Environmental Condition | 21 |
| 31. | May 2002 Preparation of the GEC Phase 1 Report; Gateman's Representations | 21 |
| 32. | Georto Receipt/Review of GEC Phase I Site Assessment Report from Gateman | 22 |
| 33. | July 7 Fax to Georto of Copy of Family Dollar Purchase and Sale Agreement | 24 |
| 34. | Reliance on Phase I Report; General | 24 |
| 35. | Reliance on Phase I Report; Construction Cost Estimates | 25 |

36.      Reliance; Construction Contract.......................................................................25

37.      Reliance; Financing ........................................................................................26

38.      Reliance; Closing............................................................................................26

39.      GEC Phase II Limited Site Investigation........................................................27

40.      Tax Indemnification Agreement......................................................................28

41.      Gateman Failure to Disclose Debris ...............................................................28

42.      April 2004 Discovery of Buried Demolition Debris ........................................29

43.      April 2004 Site Meetings/Communications.....................................................30

         Hawkins / McIntyre / Pearle Site Meeting .......................................30

         Hawkins / Gateman / McIntyre / Pearle Site Meeting .....................30

         Gateman / Hawkins April 13th Phone Call.......................................30

         Stalker / McIntyre April 14th Site Meeting.......................................31

         April 14th Gateman / Hawkins Telephone Calls ...............................32

         Gateman / Stalker Phone Call...........................................................32

         McIntyre / City of Lynn Building Inspector Site Meeting................32

         April 15th Gateman / Hawkins Phone Call ........................................33

         Wetherbee Site Visit ........................................................................33

44.      Consideration of Alternatives to Removal.......................................................33

45.      Initial Estimate of 2,000 Cubic Yards ............................................................35

46.      Subcontractor Proposals/Bids.........................................................................35

         Proposals / Analysis ........................................................................35

         Wetherbee Proposal ........................................................................36

         Roberts Corp...................................................................................36

47.      Geotechnical Expert.......................................................................................36

48.      Removal of Debris..........................................................................................39

49.      Opportunity for Gateman to Inspect and/or Cause Removal of Debris.....................40

50.      Solid Waste ...................................................................................................41

51.      Recycling/Re-Use?.........................................................................................42

52.      Gateman Not Credible; Examples of Contradictions in Testimony..........................43

         As to Debris Ramp ..........................................................................43

         Appearances.....................................................................................44

         As to Debris.....................................................................................44

         As to Excavation of Ramp................................................................45

As to April 2004 Site Visit Observations; "Fill Dirt" .......................................45

Trailer for Store ............................................................................................46

As to RIS ......................................................................................................46

As to Obligation to Provide Phase I Report ....................................................46

1. **Plaintiff, Georto, Inc.**

   a. Plaintiff Georto, Inc. is a Florida corporation formed by James Hawkins to open and operate certain franchised Aarons sales and lease ownership stores. [Trial Transcript Day I at pp. 44-45 (citations to the Trial Transcripts are hereinafter in the form of "Trial Transcript Day number: page numbers" – i.e., I: 44-45]

   b. Aarons is engaged in the business of offering furniture, electronics, computers and appliances for lease ownership. [I: 44-45]

   c. Georto's operations, at all relevant times, were headquartered in Miami.  [I: 45]

   d. James Hawkins is the sole owner, officer and director of Georto. [I: 45-46]

2. **Defendant William Gateman, Individually and as Trustee of the 200 Union Street Realty Trust**

   a. Defendant William Gateman received a business degree from Boston University and is experienced in managing various businesses and properties.  [V: 84-87]

   b. Mr. Gateman was at all relevant times the trustee of the 200 Union Street Realty Trust.  [V: 88; Ex. 4]

   c. Mr. Gateman was at all relevant times engaged in trade or commerce in Massachusetts as that term is used in Chapter 93A of the Massachusetts General Laws.  [Stipulation as stated in court; VI: 29-30]

3. **Gateman Purchase and Operation of Property**

   a. Mr. Gateman, as Trustee of the 200 Union Street Realty Trust, purchased certain commercial real property at 200 Union Street, Lynn, Massachusetts (the "Site") in 1996 for $20,000 (plus payment of approximately $100,000 in back taxes) for the purposes of renting the property for profit and holding the property as an investment. The Site included three buildings consisting of approximately 100,000 square feet. [Ex. 1, Stipulation of Facts, ¶1]

   b. Mr. Gateman bought the Site as an investment and operated it for the benefit of the beneficiaries of the trust.  [VI: 29]

   c. As owner of the Site, Mr. Gateman had certain responsibilities for managing the property.  [V: 88]

   d. Prior to the fire in 2001, the existing buildings contained approximately 100,000 square feet of space.  [VI: 27]

   e. The buildings were brick with wood floors.  The building materials contained paint. [VI: 28]

   f. Mr. Gateman acknowledged that those buildings may have contained lead paint among other things.  [VI: 28]

g.  While Mr. Gateman had previously sold the property in 1998 to River of Life Ministries, that organization was unable to make payments on the mortgage and ultimately assigned the title of the deed back to Mr. Gateman.  [VI: 31-32]

h.  When questioned why he did not record that assignment prior to attempting to resell the Site, Mr. Gateman explained that River of Life is a tax-exempt organization. [VI: 32]

**4.  Sales of Property; $600,000 Profit**

a.  Mr. Gateman listed the Site for sale as of the spring and summer of 2001.  [Ex. 1, Stipulation of Facts, ¶ 2]

b.  After a fire at the site in August, 2001, however, the City of Lynn building inspector told Gateman to demolish the buildings.  [Ex. 1, Stipulation of Facts, ¶ 2]

c.  Of the three parcels comprising the Site, Mr. Gateman ultimately sold one parcel to Family Dollar for $385,000 on January 28, 2003 and a second parcel to Georto for $300,000. [Ex. 18; Ex. 30][1]

d.  By his own estimate, Mr. Gateman profited in the amount of approximately $600,000.00 as a result of his sales of the parcels of the Site after the buildings were demolished.  [VI: 30]

**5.  City of Lynn Orders to Demolish**

a.  Pursuant to the order of the City of Lynn Building Commissioner, Francis A. Calnan dated August 31, 2001, Mr. Gateman was ordered to immediately demolish the structure on the property and was required to begin such work as of noon on September 1, 2001 and to continue until completion. The order stated that "penalties of up to one year in jail and One Thousand Dollars ($1,000.00) per day may be imposed.  [VI: 34-35; Ex. 6]

b.  Notwithstanding that he was under an order from the City of Lynn to complete the demolition work, Mr. Gateman put off the demolition project for over six months. [VI: 35, 42; VII: 13-14]

c.  As of March, 2002, the City of Lynn and the Massachusetts Department of Environmental Protection notified Gateman to complete the demolition and debris removal.  [Ex. 1, Stipulation of Facts, ¶ 4]

d.  More specifically, by letter dated March 4, 2002, the City of Lynn Building Inspector Francis A. Calnan ordered Mr. Gateman to "immediately remove all structures and fill in the excavation with clean sanitary fill."  The notice further stated that penalties of One Thousand Dollars ($1,000.00) per day may be imposed for each day said violation exists and up to one year in jail.  [VI: 43; Ex. 6, p. 6]

---

1 Mr. Gateman sold the third parcel at a later date.

e.  The March 4, 2002 order attached a Board of Survey conducted under Massachusetts State Building Code, 780 CMR, §121.0-126.6.  The attached Board of Survey, which was dated February 27, 2002, noted in part as follows:

- Structure and site not secure and open to trespass.

- The site was determined to have hazardous materials exposed to the air and wind.  A removal plan was filed at D.E.P. and not acted upon.

- A demolition permit was issued on October 9, 2001. Demolition was not carried out by October 19, 2001 as stated on application.

- The structures are a hazard to life and limb and should immediately be demolished in the interest of public safety.

[Ex. 6, p. 7]

f.  As of the date of the order, March 4, 2002, the site had hazardous materials exposed to air and wind.  Mr. Gateman knew at the time of the fire in 2001 and prior to the demolition work that there in fact was hazardous material on the site.  [VI: 43-44; VII: 12]

g.  When questioned as to what caused Mr. Gateman ultimately to undertake the demolition work notwithstanding that he did not do such work for over six months after receipt of the initial demolition order dated August 31, 2001, Mr. Gateman testified that his "deal with Family Dollar stores" gave him "a purpose to do the demolition and raise the money."  [VII: 109-110]

h.  Mr. Gateman stated to Mr. Doherty and Mr. Stalker of Roberts Corp during a meeting on March 12, 2002 that he had been ordered by the City of Lynn to go forward with the demolition work and that the City of Lynn "was on his case to get it cleaned up as soon as possible or he would be fined so much per day."  [Ex. 52, pp. 53-54]

## 6.  Roberts/Gateman Contract

a.  Mr. Gateman obtained bids for the demolition work ranging from $130,000 - $170,000.  [VI: 44-45]

b.  Mr. Doherty of Roberts Demolition had given Mr. Gateman an initial price of $135,000.00 at a meeting at Mr. Gateman's house on March 12, 2002.  That price included removal of all of the demolition debris, including the brick and concrete, off the Site.  [VIII: 29]

c.  Mr. Gateman stated that the price was too high and asked Roberts Corporation to go back and think about it and to provide him with a breakdown for leaving the brick and concrete in place.  [VIII: 30]

d.  Gateman contracted with Roberts Corporation on March 12, 2002 to take down the remainder of the building (while leaving the basement foundation) and remove certain of the demolition debris from the site and dispose of it.  [Ex. 1, Stipulation of Facts, ¶ 4; Ex. 9]

e.  Pursuant to the contract Mr. Gateman entered into with Roberts Corporation, the cost to him for removal of the brick and concrete was $25,000.00.  [Ex. 9]

f.  Mr. Gateman admitted that the initial price he had received from Roberts as a bid to the demolition work was lower than any other bid that he had received.  [VII: 15]

g.  Mr. Gateman made a number of payments to Roberts in cash rather than by check. [VI: 97-98]

h.  Mr. Gateman paid a total of $86,500.00 to Roberts, consisting of $76,500.00 reflected on Roberts' business records and an additional $10,000.00 cash payment made separately to Mr. Doherty.  [VIII: 101-102; Ex. 11, Bates No. 11 (Customer Quick Report); Ex. 1, Stipulation 9]

i.  Mr. Stalker of Roberts admitted that after the filing of the lawsuit he became aware that Mr. Doherty had received the separate $10,000.00 cash payment from Mr. Gateman of which he had not been aware and that had not been reflected on the business records.  [VIII: 102]

### 7.  Roberts' Demolition Work - General

a.  Roberts started work in March, 2002.  At the time that it started work, the site contained "all kinds of debris", including wood, burnt wood, ash, brick, concrete, steel, iron, furniture, and general trash.  [Ex. 1, Stipulation of Facts, ¶ 5]

b.  Kevin Doherty of Roberts was onsite on a daily basis during the time that Roberts was onsite.  [VIII: 44]

c.  Roberts Corporation created piles of demolition debris on the site, including piles of wood (including charred wood) and trash mixed together.  The debris piles ranged up to fifty feet high.  [Ex. 1, Stipulation of Facts, ¶ 6]

d.  Roberts first finished work at the Site on May 13, 2002 but was called back later to the site by Gateman.  [VIII: 44-45; Ex. 1, Stipulation of Facts, ¶ 8; Ex. 14, Bates No. 8]

e.  Mr. Gateman never voiced any complaint to Mr. Stalker about Roberts' performance at any time.  [VIII: 52]

f.  Roberts offered to provide Mr. Gateman fill for the Site at a cost of between $200-$300 a truckload.  [VII: 27]

g.  Rather than purchase fill from Roberts, Gateman instead made arrangements to obtain "free" fill.  [VI: 52]

h.  Mr. Gateman saved "a lot of money" by using free fill material, such that he was only required to pay for trucking and not the cost of the material itself.  [VI: 121]

### 8.  Gateman Operated as the General Contractor

4

a.  Mr. Gateman, being onsite every day and speaking with Mr. Doherty of Roberts, told Mr. Doherty from Roberts the scope of work that he wanted performed.  [VII: 93]

b.  Scott Wetherbee of Scott Wetherbee Contracting performed services at the Site at the request and direction of Mr. Gateman. [VIII: 114-116]

c.  Mr. Wetherbee reported to Mr. Gateman.  [VI: 71]

d.  Mr. Wetherbee charged Mr. Gateman on an hourly basis, which included both the use of the equipment as well as Mr. Wetherbee's time as the operator.  Mr. Gateman paid Mr. Wetherbee in cash.  [VIII: 116-119]

e.  Fill for the Site was delivered by Loveland Trucking at Mr. Gateman's request and direction.  [VI: 9]

## 9.  "Brick and Concrete" (Brick, Concrete, Wood, and Ash)

a.  The applications for demolition, the related notifications, and the demolition permit do not make any mention of leaving any brick and concrete at the Site.  [Ex. 6, 7, 8 and 10]

b.  The affidavit signed by RIS Corporation on 10/10/2001 and submitted to the City of Lynn Building Inspector in connection with Mr. Gateman's application for demolition (also dated October 10, 2001) stated in part "all debris resulting from the construction activity governed by this building permit shall be disposed of in a properly licensed solid waste disposal facility as defined by M.G.L. c. 111, §150A. (emphasis added) [Ex. 6, p. 16]

c.  Mr. Gateman did not say anything to Mr. Doherty or Mr. Stalker during the meeting at his house on or about March 12, 2002 regarding whether he had spoken to anybody from the City of Lynn as to whether the brick and concrete could remain onsite.  [Ex. 52, pp. 37-38, 52]

d.  Mr. Gateman asked Mr. Stalker and Mr. Doherty to provide two prices, one price was to remove the debris, not including the brick and concrete, and the second price was to remove the brick and concrete debris.  [Ex. 52, pp. 37-38]

e.  When Mr. Gateman directed Roberts to leave the brick and concrete, he stated that he didn't want to pay an additional charge for hauling out the brick and concrete. [Ex. 52, pp. 92-93]

f.  None of the brick and concrete was removed from the site.  [Ex. 52, pp. 101-102]

g.  Mr. Gateman saved $25,000 by not having the "brick and concrete" removed from this property.  [VI: 120-121; Ex. 9]

h.  When describing the purported communications from the City of Lynn Building Inspector, Frank Calnan, regarding leaving brick and concrete at the site, Mr. Gateman stated that Mr. Calnan explained that it was necessary to use the brick and concrete to create a slope from the basement slab to the sidewalk level so that people

would not fall in once the fence surrounding the site was removed. [VII: 105-106; VII: 18]

i.   Mr. Gateman understood that the intended purpose of putting the brick and concrete up against the foundation walls was for <u>safety reasons</u> at that time; that was how it was explained to him by Mr. Calnan. [VII: 106]

j.   While Mr. Gateman had testified about certain purported conversations with the City of Lynn Building Inspector at the time that he initially obtained a demolition permit in the fall of 2001, Mr. Gateman admitted that as of March 2002 he did not expect that the site was going to be filled at all but instead expected that the brick and concrete would be left around the perimeter of the site to make it safe. Stated otherwise, it was expected that the brick and concrete would not be buried but instead would be used for safety reasons at that time. [VIII: 15]

k.   Prior to commencement of the work at the Site in March, 2002, Mr. Stalker informed Mr. Gateman that Roberts would not be removing every single piece of wood and debris out of the debris and that there would be pieces of wood mixed in with the brick. [VI: 17-18; VIII: 90]

l.   Mr. Gateman instructed Roberts Corporation to leave all the brick and concrete and to slope it against the front foundation wall (along Union Street) so it was pitched so that no one could fall off in a similar fashion to how the debris ramp appeared prior to Roberts arriving at the site. [VII: 73; VIII: 58-59]

m.   Mr. Doherty did not tell Mr. Gateman that the brick and concrete could be left in the hole. Instead, Mr. Gateman told him that he wanted the brick and concrete to be left in the hole. [Ex. 52, p. 152]

n.   Mr. Gateman directed Roberts Corporation to move materials, including brick and concrete, from the Family Dollar side onto the Georto side. [VIII: 111; VII: 22-23, 88-89; VI: 46]

o.   Wood (including wood up to a foot in length) and ash was mixed with the brick and concrete debris buried on the Georto side. [VI: 47; VIII: 81, 83-84; VIII: 87-88]

p.   Mr. Gateman knew that there was wood and ash mixed in with the brick and concrete being left on the side of the property being sold to Georto. [VI: 18-20]

q.   Mr. Gateman admitted that at the time Roberts first left the Site in the beginning of May, 2002, the Site contained not only bricks and concrete but also the "screened material that they had left." [VI: 55-56]

r.   Mr. Gateman more specifically identified that that material was located along the front of Union Street and going down the side of the existing retail shops, on that portion of the property later sold to Georto. [V: 80-81]

s.   Mr. Gateman had expressively given permission to Roberts for that material to remain onsite. [V: 81]

t.   Mr. Stalker admitted that pursuant to the solid waste regulations of the Commonwealth of Massachusetts, brick and concrete, in order to be used as fill,

would not only have to be processed to be no more than six inches in dimension but also would have to be free of any paint or other materials. [VIII: 71-72]

u. Based on Mr. Gateman's statement to Mr. Stalker in the meeting at Mr. Gateman's house on March 12, 2002 that he was "going to check with the Town and/or whoever he needed to try to get an okay to reuse the brick and concrete." Mr. Stalker understood that Mr. Gateman did <u>not</u> have approval at that time and that that was why Mr. Gateman sought a breakdown on the price. [VIII: 74-75]

v. Mr. Stalker admitted that they he expected that Roberts would have to remove the brick and concrete because he didn't expect the Lynn of City would approve leaving the brick and concrete and that he would have been surprised if they had approved leaving the brick and concrete "because its usually not the way its done." [VIII: 76-77]

w. Mr. Stalker further admitted that brick and concrete is usually crushed before being left in a hole, that Roberts Corporation never sent a crusher to the site, and that the brick and concrete that was left on the site was never crushed. [VIII: 77-78]

x. Mr. Stalker further admitted that the brick and concrete left at the site was not hand-picked to remove the wood mixed with it. [VIII: 79]

y. Mr. Wetherbee, acting at the request and direction of Mr. Gateman, installed certain fill material over the bricks and ash located on the side of the property ultimately sold to Georto. [VIII: 116-119]

z. Mr. Wetherbee received his instructions regarding that work from Mr. Gateman. [VIII: 118-119]

## 10. Debris Ramp – Creation / Visibility of Debris

a. Turner Demolition performed certain initial demolition work at the Site the day after the fire. [Ex. 1, Stipulation of Facts, ¶ 2]

b. During that initial demolition work after the fire, consisting of the destruction of the front of the building, a ramp or road of demolition debris was placed on the Site. The debris ramp was used to drive machinery from street level into the basement foundation during the demolition work and was built before any fill was brought onto the property. [Ex. 1, Stipulation of Facts, ¶ 3; VI: 36-37; VIII: 27, 50-51]

c. The debris ramp was at the Site when Roberts Corp. first showed up at the Site on March 12, 2002. [Ex. 52, p. 80]

d. Mr. Doherty of Roberts observed at that time that the ramp consisted not only of brick and concrete but also a substantial amount of metal. [Ex. 52, p. 80]

e. When Mr. Stalker first walked the site on March 12, 2002, the ramp was readily apparent to him in that most of it was visible. [VIII: 26, 27, 74]

    f.  Mr. Stalker observed not only brick and concrete in the debris ramp as of March 12, 2002 but also wood, burnt wood, scrap metal, and trash, including burnt clothes and other debris, all of which were clearly visible.  [VIII: 85-86]

    g.  Mr. Stalker made those observations of the contents of the debris ramp without doing any digging in the ramp.  [VIII: 87]

    h.  The debris ramp was used by Roberts and other contractors to get in and out of the basement of Site, including use by trucks delivering fill to the Site.  [VIII: 50-51]

## 11. <u>Debris Ramp - Location</u>

    a.  The brick/debris ramp on the Site was not only on that portion of the property sold to Family Dollar but also extended substantially onto the side later purchased by Georto.  [Ex. 2E and 2F; V: 76]

    b.  Mr. Gateman admitted that he was able to see the debris ramp on the property. Mr. Gateman observed the debris ramp at the time that he was on the site in April of 2002.  [V: 01, 106-107]

    c.  Mr. Gateman agreed that the sketch prepared by Harding Lawson Associates identified as Exhibit 2E (reflecting the site as seen on April 19, 2002) was consistent with his recollection as to where the ramp had appeared on the site.  [V: 77]

    d.  Mr. Gateman further agreed that the debris ramp had extended not only in the Family Dollar portion of the Site but extended substantially onto the portion of the Site ultimately sold to Georto.  [V: 77-78; VI: 23-24]

    e.  Mr. Stalker admitted that the site sketch identified as Exhibit 2F (reflecting the remaining portion of the debris ramp on the Site as of May 23, 2002) was consistent his recollection as to where the ramp was located when he first observed it on the site on March 12, 2002.  [VIII: 73-74; Ex. 2F]

    f.  The width of the Family Dollar property running from School Street parallel to Union Street to the Georto property line (along the line of the old foundation) is 62 feet in length.  [Ex. 16 at site plan attached thereto as Ex. A]

    g.  The portion of the debris ramp on the Family Dollar side of the Site was approximately 62 feet in length. [Ex. 16 at site plan attached thereto as Ex. A; Ex. 2A; noting that one inch equals 20 feet on the existing conditions plan)]

    h.  As is reflected in the site sketch prepared by Harding Lawson Engineering, the debris ramp on the Georto side of the property was at least as large as the debris ramp that had existed on the Family Dollar side of the property as it appeared on April 19, 2002. [Ex. 2E]

## 12. <u>Debris Ramp – Gateman's Knowledge of Debris Ramp and its Contents</u>

    a.  Mr. Gateman acknowledged that the ramp came from the debris from the building. [VI: 39]

b. Mr. Gateman admitted that when Roberts first began work, the Site was a "disaster" because the site was filled with the entire contents of approximately 100,000.00 square feet of building, including wood, burnt brick, ash and other materials and that such materials were all mixed together. [VII: 100-101]

c. Mr. Stalker saw Mr. Gateman at the site when Roberts first commenced work (i.e. at the time that Mr. Roberts observed the contents of the debris ramp). [VIII: 86-87]

d. Mr. Gateman further admitted that at the time that he first became aware that there was a ramp onsite, materials from the debris from the building had been used to build that ramp. [VII: 101-102]

e. Mr. Gateman admitted that he knew that no materials were brought onto the site to the build the ramp. [VII: 102]

f. Mr. Gateman admitted that he saw Roberts using the ramp to get machines into the basement and "destroy" the building, that Scott Wetherbee used the ramp to get into the basement area, and that the trucks delivering fill also used the ramp. [VII: 71,74,77]

g. Mr. Gateman admitted that he knew that the ramp was at the Site when Mr. Wetherbee first arrived to perform certain site filling and grading work. [VII: 20]

h. Mr. Gateman also admitted that he believed at the time that Roberts first left the Site (May 13, 2002) the ramp had been already covered with fill. [VI: 56]

i. Mr. Gateman admitted that at the time that the Family Dollar representative "discovered" the ramp, which at that point had been buried and thus hidden, Mr. Gateman knew that the ramp had been covered with fill. [VII: 31]

## 13. Gateman's Request and Direction that the Ramp Be Covered with Fill Delivered by Loveland Trucking

a. Mr. Gateman did not direct Roberts Corporation to remove the ramp. [VIII: 50]

b. The fill that was placed on top of the ramp was delivered by Loveland Trucking at Mr. Gateman's request and direction. [VI: 9]

c. Mr. Gateman admits that he may have been at the site on May 1, 2002, the day that fill dirt was being delivered on top of the debris ramp. [VII: 93-96; Ex. 3C-72, Ex. 3C-73, Ex. 3C-45]

d. Mr. Gateman knew of the existence of the ramp on the Site at the time that the fill material was delivered, at the time that Ms. McKinlay of Goldman Environmental visited the site on May 2, 2002, and at the time shortly thereafter that he did compaction work of the fill material over the ramp. [VI: 10-14]

e. At the time that Mr. Wetherbee commenced certain filling and grading work at the Site in early May, 2002, Mr. Gateman had not told him that there was a debris ramp on the Site. [VIII: 120-121]

9

    f.    Mr. Gateman operated a roller compacting fill material on the Site in May, 2002 and is in fact depicted in at least one of the photographs taken by the engineering company on behalf of Family Dollar.  [VI: 60-61; Ex. 3C-88]

    g.    Mr. Gateman compacted soil over the debris ramp that had been buried on the site by driving the roller over the site.  [VI: 61-62; Ex. 3C-88]

## 14. <u>Debris Ramp – Gateman Caught by Family Dollar</u>

    a.    Gateman entered into a purchase and sale agreement dated April 26, 2002 to sell one of the parcels of the Site to Family Dollar for $375,000.  Family Dollar had been renting part of the property prior to the fire.  Pursuant to the negotiations for that sale, which started shortly after the fire, Family Dollar required that Gateman remove all of the debris (including brick and concrete as well as other debris) not only from the parcel to be purchased by Family Dollar but also from the adjacent parcels (including the Property later sold to Georto).  [Ex. 1, Stipulation of Facts, ¶ 7; V: 90-91; Ex. 16]

    b.    Mr. Gateman admitted that he was required under the Family Dollar purchase and sale agreement to remove all of the debris from the property, including not only that portion of the property purchased by Family Dollar but also the adjoining property later purchased by Georto.  [VI: 70]

    c.    In early May, 2002, Mr. Wetherbee, with Mr. Gateman's assistance, pushed certain fill material onto the Family Dollar side of the property and compacted it with a roller.  [VIII: 123-124]

    d.    Mr. Gateman admitted that at the time that Mr. Wetherbee was directed to remove certain ramp material, he (Mr. Gateman) had known that there was a ramp there. [VII: 33-34]

    e.    Even though the debris ramp had not been removed (in contravention of his warranty to Family Dollar), Mr. Gateman caused a fax to be sent to Family Dollar on May 7, 2002 indicating that the compaction would soon be completed. [VI: 57-58]

    f.    Mr. Gateman admitted that the Family Dollar representative required him to remove the debris ramp material from the Family Dollar side of the property.  [VI: 69-70]

    g.    Mr. Gateman admitted that he knew at the time of that discussion that that ramp material "shouldn't have been there."  [VII: 118-120]

## 15. <u>Debris Ramp - Excavation from Family Dollar Side Only</u>

    a.    Mr. Gateman was present during the discussions between the Family Dollar geotechnical engineer and Mr. Wetherbee regarding what ramp material was to be excavated.  [VII: 116-117]

    b.    Mr. Gateman admitted that it was he (Mr. Gateman) that asked Mr. Wetherbee to "uncover" the ramp. [VII: 31-32]

c.  Mr. Gateman told Mr. Wetherbee that he had been asked by Family Dollar to remove that ramp material.  [VIII: 125-126]

d.  Mr. Gateman asked Mr. Wetherbee to remove the portion of the debris ramp that was on the Family Dollar side.  [VI: 71; VIII: 125]

e.  Mr. Gateman admitted that he may have directed Mr. Wetherbee to excavate the ramp on the Family Dollar side.  [VII: 86]

f.  Mr. Wetherbee used his excavator to dig to the area of the buried debris ramp on the Family Dollar side of the Site and observed that the ramp contained demolition debris consisting of brick, ash, wood, pipe, trash, iron, scrap metal, burnt wood, clothing, rugs and other material.  [VIII: 124-125]

g.  Mr. Wetherbee, not Roberts Corporation, performed the work to excavate the debris from the ramp on the Family Dollar side of the Site.  [VIII: 53; VIII: 129-130]

h.  Scott Wetherbee operated the excavator to remove the debris ramp from the Family Dollar side of the Site.  [VI: 68]

i.  Mr. Wetherbee removed that portion of the debris ramp up to a line that had been painted indicating the extent of the removal requested by the Family Dollar geotechnical engineer.  [VIII: 126]

j.  It took Mr. Wetherbee at least two days (May 17 and May 20, 2002) to excavate the debris ramp from the Family Dollar side of the property.  [VIII: 151-152; VI: 79; Ex. 3C-143]

k.  Roberts Corporation was not onsite during the two day period in which Mr. Wetherbee excavated the debris ramp on the Family Dollar side of the property and stockpiled it onsite.  [VIII: 152]

l.  Mr. Wetherbee, in conducting the debris ramp removal, excavated and separated out the new fill material from the top area and put it onto the Union Street side of the property and separately piled the debris material elsewhere on the property.  [VI: 74; Ex. 3C-128]

m.  Mr. Gateman observed Mr. Wetherbee separate the fill that was on top of the ramp from the ramp material on May 17, 2002.  [VII: 34-35]

n.  Mr. Wetherbee stockpiled the debris material from the ramp into the middle portion of the property.  [VIII: 130; Ex. 3C-130]

o.  Approximately 1,100 cubic yards of debris material was removed from the ramp area within the Family Dollar side of the Site.  [Ex. 2F]

p.  The debris excavated from the ramp area on the Family Dollar side included wood, wood timbers of all different sizes, burnt wood, trash, scrap metal, and mixed debris. [Ex. 52, pp. 119-120; see also Ex 3C-116]

**16. Debris Ramp - Gateman's Knowledge that the Debris Ramp on the "Georto Side" Was Not Removed**

a. Mr. Gateman admitted that he observed the Family Dollar geotechnical engineer giving Mr. Wetherbee directions as to where to excavate the debris ramp on the Site. [VIII: 10-11]

b. Mr. Gateman also testified with respect to the extent of the debris removal that the Family Dollar representative had indicated a line for removal and had indicated that everything else was "okay" (i.e., would not be removed). [VI: 22]

c. Gateman admitted that he knew at the time of the debris ramp removal activity that the debris ramp extended onto that portion of the Site sold to Georto. [VI: 80]

d. Nonetheless, Mr. Gateman did <u>not</u> direct Mr. Wetherbee to remove the remaining portion of the ramp that extended onto the portion of the Site sold to Georto. [VII: 121]

e. In fact, in response to the Court's question "did you say to Wetherbee 'make sure the ramp is removed from both sides of the property'? did you say anything like that?," Mr. Gateman testified "no, I never did." [VII: 121]

f. Mr. Gateman further admitted that he didn't take <u>any</u> steps to ensure that somebody in fact had dug in the debris ramp area depicted on the side ultimately sold to Georto. [V: 129-130]

g. Mr. Gateman also admitted that as of May 23, 2003 he had not seen anybody dig in the brick debris ramp area depicted on the side ultimately sold to Georto. [V: 129]

## 17. <u>Debris Ramp - Gateman's Knowledge of the Contents and Extent of Debris</u>

a. Mr. Gateman was on the site when the ramp was "discovered" by Family Dollar. [V: 108]

b. Mr. Gateman was onsite when Mr. Wetherbee excavated the ramp material and placed it on another portion of the property and was onsite on a daily basis during that time. [V: 78-79; VIII: 127-129]

c. Mr. Gateman remembered that it took a day or two to remove the debris ramp from the Family Dollar side because he knew exactly what work took place. [V: 108,112]

d. Mr. Gateman admitted in his testimony at trial that he was onsite when debris was being excavated from the ramp. [VI: 66-67; Ex. 3C-113]

e. Mr. Gateman observed the excavation of debris from the ramp on the Family Dollar side of the property. [V: 107]

f. Mr. Gateman did see the material that was inside the ramp excavated from the Family Dollar side and that it was completely filled with debris, including wood. Mr. Gateman discussed that ramp debris material with Mr. Wetherbee. [V: 110, 118-119; VI: 72; VIII: 121, 127]

g. Mr. Gateman admitted that a large pile of demolition debris was generated by one hour of excavation of debris from the ramp and that the debris ramp excavation lasted approximately two days. [VI: 73; Ex. 3C-121, 3C-124]

h. Mr. Gateman admitted to having seen the type of debris being removed from the debris ramp as depicted in the photographs taken by Harding Lawson Engineering during the time period from May 17 – May 23, 2002. [VI: 67-68; Ex. 3C-116]

i. Mr. Gateman further admitted that he knew that the debris ramp contained the kind of material that was reflected in those photographs, including wood, trash, metal and other debris. [VI: 67-68; Ex. 3C-116]

j. Mr. Gateman admitted that the ramp was built out of demolition material. [V: 121]

k. The debris ramp material was substantially darker in color than the fill material that Mr. Gateman had caused to be brought in to be used as cover on top of the debris ramp. [VI: 73; Ex. 3C-126]

l. Mr. Gateman admitted with respect to photo Exhibit 3C-129 that the black material was the material that was in the ramp and the lighter color was the new fill that was compacted on top of it. [VII: 115]

m. Mr. Gateman admitted that he saw the type of debris materials depicted in photograph Exhibit 3C-136 (taken on May 17th at 10:37 a.m.) being removed from the ramp on the Family Dollar side of the property. [VI: 78-79]

n. Mr. Gateman also knew that the ramp on the side later sold to Georto contained the same materials as the ramp on the side of the property sold to Family Dollar. [V: 110-111]

o. Mr. Gateman testified that he didn't see demolition debris from the ramp extending on the Georto side being removed. [V: 128]

## 18. Debris Ramp - Dumping of Ramp Debris from Family Dollar Side onto Georto Side

a. As of May 17, 2002, the portion of the property later sold to Georto had not yet been filled to grade. [VI: 59-60; Ex. 3C-86; VI: 77; Ex. 3C-133; VI: 92]

b. Roberts Corporation returned to the site on May 20, 2002 and sent to the Site at that time a loader and a screener. [VIII: 54]

c. When Mr. Stalker sent the screener to the site on May 20, 2002, he expected that all of the wood debris and metal was going to be removed from the Site and properly disposed. [VIII: 89-90]

d. Mr. Doherty observed Mr. Gateman and Mr. Wetherbee taking debris after it was "screened" and moving that debris and putting it into the hole. [Ex. 52, p. 131]

e. It took Mr. Wetherbee a couple of days to move the debris material that had come from the ramp and place it on the portion of the Site later sold to Georto. [Ex. 52, pp. 132-133]

f. Mr. Gateman and/or Mr. Wetherbee placed fill to cover the debris material that was moved from the ramp area to the portion of the property later sold to Georto. [Ex. 52, p. 136]

g. Mr. Doherty admitted that at the time Roberts finally completed its work at the Site, there was additional debris that had not been removed from the Site and that Mr. Gateman directed Roberts to leave it and further stated "we will mix it in and push it in the hole." [Ex. 52, pp. 121-122]

h. Between May 17 and May 23, 2002, the level of the material on the side of the Site later sold to Georto was raised so as to be level as of May 23rd. [VI: 82]

i. No fill material was delivered to the Site during this same time period (when the level of material on the side of the Site later sold to Georto was raised). [VI: 86-87]

**19. Over 960 Cubic Yards of Debris from Just the Family Dollar Portion of the Debris Ramp Was Buried on the Property Sold to Georto**

a. No debris material was removed from the Site during the time period between May 10 and June 4, 2002. [Ex. 12 at Bates No. 8; VI: 84-85; VIII: 130-131; Ex. 52, p. 145]

b. The daily tracking report of Roberts Corporation, which is Exhibit 12, is a summary of all of the receipts that Roberts Corporation had with respect to the disposal of material. [VIII: 57; Ex. 12]

c. A loader and a screener were removed from the site on June 1, and Roberts then sent an excavator to the site on June 4th to load out certain material. [VIII: 55-56; Ex. 12]

d. Roberts removed at most one load of demolition debris and one load of recycling material after May 8, 2002; those two loads were removed on June 5, 2002. [VIII: 92; Ex. 12, Bates No. 8; VIII: 92-93]

e. Of the 1,100 cubic yards of debris material excavated from the debris ramp on the Family Dollar portion of the Site, on or after May 17, 2002, at most 140 cubic yards were removed from the Site prior to the time that Georto purchased the Property. [VIII: 94; Ex. 12; Ex. 2F]

**20. Debris Ramp – Gateman Knowledge of Dumping of Ramp Debris onto "Georto Side"**

a. Mr. Gateman admitted that he was at the Site a good portion of the time that Mr. Wetherbee excavated the debris material from the ramp and placed it on another portion of the Site. [VIII: 17-18]

b. Mr. Gateman admitted that some portion of the debris piles being excavated from the ramp on the Family Dollar side of the Site was placed on that portion of the Site later sold to Georto. [VI: 75; Ex. 3C-130VI: 79-80; Ex. 3C-147; VI: 83-84; VIII: 18]

c. Mr. Gateman admitted that he understood that the debris material coming out of the other side of Roberts' screener was all going to be placed on that portion of the Site ultimately sold to Georto. [VII: 110-111]

14

    d.  Mr. Gateman admitted that he observed Roberts using a front-end loader to move material that had been in the debris ramp onto the portion of the Site sold to Georto. [VIII: 17]

## 21. **$10,000 Credit Issued to Gateman to Leave Debris**

    a.  Roberts would have been required to pay between $800-$1,200 per truckload of demolition debris material had it removed the Family Dollar debris ramp material from the Site, without receiving any additional compensation from Mr. Gateman. [VIII: 96]

    b.  As of 2002, Roberts Corporation charged approximately $1,400.00 per load for demolition and removal of debris.  [VIII: 52, pp. 30-31]

    c.  Roberts issued a separate credit to Mr. Gateman in the amount of $10,000.00 on July 1, 2002 to "leave some stuff."  [VIII: 102-103; Ex. 11 at Bates No. 73]

    d.  Mr. Gateman admitted that he had had a discussion with Mr. Doherty of Roberts regarding the subject of a $10,000 credit to be issued to the Trust and that such a discussion was raised in connection with the subject of whether Mr. Doherty would receive a commission for getting the job.  [VI: 98-100]

    e.  Mr. Doherty also admitted that he possibly had discussions with Mr. Gateman regarding reducing the price by an additional $10,000.00 if the additional debris was left on the site.  [Ex. 52, p. 123]

    f.  Mr. Gateman made a separate $10,000 cash payment to Kevin Doherty individually that was not paid to Roberts Corporation.  Mr. Doherty did not disclose that payment to Roberts Corporation until after this lawsuit was filed. [Ex. 1, Stipulation of Facts, ¶ 9]

## 22. **Covering of Debris; Efforts to Make Georto Side Look Identical to Family Dollar Side**

    a.  Mr. Gateman admitted that he observed fill material being placed on top of the ramp material and "brick and concrete" that had been placed on the portion of the Site ultimately sold to Georto.  [VIII: 17]

    b.  Mr. Gateman further admitted that after filling and grading work was completed at the Site on or about June 6, 2002, there was no difference in appearance between the side later sold to Georto as compared to the side of the property sold to Family Dollar.  [VI: 90-91]

    c.  Mr. Gateman further admitted that "from the surface you couldn't see anything different" with respect to the appearance of the side of the property later sold to Georto as compared to the side sold to Family Dollar as of the completion of the site work on June 6, 2002  [VI: 94-95]

    d.  He further admitted that, unlike the Family Dollar side, the Georto side contained what he characterized as the "brick and concrete and the finds."  [VI: 94-97]

e.  The Georto side of the Site appeared to have been filled with glacial till material, not only at the time that the site work was completed in June, 2002 but also after Family Dollar had completed construction of its building in 2003.  [VIII: 132-133; Ex. 3F-2 and 3F-3; Ex. 3C-171]

23.  **Gateman Knowledge as to Site Work; Daily Visits to Site/Operation of Machinery**

a.  Mr. Gateman saw what was or what was not being placed on that portion of the Site later sold to Georto on a daily basis.  [V: 102]

b.  Mr. Gateman admitted that he knew exactly what was contained on the Property when Georto purchased the Property.  [VI: 15-16, 18; VII: 43]

c.  Mr. Gateman further admitted that he was certainly familiar with exactly what materials were being placed on the side of the property that was later sold to Georto.  [VI: 93]

d.  Mr. Gateman knew at the time that he entered into the Purchase and Sale Agreement with Georto that there was wood mixed in with the brick and concrete left on the side of the Property being sold to Georto.  [VI: 18]

e.  Mr. Gateman lives a few miles from the Union Street property.  [V: 93]

f.  Mr. Gateman was on the Site on a daily basis during the work on the demolition. Mr. Gateman admitted that he was onsite every day until the Site was filled and observed the work performed by Roberts.  [V: 94; VII: 63]

g.  Mr. Gateman routinely spoke with Kevin Doherty of Roberts at the site regarding the work taking place on the site.  [V: 94-95]

h.  Mr. Doherty, who was the supervisor on the project for Roberts Corporation, observed Mr. Gateman on the Site every day.  [Ex. 52, p. 24]

i.  Mr. Gateman was not only at the Site when Roberts first began work on or about March 13, 2002, but also was at the Site on a daily basis during the time that Roberts performed any work at the Site, anywhere from approximately three hours per day to all day.  [Ex. 52, p. 84-85]

j.  Mr. Gateman had the opportunity to observe what work Roberts was doing on the Site during his daily visits.  [V: 100]

k.  Mr. Gateman had the opportunity to observe exactly what work was taking place in the foundation area from the former building.  [V: 100-101]

l.  Mr. Doherty observed Mr. Gateman generally walking the property during the time that he was there, including generally walking to all of the accessible area on the property, including the area of the ramp.  [Ex. 52, pp. 86-87] Mr. Gateman began to spend more time on the site as the demolition work was winding down and the filing of the Site was about to take place.  [V: 95]

m.  At that time, Mr. Gateman's role at the site began to change and he actually began to do some of the work at the site.  [V: 95-96]

n.  Mr. Gateman operated a "roller" on the side of the property sold to Family Dollar as well as on that portion of the Site later sold to Georto. [V: 96, 101]

o.  Mr. Doherty observed Mr. Gateman operating both the bulldozer and a roller on the site.  [Ex. 52, p. 108, 109]

p.  Mr. Doherty also observed Mr. Gateman pushing "fill" into the hole.  [Ex. 52, p 105]

## 24. Selected Key Gateman Admissions as to Debris

a.  Mr. Gateman admitted in his testimony at trial that not all of the demolition debris was removed from the Property.  [V: 74]

b.  Mr. Gateman acknowledged in his testimony at trial that two categories of demolition debris were left on the Property sold to Georto, including 1) the debris in the ramp on the Georto side, and 2) the other material that was left elsewhere.  [VI: 4]

c.  Mr. Gateman admitted that debris material consisting of wood, metal, brick, concrete "just the contents of the building before" had not been removed.  [V: 79-80]

d.  Mr. Gateman further admitted that such materials should have been removed.  [V: 80]

e.  Mr. Gateman admitted that the debris from the ramp on the Family Dollar side "went onto the Georto side, yes."  [V: 107-108]

f.  Mr. Gateman admitted that the ramp material had not been removed from the side of the property sold to Georto.  [V: 74-75, 78, 122-123]

g.  Mr. Gateman also admitted that there was other material in addition to the ramp debris that was in his words "probably questionable."  [V: 80]

h.  Mr. Gateman knew that that material contained debris from the building.  [V: 82]

i.  When shown at trial the debris depicted in the photo Exhibit 3G-2 (photograph taken by Mr. Hawkins at the time of his site visit in April, 2004 upon discovery of the debris), Mr. Gateman admitted that he had seen that material on the day of his site visit.  [VII: 122; Ex. 3G-2]

j.  Mr. Gateman further stated that the debris material depicted in that picture, which clearly shows wood among other materials, was the type of material that he referred to as "fill dirt," "finds" and "fill."  [VII: 122-123]

k.  Mr. Gateman further admitted that that material, which clearly included wood, was on the site at the time that the Property was sold to Georto.  [VII: 123]

l.  Mr. Gateman further admitted that during the work at the Site he saw the material coming off the screener and it looked similar to the material depicted in Exhibit 3G-2 (the demolition debris material discovered by PM Construction in April, 2004). [VII: 123-124; Ex. 3G-2]

17

**25. Georto Initial Interest in Property**

    a.  Mr. Hawkins of Georto first became aware of the availability for purchase one of Mr. Gateman's parcels located at 200 Union Street in Lynn, Massachusetts (the "Property") in January or February, 2003. [I: 47-49]

    b.  The Property 's dimensions were 236.45 feet running from Union Street to Ellis Street by 84.69 feet running along Union Street and by 75.10 feet running by Ellis Street, as is reflected in the Existing Conditions plan marked as Exhibit 2A. [Ex. 2A]

    c.  As of that time, Mr. Hawkins and Georto had never developed any real property. [I: 48]

    d.  Mr. Hawkins was considering other properties, including certain other properties located in Lynn, for potential locations on which to lease a building for use for an Aarons store. [I: 51]

    e.  At that time (January or February, 2003), the Site was vacant without any structures or improvements. [I: 58]

    f.  Mr. Hawkins first visited the Property shortly after first becoming aware of its availability for purchase. [I: 65]

    g.  When he first visited the Property, the Site was vacant without any structures or improvements located on it. [I: 66]

**26. $1,000,000 Cap for Acquisition/Construction**

    a.  Shortly after becoming first aware of the availability of the Property, Mr. Hawkins contacted Phil Morin of PM Construction to discuss the subject of what it would cost to build a building on the property. [I: 58-60; III: 78-79]

    b.  Mr. Hawkins placed that call to Mr. Morin in the winter of 2003. [III: 79]

    c.  In order to determine if it was a viable building lot, Mr. Morin visited the Property, visited with the local town officials to determine if it was a buildable site, and inquired as to the processes necessary in order to gain acceptable building permits. [III: 79-80]

    d.  Mr. Morin visited with the building inspector and the city planner and spoke with the assessor's office and determined that the Property was capable of being developed for construction of an Aarons retail store. [III: 80-82]

    e.  Mr. Morin observed during his site visit that the Property was flat and that there was nothing out of the ordinary. [III: 81]

    f.  Mr. Morin and Mr. Hawkins discussed the estimates for the total cost of construction. [III: 84-85]

    g.  Mr. Hawkins determined that he was unwilling to spend more than $1 million to purchase the Property and complete the construction of the building to the point

where it was ready to open for business. Mr. Hawkins made such a determination in the spring of 2003. [I: 62-63]

h. PM Construction contacted various subcontractors and material suppliers in order to prepare an estimate of the total cost of construction. [III: 88]

i. In or about May, 2003, Mr. Morin of PM Construction advised Mr. Hawkins that he estimated the cost of construction for the building at approximately $620,000.00. [I: 64; III: 88]

j. Had Mr. Hawkins known that the ultimate cost for the acquisition of the Property and the construction of the building, including the $249,000 that he spent for the removal of the debris and replacement with fill, would have totaled $1,250,000.00, he would not have purchased the property. [II: 99]

## 27. Georto/Gateman Purchase and Sale Agreement

a. In June, 2003, Gateman, as Trustee of the 200 Union Street Realty Trust, entered into the Purchase and Sale Agreement with Georto. As was referenced in the Purchase and Sale Agreement, Georto intended to use the Property for the construction of a new commercial building as a retail store. [Ex. 1, Stipulation of Facts, ¶ 10; Ex. 19; I: 69]

b. Mr. Hawkins signed the Purchase and Sale Agreement on June 11, 2003, and Mr. Gateman signed it on June 18, 2003. [I: 69; Ex. 19]

c. Mr. Hawkins and Mr. Gateman each initialed each page of the Purchase and Sale Agreement. [I: 69-71; Ex. 19]

d. The Purchase and Sale Agreement, which was signed by Mr. Gateman and initialed by him on each and every page, provided that Georto intended to use the Property as a commercial retail establishment and for the construction and operation of at least one commercial space in accordance with Georto's standard plans and specifications for typical furniture, electronics, appliance, computer and jewelry leased to own facility. [Ex. 19, ¶8]

e. Mr. Gateman provided the Purchase and Sale Agreement to his counsel for review prior to signing it and initialing each page of it. Mr. Gateman's counsel advised him to sign it. [VI: 100; VII: 127-128; Ex. 19]

f. As of the time that he signed the Purchase and Sale Agreement, Mr. Gateman had had dealings with Family Dollar where they had required him (pursuant to their purchase and sale agreement with him) to remove all of the debris from their site (including the brick and concrete), had subsequently "discovered" that this removal work had not been done, and then required Mr. Gateman to remove the debris as his expense. [VI: 101]

g. Mr. Hawkins and Mr. Gateman did not engage in any communications, telephone conversations or otherwise, regarding the terms of the Purchase and Sale Agreement at any time. [I: 73]

19

h. Georto, in accordance with the provisions of the Purchase and Sale Agreement, made an initial payment of $5,000.00 upon the parties' execution of the Purchase and Sale Agreement. [I: 72; Ex. 19]

## 28. Gateman Warranted and Represented That There Were No Non-Acceptable Environmental Conditions on the Property

a. Mr. Gateman admitted that by signing the Purchase and Sale Agreement with Georto he was warranting certain things to be true. [VI: 101-102]

b. Pursuant to the Purchase and Sale Agreement, Mr. Gateman warranted and represented as of the date of the Purchase and Sale Agreement, and as of the closing date, that "there are no hazardous materials as defined by state, federal or local law or non-acceptable environmental conditions on the property." [Ex. 19, ¶2]

c. Mr. Hawkins had modified an earlier draft of the Purchase and Sale Agreement so as to add the language "or non-acceptable environmental conditions on the property" to the warranty protections in order to broaden the protection to encompass non-acceptable environmental conditions that were not otherwise covered by the hazardous waste warranty language. [I: 76]

d. By use of the term "non-acceptable environmental conditions" in the warranty section of the Purchase and Sale Agreement, Mr. Hawkins understood that he was referring to environmental conditions that would cost him money. [II: 58]

e. The Georto/Gateman Purchase and Sale Agreement did not limit the amount that Mr. Gateman would be required to spend in order to comply with his obligations under that agreement. [II: 59; Ex. 19]

f. The warranties contained in the Purchase and Sale Agreement were material to Georto's decision to enter into the Purchase and Sale Agreement. [I: 75-77]

g. The warranties, including Mr. Gateman's warranty that there were no non-acceptable environmental conditions on the property, survived the closing. [Ex. 19, ¶2]

## 29. Gateman's Contractual Obligation to Provide Phase I Report for Georto's Use in Due Diligence

a. Pursuant to Paragraph 8 of the Purchase and Sale Agreement, any obligation of Georto to purchase the property was contingent upon certain contingencies, including the results of due diligence. [I: 78-79; Ex. 19, ¶8]

b. Pursuant to Paragraph 8 of the Purchase and Sale Agreement, William Gateman agreed to furnish and certify to Georto environmental surveys of the Property, including a Phase I Environmental Assessment. [I: 79; Ex. 19, ¶8]

c. Mr. Gateman's obligation under the Purchase and Sale Agreement to furnish and certify the Phase I Environmental Assessment for the property was material to Georto's decision to purchase the property. [I: 80]

d. Georto's obligations under the Purchase and Sale Agreement were contingent on, among other matters, the results of the Phase I Environmental Assessment to be furnished and certified by Mr. Gateman being satisfactory to Georto in all respects. [Ex. 19 at ¶8]

e. As a result of signing that Purchase and Sale Agreement, Mr. Gateman understood and was aware that he had the obligation to provide the Phase I report to Georto. [VII: 38]

## 30. Phase I Reports; Recognized Environmental Condition

a. Phase I reports are typically conducted for due diligence purposes usually associated with a real estate transaction. [V: 45-46]

b. The purpose of a Phase I report is to determine if there is any recognized environmental conditions at a property. [V: 45-46]

c. Solid waste that had been buried at a site is considered a recognized environmental condition. [V: 48]

d. Any solid waste that would not have been removed from the Site was a recognized environmental condition. [V: 57]

## 31. May 2002 Preparation of the GEC Phase 1 Report; Gateman's Representations

a. Lauren McKinlay, who was a project manager/geologist at Goldman Environmental Consultants, conducted a Phase I evaluation of the Site in May, 2002. [V: 44-45, 48]

b. In order to prepare the Phase I report, which was authored by Ms. McKinlay and was dated May 29, 2002, Ms. McKinlay, among other things, conducted a site visit and interviewed the current site owner (Mr. Gateman). [Ex. 20; V: 49, 51]

c. Mr. Gateman stated to Ms. McKinlay during that interview on May 2, 2002 that all demolition debris would be removed from the Site. [V: 68; Ex. 20]

d. Based on her conversations with Mr. Gateman, Ms. McKinlay understood that all of the demolition debris, including not only wood and metal but also concrete and brick and ash and any other debris, would be removed. [V: 52, 56, 64-65; Ex. 3B]

e. Based on her conversation with Mr. Gateman, Ms. McKinlay understood that fill material consisting of sand and gravel was being used to fill the site. [V: 60-61]

f. Based on her conversations with Mr. Gateman during the site visit, Ms. McKinlay stated in the report that "based on conversations with Mr. Gateman, all demolition debris had been or will be hauled offsite by Roberts Dismantling and Recycling." [V: 51-52]

g. Based on her conversations with Mr. Gateman, Ms. McKinlay also stated in Paragraph 5.6 (entitled Solid Waste) that "all demolition debris is in the process of

being removed from the site by Roberts Dismantling and Recycling." [V: 53; Ex. 20]

h. Based on her conversations with Mr. Gateman, Ms. McKinlay also stated in the report that solid waste had been observed on the site but would be removed from the site. [V: 55; Ex. 20, p. 24]

i. When using the term "demolition debris," Ms. McKinlay was referring to any of the debris generated when the building was demolished, including concrete, brick, wood, metal, plaster, drywall. [V: 57]

j. The Phase I Environmental Report prepared by Ms. McKinlay accurately set forth information provided to her by Mr. Gateman. [V: 58]

k. Had Mr. Gateman indicated to Ms. McKinlay that any of the demolition debris was going to remain onsite, Ms. McKinlay would have stated in the report that solid waste was slated to remain onsite and would have recommended it be removed and disposed of properly. [V: 52-53, 56-57]

l. Had Mr. Gateman distinguished between brick and concrete and other types of debris, Ms. McKinlay would have noted that distinction in the Report. [V: 71-72]

m. Ms. McKinlay would have noted in the Report if she had been informed by Mr. Gateman that brick and concrete were scheduled to remain onsite. [V: 72]

n. When questioned about what Mr. Gateman had stated to Lauren McKinlay during the site interview at the site on May 2, 2002, Mr. Gateman stated that he didn't know what he had told her. [VI: 107-108]

## 32. Georto Receipt/Review of GEC Phase I Site Assessment Report from Gateman

a. Within a few days of signing the Purchase and Sale Agreement, Mr. Gateman mailed to Georto the Phase I Environmental Assessment Report prepared by Goldman Environmental Consultants. [I: 81; VI: 106; Ex. 20]

b. Mr. Gateman admitted that he provided the Phase I report to Georto in connection with Georto's due diligence regarding the property. [VI: 104]

c. Gateman admitted pursuant to the Stipulations of Fact that the Phase I Report set forth numerous material representations regarding the Property. [Ex. 1, Stipulation of Facts, ¶ 11]

d. Mr. Gateman did not provide any other environmental reports to Georto other than the Phase I Environmental Report identified as Exhibit 20. [I: 94]

e. Mr. Gateman admitted that, at the time that he provided the Phase I report to Georto, not all of the demolition debris had been removed from the Property, testifying in response to the question "obviously not." [VI: 108]

f. At the time that Mr. Gateman sent the Phase I report to Georto he knew that not only brick and concrete had been left on the site being sold to Georto but that other

material that he had identified as "finds" (material which he later explained included wood and ash) had been left at the Site. [VI: 108]

g.  Upon receipt, Mr. Hawkins read the Phase I Environmental Assessment Report in order to review the environmental condition of the Property. [I: 83, 86]

h.  The Phase I Environmental Assessment Report provides that Goldman Environmental Consultants' investigation "was conducted to understand potential environmental conditions in order to satisfy due diligence requirements associated with the real estate transaction." [Ex. 20, p. 1]

i.  Among other representations, the Phase I Environmental Report provided as follows:

- "Based on conversations with Mr. Gateman, all demolition debris has been or will be hauled offsite by Roberts Demolition and Recycling. Currently all former basement areas are being filled to grade." [Ex. 20, p. 4]

- "Based on conversations with Mr. Gateman during the demolition of the site building, asbestos abatement activities were conducted. Mr. Gateman stated that all building materials containing asbestos were removed from the site and disposed of offsite. Additionally, all demolition debris was hauled offsite or was in the process of being hauled offsite for proper disposal. The site is currently undergoing filling activities to fill in the site's building former basement areas." [Ex. 20, p. 10]

- "The former building has been demolished and removed from the site." [Ex. 20, p. 16]

- "The building formerly located at the site has been demolished and disposed of offsite." [Ex. 20, p. 17]

- "Currently the only solid waste located onsite is demolition debris from the former site building. Demolition debris is currently segregated by type (i.e. wood, metal) into piles located on site." [Ex. 20, p. 20]

- "All demolition debris is in the process of being removed from the site by Roberts dismantling and recycling." [Ex. 20, p. 20]

- "The site is currently undergoing filling and regarding. Roberts' dismantling and recycling is currently transporting fill dirt onto the site to fill the former basement areas to even out the grade of the site." [Ex. 20, p. 20]

23

- "Piles of solid waste (demolition debris) were observed throughout the site. Based on conversations with Mr. Gateman, observed piles are scheduled to be removed and properly disposed offsite by Roberts dismantling and recycling." [Ex. 20, p. 24]

j. The Phase I Environmental Report prepared by Goldman Environmental Consultants did not indicate that the side of the Site to be sold to Family Dollar would be treated in any way different from the side of the Site ultimately sold to Georto. [II: 101; Ex. 20]

k. Based on his review of the representations set forth in the Phase I Environmental Report, Mr. Hawkins understood that all demolition debris had been removed from the Site and properly disposed and replaced with fill dirt. [I:84-85, 92]

l. The representations set forth in the Phase I Environmental Report were consistent with Mr. Hawkins' expectations based upon his observations during his prior visit to the Property. [I: 92-93]

m. More specifically, the representations were consistent with Mr. Hawkins' observations based on his visit that the Property was vacant land which had been filled with fill dirt. [I: 93]

## 33. July 7 Fax to Georto of Copy of Family Dollar Purchase and Sale Agreement

a. In July, 2003, after entering the Purchase and Sale Agreement with Georto but prior to the closing, Gateman, by a fax from his counsel, also provided Georto with a copy of the Family Dollar purchase and sale agreement. [Ex. 1, Stipulation of Facts, ¶ 14; I: 105-106; Ex. 21]

b. The Family Dollar purchase and sale agreement stated that "seller warrants that seller has completed the demolition and removal of the debris on the property and on adjacent property owned by seller." [Ex. 23]

## 34. Reliance on Phase I Report; General

a. Georto used the Phase I Environmental Report prepared by Goldman Environmental in connection with its due diligence in purchasing the property. [II: 84]

b. Had the Phase I Environmental Report stated that there was demolition debris that had not been removed from the Property, Georto would not have gone forward with the purchase of the property. [I: 93-94, 111]

c. Among other uses, Georto provided the Phase I Report to its contractor, PM Construction, for the purpose of obtaining an estimate of the costs of constructing a building on the Property and to its bank for purposes of obtaining approval of financing for that purchase and for the construction of the building. [Ex. 1, Stipulation of Facts, ¶ 13; I: 83, 95]

24

d.  At Mr. Gateman's request, Goldman Environmental Consulting issued a reliance letter to Georto dated December 11, 2003 indicating that Georto could rely on the Report as if it had been prepared for Georto."  [Ex. 22]

e.  Goldman Environmental Consultants' reliance letters to Georto (and to Georto's lender, Key Bank), acknowledged that Georto (and Key Bank) were relying upon the information contained in the Phase I Report for due diligence activities and financing and stated that Georto and Key Bank could rely upon such information as if the information had been prepared for them.  [Ex. 1, Stipulation of Facts, ¶ 12; Ex. 22; Ex. 28]

## 35. Reliance on Phase I Report; Construction Cost Estimates

a.  PM Construction received the Phase I Environmental Report from Mr. Hawkins in the summer of 2003.  [III: 89, 91-92]

b.  PM Construction relied on the Phase I Environmental Report for purposes of determining known information about the Property.  [III: 103-104]

c.  Upon receipt, Mr. Morin forwarded the Report to the structural engineer and provided it to PM's estimating department for forwarding to the subcontractors.  [III: 89-90]

d.  The Phase I report was provided to the subcontractors, including the site subcontractor, Thomas Mattuchio Construction Co., Inc. ("Mattuchio").  [III: 90]

e.  PM Construction forwarded the Phase I Environmental Report to the structural engineer and subcontractors as soon as it had received that Report from Georto.  [III: 92]

f.  Had the Phase I Report indicated that there was any demolition debris that remained onsite, Mr. Morin would have made sure that there was something done to determine whether the demolition debris was still onsite.  For example, had PM Construction been advised or made aware that there was demolition debris buried on the site, it would have conducted more testing on the site.  [IV: 44-45]

## 36. Reliance; Construction Contract

a.  PM and Georto entered into an AIA construction contract dated February 2, 2004.  [I: 109; III: 97; Ex. 24]

b.  The contract sum was $659,264.00.  [III: 98; Ex. 24]

c.  The construction contract included a site work allowance of $102,000.00, pursuant to which Georto would be obligated to pay any additional amounts to the extent that the site work cost in excess of $102,000.00.  [I: 113; III: 99; Ex. 24, p.2]

d.  The site allowance of $102,000.00 reflected the expected cost for completing all of the site work on the project based on the available information.  [III: 99-100]

e.  PM's assessment of the $102,000.00 site allowance would have changed had it known that debris from the buildings that had once been on the Property were buried onsite.  [IV: 56]

f.  Had PM Construction known that all of the brick and concrete had been left on the Property under the topsoil, it would have "raised red flags" for PM Construction in assessing the amount of the site allowance and the construction cost associated with the site.  [IV: 56]

g.  Based on his review of the GEC Phase I Environmental report, Mr. Morin determined that there wasn't any demolition debris on the property.  [III: 100-101]

h.  Based on his review of the Phase I Report and a subsequent Phase II report, Mr. Morin understood that the fill material that was onsite was suitable for construction.  [IV: 49-50]

i.  Mr. Morin and Mr. Hawkins discussed those statements in the Phase I Environmental Report indicating that all of the demolition debris had been or would be removed.  [III: 101]

j.  If the Phase I Environmental Report had reflected that the demolition debris had not been removed, there would have been a substantial impact on the construction costs reflected in the AIA contract.  [III: 104]

## 37. Reliance; Financing

a.  Key Bank required submission of the Phase I as part of their approval for granting a loan for the purchase of the Property and construction of the building.  [I: 83]

b.  Key Bank, after receipt of the Phase I Environmental Report, ultimately provided financing in the amount of $712,500.00 to Georto.  [I: 96]

## 38. Reliance; Closing

a.  In reliance upon the warranty language in the Purchase and Sale Agreement, specifically including Mr. Gateman's representation and warranty that there were no non-acceptable environmental conditions on the Property, and the Phase I report provided by Mr. Gateman, Georto decided to go forward with the purchase of the Property, enter into the construction contract with PM, enter into the loan agreement with Key Bank, order and purchase the prefabricated building, and obtain approval from Aarons for the acquisition.  [I: 110-111]

b.  Georto closed on the Property on February 19, 2004 by paying the balance of the $300,000 purchase price to Gateman.  [Ex. 1, Stipulation of Facts, ¶ 15; I: 114; Ex. 29]

c.  The deed pursuant to which Mr. Gateman conveyed the property to Georto was recorded on February 20, 2004 in the Registry of Deeds.  [I: 120; Ex. 30]

d.  Georto would not have purchased the Property had it known prior to the closing that the demolition debris had not been removed from the Property.  [II: 90]

26

e.  Georto entered into a loan closing with Key Bank National Association dated February 19, 2004, including but not limited to a land acquisition and development loan agreement in the amount of $712,500.00, a promissory note for acquisition and development in the amount of $712,500.00, a performance and completion guarantee (by James Hawkins, individually and Adapt, Inc.), an unconditional guarantee (by James Hawkins, individually and Adapt, Inc.), a construction mortgage security agreement, an assignment of leases and rents and fixture filing, a Continuing Indemnity Agreement with respect to Environmental and Building Laws, a compliance agreement, and related documents.  [Ex. 29]

f.  Pursuant to the Continuing Indemnity Agreement regarding Environmental and Building Laws, Key Bank's agreement to make loans to Georto was conditioned on execution by Georto, James Hawkins, individually, and Adapt, Inc., a company 100% owned by James Hawkins, of the Continuing Indemnity Agreement.  Among other obligations, Georto, James Hawkins and Adapt were required to take steps required to restore the Property in compliance with environmental laws, specifically including not only laws regarding hazardous waste but also laws relating to soils, quality and other environmental quality of real property.  [I: 117; Ex. 29 at Bates No. P1571-P1577]

g.  Georto paid a $35,000.00 franchise fee to Aarons in connection with the franchise approval provided by Aarons.  [I: 111]

h.  In or about January, 2004, Georto authorized PM Construction to order the prefabricated building to be ultimately erected at the site and to have it delivered to the Property at a later date.  [I: 107-108]

## 39. GEC Phase II Limited Site Investigation

a.  Georto hired Goldman Environmental Consultants to prepare a Phase II report regarding the Property in or about January, 2004 (prior to the closing).  [I: 101]

b.  Goldman Environmental prepared a "limited subservice investigation" dated February 2, 2004 (prior to the closing), addressed to Georto, Inc., which stated that its purpose was to "determine current conditions at the Site relative to several former above and underground storage tanks."  [I: 101-102; Ex. 23, page 1 at Bates No. P0691]

c.  Under the heading of Soil Investigation, the limited subsurface investigation report stated that soils above the depth of the basement slab of the former building encountered at approximately 9-10 feet below grade were "typical of urban fill." The limited subsurface investigation further provided that GEC did not submit the fill material that had been used to back fill the basement for laboratory analysis but instead only submitted samples "comprised of native soils."  [Ex. 23 at Bates No. P0692]

d.  The limited subsurface investigation report further indicated that GEC encountered no evidence of soils impacted by a release of petroleum, chlorinated solvents or other "OHM." [Ex. 23, Bates No. P0693]

27

e.   The Phase II report did not make any mention of the existence of any demolition debris on the Property.  [I: 104; Ex. 23]

f.   Mr. Hawkins also sent a copy of the Phase II Environmental Report prepared by Goldman Environmental Consultants to PM Construction.  [III: 96]

g.   PM Construction then forwarded copies of the Phase II report to the site contractor as well as the project engineers.  [III: 96-97]

## 40. Tax Indemnification Agreement

a.   Pursuant to an indemnification agreement dated February 9, 2004, which survived the closing, Mr. Gateman indemnified Georto for any property tax liability for the period during which Mr. Gateman owned the Property.  [I: 120; Ex. 27]

b.   Subsequent to the closing, the City of Lynn notified Georto that additional property tax was due on the Property for the tax year July 1, 2003 to June 30, 2004.  [I: 120-121]

c.   Of that amount, Georto paid $1,190.00 with respect to property taxes that were attributed to the period during which Mr. Gateman owned the Property.  [I: 121; Ex. 43]

d.   In accordance with the indemnification agreement, counsel for Key Bank issued a notice to Mr. Gateman dated September 13, 2004 pursuant to which demand was made upon Mr. Gateman to reimburse Georto for the amount of property taxes paid by Georto that were attributed to the Property during such time that the Property was owned by Mr. Gateman.  [Ex. 38]

e.   Mr. Gateman did not at any time reimburse Georto for Georto's payment of real property taxes, nor did he respond in any manner.  [I: 126]

## 41. Gateman Failure to Disclose Debris

a.   At the time of the Purchase and Sale Agreement and as of the time of the closing in February, 2004, Mr. Gateman knew from his dealings with Family Dollar that Family Dollar had required that all of the material, including but not limited to the "brick and concrete", had to be removed before Family Dollar built a building on it. [VI: 110-111]

b.   Mr. Gateman also knew that Georto was purchasing the property to open a store. [VI: 111; Ex. 19, ¶8]

c.   Mr. Gateman did not at any time prior to the closing state to Georto that there was demolition debris on the Property.  [I: 128]

d.   Mr. Gateman admitted that he never told Georto about the debris that had been left on the Property.  [VI: 109-110]

e.   Had Mr. Gateman stated to Georto that there was demolition debris on the Property, Georto would not have purchased the Property.  [I: 128]

42. **April 2004 Discovery of Buried Demolition Debris**

    a. After the closing, Georto authorized PM Construction to begin construction work at the Property. [I: 129]

    b. PM Construction is a commercial builder that has been in business for approximately 18 years. Among other clients, PM Construction has worked on projects for Hannaford Food and Drugs, Shaws Supermarket, Rite Aid, CVS, Walgreens, Advanced Auto and others.  [III: 77-78]

    c. In early April, 2004, PM Construction began work at the site. [I: 129]

    d. Stephen McIntyre of PM Construction was the project superintendent for the work at the site on Georto's behalf. [II: 110-112]

    e. Mattuchio, the site subcontractor, started excavation at the Property by digging to a depth of around four feet below the existing grade. [II: 120]

    f. At approximately four feet deep, Mattuchio started running into wood, bricks and pipes. [II: 120]

    g. As Mattuchio and PM Construction continued the site work, they started running into demolition debris consisting not only of bricks but also of burnt wood, ash, char, large beams, etc. [II: 121]

    h. Among other materials, PM Construction and Mattuchio discovered that bricks, pipes, radiators, file cabinets, debris, clothing, burnt wood and other materials had been buried on the Property. [II: 125]

    i. Mr. McIntyre determined that the existence of the debris was a problem because one can't build on it and because it is expensive to remove. [II: 124; Ex. 37]

    j. PM Construction, by Bill Nason, determined that it had to stop work on the building as of April 7, 2004. [II: 128]

    k. PM Construction caused Mattuchio to dig test pits at the site on April 8, 2004. [II: 129; Ex. 37]

    l. The test pits contained extensive amounts of demolition debris including wood, bricks, file cabinets, radiators, clothing, alot of burnt ash, large timbers and other materials. [II: 130-131]

    m. That demolition debris material was discovered in all of the test pits throughout the Property. [II: 131; III: 36]

    n. Some of the wood discovered buried at the Property was as large as 8-10 inches in diameter and up to 4-5 feet long. [III: 12]

    o. The bricks that had been buried were mixed with other demolition debris, including wood, plastic, radiators and other materials. [III: 15, 36; IV: 35]

    p. Mr. Morin of PM Construction visited the Property when the test pits had been dug and did not find any area on the Property that contained just brick. [IV: 42]

q. To the contrary, the brick was embedded with all kinds of other debris, including wood, ash, furnishings, wire, and fixtures. The brick and demolition debris was mixed up throughout the entire site. [IV: 42-43]

r. There was a substantial amount of wood on the site, rivaling the amount of brick that had been discovered. [IV: 42-43, 54]

s. Upon discovery of the demolition debris, Mr. Morin called Mr. Hawkins to tell him that there was a serious problem at the Property. [I: 129; III: 105-106]

## 43. April 2004 Site Meetings/Communications

Hawkins / McIntyre / Pearle Site Meeting

a. Mr. Hawkins flew from Miami to Boston upon being notified of the discovery of the demolition debris and met with Steve McIntyre and Richard Pearle from PM Construction at the Property. [I: 131]

b. Mr. Hawkins observed the test pits dug at the Property, which indicated that extensive amounts of demolition debris, including burnt wood, bricks, plastic wiring, metal, metal piping, radiators and related materials, had been buried on the Property prior to Georto's purchase. [I: 136-142]

c. Mr. Hawkins then contacted Mr. Gateman and set up a meeting at the Property. [II: 6]

d. Mr. Hawkins informed Mr. Gateman during the telephone call placed from the Property that PM Construction found extensive amounts of burnt wood, pieces of wood, a radiator, wire shelving, fabric, plastic and other debris from the former building buried onsite. [II: 6]

Hawkins / Gateman / McIntyre / Pearle Site Meeting

e. Mr. Hawkins met with Mr. Gateman, as well as Steve McIntyre and Richard Pearl from PM Construction, at the Property on April 9, 2004. [II: 7]

f. Mr. Hawkins scheduled the meeting for the purpose of showing Mr. Gateman the demolition debris onsite and to provide Mr. Gateman with the opportunity to cause the removal of the demolition debris from the Property. [II: 7-8]

g. Mr. Gateman viewed the demolition debris and agreed that there was debris everywhere on the Property. Mr. Gateman claimed to Mr. Hawkins that he was surprised that the demolition debris was on the site and that it shouldn't be there, and that it wasn't what he had hired the demolition removal company to do. [II: 9-10]

h. Mr. Hawkins informed Mr. Gateman that he (Mr. Hawkins) had been advised by Mr. McIntyre of PM Construction regarding potential alternatives and that the debris needed to be removed from the Property. [II: 10-11]

Gateman / Hawkins April 13th Phone Call

i.  In a telephone call placed by Mr. Hawkins to Mr. Gateman on April 13, 2004, Mr. Gateman stated that he had spoken to Roberts Demolition and that Roberts had been to the Property and was also surprised to find considerable demolition debris at the Property.  [II: 12]

j.  Mr. Gateman further stated to Mr. Hawkins in that telephone call that he had advised Roberts Demolition that Mr. Gateman was going to be sued by Georto and that Roberts should go out there and "fix the situation" before the attorneys got involved and the expenses were run up.  [II: 21]

Stalker / McIntyre April 14th Site Meeting

k.  Mr. Gateman called Mr. Stalker in April of 2004 after his meeting with Mr. Hawkins at the Property and told Mr. Stalker that "they had some debris on the site next to the Family Dollar."  [VIII: 63-64]

l.  Mr. Stalker visited the Property shortly thereafter and observed certain of the test pits and admitted that at least one of the test pits had wood and other debris in it.  [VIII: 64-65]

m.  On April 14, 2004, Mr. McIntyre met with Robert Stalker of Roberts Demolition at the site.  [III: 28-29]

n.  While Mr. Gateman was scheduled to meet with Mr. Stalker at the Property at that time, he did not show up.  [VIII: 64-66]

o.  Mr. Stalker recalls seeing that the material on the Property included wood debris, burnt wood, doors, ash, scrap metal and that all of this material was mixed together.  [VIII: 98]

p.  Mr. Stalker admitted that, based on his knowledge of the solid waste regulations, that material should have been removed from the Property.  Mr. Stalker admitted telling Mr. McIntyre of PM Construction in April, 2004 that the debris had been the ramp to get the excavation equipment into the basement.  [VIII: 99]

q.  Mr. Stalker admitted to Mr. McIntyre that Roberts Demolition had left the debris ramp on the Property.  [III: 52]

r.  Mr. Stalker admitted to Mr. McIntyre that what was onsite was what he was told to leave onsite. [III: 53]

s.  Mr. McIntyre asked Mr. Stalker if Roberts Demolition would take care of the debris.  In response, Mr. Stalker stated "no way, what's in the ground is what [Roberts] was told to leave in the ground."  [III: 31]

t.  Mr. Stalker further admitted that the debris was the ramp that the excavators had used to get into the basement area and that it extended onto the Family Dollar side and that it was also excavated at the Family Dollar site and brought onto the side of the property sold to Georto.  [III: 31]

u. Mr. Stalker further told Mr. McIntyre that the debris ramp ran the entire length of the existing building's back wall.  [III: 32]

v. Mr. Stalker admitted that the material that had been left in the ramp was demolition debris.  [VIII: 110]

w. Mr. Stalker admitted that Mr. Gateman had told Roberts to leave the ramp where it was.  [VIII: 99]

x. Mr. Stalker further admitted that Mr. Gateman knew what was in the ground and that Roberts left what they were supposed to leave and if PM wanted it removed through Roberts it would be at a price of $60.00 per ton because the debris was mixed and that price would not include any excavating fees.  [III: 31-33; VIII: 99-100]

y. Mr. Stalker did not discuss with Mr. McIntyre what it would cost to attempt to recycle the material on the site and did not make any statement to Mr. McIntyre indicating that any of the material discovered at the site could be recycled.  The buried brick material discovered at the site was mixed with other demolition debris. [III: 65-66, 69]

April 14th Gateman / Hawkins Telephone Calls

z. In a telephone conversation on April 14, 2004, Mr. Hawkins told Mr. Gateman that he had been advised by Mr. Morin that Roberts Demolition would be considerably more expensive than other options and that Roberts Demolition had stated that they did what they were told and that they left what they were told to leave on the Property and that's all, implying that it wasn't their obligation to take the debris out. [II: 16]

aa. As of the time of that phone conversation, Georto had been advised of an estimate by Mattuchio, based on expectations at that time with regard to the amount of debris that needed to be removed, to remove the debris and to remove certain foundations for approximately $148,000.00.  [II: 18-19]

bb. Later on April 14th, Mr. Gateman called Mr. Hawkins back and stated that Roberts Demolition's secretary had reiterated to him that Roberts had done what they were told and that's all and that it was going to be $60.00 a ton to take out the material. [II: 20]

Gateman / Stalker Phone Call

cc. When Mr. Stalker spoke with Mr. Gateman after visiting the site in April, 2004, he told Mr. Gateman that all of the material was mixed and that a lot of the material would have to be removed.  [VIII: 100]

dd. After having been shown the site, including the test pits, Mr. Gateman did not ask Roberts Demolition to remove any of the debris.  [VI: 114]

McIntyre / City of Lynn Building Inspector Site Meeting

ee.  Mr. McIntyre invited a Lynn building code enforcement officer to investigate the demolition debris at the Property and to determine if it needed to be removed. [Ex. 1, Stipulation of Facts, ¶ 16]

ff.  Mr. McIntyre also met with the City of Lynn building inspector at the Property to discuss discovery of the debris.  The building inspector confirmed that the material would have to be removed and that PM would need documentation on where it went. [III: 33-34]

April 15th Gateman / Hawkins Phone Call

gg.  In a telephone call on April 15, 2004, Mr. Gateman denied to Mr. Hawkins that Mr. Gateman had delivered the property in an unsuitable condition and further stated that he had no obligation to do anything.  [II: 22-23]

hh.  Mr. Gateman further stated during that phone call: "look, I'm not going to pay anything to fix the property and you're going to have to sue me."  [II: 23; VI: 115]

Wetherbee Site Visit

ii.  Mr. Wetherbee visited the site in April, 2004 and observed debris at the site consisting of wood, burnt wood, ash, scrap metal, bricks and concrete.  [VIII: 135-136]

jj.  The material that he observed onsite at that time was similar to the debris material that he had excavated from the Family Dollar portion of the debris ramp.  [VIII: 136]

kk.  Mr. Wetherbee was not surprised that debris had been found at the Property because he

ll.  Mr. Wetherbee then spoke with Mr. Gateman and told him what he had seen at the Property.  [VIII: 136]

## 44. **Consideration of Alternatives to Removal**

a.  During Mr. Hawkins initial site visit after the discovery of the debris, Mr. Hawkins discussed with Mr. McIntyre the subject of whether the building could be built on top of the debris, including whether the building could be constructed on pilings. Mr. McIntyre informed Mr. Hawkins that it would be impractical to attempt to build the building on top of pilings, that it would require re-engineering and that, in the end, it would likely be more expensive than removing the debris.  Mr. McIntyre further stated that PM Construction could not leave the debris under the building. [II: 5; [III: 18-20]

b.  Mr. McIntyre, notified Georto that, based on the building code, PM Construction could not build on the debris and that it was more than likely that all of the debris would need to be removed.  [Ex. 1, Stipulation of Facts, ¶ 16; III: 27]

c.  Mr. Morin, upon inspection of the debris at the site, knew that the material was not suitable for building and that it was necessary to make some determinations as to how to deal with that material.  [III: 106]

d.  Mr. Hawkins asked Mr. Morin if PM Construction could just build a building on top of the buried demolition debris, and Mr. Morin refused.  [III: 107]

e.  Among other determinations, Mr. Morin determined that one could not build a building on material containing buried wood.  [III: 106]

f.  The representatives of PM Construction also informed Mr. Hawkins that if the building was built on top of the demolition debris the building could actually start sagging due to settlement created by the voids throughout the debris.  [III: 20]

g.  The representatives of PM Construction further informed Mr. Hawkins that the City of Lynn Building Department likely would not allow building a building on top of the debris.  [III: 20-21]

h.  Among other alternatives, Mr. Hawkins, Mr. Morin and Mr. McIntyre considered driving piles as well as removing the debris only in those areas where the footings were located.  [III: 107]

i.  Mr. McIntyre, Mr. Morin and Mr. Hawkins attempted to determine the least expensive way to deal with the problem of the buried demolition debris.  [III: 107]

j.  PM Construction also spoke with its geotechnical engineer, Geotechnical Services, regarding the possibility of limiting the excavation of the debris to certain portions of the property.  [IV: 6-7]

k.  As a result of that communication, PM Construction further consulted with Chad Michaud, the geotechnical engineer from SW Cole.  [IV: 7]

l.  PM Construction consulted with a structural engineering firm regarding the possibility of building the building on top of piles.  [IV: 5]

m.  Mr. Morin also spoke with PM's estimating department to see what the unit cost would be for constructing the building on top of piles.  [IV: 5]

n.  The structural engineer advised PM Construction that it would be very costly to construct the building on top of pilings and that it would be best to excavate the debris.  [IV: 5-6]

o.  It would have been considerably more expensive to build on top of pilings than to use the standard spread foot foundation.  [III: 108-109]

p.  Among other problems, Mr. Morin determined that the building could not be built on top of pilings due to the fact that it would be very expensive and that the floor slab would have sunk and cracked.  [III: 108]

q.  The representatives of PM Construction also informed Mr. Hawkins that even if one could build a building on top of piles driven into the site that they would still have problems with the ability to run utilities into the building if the debris was not removed.  [III: 20]

r.  Mr. Morin determined that the alternatives to removing all the debris were cost prohibitive.  [III: 107]

s.  Mr. Hawkins decided to remove the demolition debris, based in part on advice from PM Construction that: it was the only way to build a building; that building a building on top of piers would not result in any cost savings and would result in further delays; and that in any event the site was a non-approved trash dump.  [II: 24-25]

## 45. Initial Estimate of 2,000 Cubic Yards

a.  As of April 23, 2004, PM Construction estimated that 2,000 cubic yards of debris material needed to be removed and replaced, based on the information then available and without the benefit of full excavation of the Property.  [III: 111-112]

b.  Had PM Construction been advised of the amount of demolition debris buried on the Property at the time that it prepared its estimate of the quantity that needed to be removed, PM Construction would have revised the estimated quantities that needed to be removed.  [IV: 46-47]

## 46. Subcontractor Proposals/Bids

Proposals / Analysis

a.  By letter dated May 6, 2004, PM Construction provided a package of information to Georto pursuant to which PM included various subcontractor bids for removal of up to 2,000 cubic yards of demolition debris (an estimate made prior to receipt of the geotechnical evaluation) and provided an analysis of those bids.  [II: 28-30; Ex. 33]

b.  The subcontractors who submitted proposals for the removal of the demolition debris included Mattuchio, Scott Wetherbee and Nixon.  [II: 29; III: 113; Ex. 33]

c.  As was reflected in the spreadsheet, Mattuchio was the least expensive of the proposals for the demolition debris removal and replacement.  [Ex. 33 at p. P0064]

d.  After certain adjustments made in order to provide an "apples to apples comparison," PM determined that, based on expectations at that time, Scott Wetherbee's proposal would cost $140,000.00 while Mattuchio's proposal to remove the debris would cost less than $100,000.00.  [II: 31-32]

e.  PM Construction explained to Mr. Hawkins the information set forth in the May 6, 2004 subcontractor comparison and further explained to him who would be the best option.  Mr. Morin suggested that Mr. Hawkins agree to use Mattuchio for the removal of the demolition debris.  [III: 114]

f.  After discussing the proposals and the adjustments to make an apple for apple comparison with Phil Morin of PM Construction, Mr. Hawkins decided to use Mattuchio to remove the demolition debris because he had the best price for equal

35

scopes of work amongst all of the subcontractors who had bid on the project.  [II: 30, 32-33; I: 114;III: 114-115; IV: 12, 40-41]

g.  PM Construction contracted with the lowest bidder possible for excavation of the demolition debris and material.  [IV: 40]

Wetherbee Proposal

h.  Mr. Wetherbee acknowledged that he understood that additional material may need to be removed over and above 2,000 yards of material.  [VIII: 137]

i.  After providing his proposal, Mr. Wetherbee had two communications with Mr. Hawkins regarding that proposal.  [VIII: 138]

j.  Mr. Hawkins asked Mr. Wetherbee to explain the quote and was interested in the overage if it went over the $85,000 amount.  [VIII: 138]

k.  Mr. Wetherbee informed Mr. Hawkins that it was a "site unseen," that he couldn't really say, and acknowledged that once the work began the additional price could be over the lump sum amount.  [VIII: 138]

l.  Mr. Hawkins asked Mr. Wetherbee for a breakout of what it would cost if it went over the 2,000 cubic yards reflected Mr. Wetherbee's proposal.  [VIII: 141]

m.  Mr. Gateman never asked Mr. Wetherbee to perform any work in connection with the removal of the debris material in April, 2004.  [VIII: 137]

Roberts Corp.

n.  Robert Stalker of Roberts Demolition told Steve McIntyre of PM Construction that Roberts Demolition would charge $60 per ton to dispose the material from the site and that PM Construction would be required to load Roberts' containers.  [III:54, 69, VIII: 98]

o.  Mattuchio's price for removal of the demolition debris was less expensive than that proposed by Roberts ($60.00 per ton).  [IV: 41-42]

p.  Philip Morin of PM Construction advised Mr. Hawkins that, given Roberts Demolition's cost estimate was twice as much as other estimates and that Roberts was involved in the initial work at the site, using Roberts to remove the debris was not an option.  [II: 15-16]

q.  Based on the communications between Roberts Corporation and representatives of PM Construction at the site, Mr. Hawkins understood that the cost to engage Roberts to remove the debris would be approximately twice as much as estimates that had been obtained from other contractors to remove the debris.  [II: 14-15]

**47. Geotechnical Expert**

a. Based on an assumption that only 2,000 yards of demolition debris would need to be removed and replaced, Georto and PM Construction entered into a change order authorizing such work on April 28, 2004 for $124,283.00 ($148,483.00 total less $24,200.00 amount for foundation removal, which is not a claim in this litigation). [II: 25-26; Ex. 34 at page P0054-P0055]

b. That change order was based on the assumption that certain fill material located at the top was usable and did not need to be removed. [II: 27]

c. Mr. Morin and Mr. Hawkins determined that it was necessary to get an expert to look at the debris to determine what material could be kept and what material had to be disposed.  [III: 109]

d. The initial change order executed by PM Construction and Georto for the removal of up to 2,000 cubic yards of demolition debris and material was contingent upon the results of the geotechnical evaluation to be conducted by Chad Michaud of SW Cole. [IV: 35]

e. As of April 28, 2004, no decision had been made to excavate the basement hole on the Property. [IV: 34]

f. Prior to the commencement of any work to remove any debris, Georto engaged a geotechnical engineer, Chad Michaud of SW Cole Engineering in early May, 2004 to inspect the Property, evaluate the extent of the problem resulting from the demolition debris, provide an opinion regarding the suitability of the materials on the Property for support of the building, and to advise Georto on how much of the material at the Property needed to be removed.  [II: 33-34; IV: 107-108; Ex. 40]

g. Mr. Michaud visited the site on May 7, 2004 and observed the trench and test pit excavations.  Mr. Michaud observed demolition debris at the site including brick, concrete, wood, metal pipes, fabrics, plastics and similar materials and was surprised by the amount of wood that he saw in the sidewalls of the test pits.  [IV: 109]

h. Mr. Michaud observed a substantial amount of wood buried onsite.  Mr. Michaud determined that the wood was a "good portion" of the materials that had been filled at the site.  [IV: 109-110]

i. Mr. Michaud was most concerned about the presence of charred and burnt wood and organics such as ash and other materials.  [IV: 117]

j. Mr. Michaud prepared a diagram depicting the location of the test pits and also prepared test pit logs to reflect the stratification of the materials that he observed in the test pits.  [IV: 111-112; Ex. 40]

k. The material encountered at test pits 1 and 2, as identified in the geotechnical engineering evaluation, consisted primarily of black ash, burned wood, bricks or other solid waste debris included but not limited to plastic, glass and metal.  [Ex. 39 at P0878]

l. Test pits 3-5 encountered two primary layers of fill material, including black ash, burned wood, bricks with other solid waste debris, including but not limited to plastic, glass and metal, as well as dark brown sandy silt with some clay, organics, brick, glass, plastic long roots.  [Ex. 39 at P0878]

m. Based on his observations of the test pits, Mr. Michaud determined that there was not a consistent layering of materials discovered onsite.  [IV: 116]

n. Mr. Michaud determined that it would be difficult to separate the material given that the layering was inconsistent from location to location and further because in the process of excavation most of that material would be mixed together.  [IV: 117]

o. Mr. Michaud also observed that the material was voided, meaning that there was air space.  [IV: 118]

p. Mr. Michaud determined that the materials discovered onsite were mixed throughout the site and were not suitable to support a building.  [IV: 118; Ex. 39 at P0879; Ex. 40]

q. Mr. Michaud specifically determined that all of the fill/debris material below the proposed building required removal and was not suitable for reuse.  [IV: 124; Ex. 40]

r. Mr. Michaud provided a geotechnical engineering evaluation report to Georto dated May 13, 2004.  [II: 24; Ex. 39]

s. Mr. Michaud recommended that all of the material at the Property beneath the footprint of the anticipated building be removed and replaced.  [Ex. 1, Stipulation of Facts, ¶ 16; II: 37-38; IV: 119; Ex. 39; Ex. 40]

t. Mr. Michaud prepared a geotechnical supplemental report dated December 20, 2005.  [Ex. 40]   Based on review of additional information, including photographs (deposition exhibits), deposition transcripts, the Goldman Environmental Phase I Environmental Site Assessment Report dated May 29, 2002 and Goldman Environmental Limited Subsurface Investigation Report dated February 2, 2004, Mr. Michaud found that the observed and described composition of the existing fill/debris materials were consistent with his observations from his site visit and specifically noted that the deposition testimony indicated that the majority of the excavated fills consisted of brick, concrete, burned wood, ash, metal and other miscellaneous demolition debris items.  [Ex. 40, p. 2 and 3]

u. Mr. Michaud reiterated his opinion that the existing fills/debris were not suitable for support of the foundation and floor slab and that all of the fill/debris below the proposed building required removal and was not suitable for reuse even if replaced in a compacted controlled manner.  [Ex. 40 at page 3]

v. Mr. Michaud further determined that the brick and concrete could not have been salvaged without first screening the material and then manually picking and sorting the material so as to separate the brick and concrete from the other materials.  [IV: 122]

w. The use of manual labor would significantly increase the cost of attempting to recycle any of the brick located onsite.  [IV: 122]

x. Mr. Michaud did not believe that recycling could be used at the Property given the large amount of wood.  Recycling was not a viable option given the large amount of wood, ash and other similar materials mixed in with the debris.  [V: 35-36]

y.  Mr. Michaud also determined that the silty material was unsuitable for reuse because it was mixed with other types of materials such as wood, metal and similar materials. [V: 38-39]

z.  Mr. Michaud determined that the quantity of materials that could have been generated by recycling would not have been worth the effort for reuse on the Property.  [V: 42]

48. **Removal of Debris**

a.  Georto did not cause the commencement of the debris removal work until May 10, 2004.  [II: 24]

b.  As a result of its receipt and review of the geotechnical report prepared by Chad Michaud of SW Cole, PM Construction ultimately determined that it needed to remove approximately twice the amount of the material that it needed to be removed.  [III: 116-117]

c.  Georto contracted to have the debris removed and replaced with fill, which work was supervised by Steve McIntyre of PM Construction.  [Ex. 1, Stipulation of Facts, ¶ 17; II: 118]

d.  Georto, through PM Construction, hired Thomas Mattuchio Construction, Inc. to perform the removal of the demolition debris material.  [II: 38]

e.  It took approximately five weeks for the demolition debris and material to be removed and to be replaced with fill in material.  [II: 42]

f.  Mr. McIntyre monitored the removal of the demolition debris material from the Property in keeping track of the trucks.  [III: 34]

g.  Mr. McIntyre made sure that the trucks were full before they left the Property.  [III: 35-37]

h.  Thomas Mattuchio Construction, Inc. removed 167 loads of mixed demolition debris and material during the time period from May 12, 2004 through June 1, 2004.  [Ex. 44]

i.  Every load of material removed from the site contained mixed demolition debris, with a limited exception of two or three loads that contained concrete from the foundation (which was not included in Georto's claim).  [III: 67-68]

j.  With respect to those load slips that identified material consisting of brick, those loads also contained other materials in addition to the brick.  [IV: 37]

k.  Mattuchio identified in their invoices that the material being removed from the Property was mixed demo material.  [IV: 39; Ex. 44]

l.  Thomas Mattuchio Construction, Inc., delivered 4,231 cubic yards of urban fill to replace the removed material during the time period between May 25 and June 1, 2004.  [Ex. 44; III: 38]

m. Mr. Morin reviewed the trucking and disposal slips that were submitted by Mattuchio and then forwarded those materials to Mr. Hawkins for his review.  [III: 119-120]

n. Prior to making payment to PM for the demolition debris removal, Mr. Hawkins reviewed the package of load packets and trucking slips and invoices from Mattuchio evidencing the work that had been performed to remove the debris and replace with fill.  [II: 42-44; Ex. 44]

o. PM Construction submitted an additional revised proposed change order on June 7, 2004 in the amount of $260,826.00 based on 167 loads of demolition removal and 4,231 yards of new fill.  [Ex. 34 at P0058-P0059]

p. Mr. Hawkins engaged in strong negotiations with PM Construction in order to reduce the final cost for the removal of the demolition debris and replacement with fill.  [III: 117-118]

q. Pursuant to those negotiations, the cost was reduced to $249,171.00 pursuant to a final change order.  [III: 118; II: 38-41; Ex. 34 at P0060-P0061; Ex. 35]

r. The change order did not include any additional amount for the cost of removing any of the foundations from the property.  [II: 39-40]

s. Georto paid PM $249,171.00 on July 10, 2004 for the removal of the debris and replacement with fill dirt pursuant to the final change order.  [Ex. 1, Stipulation of Facts, ¶ 18; II: 46-47; III: 122-123; Ex. 36]

t. PM Construction removed the demolition debris and material in the least expensive way possible.  [IV: 39-40]

u. The amount of $249,171.00 paid by Georto for the removal of the debris was above and beyond the amounts paid by it to PM Construction for the site work otherwise performed at the Property.  [II: 68]

v. In addition to the $249,171.00, Georto paid approximately $135,000.00 for additional site work.  [II: 99]


**49. Opportunity for Gateman to Inspect and/or Cause Removal of Debris**

a. Pursuant to a letter from Georto's counsel to Mr. Gateman dated April 26, 2004, Mr. Gateman was provided with the opportunity to inspect the Property before any of the debris was removed.  [VI: 115-116; Ex. 31]

b. The letter further provided that the work would not commence until May 10, 2004 if Mr. Gateman wished to inspect the Property.  [VI: 115-116; Ex. 31]

c. Georto delayed the commencement of that work until May 10th in order to provide Mr. Gateman with the opportunity to inspect the Property.  [II: 24]

d. Mr. Gateman admitted that he never made any arrangements to have any kind of a geotechnical expert or solid waste expert or any other expert come in and inspect the property.  [VI: 116]

e. Upon Georto's discovery of the buried demolition debris, Mr. Gateman did not, at any time agree to pay for or cause the removal of any of the debris.  [II: 101; VI: 119; VII: 126]

f. Mr. Gateman also did not provide any information to Georto regarding where the debris had been buried.  [II: 101-102]

g. Notwithstanding his site meeting with Mr. Hawkins at the Property on April 9, 2004 and the additional phone calls with Mr. Hawkins, Mr. Gateman did not say anything to Mr. Hawkins regarding the existence or location of the brick/debris ramp.  [II: 105-106]

## 50. Solid Waste

a. Gregory C. Wirsen, M.Sc, of Green Seal Environmental, a recognized solid waste expert, submitted a solid waste report regarding the site dated December 28, 2005. As is reflected in his report, the material encountered at the Property was construction and demolition debris.  [Ex. 41 at Page 2; IV: 72]

b. Section 150A of Chapter 111 of the Massachusetts General Laws provides "no person shall depose or contract for the disposal of solid waste at any place which has not been approved by the department pursuant to the provisions of this section or other applicable law."  Sec. 19.014 of 310 of the Code of Massachusetts Regulations provides in pertinent part: "(1) No person shall establish, construct, operate or maintain a dumping ground or operate or maintain a landfill in Massachusetts in such manner as to constitute an open dump.  For the purpose of 310 CMR 19.014 the phrase 'establish, construct, operate or maintain' shall include without limitation, disposing or contracting for the disposal of refuse in a dumping ground or open dump.  (2) No person shall dispose or contract for the disposal of solid waste at any place in Massachusetts which has not been approved by the Department pursuant to M.G.L. c. 111, §150A."  [Ex. 41 at page 7]

c. The material buried/disposed at the Property was a solid waste by definition.  [Ex. 41 at Page 8]

d. Demolition debris is defined under 310 CMR 16 as rubble resulting from either construction demolition or renovation activities, usually including asphalt, brick and concrete as well as other masonry, lumber, metal and other discarded items resulting from either construction or demolition debris.  [IV: 62-63]

e. Demolition debris is a solid waste and is subject to all of the solid waste regulations promulgated in Massachusetts.  [IV: 63]

f. The material met the definition of construction and demolition debris and was solid waste  [IV: 68-69; Ex. 41 at page 8]

g. The dumping of the brick and concrete at the site did not satisfy the criteria for "recycled."  [Ex. 41]

h. The wood material found at the site was considered a waste material.  [Ex. 41 at Page 9]

i.   The material, including not only construction and demolition debris residuals but also construction and demolition "finds" was illegally dumped on the site.  [Ex. 41 at Page 9]

j.   The material discovered at the Property was mixed demolition debris consisting of wood, ferrous and non-ferrous metals, brick, concrete and other materials.  [IV: 65]

k.   Gateman's filling of the Property with the demolition debris and material was illegal.  [IV: 69, 71-73]

l.   The disposal of the demolition debris on the Property made the Property an illegal dump.  [IV: 71]

m.   All of the debris material discovered at the Property was required to be removed.  [IV: 79]

## 51. <u>Recycling/Re-Use?</u>

a.   There was a lot of wood mixed in with the brick and other debris.  [III: 69-70]

b.   Wood material cannot be recycled.  [IV: 43]

c.   The material discovered at the Property by PM Construction was not suitable for use.  [III: 68-69]

d.   Based on his twelve years of experience in dealing with construction demolition debris, Mr. Wirsen had never seen a permit issued for onsite use for the type and nature of the debris found at 200 Union Street.  [IV: 75]

e.   Onsite use of the material would be precluded because the material was co-mingled (mixed).  [IV: 73]

f.   Brick and concrete mixed with other materials (such as metals, fabrics, wood, appliances and other materials) is a solid waste and has to be handled as a solid waste.  [IV: 65-66]

g.   The brick and concrete material, as reflected in photographs taken on April 18 and 19, 2002 with respect to that portion of the property later sold to Georto would not be appropriate for recycling because, among other materials, it was mixed with a lot of wood and ground up wood. [IV: 99]

h.   Typically, on construction sites, deconstruction methodologies are used to segregate the material <u>while the building is being taken down</u> so that it is not co-mingled with other materials so as to then permit brick and concrete to be processed into a material.  [IV: 79]

i.   There is a big difference between deconstructing, on the one hand, and processing mixed demolition debris, on the other hand.  [IV: 80]

j.   Onsite disposal of brick and concrete that may have been painted, coated or treated would be a violation of solid waste regulations.  [IV: 74-75, 96]

k.   In order for brick and concrete to be recycled, proper notification must be provided to the local Board of Health as well as the Department of Environmental Protection

so that the Board of Health and DEP can inspect the material before it is turned into a recyclable commodity. [IV: 66-67]

l.   In order for brick and concrete to be recycled, it can't be painted, treated, stained or have the potential to contain asbestos. The owner of the material bears the burden of proof to demonstrate that the material is clean and does not have dust constituents within in. [IV: 67]

m.   In order for the brick and concrete to have been recycled onsite, it would not only had to have been screened and crushed but the bricks and concrete would have had to have been manually extracted from the waste stream prior to crushing. [IV: 100]

n.   Manually extracting brick and concrete is typically not done on a site. [IV: 100]

o.   Manually sorting brick significantly impacts the cost. [IV: 101]

p.   The cost of disposing material at a recycling facility significantly increases if there is material in addition to just brick and concrete. [IV: 84]

q.   Screening and crushing material on the Property was not a reasonable or viable option, due to, among other reasons, the amount of wood and other materials mixed with the brick and concrete. [III: 48, 73-74; IV: 7-9]

r.   Disposal fees for mixed debris is typically $70.00 per ton. [IV: 101]

s.   Depending on density, a 30 yard container of mixed debris will usually weigh between 15-25 tons. [IV: 101]

t.   Assuming that the 30 yard container contained 20 tons of mixed demolition debris material, the typical cost for disposal would be $1,400.00 per container, not including transportation. [IV: 101-102]

## 52. Gateman Not Credible; Examples of Contradictions in Testimony

### As to Debris Ramp

a.   Even though he had admitted in deposition testimony and had in fact stipulated (pursuant to the Stipulation of Facts marked as Exhibit No. 1) that the initial demolition contractor – Turner Demolition - had created the debris ramp, Mr. Gateman testified at trial that Turner had not created the ramp and that instead Roberts must have created the ramp. [Ex. 1 at ¶¶ 2,3; VI; 35-37; VII; 10, 19-21]

b.   In his deposition testimony on August 30, 2005 (i.e., prior to production by Family Dollar's engineers of the photographs marked as trial exhibit 3C), Mr. Gateman testified that the ramp (or as he referred to it "the road") was only on the portion sold to Family Dollar: "Q. Question: 'Where on the property did that road exist?' A. 'It was on the portion sold to Family Dollar.'" [VI: 6]

c.   In his trial testimony (i.e., after becoming aware of the existence of the Family Dollar engineers' photographs), Mr. Gateman admitted that the debris ramp had extended not only in the Family Dollar portion of the property but extended substantially onto the portion of the property ultimately sold to Georto. [V: 77-78; VI: 23-24]

d. Mr. Gateman claimed that he did not know as of the date of that deposition that the ramp had extended onto that portion of the property sold to Georto, notwithstanding that he was onsite on a daily basis and had the opportunity to observe the extent of the debris ramp (as depicted in the pictures taken on April 18 and April 19, 2002; specifically including Exhibit 3C-2).  [VI: 6-8]

e. While Mr. Gateman testified that he did see the debris ramp, he claimed that he "didn't know how far it went."  [V: 123]

f. In contradiction of his admission at trial that he knew of the existence of the ramp at the time that the fill was delivered to the Site, Mr. Gateman had testified – incredibly - at his deposition on August 30, 2005 that he was <u>not</u> aware of the existence of the ramp at the time that he was compacting fill over it.  [VI: 10-11]

<u>Appearances</u>

g. Mr. Gateman testified that prior to the "discovery" of the debris ramp by Family Dollar, the Family Dollar side looked the same as the Georto side at that time (i.e., prior to the time that debris was covered with glacial till to make it look like the Family Dollar side) notwithstanding that the photos clearly show substantial differences in the materials placed on each side. [V: 103; Ex. 3C-133, 3C-130, 3C-147]

<u>As to Debris</u>

h. Mr. Gateman initially claimed pursuant to his deposition testimony (in May, 2006, long after completion of discovery, as referenced at trial) and his answers to interrogatories that there was an "inconsequential" amount of debris (other than brick and concrete) buried at the Property– an amount that could fit in a "trash bag." When Mr. Gateman used the term "inconsequential" in his answers to interrogatories, he meant to indicate that "there might be a piece or two of something, of debris that might have been mixed in with the bricks."  [V: 105, 106,114]

i. At the time Mr. Gateman answered the interrogatories, he was aware of what the site looked like as shown in the photographs marked as Exhibits 3C (the photographs taken by Hardin Lawson Associates).  Those photographs clearly depict not only the debris ramp on the Georto side but also substantial amounts of wood and other debris mixed in with the brick.  [V: 105, 106,114; Ex. 3C]

j. When questioned at trial about his May 2006 deposition testimony regarding the amount of debris (i.e., his testimony that the debris could fit in a trash bag), Mr. Gateman admitted that his deposition testimony was "wrong." [V;123-124]

k. Mr. Gateman at one point testified that he believed that the screening process did in fact remove <u>all</u> of the wood from the brick and concrete material. [V: 83]

l. Upon being shown a photograph clearly showing the contrary, however, Mr. Gateman then admitted that the material depicted in the photograph, which he

44

referred to as "fill dirt," "finds" and "fill," contained a substantial amount of wood among other materials, [Ex. 3G-2; VII: 122-123].

m. Mr. Gateman further admitted that Roberts had told him that there would be wood mixed in with the brick and that he knew that at the time he signed the Purchase and Sale Agreement with Georto. [VI: 17-18]

n. Mr. Gateman further admitted that that material, which clearly included wood, was on the Property at the time that the site was sold to Georto. [VII: 123].

o. Mr. Gateman also denied knowing that that the brick and concrete contained ash (instead saying it "looked like dirt to me"), but then (when confronted with his admissions in his answers to interrogatories) admitted that he knew that the material contained ash. [V: 83; VI:17]

As to Excavation of Ramp

p. Mr. Gateman testified that it took two days to excavate the ramp. [VII: 80]

q. Mr. Gateman alternatively testified that it only took three or four hours to excavate the ramp.

As to April 2004 Site Visit Observations; "Fill Dirt"

r. Mr. Gateman testified that when he visited the Property for a site meeting with Mr. Hawkins in April, 2004, he only saw "bricks and concrete, and there were a few pieces of metal I think I saw" but not anything else. [V: 115]

s. Mr. Gateman then testified that the material that he observed at that site meeting in April, 2004 looked like "fill dirt." [V: 115-116]

t. In response to his own counsel's question regarding what he observed when he met Mr. Hawkins at the site in April, 2004, Mr. Gateman testified that he had seen that they had started to excavate for the foundation and that he had "saw the dirt that was there." [VII: 45]

u. When he had been questioned at his deposition regarding his meeting at the site in early April, 2004 (upon Georto's discovery of the buried demolition debris) with Mr. Hawkins and a representative of PM Construction, Mr. Gateman claimed that "I saw dirt. To me it was dirt." Mr. Gateman also claimed at his deposition that he didn't know if he had seen any bricks at the site during that meeting, that he didn't know if he had seen any wood at the site during that meeting and that he didn't know if he saw any metal at the site during that meeting (with the exception of the steel stored onsite for the prefabricated building). [VI: 112-114]

v. When shown at trial the debris depicted in the photo Exhibit 3G-2 (photograph taken by Mr. Hawkins at the time of his site visit in April, 2004 upon discovery of the debris), Mr. Gateman admitted that he had seen that material on the day of his site visit. Mr. Gateman further stated that the debris material depicted in that picture,

45

which clearly shows wood among other materials, was the type of material that he referred to as "fill dirt," "finds" and "fill."  [VII: 122-123; Ex. 3G-2]

Trailer for Store

w.  When questioned regarding his knowledge that Georto would be building a store, Mr. Gateman incredibly stated that the store "didn't have to be a building. It could have been a trailer or something like that."  [VI: 111-112]

x.  (By fax dated February 6, 2004, PM Construction had in any event provided information to Mr. Gateman's counsel regarding the "new building to be constructed."  [Ex. 25])

As to RIS

y.  Mr. Gateman testified that he never hired RIS to do anything and that RIS never did any work for him.  [V: 87; VII: 107]

z.  Mr. Gateman then admitted under direct examination by his own counsel that he had hired RIS originally to perform certain demolition work.  [VII: 13]

aa.  While Mr. Gateman initially testified that he never paid RIS anything, when confronted with his deposition testimony, he then admitted that he had paid them a few thousand dollars.  [VII: 99]

As to Obligation to Provide Phase I Report

bb.  When questioned about his knowledge that he was obligated to provide the Phase I Environmental Report to Georto, Mr. Gateman (in an attempt to disclaim knowledge of the terms of the Purchase and Sale Agreement) claimed that he believed that that obligation was set forth in the letter of intent and that he had read that document. [VI: 103]

cc.  When shown the letter of intent, however, Mr. Gateman admitted that the letter of intent made no mention of any reference to Mr. Gateman furnishing and certifying a Phase I report to Georto.  [VI: 103-104]

**PLAINTIFF GEORTO, INC.**
By its Attorney

/s/ Dale Kerester
Dale Kerester, Esq., BBO #548385
LYNCH, BREWER, HOFFMAN & FINK, LLP
101 Federal Street, 22nd Floor
Boston, MA  02110-1800
(617) 951-0800

Dated:   October 16, 2006

46

**<u>Certificate of Service</u>**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants.

<u>/s/ Dale Kerester</u>
Dale Kerester

Dated:  October 16, 2006