UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

GEORTO, INC.,                )
        Plaintiff,      )
                         )
v.                         )
                         )
WILLIAM GATEMAN, INDIVIDUALLY )    CIVIL ACTION NO. 04-11730 NG
and as TRUSTEE OF 200 UNION     )
STREET REALTY TRUST,         )
        Defendant and   )
        Third Party Plaintiff, )
                         )
v.                         )
                         )
ROBERTS CORPORATION,       )
        Third Party     )
        Defendant.     )

## PLAINTIFF GEORTO, INC.'S REQUESTS FOR RULINGS OF LAW WITH SUPPORTING AUTHORITIES

Plaintiff Georto, Inc. ("Georto") hereby sets forth its requests for rulings of law with

supporting authorities in connection with the bench trial of this matter on September 11-14, 18-

20, and 25, 2006.  Georto incorporates by reference Plaintiff's Requests for Findings of Fact

("Requests for Findings of Fact") filed contemporaneously herewith.

## I.    GEORTO'S CLAIMS

Plaintiff Georto, Inc. asserts the following claims against Defendant William Gateman

("Gateman"):

**General:  This case concerns the sale on February 19, 2004 by William Gateman to Georto
of certain real property consisting of approximately 19,500 square feet located between
Union and Ellis streets in Lynn, Massachusetts (the "Property").**

**Breach of Warranty/Contract:  Georto alleges that Gateman, as Trustee of the 200 Union
Street Realty Trust, breached his contracts with Georto by: a) breaching his express
written warranty in the purchase and sale agreement with Georto that there were no non-
acceptable environmental conditions on the Property in that Gateman had dumped and**

buried extensive amounts of demolition debris / solid waste on the Property; b) breaching a separate tax indemnification agreement by failing to reimburse Georto for the payment of certain real estate taxes; and c) breaching the covenant of good faith and fair dealing that is implied in the purchase and sale agreement by, among other breaches, misrepresenting that all of the demolition debris had been removed from the Property and by failing to disclose such debris to Georto.

**Fraud**:  Georto also alleges that Gateman, individually and as Trustee of the 200 Union Street Realty Trust, fraudulently and negligently misrepresented that all demolition debris / solid waste had been removed from the Property, that all demolition debris / solid waste had been properly disposed of, that the Property had been filled to grade with fill dirt, and that there were no non-acceptable environmental conditions on the Property.

**Chapter 93A**:  Georto also alleges that Gateman, individually and as Trustee of the 200 Union Street Realty Trust, engaged in unfair and deceptive acts and practices in violation of the Massachusetts Consumer Protection Statute and that Gateman willfully and knowingly engaged in such unfair and deceptive acts and practices.

**Damages**:  Georto, among other harm incurred by it as a result of Gateman's conduct, alleges that it was damaged in the amount of $250,361 by Gateman's conduct, consisting of $249,171 for Georto's costs to remove and replace the demolition debris with fill and $1,190.00 for payment of certain real estate taxes attributable to Gateman.

**Relief**:  Georto requests that the Court enter judgment in favor of Georto and against Gateman, individually and as Trustee of the 200 Union Street Realty Trust, on Georto's claims, award to Georto damages in the amount of $250,361 (consisting of $249,171 for the cost of removing and replacing the demolition debris with fill and $1,190.00 for payment of real estate taxes attributable to Gateman), award Georto its attorneys fees[1] and costs in accordance with Chapter 93A of the Massachusetts General Laws, award to Georto prejudgment interest on such damages at the statutory rate of 12% per annum from the dates of breach (June 18, 2003 with respect to the $249,171 in damages resulting from the breach of the warranty, and September 23, 2004 with respect to the breach of the tax indemnification agreement), award to Georto multiple damages in accordance with Chapter 93A, and enter such further relief as is just and appropriate.

## II.    BREACH OF CONTRACT CLAIM; NON-ACCEPTABLE ENVIRONMENTAL CONDITIONS WARRANTY

A contract is a promise or a set of promises for the breach of which the law gives a

remedy, or the performance of which the law in some way recognizes as a duty.  I & R

---

[1] Georto requests that the Court set a schedule for submissions in connection with an award of attorney's fees and costs.

Mechanical, Inc. v. Hazelton Mfg. Co., 62 Mass. App. 452, 454, 817 N.E. 2d 799, 802 (2004). In order to be enforceable under Massachusetts law, a contract must have valid consideration – a bargained for exchange in which there is a legal detriment of the promisee or a corresponding benefit to the promisor. Neuhoff v. Marvin Lumber and Cedar Co., 370 F.3d 197, 202 (1st Cir. 2004). Where the contract contains a warranty, "[i]n effect, the warrantor proposes to indemnify the warrantee for any damage resulting from a variation between what was promised and what actually came to pass." Sparks v. Fidelity Nat. Title Ins. Co., 294 F.3d 259, 272 (1st Cir. 2004).

Georto requests that the Court enter the following rulings with respect to Georto's claim in Count One of the Complaint that Gateman breached his warranty that there were no non-acceptable environmental conditions on the Property:

1. **Gateman, as Trustee of the 200 Union Street Realty Trust, and Georto entered into a binding and enforceable contract entitled "Contract for Purchase and Sale of Real Estate" dated June 18, 2003 (the "Purchase and Sale Agreement"), pursuant to which Gateman agreed to sell, and Georto agreed to purchase, the real property consisting of approximately 19,500 square feet located between Ellis Street and Union Street in Lynn, Massachusetts (the "Property"). Pursuant to Paragraph 2 (f) of the Purchase and Sale Agreement, Gateman expressly warranted and represented that "there are no hazardous materials as defined by state, federal, or local law, or non-acceptable environmental conditions on the property" as of the date of the Purchase and Sale Agreement (June 18, 2003) and as of the date of the closing (February 19, 2004). Gateman's warranty and representation, which was an essential and inducing feature of the Purchase and Sale Agreement, survived the closing.**

The proposed rulings set forth in section II.1 above are not disputed. [Ex. 1 (Stipulation of Facts) at ¶10; Ex. 19 (Purchase and Sale Agreement); see also Requests for Findings of Fact at Fact # 27a-h, 28a-g, 38a-b]

2. **Georto fully performed its obligations under the Purchase and Sale Agreement, specifically including purchase of the Property from Gateman by payment of the total purchase price of $300,000 to Gateman pursuant to a closing on February 19, 2004.**

3

The proposed rulings set forth in section II.2 above are not disputed.  [Ex. 1 (Stipulation of Facts) at ¶15; Ex. 19 (Purchase and Sale Agreement); Ex. 29 (Closing Binder); Ex. 30 (Deed); see also Georto Requests for Findings of Fact at Fact # 27a-h, 38a-c]

**3.  Gateman breached his warranty that there were no non-acceptable environmental conditions on the Property, both as of the date of the Purchase and Sale Agreement (June 18, 2003) and as of the closing date (February 19, 2004).  More specifically, contrary to his warranty and representation, extensive amounts of solid waste, consisting of demolition debris resulting from the demolition of 100,000 square foot building that been destroyed by fire, had been dumped and buried on the Property in violation of M.G.L. c.111, §150A and 310 CMR 19.014, effectively creating a non-approved, illegal dump.  Such breach was material.**

The testimony of Steve McIntyre, Phil Morin, James Hawkins, Chad Michaud, Robert Stalker, and Scott Wetherbee, as well as the admissions of Gateman and the photographs taken by Mr. McIntyre, Mr. Hawkins, and Mr. Michaud, conclusively established that extensive amounts of demolition debris, consisting of wood, burnt wood, metal, ash, bricks, trash and other debris from a 100,000 square foot building that had been destroyed by fire, had been buried rather than removed prior to the sale of the Property to Georto.  [See Requests for Findings of Fact at Fact # 3d, 9e,f,l,n-s,x,y, 12a-i, 13a-g, 15a-p, 16a-g, 18a-i, 19a-e, 20a-d, 22a-e, 24a-l, 42a-s, , 43a-ll]  The buried debris included:

A.  the so-called "brick and concrete" from the entire building, which in reality was a mix of wood, ash, "excess" debris, and unprocessed brick and concrete (that may have included lead paint)  [See Requests for Findings of Fact at 3f, 9e,f,l,n-s,x,y, 24a-c,g-l, 42a-s, , 43a-ll];

B.  nearly 1,000 cubic yards of the debris that had initially been excavated from the debris ramp on the Family Dollar side of the Site but was then dumped on the side

4

later sold to Georto [see Requests for Findings of Fact at Fact # 18a-i, 19a-e, 20a-d]; and

C.    the entire portion of the debris ramp on the side sold to Georto, which portion was approximately the same size (i.e., approximately 1,100 cubic yards of debris) as the portion of the debris ramp that had been on the Family Dollar side [see Requests for Findings of Fact at Fact # 15a-p, 16a-g].

Stated otherwise, while there was some non-debris fill material (including the cover fill used to conceal what was buried below so as to make the Georto side look like the Family Dollar side, as well as some material mixed in with the debris), the vast majority of the approximately 4,000 cubic yards of material in the basement hole on the Property was demolition debris.

The undisputed testimony of Mr. Hawkins, Ms. McKinlay (the author of the GEC Phase I Report), and Gregory Wirsen (the solid waste expert) conclusively established that the warranty was an essential and inducing feature of the Purchase and Sale Agreement, that the demolition debris was a recognized environmental condition as that term is used in connection with Phase I environmental reports for use in due diligence in real estate transactions, that the demolition debris was solid waste that had been illegally dumped in violation of M.G.L. c.111, §150A and 310 CMR 19.014,[2] effectively creating a non-approved (illegal) dump, that the environmental

---

[2] 150A of Chapter 111 of the Massachusetts General Laws provides "no person shall depose or contract for the disposal of solid waste at any place which has not been approved by the department pursuant to the provisions of this section or other applicable law." Sec. 19.014 of 310 of the Code of Massachusetts Regulations provides in pertinent part: "(1) No person shall establish, construct, operate or maintain a dumping ground or operate or maintain a landfill in Massachusetts in such manner as to constitute an open dump. For the purpose of 310 CMR 19.014 the phrase 'establish, construct, operate or maintain' shall include without limitation, disposing or contracting for the disposal of refuse in a dumping ground or open dump. (2) No

condition was unacceptable not only because it was illegal but also because it was expensive to remedy, and that the breach was material in that the warranty was an essential and inducing feature of the Purchase and Sale Agreement and that the breach prevented Georto from building on the Property (both because the demolition debris was not suitable for construction and because it was a solid waste that was required to be removed even if there was no construction). [see Requests for Findings of Fact at Fact # 27a-h, 28-a-g, 30a-d, 38a, 42i, 43p,ee-ff, 44b-g, 47a-z, 50a-m]  Prozinski v. Northeast Real Estate Services, LLC, 59 Mass. App. 599, 608, 797 N.E.2d 415, 423 (2003) (A material breach of an agreement occurs when there is a breach of an essential and inducing feature of the contract.); Sparks v. Fidelity Nat. Title Ins. Co., 294 F.3d 259 (1st Cir. 2004) (Under Massachusetts law, a warrantee may bring a contact action for damages in the event of a breach of an express warranty.)

Gateman did not contest at trial that he had breached his warranty in the Purchase and Sale Agreement that there were no non-acceptable environmental conditions on the Property.  In fact, in the face of the evidence at trial, Gateman conceded that there was demolition debris on the Property that should have been removed rather than buried prior to the sale to Georto.  [See Requests for Findings of Fact at Fact # 24a-l]

**4.  As a result of Gateman's breach of warranty, Georto suffered damages in the amount of $249,171; consisting of Georto's cost to remove the demolition debris from the Property and replace with fill.**

Georto is entitled to recover damages sufficient to give it the benefit of its contractual bargain; i.e., indemnification by Gateman for the damages resulting from the "variation between what was promised and what actually came to pass."  Sparks v. Fidelity Nat. Title Ins. Co., 294

---

person shall dispose or contract for the disposal of solid waste at any place in Massachusetts which has not been approved by the Department pursuant to M.G.L. c. 111, §150A."

F.3d 259, 272 (1st Cir. 2004);  Productora E Importadora De Papel v. Fleming, 376 Mass. 826,

837–38, 383 N.E.2d 1129, 1136 (1978); White Spot Constr. Co. v. Jetspray Cooler, Inc., 344

Mass. 632, 635, 183 N.E.2d 719, 721–22 (1962); John Hetherington & Sons, Ltd. v. William

Firth Co., 210 Mass. 8, 95 N.E. 961 (1911);  Fernandes v. Union Bookbinding Co., 400 Mass.

27, 37–38, 507 N.E.2d 728, 734–35 (1987); Sackett v. St. Mary's Church Soc'y, 18

Mass.App.Ct. 186, 464 N.E.2d 956 (1984); John Hetherington & Sons, Ltd. v. William Firth Co.,

210 Mass. 8, 95 N.E. 961 (1911).

Gateman stipulated that Georto contracted to have the debris removed and replaced with

fill and that Georto paid $249,171 for the removal of the demolition debris / solid waste and

replacement with fill.  [Ex. 1 (Stipulations of Fact) at ¶¶17,18; see also Ex. 35 (Additional Work

Authorization); Ex. 36 (check); Requests for Findings of Fact at 44a-s, 46a-q, 48a-v].  Those

damages were caused by Gateman's breach of his warranty that there were no non-acceptable

environmental conditions on the Property in that the demolition debris / solid waste had been

dumped and buried on the Property and that removal and replacement were necessary in order to

give Georto the benefit of its contractual bargain (i.e., a property without any non-acceptable

environmental conditions).

Over 4,000 cubic yards of demolition debris mix materials were removed and disposed

by Thomas Mattuchio Construction, Inc., who was the lowest bid of the bids / proposals obtained

by PM Construction.  [See Requests for Findings of Fact at Fact # 46a-q, 48h-k]  As was noted

above, the vast majority of the material in the basement hole at the Property was demolition

debris.  Given that the materials were largely mixed, that there was no consistency in

stratification, that there was a limited amount of non-debris material, that the building had

included painted surfaces (likely including lead paint), and that any recycling in any event (i.e.,

7

even if the brick and concrete did not contain any paint or other treatments and if the Property

had been large enough to accommodate a screener and crusher) would have required hand

sorting and would have been extraordinarily expensive (more than simply disposing of the

materials), recycling and/or reuse was not a reasonable or viable option.  [See Requests for

Findings of Fact at Fact # 51a-t]


III.    **GEORTO'S BREACH OF CONTRACT CLAIM; TAX INDEMNIFICATION
        AGREEMENT**

Georto requests that the Court enter the following rulings with respect to Georto's claim[3]

that Gateman breached the tax indemnification agreement with Georto by failing to reimburse

Georto for its payment of property taxes owed by Gateman:


1.  **Gateman, as Trustee of the 200 Union Street Realty Trust, and Georto entered into a
    binding and enforceable Indemnification Agreement dated February 9, 2004, pursuant
    to which Gateman agreed to indemnify Georto for any unpaid real estate taxes due with
    respect to the Property which were not accounted for at the closing.  The
    Indemnification Agreement survived the closing.**

It is undisputed that Georto and Gateman entered into the tax Indemnification Agreement

as referenced above and that such agreement survived the closing.  [Ex. 27 (Indemnification

Agreement); see also Requests for Findings of Fact at Fact # 40a-e]

2.  **Georto fully performed under the Indemnification Agreement.**

It is undisputed that Georto paid the taxes due to the City of Lynn with respect to taxes

attributable to Gateman (as shown on City of Lynn tax bills) that were not accounted for at the

---

[3] As is reflected in Section 8 of the parties' Joint Pretrial Memorandum, "[b]y agreement of the
parties, Georto's claim against Gateman for breach of the tax indemnification agreement, which
arose after the filing of the Complaint and was the subject of correspondence with Gateman's
prior counsel (including production of documents by Georto), [was] heard at trial without the
necessity of amending the Complaint."

closing and that Georto caused Lender's counsel to issue a notice and demand to Gateman in

accordance with the Indemnification Agreement.  [Ex. 38 (Letter from Lender's counsel to

Gateman dated September 13, 2004); Ex. 43 (Documents provided to Lender's counsel,

including tax bill); Requests for Findings of Fact at Fact # 40a-e]

**3.  Gateman breached the Indemnification Agreement by failing to reimburse Georto for such taxes that were attributable to Gateman.**

It is undisputed that Gateman did not reimburse Georto for its payment of taxes that were

attributable to Gateman and in fact did not even respond to Georto, in any manner, to the notice

and demand issued to him.  [Requests for Findings of Fact at Fact # 40a-e].

**4.  Georto suffered damages in the amount of $1,190.00 as a result of Gateman's breach of the Indemnification Agreement.**

It is undisputed that Georto paid $1,190.00 in real estate taxes to the City of Lynn that

were attributable to Gateman but had not been accounted for at the closing and that Gateman

failed to reimburse Georto for such payment.  [Requests for Findings of Fact at Fact # 40a-e]

## IV.  GEORTO'S BREACH OF CONTRACT CLAIM; IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

In addition to the express terms of a contract, there is also an implied covenant of good

faith and fair dealing between the parties.  The implied covenant of good faith and fair dealing

"imposes on the parties the obligation, once they have exchanged mutual promises of

performance, to act in good faith to accomplish the purposes of their agreement." Sparks v.

Fidelity Nat. Title Ins. Co., 294 F.3d 259, 274 (1st Cir. 2004).  The covenant means that neither

party may do anything that will have the effect of destroying or injuring the right of the other

party to receive the fruits of the contract.  Georto is entitled to recover damages resulting from a

breach of that covenant by Gateman.  Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451,

471-74, 583 N.E.2d 806, 819-21 (1991) (citing <u>Drucher v. Roland Wm. Jutras Assocs.</u>, 370

Mass. 383, 385 348 N.E.2d 763, 765 (1976)); <u>Warner Ins. Co. v. Commissioner of Ins.</u>, 406

Mass. 354, 362 n. 9, 548 N.E.2d 188, 193 (1990); <u>Fortune v. National Cash Register Co.</u>, 373

Mass. 96, 105 346 N.E.2d 1251, 1257-58 (1977); and <u>Kerrigan v. Boston</u>, 361 Mass. 24, 33, 278

N.E.2d 387, 393-94 (1972).

Georto requests that the Court enter the following rulings with respect to Georto's claim

in Count Four of the Complaint that Gateman breached the implied covenant of good faith and

fair dealing:

1. **Gateman breached the implied covenant of good faith and fair dealing, and Georto was damaged in the amount of $250,361 (consisting of $249,171 for the cost of removing the demolition debris and replacing with fill and $1,190.00 for payment of taxes attributable to Gateman) as a result of such breaches.**

Gateman, after execution of the Purchase and Sale Agreement and the tax

indemnification agreement, acted to injure Georto's rights to enjoy the fruits of those contracts -

including the right to receive the Property free of any non-acceptable environmental conditions

so that Georto could construct its building, and the right to receive prompt reimbursement of its

payment of the real estate taxes.  As is set forth in more detail in those sections of this

memorandum addressing Georto's claims of fraud and violation of Chapter 93A:

- Gateman misrepresented to Georto that all demolition debris had been removed, properly disposed, and replaced with fill dirt by providing Georto (in June, 2003, <u>after</u> execution of the Purchase and Sale Agreement) with the GEC Phase I Report (expressly and repeatedly setting forth such misrepresentations of Gateman) for Georto's reliance in its due diligence;

- Gateman further misrepresented to Georto that all demolition debris had been removed from all of the property (including not only the site sold to Family Dollar but also the site later sold to Georto) by providing Georto (by fax on July 7, 2003 from Gateman's attorney, <u>after</u> execution of the Purchase and Sale Agreement) with a copy of the Gateman - Family Dollar purchase and sale agreement (setting forth Gateman's warranty that all debris had been removed);

- Gateman failed to disclose to Georto at any time that demolition debris had been buried on the Property rather than removed and failed to otherwise disclose his knowledge of exactly what materials had been buried on the Property even though Gateman knew: that the demolition debris had not been removed; that his representations set forth in the GEC Phase I report were false; that his warranty set forth in the Gateman-Family Dollar purchase and sale agreement was false; that Georto was using such representations in connection with its decision as to whether to purchase the Property; that the debris was not suitable for construction (such knowledge was based on his dealings with Family Dollar, which specifically informed Gateman that it could not build on such debris – including not only the ramp debris but also the brick and concrete); and that Georto was purchasing the Property in order to construct a building for use as an Aaron's store;

- Gateman failed to cause the removal of the demolition debris after its discovery by Georto or to reimburse Georto for such costs;

- Gateman, after Georto's discovery of the buried demolition debris, failed to disclose to Georto his knowledge regarding the buried demolition debris (when such

knowledge of the extent of the debris would have been helpful to Georto in estimating

costs and considering alternatives); and

- Gateman failed to reimburse Georto for its payment of the real estate taxes to the City

  of Lynn and in fact did not even respond, in any manner, to the notice and demand

  issued to him.

## V.    GEORTO'S FRAUDULENT MISREPRESENTATION CLAIM

The elements of common law fraud under Massachusetts law are that the defendant made

a false representation of a material fact with knowledge of its falsity for the purpose of inducing

the plaintiff to act thereon and that the plaintiff reasonably relied upon the representation as true

and acted upon it to his damage.  Eureka Broadband Corp. v. Wentworth Leasing Corp.  400

F.3d 62, 68 (1st Cir. 2005); Kenda Corp., Inc. v. Pot O'Gold Money Leagues, Inc., 329 F.3d 216,

225 (1st Cir. 2003).  The defendant is liable if he made a false statement of fact, knowing it to be

false.  Likewise, if the defendant made an unqualified statement about facts, the truth or falsity of

which the defendant could have determined with certainty, and gave the plaintiff the reasonable

impression that he was speaking of his own knowledge, then the defendant is not excused from

liability if he did not in fact know whether that statement was true or false.  The law regards such

willful disregard of the facts as equivalent to an intentional misrepresentation.  Actual intent to

deceive need not be proven.  Kozdras v. Land/Vest Properties, Inc., 382 Mass. 34, 43, 413

N.E.2d 1105, 1111 (1980) ("if statement of fact is susceptible to actual knowledge but is made

by one's own knowledge and is false, it may still be the basis for a deceit action without proof of

actual intent to deceive"); Snyder v. Sperry & Hutchinson Co., 368 Mass. 433, 444, 333 N.E.2d

421, 427 (1975); Powell v. Rasmussen, 355 Mass. 117, 118–19, 243 N.E.2d 167, 168 (1969);

Pietrazak v. McDermott, 341 Mass. 107, 110, 167 N.E.2d 166, 168 (1960); Chatham Furnace

Co. v. Moffatt, 147 Mass. 403, 404, 18 N.E. 168, 169 (1888).

     The plaintiff is not required to investigate the truth of assertions that are made to it.  The

recipient of a fraudulent misrepresentation of fact is ordinarily justified in relying on its truth,

although it might have ascertained the falsity of the representation had it made an investigation.

Yorke v. Taylor, 332 Mass. 368, 372–73, 124 N.E.2d 912, 915–16 (1955).  If the defendant's

representations were such as to induce the plaintiff not to undertake an independent examination

of the pertinent facts, lulling it into placing confidence in the defendant's assurances, then the

plaintiff's failure to ascertain the truth through investigation does not preclude recovery. This is

so even though the defendant's representations were not consciously false.  Snyder v. Sperry &

Hutchinson Co., 368 Mass. 433, 446, 333 N.E.2d 421, 429 (1975).

     Where there has been an intentional or reckless misrepresentation, the plaintiff may

recover the benefit of what it was promised by the defendant. Rice v. Price, 340 Mass. 502, 506–

07, 164 N.E.2d 891, 893–94 (1960); see Morris v. Hutchins, 102 Mass. 439, 440 (1869).

Restatement (Second) of Torts, § 549.   The plaintiff should be awarded a sufficient amount of

money to put it in the position that it would have been in if the situation had been as represented

by the defendant.

     Georto requests that the Court enter the following rulings with respect to Georto's fraud

claim in Count Two of the Complaint:

**1.  Gateman (individually and as Trustee of the 200 Union Street Realty Trust) made false
statements to Georto that all demolition debris had been removed from the Property,
that all demolition debris had been properly disposed of, that the Property had been
filled to grade with fill dirt, and that there were no non-acceptable environmental
conditions on the Property.   Those statements concerned facts that a reasonable person
would consider important to Georto's decision whether to purchase the Property.**

13

**Gateman's conduct in concealing the debris and failing to disclose his knowledge regarding the debris also constituted actionable fraudulent representations.**

A false or misleading assertion of fact concerning a material aspect of the matter in question is an actionable misrepresentation.  Aquino v. Pacesetter Adjustment Co., 416 F.Supp.2d 181, 194 (D.Mass. 2005); In Re Lupron Marketing and Sales Practices Litigation, 295 F.Supp.2d 148, 164 (D.Mass. 2003); Twin Fires Inv. , LLC v. Morgan Stanley Dean Witter & Co., 837 N.E.2d 1121, 445 Mass. 411, 423 (2005); and Kannavos v. Annino, 356 Mass. 42, 48, 247 N.E.2d 708, 711–12 (1969) (The defendant can be held responsible not only for outright untrue statements, but also for giving misleading partial information or for telling half-truths.) Materiality depends upon whether a reasonable person would attach importance to the fact in his or her choice of action in the transaction in questions.  St. Paul Fire and Marine Ins. Co. v. Ellis & Ellis, 262 F.3d 53, 61 ( 1st Cir. 2001);  Zimmerman v. Kent, 31 Mass. App. Ct. 72, 78, 575 N.E.2d 70, 74 (1991);  and Restatement (Second) of Torts, § 538 (2)(a) (1977).

The uncontroverted evidence at trial conclusively demonstrated that Gateman, by entering into the Purchase and Sale Agreement and by providing Georto with the GEC Phase I Report in June, 2003 after execution of the Purchase and Sale Agreement and long after the demolition and site work was completed, represented in writing to Georto that all demolition debris had been removed from the Property and properly disposed offsite, that the Property had been filled to grade with fill dirt, and that there were no non-acceptable environmental conditions on the Property.  It should also be noted that it was uncontroverted that the statements in the Phase I Report were based on Gateman's express statements to the author of that report, Lauren

McKinlay, on May 2, 2002 that <u>all</u> demolition debris (including the "brick and concrete" as well as all other debris) had been or would be removed.[4]

The uncontroverted evidence also conclusively demonstrated that such representations were material to Georto's decision to purchase the Property and were outright false.  [See Requests for Findings of Fact at Fact # 32a-m, 34a-e, 35a-f, 36a-j, 37a-b, 38a; and 3d, 9e,f,l,n-s,x,y, 12a-i, 13a-g, 15a-p, 16a-g, 18a-i, 19a-e, 20a-d, 22a-e, 24a-l, 42a-s, , 43a-ll]  Contrary to

---

[4]  Gateman provided to Georto a comprehensive written Phase I Environmental Report which stated as follows:

> "Based on conversations with Mr. Gateman, all demolition debris has been or will be hauled offsite by Roberts Demolition and Recycling. Currently all former basement areas are being filled to grade."  [Ex. 20, p. 4].

> "Based on conversations with Mr. Gateman during the demolition of the site building, asbestos abatement activities were conducted.  Mr. Gateman stated that all building materials containing asbestos were removed from the site and disposed of offsite.  Additionally, all demolition debris was hauled offsite or was in the process of being hauled offsite for proper disposal.  The site is currently undergoing filling activities to fill in the site's building former basement areas."  [Ex. 20, p. 10].

> "The former building has been demolished and removed from the site." [Ex. 20, p. 16].

> "The building formerly located at the site has been demolished and disposed of offsite."  [Ex. 20, p. 17].

> "Currently the only solid waste located onsite is demolition debris from the former site building.  Demolition debris is currently segregated by type (i.e. wood, metal) into piles located on site."  [Ex. 20, p. 20].

> "All demolition debris is in the process of being removed from the site by Roberts dismantling and recycling."  [Ex. 20, p. 20].

> "The site is currently undergoing filling and regarding.  Roberts' dismantling and recycling is currently transporting fill dirt onto the site to fill the former basement areas to even out the grade of the site."  [Ex. 20, p. 20].

> "Piles of solid waste (demolition debris) were observed throughout the site. Based on conversations with Mr. Gateman, observed piles are scheduled to be removed and properly disposed offsite by Roberts dismantling and recycling." [Ex. 20, p. 24].

Gateman's written representations and as was expressly admitted by Gateman in his testimony at

trial, extensive amounts of demolition debris, consisting of wood, burnt wood, metal, ash, bricks,

trash and other debris from the 100,000 square foot building that had been destroyed by fire, had

been buried rather than removed and replaced with fill dirt prior to the sale of the Property to

Georto. [See Requests for Findings of Fact at Fact # 3d, 9e,f,l,n-s,x,y, 12a-i, 13a-g, 15a-p, 16a-g,

18a-i, 19a-e, 20a-d, 22a-e, 24a-l, 42a-s, , 43a-ll]  The extent of that debris and Gateman's

knowledge thereof at the time that he made the misrepresentations are addressed in more detail

below.

Gateman combined such misrepresentations with his conduct in covering the debris with

glacial till fill material so as make the Property appear as if all debris had been removed and

replaced with fill dirt.  Stated otherwise, Gateman actively undertook to conceal the debris and

make the Property look like a suitable building site.  As Gateman admitted at trial, after the

debris was dumped on the Property, he and Scott Wetherbee covered the debris (including not

only the debris ramp knowingly left on the Property but also the additional debris intentionally

dumped on the Property) with glacial till and graded and compacted it so that the debris was

concealed and the Property was indistinguishable in appearance from the parcel sold to Family

Dollar (which such property did not contain any debris because Family Dollar, which had

engineers on the Site monitoring Gateman's site work and therefore had access prior to

purchasing the property of photos of the debris ramp, had caught Gateman attempting to conceal

the debris and required him to remove it).  [See Requests for Findings of Fact at Fact # 14a-g,

15a-p,, 16a-g, 18a-i, 19a-e, 22a-e]  Gateman's conduct in burying and concealing the debris,

combined with his statements, were calculated to mislead and constituted intentional

misrepresentations. Vmark Software, Inc. v. EMC Corp., 37 Mass.App.Ct. 610, 617–18, 642

16

N.E.2d 587, 593 (1994); and Zimmerman v. Kent, 31 Mass.App.Ct. 72, 79–82, 575 N.E.2d 70,

75–77 (1991).

Having made such representations to Georto regarding the subject matter of the

demolition debris and the composition of the materials put into the basement hole, Gateman was

under a duty to speak honestly and to divulge all material facts of which he knew bearing upon

that subject matter. Kannavos v. Annino, 356 Mass. at 48, 247 N.E.2d at 711–12. Gateman was

obligated to disclose his knowledge regarding what materials were buried on the Property -

including not only the debris that was intentionally dumped onto the Property after demolition of

the building (debris that Gateman called "fill dirt") but also the existence of the debris ramp.

Gateman chose not to do so but instead represented in writing that all debris had been removed

and replaced with fill dirt. [See Requests for Findings of Fact at Fact # 41a-e, 32a-m]. Such

failure to disclose constituted an actionable intentional misrepresentation. In re Tri-Star

Technologies Co., Inc., 257 B.R. 629, 638 (Bankr. D.Mass. 2001) (silence can establish deceit

claim where the defendant fails to disclose information that he is bound to reveal); and Stolzoff

v. Waste Systems Intern., Inc., 792 N.E.2d 1031, 1044, 58 Mass. App. 747, 763 (Mass. App.

2003) (nondisclosure of fact is actionable as fraud where there is a duty to disclose).

The existence of such buried debris clearly was material to Georto's decision as to

whether to purchase the Property, not only because such debris was not suitable for construction

of a building but also because such debris made the Property an illegal dump and had to be

removed in any event. [See Requests for Findings of Fact at Fact # 47a-z, 50a-m] In fact,

Gateman stipulated that the Phase I Report set forth material representations regarding the

Property. [Ex. 1 (Stipulated Facts) at ¶11]

**2.  When Gateman made such statements, he knew the statements were false.  [In the alternative: Gateman recklessly made such statements by willfully disregarding their truth or falsity.]**

In an action for intentional misrepresentation, the plaintiff must show that the defendant made the false representation either knowing that the statement was false or with reckless disregard for the truth of the statement.  Damon v. Sun Co., Inc., 87 F.3d 1467, 1485(1st Cir., 1996) (party making misrepresentation need not know that the statement is false in order to be liable for fraud if the fact represented is susceptible of actual knowledge); Vision Graphics, Inc. v. E.I. Du Pont de Nemours & Co., 41 F.Supp. 2d 93, 100 (D.Mass. 1999);  Transitron Electronic Corp. v. Hughes Aircraft Co., 649 F.2d 871, 875 (1st Cir. 1981) (fraud embraces a material representation in which the maker had no basis for the belief as well as that which the maker knows to be false. )  All that must be established to prove the defendant's knowledge of the falsity of the representation is that the representation was false and was susceptible of actual knowledge; no greater showing of intent is required.  Roadmaster Industries, Inc. v. Columbia Mgf. Co., Inc. 893 F.Supp. 1162, 1176 (D.Mass. 1995).

The uncontroverted evidence demonstrated not only that the falsity of Gateman's representations was susceptible of Gateman's actual knowledge but also that he knew that the statements were false.  Gateman, having been on the Site on a daily basis and having actually worked on the site to cover the debris ramp and other debris (including not only "brick and concrete" but also what he, incredibly, characterized as "fill dirt" – wood and ash and other "excess debris") with glacial till, unquestionably knew that not all of the demolition debris had been removed and disposed off site.   [See Requests for Findings of Fact at Fact #10a-h, 11a-h, 12a-i, 13a-g, 15a-p, 16a-g, 17a-o, 18a-i, 19a-e, 20a-d, 22a-e, 23a-p, 24a-l]  In fact, Gateman admitted at trial that he knew at the time of the sale to Georto exactly what materials had been

put on the Property.  [See Requests for Findings of Fact at  Fact # 23a-p]  Such knowledge included not only knowledge that the wood, ash, brick, concrete and other debris were dumped on the Property (per Mr. Gateman's directions) before Roberts first left the Site but also included knowledge that most of the debris from the debris ramp excavated from the Family Dollar portion of the Site was dumped onto the side later sold to Georto.  [See Requests for Findings of Fact at Fact # 9a-z, 17a-o, 18a-i, 19a-e, 20a-d]

Gateman also unquestionably knew at the time of the sale to Georto that the portion of the debris ramp that extended onto the side of the Site later sold to Georto had not been excavated. [See Requests for Findings of Fact at Fact # 15a-p, 16a-g]  Gateman was not only at the Site on a daily basis during that time but actually was present at the time that the line was established to identify the areas which would and would not be excavated by Wetherbee (who was in any event acting at Gateman's request and direction).  Gateman never asked Wetherbee to remove any portion of the ramp on the side later sold to Georto.  Accordingly, even if one were to credit Gateman's conflicting testimony that he wasn't on the Site each day during the excavation of the debris ramp, Gateman had absolutely no basis to believe that such portion was somehow excavated (let alone removed from the Site).

Gateman went to great lengths to try to disclaim his knowledge regarding the debris ramp and/or to blame Roberts for the debris ramp, alternatively testifying that: the debris ramp "must have" been created by Roberts (even though he had admitted that the ramp had actually been created by Turner Demolition); he didn't know that there was any ramp at all (when initially questioned about his role in compacting fill over the ramp); he didn't know that the debris ramp had ever extended onto the Georto side (notwithstanding the photographs clearly showing the debris ramp extending substantially onto that portion of the Site later sold to Georto); and he

"assumed" that someone (Wethebee? Roberts?) had excavated the debris ramp from the side

later sold to Georto.  [See Requested Findings of Fact at Fact # 52a-f]  Mr. Gateman's efforts to

disclaim his knowledge were not only self-contradictory but were conclusively contradicted by

the photographs taken by the Family Dollar engineer (showing the extent and location of the

debris ramp), the testimony of his own contractor – Scott Wetherbee – who grudgingly admitted

that Gateman was on the site each day throughout the excavation of the debris ramp, and

Gateman's own admission that he knew of the existence of the ramp at the time fill was

delivered to cover the ramp (which such fill was delivered at his direction).    [See Requests for

Findings of Fact at Fact # 12a-i, 16a-g, 17a-o, 20a-d]  Gateman's various versions of the events

and of his knowledge changed over time so as to address the evidence with which he was then

being confronted (i.e., the production of the photos taken by the Family Dollar engineers clearly

showing the extent of the debris ramp) and to suit his litigation claims (i.e., to blame Roberts for

the debris ramp).  Such after-the-fact efforts by Gateman to deny the undeniable demonstrate his

lack of credibility and reinforce his culpability for knowing misrepresentations.

　　　　Such efforts, even if credible, would in any event be of no consequence, as Gateman's

misrepresentations were susceptible of his actual knowledge.  A misrepresentation is actionable

as fraud if accurate facts were available to the defendant "through a modicum of diligence" even

if the plaintiff does not prove that the defendant actually knew the statements to be false.

Zimerman v. Kent, 575 N.E.2d 70, 31 Mass. App. 72, 77 (1991) (purchaser of septic system was

not required to prove that the vendor knew the statements to be false where the vendor took it

upon herself to present detailed measurements and cost figures);  Acushnet Federal Credit Union

v. Roderick, 530 N.E.2d 1243, 26 Mass. App. 604 (1988).

The District Court's ruling in <u>Roadmaster Industries, Inc. v. Columbia Mgf. Co., Inc.</u> 893 F.Supp. 1162 (D.Mass. 1995) is instructive.  In that action, the Court ruled that the purchaser under a stock purchase agreement established that the seller made intentional misrepresentations regarding soil and groundwater where the misrepresentations were susceptible of the seller's actual knowledge even though the government entities did not determine that environmental laws had been violated until after the purchase agreement was signed.  <u>Id</u>. at 1165.  As the Court reasoned, the facts that were misrepresented were discoverable by the seller prior to signing the agreement.  <u>Id</u>. at 1177.  Similarly, even if Gateman had not been on site on a daily basis, even if he had not actively participated in concealing the debris (i.e., if, for example, he had been an absentee owner without any knowledge of what was or was not dumped on the Property), and even if one were to somehow credit his incredible / non-credible assertion that the debris was actually "fill dirt" when in fact any laymen upon visual inspection would know otherwise, the facts regarding the dumping of the debris as well as the facts that such material was demolition debris and not "fill dirt" were available to him through a "modicum of diligence."  Gateman had no basis, under any circumstances, to represent that all of the demolition debris had been removed, disposed offsite, and replaced with fill dirt.

**3.  Gateman made the false statements with the intention that Georto would rely on those statements in making its decision to purchase the Property.**

It is undisputed that Gateman provided the Phase I Report to Georto and warranted that there were no non-acceptable environmental conditions on the Property with the intention that Georto would rely upon such statements in connection with its decision as to whether or not it would purchase the Property.  [See Requests for Findings of Fact at Fact # 28a-g, 29a-e]  In fact, Gateman not only warranted in the Purchase and Sale Agreement that there were no non-

21

acceptable environmental conditions as of the date of that agreement and as of the date of the closing but also was obligated under the Purchase and Sale Agreement to furnish and certify the Phase I Report to Georto in connection with Georto's due diligence regarding the Property. Section 8 of the Purchase and Sale Agreement expressly provided that Georto was not obligated to purchase the Property if the results of that Phase I Report (as well as other contingencies) were not satisfactory to Georto in all respects.  [Ex. 19 at Section 8]

**4.  In making its decision, Georto did in fact rely on Gateman's statements as true, and that its reliance was reasonable under the circumstances; and**

It is also uncontroverted that Georto did in fact rely upon Gateman's statements as true. As Mr. Hawkins and Mr. Morin testified, they relied on the statements in the Phase I Report that all demolition debris had been removed in connection with the decision to go forward with the purchase of the Property.  [See Requests for Findings of Fact at Fact # 32a-m, 34a-e, 35a-f, 36-aj, 37a-b, 38a-h]  Those statements were relied upon in determining that the expected costs of construction, when combined with the $300,000 purchase price for the Property, were below the $1,000,000 total costs that Georto was willing to pay in accordance with Mr. Hawkins financial analysis regarding the potential purchase.  On the basis of that determination, Georto went forward with the purchase of the Property, entered in the loan agreements with Key Bank, obtained franchisor approval, committed to purchase the prefabricated building, and entered into the construction contract with PM Construction.   Had Georto been informed that debris had not been removed and disposed off site, it would not have purchased the Property and entered into the related commitments.  [See Requests for Findings of Fact at Fact # 26j, 34b, 36j, 38d, 41e]  Not surprisingly, Georto also relied upon those statements in connection with the scope of its investigation of the Property.  As Mr. Morin of PM Construction (a reputable general contractor

22

that has served as general contractor for many well known companies, such as Shaws Supermarket, Hannaford Food and Drug, Walgreens, and CVS) testified, had the Phase I Report indicated that demolition debris had not been removed and disposed offsite, it would have set off "red flags" so as to cause additional investigation of the Property.  [See Requests for Findings of Fact at Fact #42b, 35f, 36f]

Georto's reliance was reasonable.  First and foremost, the representations were set forth in the Phase I Report that Gateman provided to Georto for its use as part of its due diligence regarding the Property.  Stated otherwise, Georto did exactly what Gateman intended that Georto would do – use the Phase I Report and Gateman's statements set forth therein to determine whether it would or would not purchase the Property.  Second, Gateman caused Goldman Environmental (the firm that authored the Phase 1 Report) to issue a reliance letter to Georto that expressly stated that Georto could rely upon the report in connection with its due diligence and financing for the purchase of the Property as if the Report had been prepared for Georto.  [See Requests for Findings of Fact at Fact # 34d-e]  Third, the representations were set forth in a comprehensive and detailed Phase I report prepared by an environmental consulting firm, which expressly noted that such statements were based on representations made by Gateman, the site owner, during an interview at the site at the time of the demolition / filling work.  Fourth, the representations were consistent not only with the appearance of the Property (described by Mr. Hawkins as a flat piece of dirt) but also with the reasonable expectation that demolition debris / solid waste had not been dumped so as to make the Property an illegal dump.  [See Requests for Findings of Fact at Fact # 22b-c,e, 25f-g, 26e]  Finally, there was no other indication that the representations were false.  For example, while Georto caused Goldman Environmental to conduct an additional site investigation for the purpose of determining current conditions at the

23

Site relative to several former above and underground storage tanks, that report unfortunately did not reveal the existence of the buried debris (noting that the materials put into the basement were not tested and in fact stating that such materials were urban fill).

**5.  Georto suffered damages as a result of relying on Gateman's false statements.**

Georto's damages resulting from its reliance on Gateman's false statements are addressed in Section II.4 above.

**VI.    GEORTO'S NEGLIGENT MISREPRESENTATION CLAIM**

Under Massachusetts law, to recover for negligent misrepresentation, a plaintiff must show that the defendant in the course of its business supplied false information for the guidance of others in their business transactions, causing and resulting pecuniary loss to those others by their justified reliance upon the information, and that the defendant failed to exercise reasonable care or competence in obtaining or communicating the information.  Restatement (Second) of Torts §552(1); Cummings v. HPG Intern., Inc., 244 F.3d 16, 24 (1st Cir. 2001).  The court simply asks whether the speaker was negligent in failing to discover the falsity of his or her statements. Id.   The claim shares the elements as intentional misrepresentation claim except that the defendant need only act negligently.  Berenson v. National Financial Services, LLC, 403 F.Supp.2d 133, 147 (D.Mass. 2005).  Liability for negligent misrepresentation does not require a showing that the defendant even knew that the statements made were false or that the defendant actually intended to deceive the plaintiff.  Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 59, 809 N.E.d2d 1017, 1030 (Mass. 2004).  In considering whether the defendant acted negligently in supplying information for the use of others in a commercial transaction, the finder

of fact should consider the use to which the defendant expected the information would be put,

weighed against the magnitude and probability of loss that might have occurred if that

information proved to be incorrect.  Nycal Corp. v. KPMG Peat Marwick LLP, 426 Mass. at

497–98, 688 N.E.2d at 1372 (1998); Restatement (Second) of Torts § 552, cmt. a (1977).

Georto, in the alternative and without prejudice to its requests concerning its fraud claim,

requests that the Court enter the following ruling with respect to Georto's negligent

misrepresentation claim (Count Three of the Complaint):

1.  **Gateman (individually and as Trustee of the 200 Union Street Realty Trust) made false statements to Georto concerning facts that a reasonable person would consider important to Georto's decisions.**

2.  **When Gateman made the statements, he negligently failed to determine whether such statements were true or false in that he made statements about important facts without using the amount of care a reasonable person would use in those circumstances to see that what he said was true;**

3.  **Gateman made the false statements with the intention that Georto would rely on those statements and thus pay the $300,000 purchase price;**

4.  **In making its decisions, Georto did in fact rely on Gateman's statements as true, and Georto's reliance was reasonable; and**

5.  **Georto suffered financial loss in the amount of $249,171 as a result of relying on Gateman's false statements.**

Georto incorporates by reference Section V above and its Requests for Findings of Fact.

As is noted above, the evidence conclusively demonstrates that Gateman is liable for intentional

misrepresentation.  Without waiver or prejudice to such claim, Georto states that the evidence

conclusively demonstrates, at a minimum, that Gateman failed to use the amount of care that a

reasonable person would in making statements about whether debris had or had not been

removed from the Property.

25

## VII.    GEORTO'S CHAPTER 93A CLAIM

Pursuant to Section 11 of Chapter 93A of the Massachusetts General Laws, any person who engages in the conduct of any trade or commerce and who suffers any loss of money or property as a result of the use or employment by another person who engages in any trade or commerce of any unfair or captive act or practice as referenced in Section 2 shall recover actual damages and reasonable attorneys' fees and costs incurred in said action.  M.G.L. c.93A, §11. Moreover, if the act or practice was either a willful or knowing violation of Section 2, then the Court shall award up to three but no less than two times such actual damages.  Id.

A "deceptive" act or practice is simply one that has the capacity to deceive.  An act or practice is deceptive if it could reasonably cause a person to act differently from the way he would act if he knew the truth about the matter.  940 C.M.R. §3.16(2); Sargent v. Koulisas, 29 Mass. App. Ct. 956, 958, 560 N.E. 2d 569, 571 (1990) (citing Mongeau v. Boutelle, 10 Mass. App. Ct. 246, 248, 407 N.E.2d 352, 355 (1980)).  It includes any communication made with the intent to deceive another person.  However, intent to deceive is not necessary.  Maillet v. ATF-Davidson Co., 407 Mass. 185, 193, 552 N.E.2d 95, 100 (1990).  A negligent or careless misrepresentation of fact, the truth of which was reasonably capable of ascertainment, may also be a deceptive act or practice.  Maillet v. ATF-Davidson Co., 407 Mass. 185, 193, 552 N.E.2d 95, 100 (1990).

The test of whether an act or practice is "unfair" is generally held to be whether it

1.  falls "'within, at least, the penumbra of some common-law, statutory, or other established concept of unfairness'";
2.  "'is immoral, unethical, oppressive or unscrupulous'"; or

26

3.   "'causes substantial injury [to] competitors or other businesspersons.'"

Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. 760, 778, 489 N.E.2d 185, 196

(1986) (quoting PMP Assocs., Inc. v. Globe Newspaper Co., 366 Mass. 593, 596, 321 N.E.2d

915, 917 (1975)).

A material misrepresentation falls within an established basis of unfairness. As with all

individuals, sophisticated businesspersons must deal with each other honestly; a businessperson

may not induce another to act by material misrepresentation.   VMark Software, Inc. v. EMC

Corp., 37 Mass. App. Ct. 610, 619 n. 11, 642 N.E.2d 587, 594 (1994).

Nondisclosure of a material fact, the disclosure of which may have influenced Georto not

to enter into the transaction, is a violation of G.L. c. 93A. Winter Panel Corp. v. Reichhold

Chemicals, Inc., 823 F.Supp. 963, 975 (D. Mass. 1993) (knowing nondisclosure of information

necessary to make affirmative statements complete or nonmisleading gives rise to liability for

violation of Chapter 93A as well for misrepresentation).  Chapter 93A contains a general duty of

disclosure as defined in 940 C.M.R. §§ 3.05, 3.16(2).  Knowledge turns on the defendant's state

of mind at the time of the transaction.  Underwood v. Risman, 414 Mass. 96, 100, 605 N.E.2d

832, 835 (1993).

A defendant's unfair or deceptive statements were willful if he represented a fact to be

true without knowing whether it is true or not and with reckless disregard for whether it is true or

not.  Computer Systems Engineering , Inc. v. Qantel Corp., 740 F.2d 49, 66 (1st Cir. 1984)

(misrepresentation made with reckless disregard for its truth or falsity in connection with

distributorship agreement constituted a willing or knowing violation of Chapter 93A entitling

plaintiff to an award of multiple damages); Anthony's Pier Four, Inc. v. HBC Assocs, 411 Mass.

451, 475, 583 N.E.2d 806, 821 (1991) (defendant's knowing use of a pretext to coerce plaintiff

into paying defendant more than contract required established willfulness as matter of law);

Alcan Aluminum Corp. v. Carlton Aluminum of New England, Inc., 35 Mass. App. Ct. 161, 169,

617 N.E.2d 1005, 1010-11 (1993) (manufacturer's continued marketing of a product that it had

good reason to know was defective constituted willful violation of Chapter 93A); Montanez v.

Bagg, 24 Mass. App. Ct. 954, 510 N.E.2d 298 (1987) (where landlord rents apartment aware of

conditions that render it inhabitable, willful misrepresentation occurs regardless of whether

landlord knew that conditions amounted to legal violations).  A defendant's unfair or deceptive

statements were knowing if he represented a fact to be true while knowing that it was not true.

Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. 760, 779-80, 489 N.E.2d 185, 197-

98 (1986) (Court concluded that principal's intentional misrepresentation regarding the wrongful

retention and use of circulation list established knowing violation of Chapter 93A); Patry v.

Liberty Mobilhome Sales, Inc., 15 Mass. App. Ct. 701, 705-06, 448 N.E.2d 405, 408 (1983)

(defendant committed a willful and knowing violation of G.L. c. 93A by deliberately concealing

from plaintiff that leased lot on which plaintiff proposed to install mobile home had not been

approved for such purpose and that defendant encountered difficultly in getting necessary

approvals).

Georto requests that the Court enter the following rulings with respect to Georto's claim

that Gateman violated Chapter 93A (Count Five of the Complaint):

1.     **Georto and Gateman, individually and as Trustee of the 200 Union Street Realty Trust, engaged in trade or commerce within the meaning of Chapter 93A of the Massachusetts General Laws.**

2.     **Gateman, individually and as Trustee of the 200 Union Street Realty Trust, engaged in unfair and deceptive acts and practices in violation of Sections 2 and 11 of Chapter 93A, M.G.L. c.93A, §§2, 11.**

28

3.     **Georto shall recover $249,171 in actual damages resulting from Gateman's unfair and deceptive acts and practices and reasonable attorney's fees and costs incurred in this action.**

4.     **Said damages shall be trebled, as Gateman willfully and knowingly engaged in such unfair and deceptive acts and practices.**

Georto incorporates by reference Sections II.4, V, and VI above, as well Georto's Requests for Findings of Fact.  Georto further states as follows:

It is undisputed that both Georto and Gateman were engaged in trade or commerce as that term is used in Chapter 93A in that both were engaged in commercial activities for profit and engaged in a business transaction with each other.  [See Requests for Findings of Fact at Fact # 1a-d, 2a-c, 3a-h, 4a-d; 27a-h]  Similarly, Gateman does not contest that the transactions and actions took place primarily and substantially within the Commonwealth.

As is noted in Section V above, the evidence conclusively demonstrated that Gateman intentionally misrepresented that all demolition debris had been removed and disposed off site so as to induce Georto to go forward with the purchase of the Property.  Gateman was on site on a daily basis and unquestionably knew – and in fact admitted that he knew - at the time of the sale of the Property to Gateman exactly what materials had been buried on the Property but nonetheless not only failed to disclose such information to Georto but instead provided written representations - stating that all of the debris had been removed - for Georto's use in connection with Georto's decision as to whether it would purchase the Property.  Significantly, at the time that he signed the Purchase and Sale Agreement with Georto, Gateman knew that Family Dollar, in accordance with Gateman's warranty to Family Dollar, had required him to remove the debris (from the property ultimately purchased by it) that he had first attempted to bury and conceal.  Gateman's conduct was both deceptive and unfair in violation of Chapter 93A.  Moreover,

Gateman would be liable under Chapter 93A even if he had somehow been totally unaware of what materials were dumped on the Property, as the truth of his representations would have been reasonably (and in fact easily) capable of ascertainment by Gateman as the owner of the Site and the party who was responsible for requesting and directing the site work.

The evidence similarly demonstrated that Gateman's deceptive and unfair conduct was willful and knowing. Most significantly, as of the time that he signed the Purchase and Sale Agreement and sent the Phase I Report to Georto for its use in due diligence, Gateman had already been caught by Family Dollar attempting to conceal demolition debris. More specifically, Gateman knowingly directed the delivery of fill onto the debris ramp (Gateman admitted that he knew that the ramp had been made from debris from the building and not from any material delivered from off site) and then worked with Mr. Wetherbee to compact such glacial till over the ramp. Gateman did so even though he had previously warranted to Family Dollar that he had removed all of the debris. But for Family Dollar's onsite presence pursuant which they knew of the existence of the ramp (as reflected in their engineer's photographs), they would have purchased their property and either faced the same problem as Georto or actually constructed a building on the debris and encountered massive structural problems.

Moreover, Gateman admitted that Family Dollar informed him that it could not build on top of any of that debris (including not only the debris ramp but also brick and concrete). Thus, as of the time of his dealings with Georto, Gateman knew that the existence of the debris would prevent construction. Notwithstanding that knowledge and his experience in being caught by Family Dollar, Gateman decided to engage in the very same acts of deception with Georto – once again in direct contravention of his contractual warranties and representations.

30

As of the time of his dealings with Georto, Gateman not only knew exactly what had been dumped on the Property (as he was not only on site on a daily basis but actually directed and worked alongside Scott Wetherbee to cover such debris with glacial till) but also knew that the debris ramp had not been removed from the side he sold to Georto.  Gateman's struggles to explain away the ramp were belied by the photographs, the testimony of the other witnesses (including Robert Stalker, who testified that Gateman directed Roberts to leave such debris at the Site, and Scott Wetherbee, who confirmed that Gateman was on the site each day during the excavation of the debris from the Family Dollar portion of the debris ramp), and Gateman's own admissions (including his admission that he never directed Wetherbee to excavate any portion of the debris ramp from the Georto side).   In any event, as a result of being onsite when Roberts first began work in March, 2002 and while the Family Dollar portion of the debris ramp was subsequently excavated (but generally not removed from the Site), Gateman observed and therefore knew the nature and magnitude of the debris contained in the portion of the debris ramp that he let remain on the side later sold to Georto.

Gateman's state of mind as to his dealings with Georto, including not only his intentional misrepresentations but also his willful disregard of his express and implied contractual obligations to Georto, are further illustrated not only by his initial willful disregarding of his contractual obligations to Family Dollar but also by his willful disregard of multiple orders from the City of Lynn to remove debris in the interest of the health and safety of others.  As of the time of his dealings with Georto, Gateman had not only been caught by Family Dollar but had already ignored orders from the City of Lynn.  Those orders specifically required that he immediately complete the demolition of the building and fill the basement hole with clean sanitary fill.  Notwithstanding that he had received such an order dated August 31, 2001 (which

31

such order threatened him with a penalty of $1,000 per day), Gateman ignored the order for over

six months and acted only after he received a further order dated March 4, 2002.  It should also

be noted that, regardless of his excuse (Gateman claimed a lack of funds) for ignoring the first

order, his failure to act left the property in such a condition that it was a health and safety hazard

– including not only the presence of hazardous waste exposed to the air but also failing to secure

the site.  Stated otherwise, Gateman imperiled the health and safety of others for financial

reasons.  In fact, when questioned why he ultimately did proceed with the demolition, he

explained that his expectation of selling a portion of the property to Family Dollar gave him a

purpose to proceed  (i.e., financial benefit to himself).  Apparently the City of Lynn orders and

the health and safety concerns referenced therein were not purpose enough for him to act.

     Gateman's deceptive conduct was further evidenced by his deceitful testimony, both

during depositions and answers to interrogatories (as read at trial) and during his trial testimony.

As is referenced in more detail in the Requests for Findings of Fact, Gateman repeatedly

contradicted not only his own testimony (as he sought to change his story to suit his purpose at

the time, such as his various versions regarding the creation of the debris ramp, including

changing his recollection as to who created the debris ramp in the first place, various versions

regarding the location and extent of the debris ramp, evolving versions of the contents of the

debris ramp, and various versions of the content of "fill dirt", including incredible requests to

define ash and wood) but also contracted that which was undeniable (such as the photographs

clearly showing not only the location of the debris ramp but that such location was readily

apparent).  [See Requests for Findings of Fact at Fact # 52a-cc].

     Gateman significantly profited (Gateman estimated his profits from the sales of the Site

at **$600,000**) from his unfair and deceptive conduct.  First, by misrepresenting that all demolition

32

debris had been removed and properly disposed and that there were no non-acceptable environmental conditions on the Property, Gateman caused Georto to go forward and purchase the Property – thereby resulting in a payment to Gateman of **$300,000**.  Second, Gateman's conduct in moving the demolition debris - including not only the "brick and concrete" but also the debris excavated from the Family Dollar portion of the debris ramp - and dumping it on the side later sold to Georto facilitated his sale to Family Dollar and allowed him to receive the **$385,000** purchase price from Family Dollar.  Third, Gateman received a credit of **$10,000** from Roberts "to leave some stuff" (as referenced in Roberts' business records.  The amount of that credit corresponded with the expected significant disposal costs Roberts would have incurred had it properly disposed of all of the debris excavated from the Family Dollar portion of the debris ramp; Roberts saved by avoiding the labor and trucking costs to remove that debris, and Gateman reduced his demolition costs by $10,000.  Fourth, Gateman saved **$25,000** on his demolition costs by dumping the "brick and concrete" onto the side later sold to Georto rather than having it removed and disposed by Roberts.  Fifth, Gateman saved additional significant amounts by dumping the "brick and concrete" in that every load of brick and concrete dumped on the Property reduced Gateman's costs of obtaining and trucking in replacement fill. (Gateman testified that the cost would have been hundreds of dollars per truckload.)  Sixth, Gateman similarly saved additional amounts for every load of other debris dumped on the side later sold to Georto (the wood, ash, and other debris mixed with the brick and concrete, as well as the nearly 1,000 cubic yards debris excavated from the Family Dollar portion of the debris ramp but not removed from the Site) or intentionally left on the side later sold to Georto (the entire debris ramp on the Georto side) in that it reduced his costs of obtaining and trucking in replacement fill.

33

For the foregoing reasons, Georto requests that the Court treble the damages so as to send a strong message that such willful and knowing unfair and deceptive conduct is not tolerated.

**PLAINTIFF GEORTO, INC.**
By its attorney


/s/ Dale Kerester
Dale Kerester, Esq., BBO # 548385
Lynch, Brewer, Hoffman & Fink LLP
101 Federal Street
22nd Floor
Boston, MA 02110
Dated:   October 16, 2006          617-951-0800


## Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants.


/s/ Dale Kerester
Dale Kerester


Dated:   October 16, 2006