**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

CIVIL ACTION NO. 04-11730 NG

)
GEORTO, INC.,                                   )
         Plaintiff,                          )
                           )
         v.                                  )
                           )
WILLIAM GATEMAN, INDIVIDUALLY                   )
and as TRUSTEE OF 200 UNION                     )
STREET REALTY TRUST                             )
                           )
         Defendant,                         )
         Third Party Plaintiff, and         )
         Third Party Defendant-in-          )
         Counterclaim                       )
                           )
ROBERTS CORPORATION                             )
                           )
         Third Party Defendant,             )
         and Third Party Plaintiff-in-      )
         Counterclaim                       )
_____)

## WILLIAM GATEMAN'S RESPONSE TO REQUESTED RULINGS OF LAW AND FINDINGS OF FACT BY PLAINTIFF AND THIRD PARTY DEFENDANT

      Now comes the Defendant, William Gateman (hereinafter "Gateman"),

individually and as trustee of the 200 Union Street Realty Trust, and hereby

responds to the Plaintiff Georto's ("Georto") and Third Party Defendant Roberts

Corporation's ("Roberts") Requests for Rulings of Law ("RL") and Requested

Findings of Fact ("RF").

## I.    PROCEDURAL HISTORY

      1.          Georto, Inc., through its President/Owner and sole Officer

                  and member, James Hawkins ("Hawkins"), filed a Complaint

against Gateman with this Court, on August 5, 2004, alleging Breach of Warranty, Fraud, Negligent Misrepresentation, Breach of the Implied Covenant of Good Faith and Fair Dealing, and Violation of Mass. Gen. L. ch. 93A §11 in association with a certain parcel of land at 200 Union Street in Lynn, MA ("the Property").

2.    Gateman filed his Answer and Third Party Complaint on August 31, 2005, alleging breach of contract against Third Party Defendant Roberts and that Roberts was obliged to remove demolition debris from the Property, and that Roberts is liable to Gateman in the event that Gateman is held liable to Georto, and is further obligated to defend and indemnify Gateman against Georto's claims.

3.    Roberts filed its Answer to Third Party Complaint, Counterclaim against Third Party Plaintiff, and Jury Demand on December 20, 2004 and filed its Amended Answer to Third Party Complaint, Counterclaim Against Third Party Plaintiff, and Jury Demand on December 28, 2004.

4.    The case was then tried before this Court, jury-waived, for eight (8) days in September, 2006.

5.    Each of the three parties filed Requested Findings of Fact and Rulings of Law on October 16, 2006, in accordance with this Court's Order after trial of this matter.

**II.    GATEMAN'S RESPONSES TO GEORTO'S REQUEST FOR FINDINGS OF FACT (RF)**

6.         In Georto RF 52, Plaintiff purports to represent "contradictions" in Gateman's testimony.  In fact, the Plaintiff misrepresents questions of fact for "contradictions."  For instance, it is not clear from all the evidence at trial as to who constructed the ramp.  Most credible is Gateman's assertion that Turner Demolition was at the site for a total of not more than 5 hours, and never actually entered the site but rather conducted its work from Union Street.  Moreover, Gateman is entirely consistent that while he observed the ramp, as did the other parties in the case, he never saw what was beneath the ramp and had no reason to believe that it was anything other than brick and concrete, the only elements visible on the ramp.

7.         Gateman did not testify to making a profit of $600,000.00 on the Property, as erroneously cited by Georto's RF 4(d). Transcript, Vol. VI, p. 30.

8.         Contrary to Georto's RF 5, Gateman obtained permission from Frank Calnan, City of Lynn Building Inspector, that he could leave brick and concrete on the Property.  Vol. VII, p. 15, 10-16.  Moreover, Gateman responded to communications from the City of Lynn to demolish the

burned out building, a building that had been burned and
destroyed by vandals, and hired Roberts Corporation to take
away all demolition debris, other than brick and concrete, for
$90,000.00.  Additionally, the City of Lynn Building Inspector
communicated to Gateman that brick and concrete could
remain and that the property should be sloped in such a
manner so that someone walking by would not fall in
property.  Vol. VII, p. 19, 3-10.

9.      Contrary to Georto's RF 5(b), Gateman did not testify in Vol.
VI, pp. 35 and 42, that he delayed initial demolition work on
the Property for six months.

10.     Georto asserts in RF 6(c) and (d) that Gateman contracted
with Roberts to remove only **certain** (emphasis in Georto RF
6(d)) debris from the Property.  In fact, it is undisputed that
Gateman contracted with Roberts to remove **all** (emphasis
added) debris, other than brick and concrete.  The reason for
the two quotes, one for $90,000.00 and one for $115,000.00,
was for removal of everything besides brick and concrete
and one for removing everything including brick and
concrete, respectively.  It was testified at various times at
trial that Gateman contracted with Roberts for removal of all
debris, other than brick and concrete (because Gateman had

received permission from City of Lynn officials that brick and concrete could remain), for $90,000.00.  Exhibit 9.

11.   Contrary to the assertion in Georto's RF 6(f), Gateman did not distribute a separate payment to Doherty, but rather paid Roberts in association with the contract.

12.   Gateman occasionally made cash payments to Roberts, rather than payments by check, because Roberts requested that he do so.  All payments were made to Kevin Doherty of Roberts, contrary to the assertion of Georto in RF 6(g) and (h) that payments to Doherty were somehow distinct and/or additional to payments to Roberts.

13.   If the $10,000.00 payment to Doherty referenced in Georto's RF 6 (i) was not reflected in Roberts' records, the clear inference is that Doherty did not report the payment to Robert Stalker, President of Roberts, and retained it for himself, as there was undisputed evidence that Gateman made all payments to Doherty, not some other official of Roberts.  Doherty was not made available at trial for cross-examination on this or any other issue.

14.   In responding to Georto's RF 7(g) and (h), Gateman acknowledges that he used new fill that he indeed obtained "free" (other than transportation charges) and further asserts that the same fill was used throughout the site, including the

parcel sold to Family Dollar as well as the parcel sold to Georto.

15.     Contrary to Georto's RF 9(c), Roberts provided Gateman with separate quotes and prices precisely because Gateman had obtained permission from the City of Lynn that brick and concrete could remain on the Property.  Therefore, Roberts gave one price if Gateman wanted the brick and concrete removed (even though he received authorization to have the brick and concrete remain) and one to have the brick and concrete remain.

16.     In reference to Georto's RF 9(k), Gateman relied on Roberts' representations in terms of what could be left on the site and what constituted acceptable fill.

17.     Contrary to Georto's RF 9(m), Gateman reiterates that Roberts' own officials testified that brick and concrete could remain and routinely did so in jobs they performed in the City of Lynn.  Doherty Transcript, pp. 35-36.

18.     Georto misrepresents Gateman's testimony in its RF 9(p), 9(q), and 9(s).  Gateman testified that he was aware that "fines" would be left on the site and constituted acceptable fill, again relying on Roberts' representation that this screened material, or fines, was acceptable fill.

19.      In response to Georto's RF 9(u) and 9(v), Gateman states once again that Roberts' own officials testified that brick and concrete could remain and routinely did so in jobs they performed in the City of Lynn. Doherty Transcript, pp. 35-36.

20.      In response to Georto's RF 10(b) and 10(c), Gateman reiterates that Turner Demolition was at the site for a total of not more than 5 hours, and never actually entered the site but rather conducted its work from Union Street and therefore could not have constructed the ramp.

21.      Contrary to Georto's assertion in RF 10(f), 10(g) and 10(h), when Roberts left the site for the first time in March, 2002, the evidence indicates that Roberts' officials could not observe any debris beneath the ramp of brick and concrete. Doherty Transcript, p. 87, 8-14. Moreover, when Roberts left the site for the first time, all that remained were brick and concrete and the access ramp, which appeared to be brick and concrete on top of fill. Doherty Transcript, p. 94, 9-14.

22.      In response to Georto's RF 11 and RF 12, Gateman testified that he observed the ramp and that it looked only like brick and concrete. The debris, if any, was covered by the ramp and only brick and concrete were visible, Transcript, Vol. VI, p. 7, 10-20. Exhibit 3C-2. Gateman further testified that he simply did not know the dimension of the ramp, where it

started and where it ended, and further testified that photographic evidence reinforced his perspective. Transcript, Vol. VI, p. 9, 5-18. Exhibit 3C-5. Additionally, Gateman testified that in April, 2002, after a geotechnical engineer from Family Dollar told him, he became aware of the ramp and saw it then and sees it subsequently in photos that the ramp looks like brick and concrete and just sloped in so Roberts could get machinery in and out. Transcript, Vol. VI, p. 11, 3-10. Finally, at no point in time did Gateman ever see the ramp being constructed or built. Transcript, Vol. VI, p. 39, 19-21. And every photo of the ramp that Gateman has ever seen appears to be brick and concrete; nothing below the ramp is ever visible. Transcript, Vol. VI, p. 40, 7-10.

23.    In response to Georto's RF 13, Gateman reiterates that Roberts' officials acknowledged that, after discovery of the ramp, Roberts was obligated to return to the Property and remove any remaining debris. Doherty Transcript, p. 159, 8-10. In early May, 2002, Roberts leaves site for the first time and the site looks completely clean, except for bricks and concrete and screened material. Vol. VI, p. 55, 20-25, p. 56, 1-7. Gateman reiterates that he contracted with Roberts specifically to remove all debris, Vol. VII, p. 19, 1-6.

Moreover, Gateman testified that he observed in Exhibit 3C-70, taken May 1, 2002, that Roberts is on site covering the ramp with clean dirt. Vol. VII, p. 50, 22-25. Gateman was aware of a ramp that was used to bring machinery up and down the site but thought it was only brick and concrete because that is all that was visible from the surface. He was not aware of any debris beneath the ramp until debris was discovered in May, 2004. Transcript, Vol. V, p. 78, 13-20.

24.    In response to Georto's RF 14 and RF 15, Gateman reiterates that on or about May 17, 2002, Family Dollar officials discover presence of a ramp and ask Gateman to have it excavated. Since Wetherbee is already on site doing filling work, Wetherbee is asked by the geotech with Family Dollar to excavate the ramp to see what is there. Vol. VII, p. 33, 3-20. As soon as Gateman became aware of the ramp, in May, 2002, he immediately contacted Roberts Corporation to have them return to the site to remove the ramp and any remaining debris. Vol. VII, p. 34, 10-14. Roberts indicated they would return to the site and take care of any and all debris. Vol. VII, p. 34, 19-21. Scott Wetherbee was already at the site, working on filling the site, and so in the interests of expediency, Wetherbee began removing the ramp until Roberts could return to the site; it was always Roberts'

responsibility to remove the debris that had been discovered and excavated.  Wetherbee was already on site and FD wanted it done as soon as possible.  Vol. VII, p. 35, 10-16.  Moreover, Robert Stalker of Roberts Corporation testified that he was well aware that Roberts was hired to take away all debris other than brick and concrete.  Vol. VIII, p. 105, 4-8.

25.    In response to Georto's RF 16 and RF 17, Gateman reiterates that Roberts left the site initially in May, 2002, leaving behind only brick and concrete, per the Order and knowledge of the Lynn Building Inspector, and the "fines" that had been screened.  Vol. VII, p. 72, 19-25.  Roberts returns to the site on or about May 19, 2002, after the ramp is discovered, per the direction of a geotechnical engineer from Family Dollar and as a result of Scott Wetherbee's excavation, on or about May 17, 2002.  Vol. VII, p. 79, 7-13.  Once the excavation of the ramp began, it was obvious that the entire ramp and all the debris needed to be removed.  So Gateman called Roberts and instructed them to return to the site and take away all debris.  Vol. VII, p. 118, 1-4.  Removal of the ramp was directed at least in part, if not entirely, by a geotechnical engineer affiliated with Family Dollar.  Vol. VII, p. 118, 18-21.  Additionally, in reviewing a photo taken on

April 19, 2002, Exhibit 3C-13, Gateman testifies that he observes the ramp, with only brick and concrete on top. Gateman assumed at all times that only dirt/fill was underneath the brick and concrete ramp. Vol. VIII, p. 4, 19-25, p. 5, 1-8. Finally, Gateman testified that he observed a Family Dollar geotechnical engineer directing Wetherbee and the removal of the ramp. 10-11, 13-3

26.    In response to Georto's RF 18, RF 19 and RF 20, Gateman references Scott Wetherbee's testimony that he was directed in his activities by the geotechnical engineer affiliated with Family Dollar and never by Gateman. Vol. VIII, p. 139, 10-17.    Specifically with reference to Georto's RF 18(d), Gateman reiterates that Roberts brought a screener onto the site for the specific purpose of using the screened material as acceptable fill. That decision was entirely in the domain of Roberts, not Gateman. Also, with respect to RF 18(f), it was Roberts, not Gateman, that was responsible for removing debris. With specific reference to RF 18(g), Gateman reiterates that he had no such conversation with Kevin Doherty and again states that Mr. Doherty was unavailable at trial to be cross-examined. Finally, in specific reference to RF 20(c), Gateman reiterates that Roberts brought a screener on site for the specific purpose of

screening out debris and then using the screened material,
or "fines" as acceptable fill.

27.     In responding to RF 21, Gateman again points to his
contract with Roberts.  It is undisputed that he had a
contract, that it was a contract for $90,000.00 (because he
obtained authorization to leave brick and concrete on site),
and that he made all payments, both check and cash, to
Kevin Doherty, the person from Roberts responsible for
collecting payment on the contract.  There is no evidence,
other than Doherty's self-serving transcript testimony,
suggesting that Gateman ever made a payment to Doherty
separate from any payments per the contract with Roberts.
If Doherty did in fact conceal a payment made to him, that is
a dispute between him and Roberts Corporation, and not in
any way involved with Gateman.

28.     In responding to RF 22, Gateman affirms that he sought to
have his entire site filled with acceptable material, that he
owned the entire site and hired professionals with expertise
to perform the work in a competent fashion.  He simply had
no motivation to have part of his site, ie the Family Dollar
parcel, "acceptable", and another part of his Property, ie the
parcel eventually sold to Georto, as "unacceptable."

29.        Contrary to the self-serving and uncorroborated testimony of

Kevin Doherty cited in RF 23, Gateman reiterates his

testimony that he would be at the site for approximately 15 to

30 minutes a day during the demolition work, and that he

only was inside the Property after the demolition work was

completed.  Additionally, Gateman reiterates a complete

denial of Doherty's unsubstantiated statements that he ever

operated a bulldozer or front end loader or ever "pushed fill

into the hole."

30.        In responding to Georto's RF 24, Gateman reiterates that he

never saw the ramp being built but acknowledges that a

ramp was there that Roberts and other contractors used to

access the site.  At no point prior to the discovery of debris

beneath the ramp was Gateman aware of any debris on the

Property, other than brick and concrete and "fines."  Roberts

brought the screener onto site, specifically to sift out debris.

Remaining material, screened and sifted and known as

"fines" was to be used as acceptable fill and Roberts

indicated that it was acceptable fill.  Vol. VII, p. 27, 16-21.

31.        In response to Georto's RF 26, Gateman asserts that it

simply is not credible that Hawkins could be given a reliable

price for the project without testing of the subsoil to

determine its suitability.  Phil Morin of PM Construction

testified that there were no representations in either the Phase I Report or the Phase II Report (which Hawkins commissioned) as to whether soil under the surface at the Property could support a building.  Vol. IVa, p. 16, 20-25, p. 17, 1.  Hawkins testified that he did not want to purchase a "money pit" yet failed to conduct any substantive due diligence as part of his purchasing decision.  He also failed to mitigate his remedial costs, thus incurring the inflated cost of $249,000.00 referenced in RF 26(j). Hawkins testified that he would not have altered his decision in any way had he known that bricks and concrete only were on the Property.  Transcript, Vol. II, p. 94, 1-3.  Hawkins testified that he reviewed the Phase I Report as part of his due diligence; as part of that report, he saw and knew about photos that illustrated bricks and concrete on the premises.  Transcript, Vol. II, p. 109, 18-25, p. 110, 2.  Hawkins testifies that Gateman was never credited $102,000.00 for the "site work" that Hawkins had already budgeted as part of his plan, even if the property had not encountered any problems.  Transcript, Vol. II, p. 68, 6-14.

32.    In response to RF 27, Gateman reiterates that he never reviewed the Purchase and Sale Agreement with Georto; he relied on Attorney Paul Yasi, who he hired specifically for the

purpose of reviewing and negotiating the Agreement with Hawkins.  Vol. VII, p. 39, 16-18.  Gateman never read the Family Dollar Purchase and Sale Agreement and relied solely on his counsel's recommendation.  Transcript, Vol. VI, p. 53, 21-25, p. 54, 1-6.  Moreover, Hawkins testified that the down payment he made on the purchase of the property was less than 2% and that such a small down payment was "atypical" in a Purchase and Sale Agreement.  Transcript, Vol. II, p. 53, 9-12.  Hawkins testified that he paid $3,000.00 to extend the closing date for the sale of the Property so that it could conduct "further due diligence." Transcript, Vol. II, p.54, 10-14.  Hawkins testified that he sold the property in March, 2005 for $1,150,000, after purchased the property in 2004 for $300,000.00 in February, 2004.  Transcript, Vol. II, p. 49, 12-15.

33.    Contrary to assertions made in RF 28, Hawkins testified that he expected Gateman and/or his transactional counsel to have "apprehension" about the warranty language.  He further testified that he would not sign an agreement with such language in it if he were the Seller.  Transcript, Vol. II, p. 57, lines 18-23.

34.    In response to Georto's RF 29, RF 30 and RF 31, Gateman states that Hawkins testified that the only documents he

relied upon were the Purchase and Sale Agreement from Family Dollar, the Phase I and Phase II Reports and the Purchase and Sale Agreement he signed with Gateman. Transcript, Vol. II, p. 83, 2-17.  Moreover, the term "non-acceptable environmental conditions on the property" contained in paragraph 2(f) of the parties' purchase and sale agreement is ambiguous as a matter of law because it is subject to different interpretations as to whether recyclable materials, such as brick and concrete, constitute environmental conditions within the meaning of said paragraph.  Morin of PM Construction testified that screening and crushing, and recycling in general, were nor considered as a possibility on the site, nor even discussed.  Transcript, Vol. IVa, p. 7, 17-22.  Morin testified that PM Construction never even asked for a proposal or estimate as to the costs of estimating for screening and crushing and/or recycling brick and concrete.  Vol. IVa, p. 9, 3-6.  The warranty that "there are no hazardous materials as defined by state, federal or local law, or non-acceptable environmental conditions on the property" was not, as a matter of law, a guarantee that the property at issue was suitable for building a commercial retail establishment as contemplated by Hawkins.

35.        Responding to RF 32 and RF 33, Gateman reiterates that
           Hawkins testified that he reviewed the Phase I Report as
           part of his due diligence; as part of that report, he saw and
           knew about photos that illustrated bricks and concrete on the
           premises.  Transcript, Vol. II, p. 109, 18-25, p. 110, 2.
           Specifically in response to 32(e) and 32(i), Gateman
           reiterates that he hired Roberts to remove any and all
           demolition debris from the Property and relied on his
           contract with Roberts in representing that all debris would be
           removed.

36.        In response to RF 34, Gateman references the testimony of
           Phil Morin, who testified that no one from PM ever asked
           anyone from Roberts whether Roberts had removed all
           debris from the site.  Vol. IVa, p. 17, 11-17.  At the time that
           PM Construction and Georto ordered the building in
           December 2003 the only information they had about soil was
           from the Phase I Report.  No engineering tests had been
           done to determine whether soil was suitable to build upon.
           Vol. IVa, p.  22, 23-25, p. 23, 1-6.  Moreover, Morin affirmed
           that Hawkins relied on 2 year old Phase I Report.  Vol. IVa,
           p. 28, 5-13.  He also testified that Hawkins and PM
           Construction knew there was a risk that soil was not suitable
           and/or properly compacted.  Vol. IVa, p. 29, 7-12.

37.         Contrary to the assertions in RF 35, Morin testified that PM
            Construction never asked Mattuchio, who conducted the
            removal of material from the site, whether material was
            going to a recycling center or a landfill.  Vol. IVa, p. 11, 14-
            18.  Additionally, no official from Mattuchio ever attended a
            deposition, despite being issued a subpoena, and there was
            no evidence introduced at trial that indicated that anyone
            associated or affiliated with Mattuchio ever tested the soil or
            submitted cost justifications to charge $950 per load to bring
            material to a recycling center.  Moreover, with specific
            reference to 35(f), the photos which accompanied the Phase
            I Report clearly showed that brick and concrete were on site.
            Finally, PM Construction never asked Mattuchio what the
            costs would be to remove debris and bring in new fill.  Vol.
            IVa, p. 12, 5-12.

38.         In response to RF 36, Gateman reiterates that Hawkins
            conducted very little due diligence and instead is trying to
            transfer any and all costs incurred to Gateman.  Gateman
            was under the reasonable belief that Hawkins was
            conducting his own soil investigations.  Transcript, Vol. VII,
            p. 43, 20-23.

39.         In response to RF 38, Gateman reiterates that Hawkins
            testified that the only documents he relied upon were the

Purchase and Sale Agreement from Family Dollar, the Phase I and Phase II Reports and the Purchase and Sale Agreement he signed with Gateman.  Transcript, Vol. II, p. 83, 2-17.  Moreover, the term "non-acceptable environmental conditions on the property" contained in paragraph 2(f) of the parties' purchase and sale agreement is ambiguous as a matter of law because it is subject to different interpretations as to whether recyclable materials, such as brick and concrete, constitute environmental conditions within the meaning of said paragraph.

40.    In response to RF 39, Gateman asserts that Morin testified that after reviewing the Phase II Report, which Hawkins and PM Construction commissioned, they were satisfied that there were no unacceptable environmental conditions and proceeded with construction of the building, Transcript, Vol. IV, p. 26, 17-25, p. 27, 1-3.  Morin testified that although the final Phase II report was not completed until February, 2004 (note: the trial transcript records this in error as February, 2006; there is no dispute that the report was completed in February, 2004), the decision had already been made to order the building.  As late as April, 2004, no soil testing or engineering tests had been done when construction began.  Moreover, the purpose of the Phase II had nothing to do with

whether or not soil was suitable to be built upon.  Vol. IVa, p. 23, 7-22.

41.     Responding to RF 41, Gateman reiterates that he responded at all times in a manner that any reasonable, responsible person would, ie, he reiterates that as soon as he was aware of any problem with the site and, more specifically, the discovery of debris on the Property, he took immediate steps to rectify the situation.  The record is rife with evidence that Gateman was satisfied with Roberts' work because he made one phone call, Roberts agreed to return to the site and assured him that all debris would be removed.  Vol. VII, 36, 4-14.  Moreover, as Hawkins and Gateman both testified, Gateman offered him the full purchase price of $300,000.00 back after discovery of the debris on the Property. Transcript, Vol. II, p. 79, 12-17.

42.     In responding to RF 42, in which the Plaintiff acknowledges that debris was discovered in April, 2004, Gateman reiterates that he had no knowledge of any such debris at any time prior to this time and specifically relied upon Roberts to remove any and all debris, other than brick and concrete, from the entire site.  Steve McIntyre was hired by Hawkins, despite not being a licensed construction supervisor in Massachusetts, and had the responsibility of

supervising the construction work at the Property.  Vol. III, p.
41, 8-10.  McIntyre testified that brick and concrete were
standard fill.  Vol. III, p. 45, 5-8.  In reviewing the slips from
Pacella (Exhibit 44), McIntyre testified that he saw no slips
other than for brick and concrete.  Vol. III, p. 48, 20-25, p.
49, 1-7.  McIntyre testified that using a screener and crusher
and recycling could have saved considerable money.  Vol.
III, p. 50, 18-24.  McIntyre testified that it was his
understanding that the material was taken from the Property
to a recycling center, not a landfill.  Vol. III, p. 56, 23-25, p.
57, 1-2.  McIntyre testified that at least 108 of 165 truckloads
were ticketed for a landfill and described as brick only.  Vol.
III, p.  59, 6-11.  McIntyre testified that neither a crusher nor
a screener was ever considered.  Vol. III, p. 72, 21-23.
McIntyre acknowledges that a 73-74, 9-3, screener was
used for the Family Dollar site, as illustrated in Exhibit 3C-
153, and that a screener and/or crusher could have been
brought on site purchased by Georto but was not.  Vol. III, p.
73, 9-25, p. 74, 1-3.  Morin of PM Construction also testified
that he could not dispute that the removal work could have
been done for $125 per load, rather than the $950 as
charged, since most of what was removed was brick.  Vol.
IVa, p. 38, 22-25, p. 39, 1-11.  Expert Greg Wirsen also

testified that even mixed debris can be recycled and that crushers could have been brought on site. Vol. IVa, p. 87, 4-15. In particular, with regard to 42(f) and other references to Mattuchio, it is telling that Plaintiff did not call upon Mattuchio to testify, and it can be inferred that Mattuchio would not have provided evidence favorable to the Plaintiff. Also, with specific reference to 43(f), Gateman reiterates his denial that he ever told Stalker or any other official from Roberts to leave the ramp. With specific reference to 43(aa), Gateman reiterated that he received a letter from Attorney Kerester asking for $148,000.00 for site remediation costs incurred by Hawkins. Gateman called Hawkins at that point and offered to return to Hawkins his purchase price of $300,000.00. Vol. VII, p. 47, 3-15. Gateman also called Attorney Kerester to register his displeasure that he was being threatened with a lawsuit after Gateman twice extended the time for closing on the Purchase and Sale Agreement and offered Hawkins his money back. Vol. VII, p. 49, 8-15. With specific reference to 44(hh), Gateman acknowledges that he stated words to that effect, but only after Hawkins rejected his offer to return the purchase price AND after rejecting Gateman's recommendation to use Scott Wetherbee for remediation work at a dramatically lesser cost.

43.    In response to RF 44, Gateman again points to McIntyre's testimony and Morin's testimony that lower cost alternatives, including recycling and other alternatives, were never considered.

44.    Georto's RF 45 is nothing more than a bold attempt at justifying the outrageous fees that were incurred by Hawkins in this matter.

45.    In responding to Georto's RF 46, Gateman asserts that the purported "analysis" of bids and estimates amounts to nothing more than a self serving justification for using Mattuchio and the exorbitant fees that he charged.  It was acknowledged at trial that the Wetherbee estimate was analyzed differently than all the others (rather than an "apples to apples" comparison as the Plaintiff alleges).  Both Hawkins and Morin testified that Wetherbee's estimate was altered and both acknowledged that they did not contact Wetherbee to discuss his proposal/estimate.  Exhibit 33.

46.    Contrary to RF 47 and RF 48, Gateman never received a credit for the removal of the concrete, nor did Gateman ever receive a credit for any of the work done by Hawkins that he would have needed to do in any circumstances.  Moreover, Gateman reiterates that this material was taken to a recycling center, not a landfill.  If the material were as

described, ie wood and other debris other than brick and concrete, that material would need to be taken to a landfill, at a higher cost.  Essentially, Mattuchio charged landfill prices to have material taken to a recycling center (and in stark contradiction to Mr. Michaud and others who testified that the material could not be recycled; the material was, in fact, recycled, as the vast majority of the material was brought to a recycling center.)  With particular reference to 47(q), the logical extension of Michaud's "analysis" would require the removal of all material, including from the parking lot.  With particular reference to 48(t), the clear fact that materials were brought to a recycling center, but still charged at a rate of $950 per load, is compelling evidence that PM Construction did not perform this project in the least expensive way possible.

47.     In responding to RF 49, Gateman reiterates that upon discovery of the debris, he immediately contacted Roberts and directed Roberts to return to the site and remove all debris, as per the contract.

48.     Gateman responds to RF 50 that it was Roberts, not Gateman, who left behind the "fines" or screened material. Despite Wirsen's continual references to the Property being

an "illegal dump," incredibly the inference is apparently
limited to the building pad only.

49.    In response to RF 51, Gateman repeats all of the above
statements with respect to recycling and further states that it
simply is not a credible story that this particular parcel could
be such a "dump" and have the rest of the Property,
including the Family Dollar site and the parking lot, have
perfectly acceptable fill.  Again, Gateman had no motivation
to have his Property filled in the manner in which the Plaintiff
alleges.  With particular reference to 51(t), that estimate may
very well be valid, but we now know as a result of the trial
that it was not demolition debris that was trucked out, but
rather brick and concrete, and sent to a recycling center.

50.    In further responding to Georto's RF 51, Gateman repeats
that he was satisfied that the land he sold to Hawkins was
free of debris, because he contracted with Roberts to take
away all debris and to the best of Gateman's knowledge all
that remained was brick and concrete and fines.  Vol. VII, p.
43, 8-15.  Both Hawkins and Phil Morin, President and
Owner of PM Construction ("Morin"), who was hired by
Hawkins as the project manager for the Property,
acknowledge that by the time of construction beginning in
April, 2004, the Phase I Report that they were relying on was

nearly two years old.  Transcript, Vol. IV, p. 23, 14-17.
Gateman also references photos introduced in evidence that
illustrate that Roberts Corporation is on site, covering the
ramp with fill, before Gateman comes onto the site and
performs any filling or compaction work.

51.        Express warranties promise that a specific result will be
achieved. *Coca-Cola Bottling Co. of Cape Cod v. Weston &
Sampson Eng'rs, Inc.*, 45 Mass. App. Ct. 120, 128 (1998).
Thus, under an express warranty, the standard of
performance is set by a defendant's statements, rather than
imposed by law. *Anthony's Pier Four, Inc. v. Crandall Dry
Dock Eng'rs, Inc.*, 396 Mass. 818, 822(1986).

52.        Although transactions involving real estate fall outside the
Uniform Commercial Code, analogy to its policies and
principles is not precluded.  *Mary Anne Brewer, et al v.
Poole Construction Co., et al.*13 Mass. L. Rep. 97 (2001).

53.        "Express" warranties rest on "dickered" aspects of the
individual bargain.  M.G.L. c. 106, §2-313, Comment 1.

54.        For an affirmation to comprise a warranty, it must become
part of the "basis of the bargain" between the parties.  *Stuto
v. Corning Glass Works,* Prod. Liab. Rep. para. 12,585 at
37,582 (USDCMA) (CCH 1990).

55.    Some minimum of reliance is a required element of a breach of express warranty claim in Massachusetts. *Stuto v. Corning Glass Works,* Prod. Liab. Rep. para. 12,585 at 37,582 (USDCMA) (CCH 1990).

56.    "Under Massachusetts law, a contract term is ambiguous when its language is "reasonably prone to different interpretations" or "susceptible to differing, but nonetheless plausible, constructions." *Alison H. v. Byard*, 163 F.3d 2, 6 (1st Cir. 1998); see also *Bercume v. Bercume,* 428 Mass. 635, (Mass. 1999). Whether a term is ambiguous is a question of law. See *Alison H.*, 163 F.3d at 6." Lanier Professional Servs. v. Ricci, 192 F.3d 1, 4 (1st Cir. 1999).

57.    "When contractual language is ambiguous, its meaning is a question of fact. See *Den norske Bank AS v. First National Bank*, 75 F.3d 49, 52 (1st Cir. 1996). The resolution of the ambiguity turns on the parties' intent, as "discerned by the factfinder from the circumstances surrounding the ambiguity and from such reasonable inferences as may be available." *Colasanto v. Life Ins. Co. of N. Am.*, 100 F.3d 203, 211 (1st Cir. 1996). Extrinsic evidence is admissible to assist the factfinder in resolving the ambiguity, including evidence of, in descending order of importance: (1) the parties' negotiations concerning the contract at issue; (2) their course of

performance; and (3) trade usage in the relevant industry.
See *Den norske*, 75 F.3d at 52-53; see also *Keating v.
Stadium Management Corp.*, 24 Mass. App. Ct. 246, (Mass.
App. Ct. 1987)." *Lanier Professional Servs. v. Ricci*, 192
F.3d 1, 4 (1st Cir. 1999).

58.     Given that the purpose of judicial interpretation is to
ascertain the parties' intentions, the parties' own practical
interpretation of the contract – how they actually acted,
thereby giving meaning to the contract during the course of
performing it – is to be given great weight by the Court.
*Williston on Contracts*, §32:14 (Fourth Edition, 1999)

59.     A plaintiff in a contract action is obliged to take all
reasonable steps that do not entail undue risk, expense or
inconvenience in order to minimize damages. Burnham v.
Mark IV Homes, Inc., 387 Mass. 575, 586, 441 N.E.2d 1027
(1982), Krasne v. Tedeschi & Grasso, 436 Mass. 103, 109,
762 N.E.2d 841 (2002).

60.     The duty to mitigate its damages obligated Georto to be
willing to expend such sums as would reasonably be
necessary to reduce the amount of its damages which would
otherwise be incurred. See *Burnham v. Mark IV Homes, Inc.*,
387 Mass. 575, 586 (1982), citing Warren v. Stoddart, 105
U.S. 224, 229, 26 L. Ed. 1117 (1881).

61.     The party in breach bears the burden of demonstrating that the plaintiff did not make reasonable efforts to mitigate its damages and that the plaintiff would have been able to mitigate its damages if it had undertaken such efforts. See *American Mechanical Corp. v. Union Machine Co. of Lynn, Inc.*, 21 Mass. App. Ct. 97, 103, 485 N.E.2d 680 (1985).

62.     To prove fraud, the plaintiff must show 1) that the defendant made a false statement of a material fact; 2) which the defendant knew was false; 3) for the purpose of inducing the plaintiff to rely upon it; and 4) that the plaintiff did in fact rely upon it to its detriment. *Commonwealth v. Ravosa*, 40 Mass. App. Ct. 47, 52 (1996); *VMark Software, Inc. v. EMC Corp., Inc.*, 37 Mass. App. Ct. 610, 617 & n. 9, 642 N.E.2d 587 (1994).

63.     Proof of negligence does not establish wilfulness to fulfill the "intent" element of fraud. *Macoviak v. Chase Home Mortg. Corp.*, 40 Mass. App. Ct. 755, 760 (Mass. App. Ct. 1996).

64.     It is a question for the jury or other trier of fact to determine whether a material fact has been concealed. *Campbell v. New England Mut. Life Ins.* Co., 98 Mass. 381, 395-396 (1867). *In-Towne Restaurant Corp. v. Aetna Casualty & Surety Co.*, 9 Mass. App. Ct. 534, 538 (Mass. App. Ct. 1980).

65.     In all cases, a plaintiff's reliance upon the statements of the defendant must be reasonable or justifiable. *Town & Country Fine Jewelry Group v. Hirsch*, 875 F. Supp. 872, 876 (D. Mass. 1994).

66.     In order to prove negligent misrepresentation, the plaintiff must establish that the defendant, (1) in the course of his business; (2) supplied false information for the guidance of others in their business transactions; (3) is subject to liability for pecuniary loss caused to it by their justifiable reliance upon the information; (4) failed to exercise reasonable care or competence in obtaining or communicating the information. Restatement (Second) of Torts, § 522; see *NYCAL v. KPMG Peat Marwick LLP*, 426 Mass. 491, 496 (1998).

67.     To maintain a claim for negligent misrepresentation, there must be justifiable reliance and detriment suffered on account of the reliance. See *Nota Construction Corp. v. Keyes Associates, Inc.,* 45 Mass.App.Ct. 15, 19-20 (1998). (D. Mass. 1994).

68.     A duty of good faith and fair dealing is implicit in the performance of a party's contractual obligations." *Lafayette Place Associates v. BRA*, 427 Mass. 509, 525, 694 N.E.2d 820 (1998).

69.     The covenant of good faith and fair dealing requires "that
neither party shall do anything that will have the effect of
destroying or injuring the right of the other party to receive
the full fruits of the contract." *Anthony's Pier Four, Inc. v.
HBC Associates*, 411 Mass. 451, 471-72, (1991).

70.     New or independent rights or duties separate from those
already in a contract cannot be added by a judge in the cloak
of the implied covenant of good faith and fair dealing. See,
e.g, *Bateman v. FDIC*, 112 F. Supp. 2d 89, 97 (D.Mass.
2002).

71.     The requirement of good-faith performance, under the
implied covenant of good faith and fair dealing, ultimately is
circumscribed by the obligations actually contained in the
agreement. *AccuSoft Corp. v. Palo*, 237 F.3d 31 (1st Cir.
2001).

72.     Whether the conduct evidence by the record rises to the
level of a violation of  c.93A is a question of law.  *See R.W.
Granter & Sons, Inc. v. J&S Insulation, Inc.* 435 Mass. 66, 73
(2001); *Ahern v. Scholz,* 85 F. 3d. 774, 800 (1st Cir. 1996).

73.     To trigger liability under G.L. 93A, § 11, the conduct in
question "must attain a level of rascality that would raise an
eyebrow of someone inured to the rough and tumble world of
commerce*"; Quaker State Oil Ref. Corp., v. Garrity Oil Co.*,

884 F.2d 1510, 1513 (1st Cir. 1989); have "an extraordinary quality that gives it the rancid flavor of unfairness"; *Atkinson v. Rosenthal*, 33 Mass.App.Ct. 219, 225-26 (1992); or falls "within 'at least the penumbra of some common-law, statutory, or other established concept of unfairness . . . [or] is immoral, unethical, oppressive, or unscrupulous.' " *Cambridge Plating Co. v. Napco, Inc.*, 85 F.3d 752, 769 (1st Cir. 1996),.

74.     Often, an act might be unfair if practiced upon a commercial innocent yet would be common practice between two people engaged in business. *Spence v. Boston Edison Co.*, 390 Mass. 604, 616 (Mass. 1983). Therefore, plaintiff's reliance on case law decided under Section 9 of G.L. c. 93A is misplaced.

75.     Mere breaches of contract, without more, do not violate Chapter 93A. *Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc., 754 F.2d 10, 18 (1st Cir. 1985)*.

76.     Conduct in disregard of  known contractual arrangements' and intended to secure benefits for the breaching party constitutes an unfair act or practice for c. 93A purposes. *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 474 (1991).

77.     Breach of the implied covenant of good faith and fair dealing may be found to be a violation of G.L. c.93A, but only where the conduct complained of is undertaken as leverage to destroy the rights of another party to the agreement while the agreement is still in effect. *Massachusetts Employers Ins. Exch. v. Propac-Mass, Inc.*, 420 Mass. 39, 43 (1995)

78.     Massachusetts courts have recognized 93A liability in the context of a breach of contract only where the defendant's conduct displays particular self-interest or oppression..  As stated by the Court in Atkinson v. Rosenthal, 33 Mass. App. Ct. 219, 225-226 (Mass. App. Ct. 1992):  Examination of the facts in the Pier Four case and the cases there cited n5 discloses an additional factor. There is in those decisions a consistent pattern of the use of a breach of contract as a lever to obtain advantage for the party committing the breach in relation to the other party; i.e., the breach of contract has an extortionate quality that gives it the rancid flavor of unfairness. Cf. Piccicuto v. Dwyer, 32 Mass. App. Ct. 137, 139 (1992). In the absence of conduct having that quality, a failure to perform obligations under a written [contract], even though deliberate and for reasons of self-interest, does not present an occasion for invocation of c. 93A remedies.

79.    "'[N]ot every negligent act is unfair or deceptive and thus unlawful under G. L. c. 93A, § 2.' *Swanson v. Bankers Life Co.*, 389 Mass. 345, 349 (1983*)."  Walsh v. Chestnut Hill Bank & Trust Co.*, 414 Mass. 283, 288 (Mass. 1993).

80.    Ineptitude, although negligent, does not rise to level of a 93A violation.  *Churgin v. Hobbie*, 39 Mass. App. Ct. 302, 308 (Mass. App. Ct. 1995).

81.    "A duty exists under c. 93A to disclose material facts known to a party at the time of a transaction.  See *Nei v. Burley*, 388 Mass. 307, 316-317 (1983); *Sheehy v. Lipton Indus.*, 24 Mass. App. Ct. 188, 195 (1987); *Lawton v. Dracousis*, 14 Mass. App. Ct. 164, 170 (1982). There is no liability for failing to disclose what a person does not know. *Sheehy v. Lipton, Indus.*, supra at 196." *Underwood v. Risman*, 414 Mass. 96, 99-100 (Mass. 1993).

82.    Reason to suspect or likelihood that a certain condition may exist is not an adequate predicate for the imposition of liability under G.L. c.93A.  *Underwood v. Risman*, 414 Mass. 96, 100-101 (Mass. 1993).

83.    The notion of disclosure necessarily implies that the fact in question is known to the person expected to disclose it. Lawton v. Dracousis, 14 Mass. App. Ct. 164, 170 (1982).

84.     Knowing requires more than negligence. *Underwood v. Risman*, 414 Mass. 96, 100 (Mass. 1993).

85.     Punitive damages are awarded only for "willful or knowing" violations of section 2 of Chapter 93A.  Cambridge Plating Co. v. Napco, Inc., 85 F.3d 752, 770 (1st Cir. 1996)

86.     Shades of culpability are supposed to matter in applying the punitive damages provision of the statute. See *Kansallis Fin. Ltd. v. Fern*, 421 Mass. 659, (1996) ("The Legislature envisaged multiple damage awards against those defendants with a higher degree of culpability than that sufficient to ground simple liability."); *Heller v. Silverbranch Constr. Corp.*, 376 Mass. 621 (1978) (only "callous and intentional violations" merit multiple damages); *VMark Software v. EMC, Corp.*, 37 Mass. App. Ct. 10 (1994) (court refused to multiply damages in intentional misrepresentation case stating that section 11 multiple damages are an "extraordinary remedy" not applicable to a case of "dogged bumbling"); cf. *International Fidelity Ins. Co. v. Wilson*, 387 Mass. 841 (1983) ("The Massachusetts legislature consciously enacted a rule whereby defendant's [Chapter 93A] liability is measured by the degree of his culpability.").

87.     Liability under Chapter 93A for conduct amounting to intentional misrepresentation (or breach of warranty like that

here) does not automatically trigger punitive damages. There must be something more. See *VMark Software*, 642 N.E.2d at 595 (liability for intentional misrepresentation supported Chapter 93A liability, but misrepresentations were not "made so 'knowingly' as to warrant the punitive sanctions of double damages under Chapter 93A"); *International Totalizing Sys., Inc. v. Pepsico, Inc.*, 29 Mass. App. Ct. 424, 560 N.E.2d 749, 757 (Mass. App. Ct. 1990) (defendant liable for "knowing" misrepresentation and failure to disclose also violated Chapter 93A, but was not liable for multiple damages because of the absence of "willful or intentional conduct within the purview of [Chapter 93A]" (internal quotation omitted)).  *Cambridge Plating Co. v. Napco, Inc.*, 85 F.3d 752, 770 (1st Cir. 1996).

## III.    GATEMAN'S RESPONSE TO ROBERTS CORPORATION'S REQUESTS FOR FINDINGS OF FACT (RF)

88.        Contrary to Roberts' assertion in RF 3, Gateman states that there is no evidence that Gateman ever acted as a General Contractor on the Property.

89.        The record indicates conflicting testimony and evidence with regard to the construction of a ramp or ramps on the

property.  Contrary to Roberts' assertions in RF 9 and RF 30, Gateman reiterates that Turner Demolition was never actually on the Property and performed its work, a total of less than 5 hours and consisting only of knocking down the front of the burned out building to make the Property safe, entirely from Union Street.  Transcript, Vol. VII, p. 9.

90.     Gateman reiterates that he was never a General Contractor on the Property, nor functioned as one, in direct contradiction to Roberts' assertion in RF 9.  As stated repeatedly throughout the trial, Gateman had obtained permission to have brick and concrete remain on the property to be used as fill.  In fact, Roberts' own officials verify that brick and concrete were routinely left behind as fill for jobs that Roberts had contracted to perform.  Doherty Transcript, pp. 35-36.

91.     Contrary to the assertions of Roberts in RF 10, RF 19, RF 20, RF 21 and RF 22, there is incontrovertible testimony that Gateman obtained permission from Frank Calnan, City of Lynn Building Inspector, that he could leave brick and concrete on the Property.  Vol. VII, p. 15.  Despite Roberts' unsupported claims to the contrary, Roberts introduced no evidence that brick and concrete could not remain nor any evidence that the City of Lynn Building Inspector or any City

of Lynn official indicated that brick and concrete could not be removed.  Moreover, there is no evidence attributed to officials from the City of Lynn or the Massachusetts DEP that brick and concrete could not remain.  In fact, Roberts' own officials testified that brick and concrete could remain and routinely did so in jobs they performed in the City of Lynn. Doherty Transcript, pp. 35-36.

92.     Gateman acknowledges that he did direct Roberts to leave brick and concrete behind, as stated in Roberts RF 23, and precisely because he had obtained permission from City of Lynn officials as well as Roberts' officials, but reiterates that it had always been Roberts' responsibility to remove any and all other debris or demolition remains, as per the Contract with Roberts.  Exhibit 9, Transcript, Vol. V, p. 74, 15-25, p. 75, 1-8.  Gateman acknowledges that debris material on the parcel eventually purchased by Mr. Hawkins was not removed by Roberts.  Transcript, Vol. V, p. 79, 21-25, p. 80, 1-2.  Gateman testifies that he typically was at the site for 15-30 minutes a day or so and would simply confer with Roberts officials or other site workers.  He did not have intimate knowledge of what was happening at the site, nor was he "directing" the site.  Transcript, Vol. V, p. 99, 20-24.

93.         Gateman asserts, contrary to Roberts' RF 24, that other than

bricks and concrete, there was nothing other than an

"inconsequential amount of debris" left on site because he

relied on the Roberts contract that all debris, other than

bricks and concrete had been removed.  Transcript, Vol. V,

p. 104, 17-25, p. 105, 1-6.

94.         In May, 2002, the ramp and debris were discovered and Mr.

Gateman assumed that Roberts, after agreeing to return to

the site and remove any debris, removed all the ramp and

debris.  Contrary to Roberts' RF 33, there is no dispute that

Roberts, as well as other contractors at the site, used the

ramp to allow machinery in and out of the site.  Moreover,

Roberts' further assertion in RF 33 that they left no debris

other than brick and concrete (although such an assertion is

accurate regarding the first time that Roberts left the

property) at the site when the left the site for the second time

is not supported by the evidence.  Transcript, Vol. V, p. 107,

20-25, p. 108, 1-2.

95.         At the time Gateman entered into a Purchase and Sale

Agreement of the Property with Hawkins, he assumed that

Roberts, per its contract with Gateman, had taken away any

and all debris from the site that had been discovered in May,

2002.  Transcript, Vol. V, p. 111, 5-15.

96.          Gateman instructed both Roberts and Scott Wetherbee to remove all debris from the entire site, not just Family Dollar. He owned the entire site at 200 Union Street and his contract with Roberts provided that Roberts would take away all debris.  Transcript, Vol. V, p. 111 16-21.  While Gateman acknowledges that he performed a minor role in filling the site, along with Scott Wetherbee, such work was conducted only after Roberts had indicated that their work had been completed.  Unknown, and more importantly unseen, to Gateman was debris buried under the ramp that Roberts had failed to dispose of, in contradiction of Roberts' RF 43.

97.          Gateman observed debris being taken away from the site in May, 2002 and assumed that Roberts was taking away all debris from the site, as contracted.  Transcript, Vol. V, p. 124, 24-5, p. 125, 1-7.

98.          Gateman immediately called Roberts after discovery of the debris ramp in May, 2002 and instructed them to take everything away.  Gateman never instructed them to take away some debris but yet leave other debris on the site. Transcript, Vol. V, p. 128, 8-12.

99.          In responding to Roberts' RF 45, Gateman acknowledges that he represented to Family Dollar that the site was free of

debris, precisely because he relied on his contract with Roberts that all debris would be removed from the site.

100.     In answering questions about how he knew debris was being removed, Gateman asserts that he had Scott Wetherbee there, Roberts' officials, and a geotech engingeer directing the operation, and justifiably assumed that all the debris was being removed.  Transcript, Vol. V, p. 128, 21-25.

101.     Kevin Doherty of Roberts Corporation, who was unavailable at trial, testified at his deposition that in most of his work, a substantial amount of material is recycled.  Doherty Deposition Transcript, p. 32, 1-7.

102.     Doherty testified that trucking away brick and concrete would cost approximately $600 per load, as opposed to $1400 for typical demolition debris, because brick and concrete are taken to recycling centers.  P. 33, 1-14.

103.     Doherty testified that brick and concrete can remain on site and he has done many jobs in Lynn in which he has left brick and concrete on site.  P. 35, 17-25, p. 36, 1-5.

104.     Doherty testified that he recalls City of Lynn officials telling him that brick and concrete can remain on site on other jobs he has had in Lynn.  P. 37, 2-5.

105.        A geotechnical engineer affiliated with Family Dollar was
            overseeing the whole site, confirmed to Doherty by
            Gateman.  P. 96, 16-25.

106.        Doherty testified that Gateman asked Roberts to remove the
            debris from the dug up ramp from the entire property and
            reiterates that brick and concrete can remain.  All other
            debris needs to be taken away.  P. 121, 14-23.

107.        Contrary to Roberts' RF 47, Stalker and Doherty explicitly
            acknowledged their ongoing responsibility to remove all
            debris from the site by returning to the site to remove the
            debris that had been discovered as a result of the ramp
            being excavated.  Again, Gateman expressed no
            dissatisfaction when Roberts left the second time because,
            while he was not present, he had every reason to believe
            that the return of Roberts with machinery for the express
            purpose of removing the newly discovered debris meant that
            all debris was finally removed.  Mr. Wetherbee began the
            excavation of the ramp, at the request and direction of
            Family Dollar officials, to expedite the removal of debris.  It is
            undisputed that the actual removal of the debris remained
            within the purview of Roberts.

108.        Roberts' RF 49 further offers deposition testimony from
            Kevin Doherty of Roberts Corporation, who was unavailable

for trial and not subject to cross examination.  There is no corroborating testimony or evidence that Gateman ever operated a front end loader or participated in the excavation of the ramp.  Gateman acknowledges that he operated a roller, at the direction of a Family Dollar geotech and Scott Wetherbee, to fill the site only.

109.    Gateman acknowledges that Roberts, per its assertion in RF 53, did not know to whom the Property was being sold, but that fact in no way altered or diminished the responsibility to remove all debris from the Property.  Exhibit 9.

110.    Contrary to Roberts' RF 59, the "gravamen" of Georto's claim does not involve brick and concrete being left on site, but rather demolition debris being discovered, which had not been removed by Roberts per its contract with Gateman, that prevented Georto from building on the parcel purchased.

111.    Contrary to Roberts' RF 60, Roberts had every reason to believe that there was debris on the site, acknowledges that it was their responsibility to dispose of it, and failed to do so.

112.    Contrary to Roberts'    it can be inferred that Roberts became aware of the debris on or about May, 2002, returned to the site with a screener and other machinery to remove the newly discovered debris and negligently removed the

debris.  Its failure to do so resulted in debris being strewn throughout the property and resulting in the Plaintiff's decision that the entire parcel needed to be dug up, all fill removed and new fill brought in, at an eventual cost of $250,000.00

113.     Stalker agrees that ramp appears to be just brick and concrete with good fill underneath it.  Vol. VIII, p. 105, 18-20.

114.     A party to a commercial transaction is bound by the contract he executes. *Mayflower Sea Foods, Inc. v. Integrity Credit Corp.*, 25 Mass. App. Ct. 453 (1988).

115.     To establish breach of contract**,** the plaintiffs must demonstrate that there was a valid contract**,** that the defendants failed to perform the terms of the agreement without legal excuse, and that the defendants' breach caused the plaintiffs damage. *Loranger Constr. Corp. v. E.F. Hauserman Co.*, 1 Mass.App.Ct. 801, 801, 294 N.E.2d 453 (1973); *Guckenberger v. Boston Univ.*, 957 F. Supp. 306, 316 (D.Mass. 1997).

116.     It is elementary that an unambiguous contract must be enforced according to its terms. *Schwanbeck v. Federal-Mogul Corp.*, 412 Mass. 703, 706 (1992).

117.     A contract is not to be struck down because one of its material provisions is stated in broad and general terms if,

when applied to the transaction and construed in the light of
the attending circumstances, the meaning to be attributed to
it can be interpreted with reasonable certainty so that the
rights and obligations of the parties can be fixed and
determined. *Cygan v. Megathlin*, 326 Mass. 732, 734 (Mass.
1951).

118.    "[T]he mode of performance required by a written contract
may be varied by a subsequent oral agreement based upon
a valid consideration." *Siegel v. Knott*, 316 Mass. 526, 528
(1944). *First Pa. Mortgage Trust v. Dorchester Sav. Bank*,
395 Mass. 614, 625 (1985). *Wesley v. Marsman*, 393 Mass.
1003, 1004 (1984). *Schinkel v. Maxi-Holding, Inc.*, 30 Mass.
App. Ct. 41, 47 (1991)."  *Cambridgeport Sav. Bank v.
Boersner*, 413 Mass. 432, 439 (Mass. 1992).

119.    Consideration required to support a promise is a detriment
incurred by the promise or a benefit received by the promisor
at his request.  *Williston on Contracts*, §7:4 (Fourth Edition,
1999).

120.    Mutual agreement on modification of the requirement of a
writing may be inferred from the conduct of the parties and
from the attendant circumstances' of the instant case.
*Cambridgeport Sav. Bank v. Boersner*, 413 Mass. 432, 439
(Mass. 1992).

121.        Roberts reliance on the doctrine of *in pari delecto* in

misplaced.  The doctrine applies to action in tort, or where

there is an illegal contract. **Baena v. KPMG LLP, 453 F.3d 1,**

**6 (1st Cir. 2006).  Berman v. Coakley, 243 Mass.**

**348, 350 (Mass. 1923)** (It is a doctrine so well settled as

not to be open to discussion that courts will not aid in the

enforcement, nor afford relief against the evil consequences,

of an illegal or immoral contract).  No equitable or public

policy is served by allowing Roberts to avoid its contractual

obligations by the doctrine of in pari delecto.


## CONCLUSION

For the above stated reasons, and those to be advanced at the time of

hearing on this matter on October 27, 2006, Gateman asks that this Court grant

Judgment in his favor on all Counts in the Complaint filed by the Plaintiff and in

Gateman's Complaint filed against Third Party Defendant, Roberts Corporation.


Respectfully submitted,
William Gateman,
Individually and as Trustee
By his Attorney,

_____
Mark P. McGrath, BBO
#642913
9 West Broadway  #214
Boston, MA  02127
(617) 271-9009
mpgrath@aol.com

## CERTIFICATE OF SERVICE

I hereby certify that this document was this day served upon all counsel of record by filing a true and exact copy of same, via the ECF system.

SIGNED under the pains and penalties of perjury.

Dated: October 23, 2006                  _____
                                          Mark P. McGrath