UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GEORTO, INC., )<br> Plaintiff, )<br> )<br>v. )<br> )<br>WILLIAM GATEMAN, INDIVIDUALLY )<br>and as TRUSTEE OF 200 UNION )<br>STREET REALTY TRUST, )<br> Defendant and )<br> Third Party Plaintiff, )<br> )<br>v. )<br> )<br>ROBERTS CORPORATION, )<br> Third Party )<br> Defendant. ) | CIVIL ACTION NO. 04-11730 NG |

**PLAINTIFF GEORTO, INC.'S RESPONSES TO
THE PROPOSED FINDINGS OF FACT AND RULINGS OF LAW
SUBMITTED BY WILLIAM GATEMAN AND BY ROBERTS CORPORATION**

Plaintiff Georto, Inc. ("Georto") hereby responds to William Gateman's Proposed

Rulings of Law and Findings of Fact ("Gateman's Requests") and Roberts Corporation's

Requests for Findings of Fact and Rulings of Law ("Roberts' Requests").

**I.     RESPONSE TO GATEMAN'S REQUESTS**

**A.   Credibility of William Gateman**

While his counsel requests at footnote 1 that William Gateman's ("Gateman") testimony

referenced in his Requests "be deemed credible," his testimony is anything but credible and

should be rejected.

1. <u>**No Basis to Deny**</u>

Gateman, who had absolutely no basis whatsoever to make such denials at any time given his daily presence onsite and his active participation in the burying of the burnt demolition debris on the property sold to Georto (the "Property"), nonetheless at various times denied that which was irrefutable.  For example:

a. "<u>Inconsequential</u>":  Notwithstanding that extensive amounts of demolition debris (in addition to brick and concrete) had been dumped on the Property, Gateman testified in his deposition (prior to becoming aware of the Family Dollar engineer photographs – Exhibit 3C1-172) and asserted in his answers to interrogatories that there was an "inconsequential" amount of debris that could "fit in a trash bag."[1]  [Trial Transcript Volume V at p. 124, hereinafter cited in the format of "V: 124"]

b. <u>Wood and Ash</u>:  Notwithstanding that extensive amounts of wood and ash had been dumped on the Property with the "brick and concrete", Gateman at one point denied that there was any wood or ash in the debris materials on the Property.  [V: 83]

c. <u>Debris Ramp on Georto Side</u>:  Notwithstanding that the existence of the debris ramp on the side later sold to Georto had been open and obvious to even a casual observer on Union Street, Gateman testified (in his deposition, prior to the discovery of the Family Dollar engineer photographs and corresponding sketches clearly showing such location) that the debris ramp had only been on the Family Dollar side.  [V: 6]

---

[1] Pursuant to his Request No. 121, Gateman proffers that he made such an assertion "because he relied on the Roberts contract that all debris, other than bricks and concrete had been removed." In other words, he disregarded what he knew to be the case based on his observations and conduct - that the debris had not been removed but instead had been buried - and instead falsely testified and then attempted to justify such lie by saying that he falsely testified because he had relied on a document that predated the burying of the debris.

2. **<u>Word Games</u>**

Gateman engaged in word games:

a. "<u>To me it was dirt</u>:" When questioned about the debris revealed by the excavation and
   test pits in April, 2004, Gateman testified that "I saw dirt. To me it was dirt."  [VI: 113]
   As he ultimately admitted when questioned about Exhibit 3G-2, a photograph taken by
   Mr. Hawkins in April, 2004 clearly showing substantial amounts of wood and ash that
   had been buried on the Property, Gateman conceded that those materials were what he
   considered to be "fill dirt."  [VII: 122]  It is reasonable to infer that Gateman had
   deliberately chosen to refer to such materials as "fill dirt" in response to Georto's claim
   in this lawsuit that Gateman had represented that all of the demolition debris had been
   removed and replaced with fill dirt.  Since he knew that extensive amounts of debris had
   not been removed, he simply chose to call that material "fill dirt."  Gateman could not
   possibly have believed that a site full of concealed demolition debris could be described
   as fill dirt or be in any way used for construction of a building, especially given that
   Family Dollar had just required him to remove the demolition debris (including not only
   the concealed debris ramp but also the "brick and concrete") from their side pursuant to
   the warranty that all demolition debris had been removed. Family Dollar did so after
   "discovering" the concealed debris ramp as a result of having the benefit of having seen
   photos depicting the debris ramp  before it was concealed by Gateman.

b. "<u>Ramp</u>:"  When questioned at his deposition (in August, 2005, prior to production of the
   Family Dollar engineer photographs) as to whether there was a ramp coming into the
   basement area of the former building, Gateman testified:  "What do you mean ramp?"  "I

don't know what you mean by ramp," and "I don't know what you mean." [VI: 5-6]
After further exchanges with examining counsel, Gateman only finally admitted to a
ramp being onsite when he referred to it as a "road." Thereafter, in his testimony, he
referred to it as a ramp, as this is clearly what it was and what he knew it to have been.

c.    "Ash:"  When questioned about his claim that the material mixed with the brick and
concrete (prior to being buried with fill) from the burnt building was dirt and not ash,
Gateman instead asked: "If I could ask you, could you give me a definition of what ash
is?" [VI: 20].   After such exchange with examining counsel, he then admitted that there
was ash in the material.

d.    "Assumed:"  While Gateman, who was onsite each day during the excavation of the
debris ramp and received a credit of $10,000 from Roberts to "leave some stuff,"
admitted that he had observed the demarcation of the line for excavation of the debris
ramp and that he never asked Wetherbee to excavate any portion of the debris ramp from
the Georto side, Gateman nonetheless claimed that he had "assumed" the debris ramp had
been removed from the Georto side as well.  [VI: 22; VIII: 10-11; VII: 121]

**3.  Changing Story**

Gateman continually changed his story throughout this case in an attempt to disclaim his
knowledge regarding the demolition debris and its impact upon use of the Property.   Such
changes included:

a.  Creation of Debris Ramp:   Even though he had not only testified in his deposition but
actually had stipulated in the parties' Stipulations of Fact (Exhibit 1) that the debris ramp
had been created by a prior demolition contractor (i.e., before the buildings were
demolished and the debris was sorted by Roberts) [Ex. 1 (Stipulation of Facts) at ¶¶2, 3;

4

VI: 36-37], Gateman nonetheless speculated that the ramp must have been created by

Roberts.  [VII: 20-21]. In changing his story, Gateman apparently sought not only to

blame Roberts for the ramp but also sought to disclaim his knowledge that the ramp had

been created prior to the time that the debris was sorted by Roberts.  Stated otherwise,

Gateman sought to disclaim his knowledge that the ramp contained unsorted demolition

debris (therefore containing wood, metal, ash, etc.) and was willing to alter his testimony

to suit that purpose.[2]

b.  <u>Debris ramp on Georto side</u>:  While Gateman ultimately acknowledged (after the

discovery of the Family Dollar engineer photos and sketches clearly showing the

location of the debris ramp) that the ramp had extended substantially onto the Georto

side, he had initially testified (in his deposition, as referenced in his trial testimony, prior

to the discovery of the Family Dollar engineer photographs) that the debris ramp

extended only onto the Family Dollar side; i.e., that there <u>never</u> was a ramp on the

Georto side.  [VI: 6].  Had those photos not been produced, Gateman likely would have

continued to testify that the ramp had not extended onto the Georto side.

c.  <u>Disappearing Ramp ?</u>:  When questioned at his deposition (prior to becoming aware of

the Family Dollar engineer photos) as to his knowledge of the ramp as of the time that he

was working to compact fill over the ramp in May, 2002, Gateman incredibly testified

that he wasn't even aware of the existence of the ramp at that time.  [VI: 10-11].

d.  <u>Role at Site</u>:  Despite his contrary prior testimony, Gateman apparently concluded that it

would be beneficial to his litigation position to claim that he had not directed Wetherbee

---

[2] When questioned about his changing versions, Gateman, consistent with his habit of not taking
any responsibility and instead blaming others, blamed his trial counsel even though counsel had
rightfully based the stipulation on Gateman's deposition testimony.  [VII: 71]

and that instead all work was directed by the Family Dollar engineer.  [See Gateman's Request # 100]   Such a contention, however, is contradicted by the evidence. Wetherbee performed services at the Site at the request and direction of Mr. Gateman [VIII: 114-116], and Mr. Wetherbee reported to Mr. Gateman.  [VI: 71]  Also, Gateman admitted that it was he (Gateman) that asked Wetherbee to "uncover" the ramp. [VII: 31-32]  Moreover, Gateman told Wetherbee that he had been asked by Family Dollar to remove that ramp material.  [VIII: 125-126]  Gateman asked Wetherbee to remove the portion of the debris ramp that was on the Family Dollar side.  [VI: 71; VIII: 125] Gateman admitted that he may have directed Wetherbee to excavate the ramp on the Family Dollar side.  [VII: 86]

When initially questioned about what he knew to have been put on the Property, Gateman stated that it was "fill dirt" (so as to coincide with the statement in the Phase 1 Report that the site was being filled with fill dirt).  After initially denying that the material included wood and ash, he then characterizes the debris as "inconsequential" - no more than would "fit in a trash bag."  When he ultimately admits that an extensive amount of debris was buried at the Property, he then seeks to blame Roberts for the debris.  For example, Gateman claims that Kevin Doherty of Roberts had told him that he could leave such material.  Gateman's purported reliance, however, is contradicted by his initial denials.  If in fact Gateman had actually believed that such materials could be dumped on the Property, why did he initially deny that such materials had been dumped?  His early testimony contradicts, albeit indirectly, his "last version" of events.

Gateman altered his testimony as to many of the key issues in the case based on his perception of the available information.  For example, Gateman many times prefaced his acknowledgements at trial as to the existence of the debris on the Property by words such as

6

"what I know today" and "as of today." [VI: 4-5). What caused Gateman, who was not only on the site on a daily basis but actually worked on the site to bury the burnt debris on the Property, to finally acknowledge such debris whereas in his prior sworn testimony and answers to interrogatories he had repeatedly and vigorously denied the existence of such debris (characterizing it as "inconsequential" or "fill dirt")? What caused Gateman, who had asserted a third party claim against Roberts pursuant to which he asserts that Roberts failed to remove the debris ramp [See Gateman Request ## 118, 119; see also V: 72-75], to finally acknowledge that the debris ramp and other debris had been buried and left on the Property?

Gateman's epiphany at trial can be attributed to the production of the Family Dollar engineer photos (Exhibit No. 3C1-172) shortly before trial. Those photos, which were produced in response to a trial subpoena, caused Gateman to acknowledge that which he didn't believe he could continue to deny (i.e., that the ramp had at all times extended substantially onto the Georto side and contained extensive amounts of debris). Had those pictures not been produced by the Family Dollar engineers, Gateman likely would have continued to insist at trial that the ramp had been only on the Family Dollar side and that there was an "inconsequential" amount of debris on the Property.

The production of the Family Dollar engineer photos also caused Gateman to base and shape his testimony regarding the appearance of the debris ramp upon what was apparent in particular photos. Many of Gateman's Requests regarding the appearance of the debris ramp (i.e., that it looked like brick and concrete to Gateman) are based upon his commentary at trial about what he believes to be apparent in particular photographs. Gateman's statements were frequently prefaced by words to the effect of "what I see in the photos", "I have not seen any photos," as if he has no intent to tell the truth but is openly stating that he will form his version to

his benefit around whatever photographic evidence we have discovered.  [See Gateman Requests ## 6-8, 10, 63]  Those photos reflected the appearance of the ramp on or after April 18, 2002, well more than a month after Roberts began its demolition work at the site and long after Roberts cleaned up the appearance of the ramp.  In so doing, Gateman ignores not only the appearance of the ramp as of the date that Roberts first began work (March 12, 2002) but also his knowledge at all times that the ramp contained extensive amounts of debris other than brick and concrete.  As both Mr. Stalker and Mr. Doherty of Roberts testified, the ramp was not only already in existence as of March 12, 2002 (i.e., further confirming Gateman's own stipulation that the ramp was created by a prior demolition contractor) but it was readily apparent to any observer (including Gateman, who was also at the site at that time) that the ramp included extensive amounts of wood and metal debris.[3]  [VIII: 85-7; Ex. 52, p. 80].

Many of Gateman's Requests are framed as "Gateman testifies that …" or "Gateman asserts that …" rather than as statements of fact.  For example, whereas Gateman's Request no. 8 states "[i]n April, 2002, Gateman was aware of ramp and saw it then …" (an awareness as of April 2002 that he does not try to deny), Request no. 7 merely states that "Gateman testified that he simply did not know the dimension of the ramp, where it started and where it ended…" (testimony that attempts to explain the discrepancy between the Family Dollar engineer photographs / sketches – which clearly show where the ramp started and ended and that such location was readily apparent to any casual observer on Union Street -  and Gateman's prior testimony where he testified that the debris ramp was located only on the Family Dollar side).

---

[3] Contrary to Gateman's characterizations at Request ## 132, 133, and 137, Stalker and Doherty testimony never testified or suggested that the debris ramp was just brick and concrete covering "good fill".  To the contrary, they both testified that it was readily apparent that the debris ramp was constructed from debris including wood and metal.

Similarly, while Gateman's Request # 51 first states that "Gateman never saw ramp being built" (a proposition that may be true if Gateman was not on the Site during the actual hours that the ramp was being built), the Request goes on to provide that Gateman "testified that the only possible origin could have been Roberts, who needed it to access the Property" (speculation that contradicts his prior admission and stipulation that the ramp was built by a prior demolition contractor). Given Gateman's ever-changing versions of events, such prefatory language (i.e., setting forth that he testified in a certain way rather than simply stating the proposition as fact) was appropriate and likely not accidental.

## B.  Responses to Specific Requests

### 1.  Debris Ramp

#### a.  Creation of Ramp [Gateman Request ## 49,51]

Gateman's speculation that the initial demolition contractor (Turner) could not have built the ramp is expressly contradicted by not only by his testimony and stipulation that Turner had created the ramp but also by the testimony of Robert Stalker and Kevin Doherty of Roberts that the ramp was present when they first saw the Site and that it was readily apparent (including to Gateman who was onsite at that time) that the ramp contained substantial amounts of wood, metal, ash, and other debris in addition to brick and concrete. [Ex. 1, Stipulation of Facts, ¶ 2,3; VI: 36-37; VIII: 27, 50-51; Ex. 52, p. 80; VIII: 26, 27, 74, 85-87]

#### b.  Content / Appearance / Knowledge [Gateman Request ## 6,8-10, 69,74]

Incredibly, Gateman  proffers not only that he "assumed at all times that only dirt/fill was underneath the brick and concrete ramp" but also questions whether there was any debris at all in the ramp ("[t]he debris, if any, was covered by the ramp") even though he knew exactly what

9

was contained in the ramp and admitted that the ramp was built out of <u>nothing but demolition debris</u>.  [V: 121; VI: 39; VII: 100-102]  The ramp didn't <u>cover</u> demolition debris; the ramp <u>was</u> demolition debris.

Gateman's claim that he "was not aware of any debris beneath the ramp until debris was discovered in May, 2004" is similarly outrageous, and Gateman's testimony that the ramp "looked only like brick and concrete" as of April 18, 2002 is irrelevant.  Gateman not only was onsite as of March 12, 2002 so as to see that the debris ramp contained wood, metal, ash and other debris [VIII: 86] but also observed exactly what was in the ramp when he watched Wetherbee excavate the debris from the Family Dollar side on <u>May 17, 2002</u>.  [VII: 34-35].  It is also interesting to note that Gateman's Requests rely so heavily on Gateman's comments on the photographs ("every photo of the ramp that Gateman has ever seen appears to be brick and concrete") rather than on what was actually in the debris ramp and Gateman's knowledge thereof based on his daily presence onsite. [V: 94; VII: 63; Ex. 52, p. 24]

c.   <u>Location [Gateman Request # 7]</u>

While Gateman may not have known the exact dimensions of the debris ramp (i.e., length in feet, etc.), he certainly knew that the ramp had substantially extended onto the Georto side. [V: 77-78; VI: 23-24]  In fact, Gateman agreed that the sketch prepared by Harding Lawson identified as Exhibit 2E (reflecting the Site as seen on April 19, 2002) was consistent with his recollection as to where the ramp had appeared on the Site. [V: 77]  As is reflected in the Site sketch prepared by Harding Lawson, the debris ramp on the Georto side of the property was at least as large as the debris ramp that had existed on the Family Dollar side of the property as it appeared on April 19, 2002. [Ex. 2E]

d.   <u>"Discovery" [Gateman Request # 53-55, 65]</u>

10

Family Dollar not only discovered the debris ramp but also discovered that Gateman had attempted to bury and conceal the debris ramp notwithstanding that he had warranted in his purchase and sale agreement that he had removed all debris (including not only wood, metal, ash and other debris but also brick and concrete) from the entire Site.

Contrary to Gateman's assertions that Roberts left behind only brick and concrete and "fines" and that "[a]s soon as he became aware of the ramp, in May 2002, he immediately contacted Roberts to have them return to the site to remove the ramp and any remaining debris" (emphasis added), it is undisputed that Gateman had known of the existence of the ramp long before May, 2002 and had not asked Roberts to remove the ramp. To the contrary, he requested and directed Loveland Trucking to deliver fill to the Site [VI: 9] and then worked to compact that fill over the ramp.  [VI: 61] Moreover, Gateman's Request #54 mischaracterizes the cited testimony. He did not testify that he contacted Roberts to remove the ramp and any remaining debris but instead testified only that he told them to "take care of it."  [VII: 34].  As we know, it was taken care of by dumping most of it on the Property. In exchange, Gateman received a credit of $10,000.

e.  "[I]t was obvious that the entire ramp and all the debris needed to be removed."
    [Gateman Request ## 56-57, 67]

It absolutely was, as Gateman testified, "obvious at that point that the ramp had to be removed" and that "as soon as you see it, we all knew that it was material that shouldn't have been there."  [VII: 118]   In fact, it was obvious to Gateman not only at the time that Family Dollar discovered Gateman's attempt to bury the ramp but at all times before and after. Unfortunately, Gateman took no steps to remove the debris ramp from the Georto side and instead dumped most of the debris from the Family Dollar side of the debris ramp onto the

Georto side and knowingly left the Georto side of the debris ramp covered under the fill that
Gateman had compacted.

Contrary to the characterization of the cited testimony in Gateman's Request # 67,
Gateman did not testify that he "called Roberts and instructed them to return to the site and take
away all debris" but instead testified simply that "I got on the phone and called Roberts." [VII:
118] Contrary to the characterization of the cited testimony in Gateman's Request # 57,
Gateman did not testify that Roberts "assured" Gateman that "all debris would be removed."
Rather, Gateman testified that Roberts told him that "they would take care of what they had to
take care of." [VII; 36 at lines 4-14] Stated otherwise, Roberts would return and assist in
cleaning up only the Family Dollar side of the Site – the side that had to be taken care given that
Family Dollar required that work to be done before they would go forward with the purchase.


    f.   "[A]ssumed that Roberts… removed all the ramp and debris." [Gateman Request #
        52, 70, 122-127]

Not only did Gateman not have any basis to assume that Roberts removed all of the ramp
and debris, Gateman knew that they did not do so.[4] As is referenced in more detail in Georto's
Request for Findings of Fact, Gateman knew the location of the line marking what portions of
the ramp would and would not be removed (he was present for such discussions and observed
such demarcation [VI: 22; VIII: 10-11; VII: 121; see also admission at Gateman's Request # 70],
knew that Wetherbee – not Roberts – was doing the debris ramp excavation work (he was
present for such work) [VII: 31-32], knew that Wetherbee excavated only the Family Dollar

---

[4] Much like his mischaracterizations in Request ## 57 and 67, the testimony cited in Request ##
122 – 127 does not support the characterizations that Roberts had agreed to return to the site and
remove any and all debris or that Gateman had instructed Roberts to take "everything" away.

portion of the debris ramp (Gateman was onsite for such work and admits that he never asked Wetherbee to excavate the debris ramp on the Georto side) [VII: 121],  and knew that nobody excavated the debris ramp from the Georto side (he admits that he was onsite on a daily basis, never saw anyone excavating the debris ramp from the Georto side, and took no steps to cause that excavation).   [V: 129-130].

Gateman's contention that he "assumed" that Roberts ultimately removed the ramp is also contradicted by his admissions that, prior to the "discovery" of the concealed debris ramp by Family Dollar, he knowingly permitted Roberts to complete its work and leave the Site <u>without removing the ramp</u>.  Pursuant to  Request #47, Gateman, choosing his words carefully, states that when Roberts left the site for the first time, in early May, 2002, the "site <u>looks</u> completely clean, <u>except for brick and concrete and screened material</u>" (emphasis added).  Of course, Gateman could not state that the Site was actually clean because he knew not only that the "brick and concrete" and "screened material"[5] had been dumped but also that the demolition debris ramp had been buried under the fill delivered at his request and direction.  Gateman knowingly permitted Roberts to leave the entire debris ramp as of the first time Roberts left the Site and then knowingly permitted Roberts to leave the portion of the debris ramp on the Georto side when Roberts left the Site the second and last time.  The only reason any portion of the debris ramp was excavated was because Family Dollar caught Gateman and made him do it.  He then only did what he had to do to prepare the Family Dollar portion of the Site for sale to Family Dollar and left the remaining portion buried.

---

[5] Contrary to Gateman's characterization in his Request # 52, the cited testimony does support the contention that the screened materials was "acceptable fill".  Instead, he simply testifies that "the demo debris would be left behind" [VII: 27]  The screener does not dispose of or magically transform the demolition debris, it merely separates it by size.

Gateman could not possibly have assumed that Roberts had taken away all debris from the Site for the additional reason that Roberts issued a separate credit to Mr. Gateman in the amount of $10,000.00 on July 1, 2002 to "leave some stuff." [VIII: 102-103; Ex. 11 at Bates No. 73] Gateman admitted to having had discussions with Doherty regarding the credit. [VI: 99-100]. Gateman's claim that, because he owned the entire Site, he would not take out some debris and merely move it around his property, is similarly disingenuous. Gateman contracted with Roberts on March 12, 2002 for demolition work because he believed that Family Dollar's interest in buying a portion of the Site gave him a purpose to do so. When questioned as to what caused Gateman ultimately to undertake the demolition work notwithstanding that he did not do such work for over six months after receipt of the initial demolition order dated August 31, 2001, he testified that his "deal with Family Dollar stores" gave him "a purpose to do the demolition and raise the money." [VII: 109-110] Knowing that he only had to prepare one portion of his Site for sale to Family Dollar, Gateman had no purpose (in his mind) to remove all of the debris - especially since reducing cost was a primary motivation for him.

## 2. "**Brick and Concrete" [Gateman Request ## 17-19, 40, 65]**

Gateman's testimony regarding his conversations with the City of Lynn Building Inspector, Frank Calnan, were not admitted for purposes of the truth of the matter asserted. Accordingly, there was no evidence that the City of Lynn ever actually gave Gateman permission to leave brick and concrete on the Property. (It should be noted that Gateman chose not to call Mr. Calnan as a witness.) Moreover, it was undisputed that Gateman did not at any time provide any notice to the City of Lynn Board of Health or to the Massachusetts Department of Environmental Protection, let alone receive any permission, as would have been required, and as one would have expected Mr. Calnan to instruct Mr. Gateman, in the unlikely event that Mr.

14

Calnan had stated that brick and concrete might be left on the Property.)  To the contrary, the evidence actually indicates that no such permission was given.  The applications for demolition, the related notifications, and the demolition permit do not make any mention of leaving any brick and concrete at the Site.  [Ex. 6, 7, 8 and 10]  Moreover, the affidavit signed by RIS Corporation on 10/10/2001 and submitted to the City of Lynn Building Inspector in connection with Gateman's application for demolition (also dated October 10, 2001) stated that "all debris resulting from the construction activity governed by this building permit shall be disposed of in a properly licensed solid waste disposal facility as defined by M.G.L. c. 111, §150A."  (emphasis added) [Ex. 6, p. 16]

Contrary to Gateman's characterization of the cited testimony in Request # 19 (the citation should in any event have been to page 18 of the transcript, not page 19), Gateman did not testify that Mr. Calnan told him that the brick and concrete could permanently remain but instead merely testified that Mr. Calnan wanted the bricks and concrete sloped against the foundation wall "so if someone did fall into the site, they wouldn't just drop 10 feet, they would basically, you know, they would have a slope to fall into."  [See VII; 18]   Gateman similarly mischaracterizes the cited testimony in Request #65, as Gateman did not testify that the Order from the City of Lynn Building Inspector permitted him to leave the brick and concrete.  [See VII: 72]  (As is noted above, the Orders did not permit anything to remain but instead required that Gateman fill with clean sanitary fill.)

Even if one were to give any credit to Gateman's testimony insofar as it relates to his state of mind, Gateman understood that the intended purpose of putting brick and concrete up against the foundation walls was for safety reasons until such time as the Site was filled to grade; that was how it was explained to him by Mr. Calnan.  [See VII: 106]  Gateman admitted that as

15

of March 2002 he did not expect that the Site was going to be filled at all and testified that he instead expected that the brick and concrete would be put around the perimeter of the Site to make it safe (to create a slope against the foundation walls so that someone would not fall into a ten foot deep hole).  Stated otherwise, he knew that, even if he could use the brick and concrete for safety purposes until such time as the Site was filled to grade, he did not have any permission to permanently leave such brick and concrete - i.e., as part of the permanent fill.  [See VIII: 15; VII; 18]

In any event, it is undisputed that: the brick and concrete was demolition debris; the brick and concrete had not been processed; no determination was ever sought or obtained that it had not been painted or treated (such determination being a requirement before it could be processed for use onsite); it was illegally dumped on the Property so as to create an illegal dump; Gateman stated to Lauren McKinlay of Goldman Environmental that all demolition debris would be removed; he did not ever tell her that brick and concrete would remain; and Gateman provided Georto with the Phase I Report stating that all demolition debris had been or would be removed.

Similarly, it is undisputed that Gateman never believed that the City of Lynn permitted him to leave any other demolition debris (such as the "screened material").[6]  Gateman does not contend that he ever had obtained any permission to leave such material. [See Request #65] Moreover, the evidence further demonstrated that Gateman knowingly buried extensive amounts of debris in addition to the brick and concrete notwithstanding whatever his original contract with Roberts provided.

---

[6] Much like the expression "garbage in, garbage out," the screener doesn't somehow magically transform debris into something other than debris. It's still debris, but now in smaller pieces.  As Mr. Stalker admitted, when he sent the screener to the site on May 20, 2002, he expected that all of the wood debris and metal was going to be removed from the Site and properly disposed. [VIII: 89-90]

16

Gateman's suggestion in Request # 40 (without reference to any evidence, expert or otherwise) that the brick and concrete somehow did not constitute an unacceptable environmental condition is unavailing not only because it was uncontroverted that the brick and concrete constituted an unacceptable environmental condition in and of itself (per the testimony of Greg Wirsen as well as Lauren McKinlay) but also because, as was readily apparent from the photographs and the testimony, the brick and concrete was part of a burnt demolition debris mix intentionally and unconscionably dumped in the middle of a metropolitan area.  Even if brick and concrete ultimately could have somehow been hand picked out of the debris soup and even if such brick and concrete somehow could have been processed for reuse (i.e., if it could have been demonstrated that the brick and concrete did not include lead paint, etc.), its presence on the Property, especially as part of a debris soup, was a breach of warranty.[7]

### 3.  Roberts Contract [Gateman Request ## 50, 59, 64, 136]

Contrary to the characterizations set forth in Gateman's Request ## 50, 59, and 64, Gateman did not contract with Roberts to remove "all debris."  Instead, Gateman not only directed Roberts to leave the brick and concrete (so as to avoid paying $25,000 to Roberts for such removal and to reduce the costs of obtaining and delivering replacement fill) but also agreed to leave extensive amounts of additional debris (so as to obtain a $10,000 credit from Roberts and to reduce his costs for obtaining and delivering replacement fill) consisting not only the "screened material" but also the debris ramp (Gateman concedes that the ramp had not been removed when Roberts first finished its work at the Site) and debris from the Family Dollar portion of the debris ramp.  Moreover, Mr. Stalker informed Mr. Gateman prior to

_____

[7] Gateman had in any event fraudulently represented that all demolition debris had been removed.

commencement of the work at the Site that Roberts would not be removing all of the wood and other debris and that there would be pieces of wood mixed in with the brick (seemingly for the purpose of alerting Gateman that the presence of this material was problematic). [VI: 17-18; VIII: 90][8]

4. **Additional Admissions Regarding Debris [Gateman Request ## 47, 59, 67,118, 119]**

Gateman admits in Request ## 118 and 119 that debris material, including the debris ramp, was not removed from the Property. Gateman also admits in Request # 47 that a site containing bricks and concrete and/or "screened material" was not "clean." As is noted above, Gateman also admitted that it was "obvious" that the entire ramp and all the debris should have been removed. [Gateman Request ## 67]

Gateman also admits in his Request # 109 that he had the duty to disclose to Georto material facts known to him at the time of the transaction with Georto. Notwithstanding that admitted duty, it is undisputed that Gateman chose not to disclose his knowledge regarding the demolition debris materials that he knew had been dumped on the Property. To the contrary, he represented in writing that all demolition debris had been removed and replaced with fill dirt.

Gateman's contention in Request # 59 that he was "satisfied that land he sold to Hawkins was free of debris, because he contracted with Roberts to take away all debris and to the best of Gateman's knowledge all that remained was brick and concrete and fines" not only is contradicted by his agreements with Roberts (agreeing not only that Roberts could leave the brick and concrete and "screened materials" but also the entire debris ramp – before the "discovery" by Family Dollar – and the remaining portion of the debris ramp – after the

---

[8] Mr. Doherty denied that he or anyone else from Roberts Corporation told Mr. Gateman that he could use any other demolition debris and material as fill on the property. [Ex. 52, pp. 152-153].

"discovery" by Family Dollar) but further demonstrates that Gateman knowingly buried extensive amounts of demolition debris in contravention of his representations and his warranty, even admitting to using a roller to compact the burnt demolition debris mix on the Georto side. [VI:61] [See also Request # 64, where Gateman states that he "expressed satisfaction" with Roberts]  It is reasonable to infer that the true reason that Gateman was satisfied with Roberts was that Gateman not only received a $10,000 from Roberts "to leave some stuff" but also thereby reduced his costs of filling the Site to grade.

   5.  **Purchase and Sale Agreement;  Warranty [Gateman Request ## 11-13, 16, 58]**

   Gateman not only signed the Purchase and Sale Agreement but initialed each and every page and did so in accordance with his counsel's review of the Agreement.  [Ex. 19; VI: 100, VII: 127]  Gateman's contention that he did not read its provisions is doubtful as Gateman not only knew that he had to provide Georto with the Phase I Report as required by Section 8 of the Purchase and Sale Agreement but he also had just previously been required by Family Dollar to remove the concealed debris ramp from their site due to similar warranty language in their purchase and sale agreement (but with the added leverage that Family Dollar had not yet paid for the property).  However, even if credited, this contention would be irrelevant except to demonstrate his disregard for his contractual obligations (much like he had disregarded his obligations to the City of Lynn, as set forth in the Orders, and his obligations to Family Dollar, as set forth in that purchase and sale agreement) and for that matter his disregard for anyone other than himself as illustrated by his statement that the only thing that he focused on was the price.  [VI: 102]

   Gateman's contentions at Request # 11 (regarding Mr. Hawkins' testimony regarding pre-contract speculation/beliefs regarding Gateman's potential reaction to the warranty language)

not only are irrelevant but mischaracterize Mr. Hawkins' testimony.  Moreover, in response to

Gateman's counsel's follow up question, Mr. Hawkins goes on to testify that the warranty

language gave him broad protection that made him comfortable.  [II: 57-58]  As Mr. Hawkins

also made clear, the warranties contained in the Purchase and Sale Agreement were material to

Georto's decision to enter into the Purchase and Sale Agreement.  [I: 75-77]

Gateman's characterization of Mr. Hawkins' testimony in Request # 12 is disingenuous.

Contrary to Gateman's characterization, Mr. Hawkins did not testify that he would have

purchased the Property if he had known that brick and concrete only had not been removed.

Instead, he merely testified that he would not have known enough about brick and concrete at

that time to have known that it was an "issue."  [II: 93-94]  Mr. Hawkins clearly testified that he

forwarded the Phase I Report to Mr. Morin of PM Construction for his review and comment for

purposes of determining if the expected costs of construction (so as to determine if he would

purchase the Property) [I: 83], and Mr. Morin testified that had he known that all of the brick and

concrete had been left on the Property under the topsoil, it would have "raised red flags" for him

in assessing the amount of the site allowance and the construction cost associated with the site.

[IV: 56]  Mr. Morin further testified that had the Phase I Report indicated that there was any

demolition debris that remained onsite, Mr. Morin would have made sure that there was

something done to determine whether the demolition debris was still onsite - including more

testing on the site.  [IV: 44-45]   In any event, Gateman's illegal dumping was not limited to

brick and concrete but included also wood, ash, and metal, among other demolition debris.  Mr.

Hawkins would not have gone forward with the purchase had he known of the demolition debris.

[I: 93-94, 111]

Gateman's references in Request # 13 to the photos in the Phase I Report are similarly unavailing. Among other things, those photos depict piles of demolition debris - including but not limited to piles of brick and concrete (mixed with other debris) - on May 2, 2002. The Phase 1 Report, which was prepared before the work was completed, expressly sets forth Gateman's representations that all demolition debris has been or will be removed and that the Site was being filled with fill dirt. [Ex. 20 at pp. 4, 10, 17, 20, 23-24] Moreover, the Report includes a photo showing a separate pile of fill dirt that had been delivered to the Site (which we now know to have been on top of the hidden debris ramp). [V: 60-61; Ex. 3B at third page; and Gateman's Request #63, where Gateman refers to such material as "clean dirt"]

### 6. No Duty to Discover Gateman's Fraud [Gateman Request ## 24-29, 41, 60, 72, 73]

Gateman attempts to shift focus away from his duty to make truthful representations and his contractual warranty obligation by essentially arguing that Georto should not have relied upon Gateman's representations and warranties and should have done something to have discovered his fraud. For example, Gateman suggests that PM should have asked Roberts whether they had removed the debris (Request # 25), that Georto should have conducted additional investigations of the Property before the closing (Request ## 26, 27, 60)[9], that Georto should not have relied upon the Phase I Report (Request # 28, 71), and that Georto and PM in any event relied upon the Limited Subsurface Investigation report of GEC (Request # 72, 73). It is also notable that Family Dollar only discovered the concealed debris ramp on their side due to having viewed photos of the debris ramp before Gateman covered it up. Mr. Hawkins did not have the benefit of such photos and relied on Gateman's representations and warranties.

---

[9] It is standard practice in the construction industry for the initial geotechnical engineering testing to take place only after commencement of excavation of the foundation. [IV: 29-31]

Gateman's contentions not only are contrary to the uncontroverted facts establishing that Georto did in fact rely upon Gateman's express warranty and representations [see Georto's Requests for Findings of Fact at 38a] but also are contrary to established case law providing that a plaintiff is entitled to rely on a defendant's representations and warranties and that a plaintiff has no duty to investigate to determine if the representations and warranties are false.  Gateman, who was not only the owner of the Property but who also had been onsite on a daily basis during the demolition process and actively worked on the Site, expressly warranted that there were no non-acceptable environmental conditions, expressly represented that all demolition debris had been removed and replaced with fill dirt by sending the Phase I Report to Georto for its use in connection with due diligence, and caused Goldman Environmental to issue contemporaneous reliance letters to Georto and to Georto's bank expressly stating that Georto and its bank were entitled to rely upon the Phase I Report in connection with their due diligence and  financing. There was no reason to think that Gateman was lying – such representations were consistent with the appearance of the Property (which Gateman purposely caused to look like all demolition debris had been removed and replaced with fill dirt) and with the reasonable expectation that a seller would not have made the property into an illegal dump.   Georto (as well as KeyBank, a national lender) was entitled to – and in fact did - rely on those representations and the warranty.

Gateman's contentions regarding the risk that "the soil was not suitable and/or properly compacted" (Request ## 29, 41) not only ignore the unfortunate reality that the materials dumped in the hole were demolition debris and not soil, but also misconstrue Georto's claims. Had all of the demolition debris been removed from the Property and been replaced with fill dirt in accordance with his representations such that there were no unacceptable environmental conditions, Georto would have borne additional costs, if any, if the fill dirt was not sufficiently

compacted. (In any event, as Mr. Morin testified, additional costs, if any, for compaction under such circumstances would have been less than 10% over the site allowance of $102,000. [IV: 30]) Further, there is no evidence that there would have been any such compacting costs. Moreover, even if Georto had not intended to build on the Property, the presence of the demolition debris on the Property made it an illegal dump such that the debris had to be removed in any event.

7. **Mitigation [Gateman Request ## 14, 20-23, 30-31, 83-90, 128-131]**

Georto's efforts to minimize its damages fully satisfied the duty to mitigate. Georto incorporates by reference Georto's Requests for Findings of Fact at ## 42-51 and further states that those efforts included:

    a.  Upon discovery of the buried demolition debris, PM Construction stopped further site work and instead caused its site subcontractor to dig test pits to explore the nature and magnitude of the problem. [II: 128-129].

    b.  Georto and PM Construction considered and investigated alternatives to removal of the demolition debris, including building on top of the debris, re-engineering the building to be built on top of pilings, and removal of debris in selected areas. [III: 18-20; III: 107; IV: 6-7] PM Construction after consultation with structural and geotechnical engineers, as well its Estimating Department, in connection with those alternatives, determined that the alternatives to removing all the debris were cost prohibitive. [III: 32-33; III: 107] Moreover, the City of Lynn Building Inspector required that the debris material be removed, and it is quite likely that the Massachusetts Department of Environmental Protection DEP would have required the same as it constituted an illegal dump. [IV: 7; IV: 5; IV: 5; IV: 5-6].

    c.  Georto decided to remove the demolition debris based in part on advice from PM Construction that it could not build on top of the debris, that building a building on top of piers would not result in any cost savings and would result in further delays, and that in any event the site was a non-approved illegal dump. [II: 24-25].

    d.  Georto and/or PM Construction met and spoke with Gateman, Roberts (Robert Stalker), and Scott Wetherbee shortly after discovery of the buried debris. Gateman (and for that matter Stalker and Wetherbee as well) had the opportunity to inspect the site and provide any proposals for resolving the problem. [II: 7, VIII: 28-29, 135; VIII: 99 (Stalker)]. Each of those parties has acknowledged that the debris needed to be removed. None of those parties engaged any expert or made any proposal or suggestion other than removal

of the debris. None of those parties agreed to remove the debris, and none of those parties proposed or even suggested that any of the debris material should be recycled.

e.  Georto, by PM Construction, obtained competitive bids from three site subcontractors and contracted with the least expensive of those subcontractors. [II: 28-30; IV: 40]. Georto considered and reviewed PM Construction's comprehensive bid comparison package prior to making any decision. [II: 30]. Mr. Hawkins even called Wetherbee directly, who confirmed that his proposal contemplated additional charges for removal of debris over and above 625 cubic yards. [II: 24]

f.  Georto delayed commencement of the debris removal work for over one month until May 10, 2004 so as to provide Gateman with additional time to make any arrangements to inspect the site, including the opportunity for inspection by any expert of his choosing. Gateman did not engage any expert to inspect the Property. [II: 24]

g.  Georto engaged a geotechnical engineer, Chad Michaud, P.E. of SW Cole Engineering, to inspect the Property and render his opinion regarding how much of the debris material would need to be removed. [II: 33-34; IV: 107-108]. Mr. Michaud determined that the existing debris materials, which were mixed throughout the Property, were not suitable for support of the foundation and floor slab and that all of those materials below the proposed building required removal and was not suitable for reuse even if replaced in a compacted controlled manner. [IV: 118; IV: 124]

h.  PM Construction supervised the work to remove the debris material and replace it with fill, including monitoring and inspection of each truckload of demolition debris material removed from the Property. [II: 118; III: 34].

Notwithstanding that Gateman and his contractors had made no such suggestion before the work began, Gateman, without any expert or evidentiary support, now contends (or, more accurately, speculates) that Georto should have engaged in onsite recycling of certain of the debris material. Gateman's contentions are without merit. The uncontroverted testimony of Chad Michaud (geotechnical expert), Greg Wirsen (solid waste expert), and Phil Morin and Steve McIntyre of PM Construction[10] conclusively established that onsite recycling was not a reasonable or viable option on this project, and likely not even legal. Among other reasons:

a.  Typically, deconstruction methodologies are used to segregate the material <u>while the building is being taken down</u> so that it is not co-mingled with other materials so as to then permit brick and concrete to be processed into a material. [IV: 79] Stated

---

[10] PM Construction did have a licensed construction supervisor on the Property. [III: 64]

otherwise, by dumping the debris in the hole with other materials, Gateman created a much larger problem, a burnt debris mix, and thereby increased the cost and decreased the practicality if not the possibility of rectifying the problem.

b.  Recycling was not a viable option given the large amount of wood, ash and other similar materials mixed in with the debris.[11]  [V: 35-36]

c.  The silty material was unsuitable for reuse because it was mixed with other types of materials such as wood, metal and similar materials.  [V: 38-39]

d.  The quantity of materials that could have been generated by recycling would not have been worth the effort for reuse on the Property.  [V: 42]

e.  Based on his twelve years of experience in dealing with construction demolition debris, Mr. Wirsen had never seen a permit issued for onsite use for the type and nature of the debris found at 200 Union Street.  [IV: 75]

f.  Onsite use of the material would be precluded because the material was co-mingled (mixed).  [IV: 73]

g.  Brick and concrete mixed with other materials (such as metals, fabrics, wood, appliances and other materials) is a solid waste and has to be handled as a solid waste.  [IV: 65-66]

h.  The brick and concrete material, as reflected in photographs taken on April 18 and 19, 2002 with respect to that portion of the property later sold to Georto would not be appropriate for recycling because, among other materials, it was mixed with a lot of wood and ground up wood. [IV: 99]

i.  Onsite disposal of brick and concrete that may have been painted, coated or treated would be a violation of solid waste regulations.  [IV: 74-75, 96]  Further, recyling may have been precluded for the additional reason that the bricks and concrete had been mixed (i.e., treated) with ash and other debris.

j.  In order for brick and concrete to be recycled, it can't be painted, treated, stained or have the potential to contain asbestos.  The owner of the material bears the burden of proof to demonstrate that the material is clean and does not have those constituents within it.  [IV: 67]

k.  As Mr. Stalker admitted,  pursuant to the solid waste regulations of the Commonwealth of Massachusetts, brick and concrete, in order to be used as fill, would not only have to be processed to be no more than six inches in dimension but also would have to be free of any paint or other materials.  [VIII: 71-72]

l.  The brick and concrete could not have been salvaged without first screening the material and then manually picking and sorting the material so as to separate the brick and

---

[11] Counsel for Gateman and counsel for Roberts ignored the testimony of percipient witnesses regarding the mixed debris found buried throughout the Property and instead proffered speculation based upon some notation made upon disposal slips (whereby someone had checked a box marked "brick") in an attempt to suggest that those loads were nothing but brick.  As the witnesses with personal knowledge testified, all of the brick was mixed with other demolition debris.  [Michaud - IV: 118; McIntyre - III: 68; Wirsen - IV: 65; Morin - IV: 35]

concrete from the other materials.  [IV: 122]  The use of manual labor would significantly increase the cost of attempting to recycle any of the brick located onsite. [IV: 122]

m.   In order for the brick and concrete to have been recycled onsite, it would not only had to have been screened and crushed but the bricks and concrete would have had to have been manually extracted from the waste stream prior to crushing.  [IV: 100]

n.   Manually extracting brick and concrete is typically not done on a site and significantly impacts the cost.  [IV: 100-101]

o.   The cost of disposing material at a recycling facility significantly increases if there is material in addition to just brick and concrete.  [IV: 84]

p.   Screening and crushing material on the Property was not a reasonable or viable option, due to, among other reasons, the amount of wood and other materials from the burnt building mixed with the brick and concrete.   [III: 48, 73-74; IV: 7-9]

q.   Screening and crushing was not an option for the additional reason that the site was too small. [III: 48, 66, 73; IV: 7]

Gateman's after-the-fact complaints about the actual cost that Georto paid to remove and replace the debris are similarly without merit.  First and foremost, Georto, by its general contractor PM Construction, solicited competitive bids and chose the least expensive of those subcontractors.  Second, Gateman's contentions regarding the subcontractor's costs are irrelevant.  Neither Georto nor PM Construction were privy to site subcontractors' expenses.  The bids are based on supply and demand, as is the case with all services, construction or otherwise. Third, Gateman offered nothing more than speculation.[12] Gateman chose not to call anyone from

---

[12] For example, Gateman set forth a proposed finding based on nothing more Gateman's counsel's speculation as to what Mattuchio (a subcontractor of PM Construction) might have paid for its costs of disposal and Mr. Morin's lack of knowledge as to Mattuchio's costs.  [See Gateman Request # 30]  Gateman similarly sets forth proposed findings based on Mr. McIntyre's statements that you would "probably" save certain dumping and trucking charges if you could use a screener and crusher onsite, without noting that Mr. McIntyre testified that the site was not large enough to accommodate use of a crusher [III: 73-74] and without mentioning any of the uncontroverted evidence that such recycling was not a reasonable or viable option for this project (as is more fully set forth above).  [See Gateman Request # 86]  Gateman's reliance on Mr. Doherty's testimony regarding recycling is misplaced as that testimony pertained to other sites

26

Mattuchio as a witness and did not introduce any expert testimony to support its speculation. Fourth, as Greg Wirsen testified, the typical cost for disposal of a thirty cubic yard container of mixed demolition debris would be $1,400.00 per container, not including transportation. [IV: 101-102] Georto paid $950 per thirty cubic yard container, including transportation. [Ex. 44].

Gateman's counsel's speculative suggestions that the Site Subcontractor (chosen as the best and least expensive of three options) working for the General Contractor working for Georto made too much money is, as mentioned, speculative, not supported by any evidence, and ludicrous. Even in the unlikely event that Mr. Hawkins could have obtained information about the Site Subcontractor's costs, it is highly doubtful that the Site Subcontractor working for the General Contractor working for Georto would have done it for less. The cost is based on supply and demand. It should also be noted such costs likely were impacted by the fact that the work took place during the time of the Big Dig.

Gateman's contentions in Request # 14 regarding a so-called credit for the $102,000 sitework allowance in the Georto-PM Construction contract for the construction of the building are nonsensical and highly disingenuous. It is undisputed that Georto paid $249,171 for the removal and replacement of the debris materials and that such costs were over and above the $135,000 amount, which was the actual amount paid instead of the initially projected $102,000, that it paid for sitework. There was no duplication. [II: 99-100]. Once the debris material had been removed and replaced with fill, Mattuchio had to begin again all of the sitework that was originally anticipated as part of the site allowance. To the extent that any accounting reflects that

_____

and is entirely irrelevant (see Georto's objections to such designations of deposition testimony, including the grounds of relevance and hearsay). [See Georto Request ## 128-131]

Georto was credited with the $102,000 <u>anticipated</u> sitework allowance figure, it was then debited with the $135,000 <u>actual</u> sitework expense (which it paid).

### 8. <u>So-called offer [Gateman Request ## 15, 61-62]</u>

Gateman's so-called offer to repurchase the Property from Georto for $300,000, while indicative of Gateman's culpability, is otherwise irrelevant (even if it had been credible). First, Georto was entitled to the benefit of its bargain – the Property without any non-acceptable environmental conditions. Notwithstanding his acknowledgements that the debris should have been removed, Gateman didn't offer to pay any damages. Gateman didn't offer <u>a single dollar</u> toward removal of the debris nor did he make any offer to otherwise cause the removal of any of the debris. Second, as of the discovery of the demolition debris, Georto had entered into a binding contract with PM [see Georto Finding of Fact #38a] for the construction of the building, had commenced work (including the hiring by PM Construction of various subcontractors), had purchased the pre-fabricated building [see Georto Finding of Fact #38h], had entered into binding loan agreements with KeyBank (including not only a promissory note, but also guarantees, performance guarantees requiring completion of the project, and agreements indemnifying KeyBank with respect to environmental laws) [see Georto Finding of Fact #38e], and had paid the site franchise fee to Aarons [see Georto Finding of Fact #38g]. Gateman's supposed offer did not account for any of these obligations of Georto (all of which resulted from Georto's reliance upon Gateman's representations and warranties). Finally, pursuant to Section 11 of Chapter 93A, only written offers of settlement for damages tendered with an Answer to the Complaint are potentially relevant to the determination of an award of multiple damages. It is undisputed that Gateman made no such offer. Moreover, even as referenced by Gateman's own characterization, the so-called offer was not immediate but was more of an off- the-cuff remark

to counsel, long after Gateman's credibility was questionable, did not take Georto out of the chain of title and would have left Georto possibly permanently exposed to potential liability (i.e., it is likely that Gateman simply would have resold the Property without removing the debris), and did not change the fact that the Property had to be cleaned up.

It should also be noted that Gateman only made such purported offer after having first told Mr. Hawkins to "sue me" and only after he learned of the magnitude of the expected costs of remedying Gateman's breach of his warranty and his fraudulent, unfair, and deceptive conduct. [VI: 115]  Furthermore, given Gateman's repeated intentional disregard of his contractual and legal commitments (i.e., to Family Dollar, to Georto, and to the City of Lynn), the so-called offer was really no offer at all.

9.  **Georto's Sale of the Property [Gateman Request # 96]**

Gateman's reference in Request # 96 to Georto's subsequent sale of the Property for $1,150,000 is not only irrelevant but is blatantly deceptive.  While Gateman refers to the purchase price of $300,000 (the price paid for land without any improvements) and seeks to suggest that Georto sold the Property for a huge gain, Gateman fails to mention not only that Georto incurred substantial costs to improve the Property through the construction of the building but also that Georto sold the Property at a significant loss.  As Mr. Hawkins testified, Georto's total costs were $1,350,000.  [II: 98-99]  Rather than realizing a gain, Georto incurred a loss of approximately $200,000.  In contrast, Gateman profited from the sales of the Site in the amount of $600,000.

## II.    RESPONSE TO ROBERTS' REQUESTS

Roberts' Requests are largely in accord with Georto's Requests.  Contrary to Roberts characterization at its Request # 59, however, the gravamen of Georto's claims is not the "brick and concrete."  While Roberts' written contract with Gateman, by virtue of its separate provision regarding brick and concrete, gives Roberts some incentive to recharacterize Gateman's claims so as to emphasize the brick and concrete buried at the Property, the gravamen of Georto's claims were that Gateman had used the Property as an illegal dump by burying extensive amounts of demolition debris consisting of wood, burnt wood, ash, metal, trash, and other debris in addition to the brick and concrete debris.  The claims are based not on what some unnamed individual chose to check off on the disposal slips (Exhibit 44) but rather on what was actually buried (as referenced by Mr. McIntyre and documented by Mr. Michaud and as any reasonable person would conclude from the photographs and the undisputed testimony) and on what Georto had to pay in order to remove the debris material and replace with fill.

Finally, while Roberts' statement at footnote 2 of its Requests that a screener "loosens the dirt and segregates the larger pieces, returning the dirt and fill to the ground" might be accurate if dirt and fill is put into the screener in the first place (i.e., so as to remove larger rocks), it is not accurate to the extent that demolition debris is put in the screener. In that case (and in fact in our case), the screener will simply separate out the demolition debris by size.  "Debris in, debris out." When Mr. Stalker sent the screener to the site on May 20, 2002, he expected that all of the wood debris and metal was going to be removed from the Site and properly disposed.  [VIII: 89-90]

30

**PLAINTIFF GEORTO, INC.**
By its attorney


/s/ Dale Kerester
Dale Kerester, Esq., BBO # 548385
Lynch, Brewer, Hoffman & Fink LLP
101 Federal Street
22nd Floor
Boston, MA 02110
Dated:   October 23, 2006        617-951-0800


## Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants.


/s/ Dale Kerester
Dale Kerester


Dated:   October 23, 2006

31