UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GEORTO, INC., | ) |
|     Plaintiff, | ) |
| | ) |
|     v. | )Civ. Action No. 04cv11730-NG |
| | ) |
| WILLIAM GATEMAN, | ) |
|     Defendant, | ) |
|     Third Party Plaintiff, | ) |
| | ) |
|     v. | ) |
| | ) |
| ROBERTS INC., | ) |
|     Third Party Defendant. | ) |

GERTNER, D.J.:

**MEMORANDUM AND ORDER**
July 3, 2007

I.    **INTRODUCTION**

This dispute is about contracts and debris.  The issue is how it came to be that Georto, Inc., ("Georto") ended up with debris-filled property, unsuitable for the construction for which it was purchased, notwithstanding contracts that apparently required otherwise.

James Hawkins ("Hawkins") (the principal of Georto)[1] was looking for a building to rent in order to open a franchised Aaron's Sales and Lease Ownership Store ("Aarons"), when he came across the property at 200 Union Street in Lynn, Massachusetts, owned by William Gateman ("Gateman").  Hawkins decided to buy the property instead and construct a building.  This was his first construction project and he was anxious about the details.  He

---

[1] The plaintiff will be referred to interchangeably as Hawkins or Georto.

drafted a contract that included various protections for the buyer in an effort to avoid buying a "money pit." The Purchase and Sale Agreement entered into by the parties provided that Georto intended to use the property as a commercial retail establishment and for the construction and operation of a commercial space. Exhibit ("Exh.") 19 ¶ 8. Among other things, Gateman warranted that "there are no hazardous materials as defined by state, federal, or local law, or non-acceptable environmental conditions on the property." Exh. 19 ¶2(f). Hawkins modified an earlier draft of the agreement to add the language "or non-acceptable environmental conditions on the property" in order to broaden his protection. <u>See</u> Trial Tr. vol. I, 76 (Sept. 11, 2006). Gateman assented to the contract language that Hawkins proposed.

Indeed, in their initial dealings, Gateman seemed very open with Georto. Gateman gave Hawkins full access to the property -- to look around, test it, whatever he wished. Gateman had previously sold the adjacent piece of property to the Family Dollar Store ("FDS" or "Family Dollar"). Gateman gave Hawkins a copy of the Phase I Report prepared in conjunction with the Family Dollar Store sale, which indicated that the property was free of any solid waste or debris. Gateman also provided Georto with the FDS Purchase and Sale Agreement, which provided that both the FDS property *and* its adjacent property (i.e. the site

Georto was purchasing), were free of all demolition debris.  His behavior during the negotiations was not consistent with hiding anything.

Indisputably, however, the property sold to Georto was not delivered in the condition for which Georto contracted.  Hawkins hired PM Construction ("PM") to construct a building on his property.  When PM began to trench the site, they came across a mass of buried debris.  Bricks, concrete, wooden beams, pipes, file cabinets -- everything but the proverbial kitchen sink (there was even a radiator).  The photographic evidence confirms it, in addition to the undisputed testimony of Hawkins, PM employees Phil Morin ("Morin") and Stephen McIntyre ("McIntyre"), and Chad Michaud ("Michaud"), a geotechnical expert.  Even Gateman himself admitted that debris was buried on the property.  The question, therefore, is how the debris came to be there and who must be held responsible.

Georto brings five claims against Gateman: (1) breach of contract, (2) fraud, (3) negligent misrepresentation, (4) breach of covenant of good faith and fair dealing, and (5) violation of Massachusetts General Laws Chapter 93A ("93A").  Gateman, in turn, brings a breach of contract claim against Roberts Dismantling and Recycling ("Roberts") -- the company Gateman hired to remove demolition debris from the property -- arguing that any fault lies with Roberts.

An eight-day jury-waived trial was held, after which the parties submitted briefs and proposed findings of fact.

## II.  FINDINGS OF FACT

To solve the mystery of the buried debris, I must start at the beginning.

### A.  The Initial Demolition Work

#### 1.  The 200 Union Street Property and the Fire: 1996-2002

Gateman, as Trustee of the 200 Union Street Property Trust, purchased the property in question in 1996.  In the summer of 2001, Gateman put the real estate up for sale.  In August of that year, however, the building at the site was destroyed by fire. Due to safety concerns, the City of Lynn building inspector ordered Gateman to demolish what was left.  Turner Demolition ("Turner") performed the initial demolition work, knocking down the front of the building.  Exh. 1 ¶ 2-3.

During its work, Turner created a "debris ramp":

> The debris ramp was used to drive machinery
> from street level into the basement
> foundation during the demolition work and was
> built before any fill was brought onto the
> property.  [It] was approximately sixty feet
> wide, forty feet long, and ten to twelve feet
> high.

Exh. 1 ¶3.

Turner worked on the site only briefly.  Sometime later, Gateman hired Regional Industrial Services Corp. ("RIS") to

perform additional demolition work[2], Envirotest to perform air monitoring (determining what hazardous materials had to be removed), and SCS to perform asbestos work.  <u>See</u> Tr. VII: 13, 20. Gateman's insurance claim was soon denied and he no longer had the funds to pay contractors.

2.   <u>**Family Dollar Store Construction - 2002**</u>

On April 26, 2002, Gateman entered into a Purchase and Sale Agreement with the Family Dollar Store to sell a parcel of the 200 Union Street Property.  <u>See</u> Exh. 1 ¶7.  The contract provided that Gateman had removed all demolition debris from the parcel Family Dollar Store was purchasing, as well as from the adjacent property owned by Gateman. <u>See</u> Exh. 16 ¶2A; <u>see also</u> Exh. 1 ¶7.[3] Gateman testified that the pending deal with FDS gave him the incentive to raise the funds to continue the demolition work.

a.   <u>**Gateman's Contract with Roberts**</u>:

In March of 2002, before the FDS purchase was completed, Gateman contracted with Roberts to continue the demolition work initiated by Turner and RIS.  The contract between Gateman and Roberts included two different prices, reflecting work of different scope.  The contract provided that Roberts would demolish what was left of the building, remove the "demo debris"

---

[2] During their brief work, they knocked down a wall and moved debris materials so that the arson investigators could access the basement.  <u>See</u> Trial Tr. vol. VII, 67 (Sept. 20, 2006).

[3] The FDS Purchase and Sale Agreement does not define the term "demolition debris."

off site, "leave concrete and brick in hole to bury," and rough grade the site, for the price of $90,000.  <u>See</u> Exh. 9; Trial Tr. vol. VIII, 33-34 (Sept. 25, 2004).  If Gateman determined that he wanted to have the brick and concrete removed, Roberts would do the additional work for another $25,000.  <u>See</u> Exh. 9.

It is undisputed that Gateman instructed Roberts to leave the brick and concrete onsite.  Tr. VII: 17, 72, 78.  Although Gateman maintains that he received permission from the City of Lynn to use those materials as fill, he offered no corroborating evidence.[4]

Roberts screened and sorted the waste from the middle of March 2002 to early May 2002, removing over 1,178 tons of debris. <u>See</u> Exh. 12.  Significantly, Gateman came by the site almost daily.

As Roberts concluded their work, they placed the brick and concrete -- mixed with ash and small pieces of wood -- in piles

_____

[4] The demolition application does not make any mention of leaving brick and concrete onsite, nor do any of the related notifications or the demolition permit.  <u>See</u> Exhs. 6, 7, 8, 10.  The RIS affidavit submitted to the City of Lynn in connection with Gateman's application for a demolition permit stated "all debris resulting from construction activity governed by this building permit shall be disposed of in a properly licensed solid waste disposal facility as defined by M.G.L. c. 111 § 150A."  Exh. 6 at 16.

Gateman contends that Frank Calnan, head of the City of Lynn building department, gave him permission to leave the brick and concrete, <u>see, e.g.</u>, Tr. VII: 90, but concedes that his discussions with Calnan pertained only to making the site safe for passers-by as a temporary measure.  Gateman testified that Calnan told him to leave the concrete and bricks sloped against the side of the foundation hole, so that if someone fell in, he would not drop ten feet straight down.  While I believe that Calnan gave Gateman that instruction, that is in no way relevant to the question of whether bricks and concrete constituted appropriate fill.

along the wall of the foundation hole.  Roberts left the debris ramp in place.  Gateman, given his regular oversight of the property, plainly knew it was there and did not direct Roberts to remove it.  Indeed, other contractors, Loveland Trucking ("Loveland") and Wetherbee Construction ("Wetherbee"),[5] who began their work as Roberts was finishing, and remained on site after Roberts left on or around May 9, continued to use the ramp to get their machinery into the foundation hole.

### b.    Filling the Site

Although the contract between Gateman and Roberts stated that Roberts would "cover with fill and rough grade the site," the parties understood that Roberts was not required to perform that work.  Gateman contracted with Wetherbee, a personal friend, to fill and compact the site.  Gateman obtained fill at no cost and had it trucked in by Loveland.  Wetherbee filled the site, covering the debris ramp so that it was no longer visible.  To save on costs, Gateman helped by operating a roller.  Again, he had to have known that the debris ramp was there, now covered by fill.

### c.    "Discovery" of the Debris Ramp

---

[5] "Wetherbee" refers to both Wetherbee Construction, and Scott Wetherbee, the company's owner.

On or around May 17, 2002, the Family Dollar Store discovered the debris ramp and demanded its immediate removal.[6] Because Wetherbee was still on site performing fill work, and no doubt because he was a personal friend, Gateman asked Wetherbee to excavate the ramp.  Gateman also called Roberts back to sort the excavated debris and remove it.

Gateman then had the Family Dollar Store's geotechnical engineer ("geotech") direct the removal project; Gateman's goal at the time being to meet Family Dollar's needs so that the deal would go through.  Wetherbee removed the ramp "to a line that the geotechs [sic] had painted it as far as they wanted it removed to."  Tr. VIII: 126.  That line ended at the edge of the FDS property; the ramp on what would become the Georto side was not excavated.  Gateman was part of the initial conversations between Wetherbee and the geotech about excavating the ramp, <u>see</u>, Tr. VII: 117; Gateman observed the FDS geotech directing Wetherbee where to dig, <u>see</u>, Tr. VIII: 10-11; Gateman was on site while Wetherbee did the excavation work, <u>see</u> Tr. VIII: 127-29. Approximately 1,100 cubic yards of debris were excavated, including brick, ash, wood, pipe, scrap metal and other trash. <u>See</u> Exh. 2F; Tr. VIII: 124-25.  By the time Roberts returned to the site, the excavation had been completed.  <u>See</u> Tr. VII: 120.

---

[6] FDS also demanded that the piles of brick and concrete be removed.

Since Wetherbee had only excavated the FDS side, that is all Roberts removed.[7]

After the site work was completed, the FDS property was in good shape, but what would become the Georto side was a dump. It contained the brick and concrete that Gateman acknowledged Roberts was supposed to leave,[8] the portion of the debris ramp that extended onto the Georto site,[9] as well as additional material that had been dumped onto the Georto side during the FDS excavation.[10]  But after both sides were covered with fill,

---

[7] Gateman never specifically instructed Wetherbee to make sure the ramp was removed in its entirety from both portions of the property, see Tr. VII: 121, although he was aware that the debris ramp extended onto the Georto side, see Trial Tr. vol. VI, 80 (Sept. 19, 2006).  Gateman now argues that he assumed Roberts would remove the other half of the ramp.  That is implausible, given that the excavation had ceased by the time Roberts returned.

[8] According to Gateman, "[T]he Family Dollar representative came over, they said that they didn't want the brick and concrete on the portion that they were going to buy but they said just put it on the other side."  Tr. VII: 23-24.  Gateman contends that Roberts moved the piles of brick and concrete, see Tr. VII: 24, while Roberts maintains that Gateman and Wetherbee performed that work.  Either way, Gateman approved placing the piles onto the Georto side.

[9] A contemporaneous sketch prepared by Harding Lawson Engineering ("Harding Lawson") (the engineering firm working for Family Dollar), dated May 23, 2002, shows that there is a buried debris ramp on what would become the Georto side, running along the side of the site opposite Union Street, as well as other buried debris all along the side of the site opposite School Street. See Exh. 2F.  The Harding Lawson sketch indicates that the buried ramp on the Georto side was as large as the debris ramp that had been excavated from the Family Dollar side.

[10] Kevin Doherty, Roberts' site manager, testified that when Roberts was about to leave the site for the second time, "[t]here was some excess debris, just a few pieces of stuff.  [Doherty] said [he] would send another truck and [Gateman] said no problem, just leave it."  Exh. 52 at 122.  "We'll just mix it in and push it into the hole."  Id.  That pile of "stuff" was "twenty to thirty yards."  Id.  According to Doherty, Gateman and Wetherbee took this "excess debris," screened from the debris ramp removal on the Family Dollar site, and dumped it into the hole on the Georto site, which was not yet filled to grade.  Exh. 52 at 136, 121-22.  While Doherty was plainly wrong about the amount -- given what was found later -- I credit his account of Gateman's and Wetherbee's actions.  Other evidence supports this account.  See Exh. 52 at

they appeared identical.  Gateman himself testified that as of June 6, 2002, "from the surface, you couldn't see anything different."  Tr. VI: 95.  At the time, however, Gateman knew full well that appearances were deceiving.

**B.    Contract between Georto and Gateman - 2003**

In 2003, after learning about Gateman's property, Hawkins began considering constructing a building there.  He contacted Phil Morin of PM Construction to determine what that would cost.  Morin visited the site some time in the winter of 2003 to determine whether it was buildable; he concluded that the site was flat and nothing appeared out of the ordinary.  See Trial Tr. vol. III, 81 (Sept. 13, 2006).[11]

---

122.  On May 17, 2002, the day the debris ramp was discovered by Family Dollar, the Georto side of the property was not filled level; however by May 23, 2002, the level of material on the Georto side had been significantly raised.  See Tr. VI: 86.  During that time, no new fill material was delivered to the site.

Although I find that Gateman did the dumping, even if Roberts was the dumper, Gateman's knowledge and approval can be inferred by his hands-on management of the site.  He lived only a few miles from the 200 Union Street property.  He testified that he was on site on a daily basis during the demolition work.  See Trial Tr. vol. V, 94 (Sept. 18, 2006); Tr. VII: 63.  Although some of Gateman's site visits were brief, Gateman routinely spoke with Doherty about the work that was being done on site, and he observed the work as it was being performed.  As the Roberts demolition work was being completed and the filling work began, Gateman spent increasingly more time on site, even participating in some of the work.  See Tr. V: 95-96.  Gateman testified that he operated a roller on both the Family Dollar side of the property, as well as the portion later sold to Georto.  Roberts contends that his involvement was more extensive (using a "dozer" to push "fill" into the Georto foundation hole), and I credit that testimony.

[11] Hawkins decided that he could only spend $1,000,000 on the purchase of the land and building construction combined.  Morin told Hawkins that the estimated cost of construction would be $620,000.  See Tr. III: 88.  From that estimate, Hawkins determined that he was able to spend the $300,000 to purchase Gateman's property.

In June 2003, Gateman entered into a Purchase and Sale
Agreement with Georto. <u>See</u> Exh. 1 ¶ 10. <u>See</u> <u>also</u> Exh. 19. Both
Hawkins and Gateman signed the agreement, initialing it on each
page. Gateman warranted, inter alia, that there "are no
hazardous materials as defined by state, federal or local law or
non-acceptable environmental conditions on the property." Exh.
19 ¶ 2. That warranty was material to Georto's decision to
purchase the property.

C.    **Gateman's Representations**

1.    **Family Dollar Store Purchase and Sale Agreement**

In July 2003 Gateman provided Georto with a copy of the Family Dollar Store Purchase and Sale Agreement.   See Exh. 1 ¶ 14.   The agreement provided that Gateman was to remove all debris from the portion of the land sold to Family Dollar, as well as from the adjacent property, which was the subject of the sale between Gateman and Georto.[12]   At the time Hawkins signed the contract with Gateman, the Family Dollar site work had been completed.

2.    **Phase I Report**

Per the Purchase and Sale Agreement, see Exh. 19 ¶ 8(b)(v), Gateman furnished Georto with a Phase I Environmental Assessment Report ("Phase I Report") prepared by Goldman Environmental Consultants ("GEC") in connection with the FDS sale in 2002, which underscored repeatedly that there was no demolition debris on the site.   See Exh. 20.[13]

---

[12] "Seller warrants that seller has completed the demolition and removal of all debris on the property and on adjacent property owned by seller."   Exh. 16 ¶ 2A.

[13] Phase I reports are typically prepared for due diligence purposes in conjunction with real estate sales.   See Tr. V: 45-46.   This report was prepared by Lauren McKinlay ("McKinlay"), a project manager for GEC, in May of 2002.   McKinlay engaged in various research in preparing her report, including a site visit and interview with Gateman on May 2, 2002.   In that interview, Gateman stated that all demolition debris would be removed from the site.   McKinlay understood that to include the wood, metal, concrete, brick, ash, and any other debris.   McKinlay included this information in her report in several places.   "All demolition debris is in the process of being removed from the Site by Roberts Dismantling and Recycling."   Exh. 20 at 20.   "Piles of solid waste (demolition debris) were observed throughout the Site.   Based on conversations with Mr. Gateman, observed piles are scheduled to be removed and

Hawkins received the Phase I Report in June 2003 and read it immediately. Based on its representations, Hawkins understood that all debris had been removed from the site, and that the site had been filled with "fill dirt."[14]

In January 2004, prior to the closing with Gateman, Georto hired GEC to prepare a Phase II Report. The report stated that its purpose was to "determine current conditions at the Site relative to several former above and underground storage tanks."

---

properly disposed off Site by Roberts Dismantling and Recycling." Exh. 20 at 24.

McKinlay explained that the term "demolition debris" in her report referred to "[a]ny type of building materials or concrete, brick, wood, metal, plaster, dry wall." Tr. V: 57. She testified that had Gateman indicated that any of the demolition debris was going to remain on the site, she would have written in the report that solid waste remained on the site, and would have recommended that it be removed. See Tr. V: 52-53, 56-57. According to McKinlay, solid waste buried at the site would be considered a recognized environmental condition; under solid waste regulations, solid waste can only be disposed of at proper facilities. See Tr. V: 48. Gateman testified that he did not remember what he had told McKinlay. I conclude that Gateman did not tell McKinlay he intended to leave the bricks and concrete on site.

GEC issued its report on May 29, 2002, see Exh. 20.

[14] He then passed it along to Phil Morin. See Tr. I: 83, 95; see also Exh. 1 ¶13. Morin, in turn, read the report and forwarded it to his structural engineer, his estimates department, and Thomas Mattuchio Construction ("Mattuchio"), the site subcontractor. See Tr. III: 89-90. If the Phase I Report had indicated that debris was left on site in 2002, PM Construction would have done testing to determine whether any debris still remained on the site before making its estimate. See Trial Tr. vol. IV, 44-45 (Sept. 14, 2006).

Hawkins also forwarded the Phase I report to Key Bank to obtain financing for his project. See Exh. 1 ¶¶12-13. Key Bank required submission of a Phase I Report as part of the approval process for granting a loan. See Tr. I: 83. GEC issued reliance letters to Georto and to Key Bank, stating that they could rely on the information in the report as if it had been prepared for them. See Exh. 1 ¶ 12. Georto entered into a loan closing with Key Bank on February 19, 2004. The loan agreement was conditioned on Georto's execution of a Continuing Indemnity Agreement. The indemnity agreement provided that Georto was required to take steps to restore the property in compliance with environmental laws, including not only laws regarding hazardous waste but also laws relating to soils and other environmental quality of real property. See Exh. 29.

Exh. 23 at 1.  That is, the Phase II test borings were designed to take soil samples for the presence of chemicals; they were not designed to unearth large amounts of debris.[15]  Georto suggests that the Phase II Report was very limited in scope precisely because he relied on the representations in the Phase I Report.

On February 2, 2004, Georto entered into a construction contract with PM for $659,264.  See Exh. 24.[16]

### 3.   Closing

Relying on Gateman's warranties and representations, Georto closed on the property on February 19, 2004, paying the balance of the $300,000 purchase price.  See Exh. 1 ¶ 15; see also Exh. 29.

### D.   Discovery of Debris on Georto Site

PM began construction in early April of 2004.  Stephen McIntyre ("McIntyre") was the project superintendent on the job; Thomas Mattuchio Construction ("Mattuchio") was hired as a subcontractor to do excavation work.  On April 6, when they had dug down four feet to the "frost line," they hit a massive pile

---

[15] GEC determined that the soil did not contain evidence of petroleum, chlorinated solvents, and other hazardous materials.  See Exh. 23 at Bates No. P0693.  GEC also determined that the soil at 9-10 feet below grade was "typical of urban fill."  Id. at Bates no. P0692.

[16] The contract had a site work allowance of $102,000, which was based on the information about the site that Georto and PM had at the time; information indicating that there was no debris buried on site.  The construction contract provided that Georto would be required to pay for any site work over $102,000.

of demolition debris.  <u>See</u> Trial Tr. vol. II, 120-21 (Sept. 12, 2006).  <u>See also</u> Exh. 37.[17]  The buried material made the site unsuitable for building.  PM's Bill Nason ("Nason") determined that they had to stop construction as of April 7.[18]  PM later confirmed their conclusion with the City of Lynn building inspector, who told them the debris would have to be removed. <u>See</u> Tr. III: 33-34.

After viewing the site, Hawkins called Gateman to set up a meeting at the property to address the problem.  On April 9, PM's McIntyre and Richard Pearl met with Hawkins and Gateman at the lot.  Gateman expressed surprise at the debris.  Hawkins explained that the site could not be built upon unless the debris was removed.[19]

On April 15, Gateman informed Hawkins that he did not believe he had delivered the property in an unsuitable

---

[17] McIntyre testified that at four feet, he started to come across wood, bricks, and pipes.  <u>See</u> Tr. II.  "A lot of [the wood] was burnt, a lot of ashes, a lot of char, big beams."  <u>See</u> Tr. II: 121.  The wood was also "rotted out."  <u>See</u> Tr. III.  As they continued to dig, they came across bricks, pipes, radiators, file cabinets, debris, clothing, and burnt wood, among other materials.  <u>See</u> Tr. II: 125.

[18] On April 8, PM had Mattuchio dig a series of test pits to determine the extent of the debris problem.  The test pits contained various debris, including wood, bricks, file cabinets, radiators, clothing, burnt ash, and large timbers.  <u>See</u> Tr. II: 130-31.  The debris was mixed across the entire site; the brick embedded with the rest of it.

[19] At Gateman's request, Stalker (from Roberts Demolition) met with PM's McIntyre at the site on April 14.  McIntyre asked Stalker if Roberts would take care of removing the debris.  Stalker replied that whatever was there, Roberts had been instructed to leave there.  <u>See</u> Tr. III: 31; Tr. VIII: 99.

condition, and that he would not pay to have the debris removed.
See Tr. II: 22-23; VI: 115.[20]

### 1.  Removal of Debris from Georto Site

After the debris was discovered, Hawkins discussed various
options with PM as to how to proceed,[21] concluding that leaving
the debris in place was not an option.  See Exh. 1 ¶ 16.  PM
solicited bids from several sub-contractors, selecting
Mattuchio, the lowest bidder.

Before beginning the debris removal work, Georto hired Chad
Michaud ("Michaud"), a geotechnical engineer, to inspect the
site, determine how much material needed to be removed, and if
any of the material could remain.  After extensive
investigation, Michaud concluded that the debris and fill ran
throughout the site, that it could not be built on, and that it
all had to be removed.  See Exh. 40.[22]  Michaud prepared a

---

[20] At some point in early to mid April, Gateman offered Hawkins the
purchase price back.  Hawkins contends that this was not an actual offer, but
more of an angry outburst.  The comment was clearly not sufficient to
constitute a written offer to settle under 93A.

[21] Hawkins asked whether they could leave the debris in place and build
on top of it using pilings.  McIntyre replied that it was both impractical and
more expensive to build on pilings than it would be to remove the debris.  See
Tr. II: 5; III: 18-20.  Furthermore, McIntyre explained that because of the
building code, they could not build on the debris.  Morin agreed with
McIntyre's assessment, and similarly stated that PM could not build on the
debris.  See Tr. III: 107.  PM also contacted a structural engineer and
consulted with their estimating department, which confirmed the observations
of McIntyre and Morin.

[22] Even the brick and concrete could not be salvaged without screening
the material and then manually sorting through it.  See Tr. IV: 122.  Nor did
he believe that recycling was an option, given the amount of wood and ash
mixed in with the rest of the debris.  See Tr. V: 35-36.

geotechnical report for Georto, dated May 13, 2004.  <u>See</u> Exh. 39.

Based on the work that was done, PM and Hawkins negotiated a price of $249,171.[23]

###     E.    <u>Tax Indemnification Agreement</u>

Georto and Gateman entered a tax indemnification agreement on February 9, 2004, providing that Gateman indemnified Georto for any property tax liability incurred during the period when Gateman owned the property.  <u>See</u> Exh. 27.  The City of Lynn notified Georto that taxes were due on the property for the tax year July 1, 2003, to June 30, 2004.  Georto paid $1,190 with respect to property taxes that were due from the period during which Gateman owned the property.

On September 13, 2004, Key Bank sent a notice to Gateman, informing him that he must reimburse Georto for the property taxes.  Gateman did not respond.  Nor did Gateman respond to this part of Georto's Requested Findings, or even address Exhibit 27.

## III.  <u>CONCLUSIONS OF LAW</u>

###     A.    <u>Georto's Breach of Contract Claim</u>:

Gateman expressly warranted that there were no "hazardous materials as defined by state, federal, or local law, or non-

---

[23] The $249,171 price was over and above the $102,000 that Georto and PM had previously contracted for site work.

acceptable environmental conditions on the property." <u>See</u> Exh. 19 ¶ 2f. When parties contract for a warranty, "[i]n effect, the warrantor proposes to indemnify the warrantee for any damage resulting from a variation between what was promised and what actually came to pass." <u>Sparks v. Fidelity Nat. Title Ins. Co.</u>, 294 F.2d 259, 272 (1st Cir. 2002).

Gateman promised Georto a property with no non-acceptable environmental conditions. What actually came to pass was that Georto received a property brimming with solid waste. The undisputed testimony of Hawkins, Morin, McIntyre, Michaud, and Stalker -- as well as the photographic evidence and Gateman's own admissions -- conclusively establish that the site was filled with buried debris: bricks, concrete, burnt wood, ash, pipes, metal, plastic, trash.

Gateman contends that the phrase "non-acceptable environmental conditions" is ambiguous and does not clearly encompass the debris found on the site. In addition, he argues that most of the "so-called" debris was brick and concrete, which he claims constitutes acceptable fill. The evidence goes against him on both fronts.

Whether a contractual term is ambiguous is a question of law; when a contractual term is ambiguous, the meaning of the term is a question of fact. <u>See</u> <u>Alison H. v. Byard</u>, 163 F.3d 2, 6 (1st Cir. 1998); <u>Den Norske Bank AS v. First National Bank</u>, 75

F.3d 49, 52 (1st Cir. 1996).  Sitting as a factfinder in this case, both conclusions are mine to draw.  A contract is not ambiguous simply because the parties disagree as to its meaning. Rather, a contract is only ambiguous if it is "<u>reasonably</u> prone to different interpretations."  <u>Alison</u>, 163 F.3d at 6 (emphasis added).  Resolution of any ambiguity turns on the parties' intent, as "discerned by the factfinder from the circumstances surrounding the ambiguity and from such reasonable inferences as may be available."  <u>Colasanto v. Life Ins. Co. of North America</u>, 100 F.3d 203, 211 (1st Cir. 1996).

The term "non-acceptable environmental conditions" was not defined in the Purchase and Sale Agreement, but that alone does not render it ambiguous.  The question is whether a reasonable person reading the Purchase and Sale Agreement would understand non-acceptable environmental conditions to include buried debris of the type found on site.  I conclude that they would.

Section 150A of Chapter 111 of the Massachusetts General Laws provides, "no person shall dispose or contract for the disposal of solid waste at any place which has not been approved by the department pursuant to the provisions of this section or other applicable law."  Section 19.014 of the Code of Massachusetts Regulations provides that:

> (1)No person shall establish, construct, operate or maintain a dumping ground or operate or maintain a landfill in Massachusetts in such manner as to

constitute an open dump.  For the purpose of
310 CMR 19.014 the phrase 'establish,
construct, operate or maintain' shall
include without limitation, disposing or
contracting for the disposal of refuse in a
dumping ground or open dump.  (2)No person
shall dispose or contract for the disposal
of solid waste at any place in Massachusetts
which has not been approved by the
Department pursuant to M.G.L. c. 111 § 150A.

Gregory Wirsen ("Wirsen") of Green Seal Environmental
prepared a solid waste report for use in this litigation.  That
report states that the debris found on the site is solid waste,
or demolition debris, "by definition."  See Exh. 41 at 8.
"Specifically rubble resulting from the demolition of buildings
that includes but is not limited to concrete, bricks, lumber,
masonry, road paving materials, steel (and other metals) would
be placed in this category."  Exh. 41 at 8.  Wirsen concluded
that the filling of the site with the demolition debris violated
solid waste regulations by setting up an unauthorized landfill.
See Tr. IV: 69.[24]

Contrary to Gateman's assertions, unprocessed bricks and
concrete are not acceptable fill.  Gateman was unable to produce
any evidence that he had obtained permission from the City of
Lynn to use the demolition brick and concrete as fill.  Wirsen's

_____

[24] McKinlay concurred.  According to McKinlay, Phase I reports are
conducted to determine if there are "recognized" environmental conditions at a
property.  See Tr. V: 45-46.  Buried solid waste is considered a recognized
environmental condition and unprocessed bricks and concrete -- not to mention
the other debris -- are considered solid waste.  See Tr. V: 56-57, 71-72; IV:
63, 65-66, 68-69.

testimony made clear that onsite disposal of brick and concrete that may have been painted, coated, treated, or potentially contain asbestos is a violation of solid waste regulations. <u>See</u> Tr. IV: 67, 74-75, 96.[25]  Gateman made no effort to bring the bricks and concrete into compliance.  He simply instructed Roberts to leave it in piles.  Moreover, I have already found that the buried debris consisted of much more than bricks and concrete.

"Non-acceptable" may not have been defined in the contract, but buried solid waste certainly comes within its ambit.[26]  In the alternative, I find that if the term was ambiguous on its face, given the intent of the parties at the time of drafting, as laid out in Part II, it should be construed to include buried solid waste that makes the land unsuitable for building.

_____

[25] Construction demolition debris is subject to all the solid waste regulations promulgated in Massachusetts.  <u>See</u> Tr. IV: 63.  In order for brick and concrete not to be considered solid waste, it must be "free from other debris and waste materials."  Tr. IV: 65.  When brick and concrete are mixed with other or "mixed" demolition debris -- metals, fabrics, appliances, wood -- it is solid waste and must be handled as such.  <u>See</u> Tr. IV: 66.  For brick and concrete to be used as fill it must also be crushed so that the largest dimension of any piece of rubble is only six inches.  <u>See</u> Exh. 41 at 8.

[26] The non-acceptable environmental conditions clause is part of the provision warranting that there are no hazardous materials as defined by federal, state, or local law.  Reading the provisions as a whole, the plain language of the term provides a warranty that there are no other (non-hazardous) materials that violate federal, state, or local law.

By its plain terms, "non-acceptable environmental conditions" may provide for an even broader warranty.  Georto contends that the buried waste was "non-acceptable" because it was expensive to remedy.  I do not need to reach the question of whether that comes within the meaning of the term.

Gateman's breach of warranty was clearly material.  <u>See,</u> <u>e.g.</u>, <u>Prozinski v. Northeast Real Estate Services</u>, 797 N.E.2d 415, 423 (Mass. App. Ct. 2003) (breach of essential and inducing feature of contract is material); <u>Sparks</u>, 294 F.3d 259 (contract action for breach of express warranty).  The waste both prevented Georto from building on the site and was a condition that had to be remedied regardless of construction because the waste could not legally remain on the property.  I find Gateman in breach of contract and hereby rule in favor of Georto on Count I.

**B.   Georto's Breach of Implied Covenant of Good Faith and Fair Dealing**

The implied covenant of good faith and fair dealing "imposes on the parties the obligation, once they have exchanged mutual promises of performance, to act in good faith to accomplish the purposes of their agreement."  <u>Sparks</u>, 294 F.3d at 274 (1st Cir. 2002).  Such an implied covenant exists in every contract.  <u>See Druker v. Ronald Wm. Jurtas Associates,</u> <u>Inc.</u>, 348 N.E.2d 763, 765 (Mass. 1976) ("[I]n every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing.")  The purpose of the covenant is to ensure that the objectives of the contract

are met.  It cannot be "invoked to create rights and duties not
otherwise provided for in the existing contractual relationship,
as the purpose of the covenant is to guarantee that the parties
remain faithful to the intended and agreed expectations of the
parties in their performance."  Uno Restaurants, Inc. v. Boston
Kenmore Realty Corp., 805 N.E.2d 957, 964 (2004).

Georto bases his claim on Gateman's conduct after the
parties entered into the Purchase and Sale Agreement.  Accord
Massachusetts Eye and Ear Infirmary v. QLT Phototherapeutics
Inc., 412 F.3d 215 (1st Cir. 2005)(covenant applies after
contract has been entered into).  Essentially, Georto argues
that Gateman's misrepresentations about demolition debris
deprived Georto of the fruits of the contract -- land that was
free of debris.  I agree.[27]

After the parties had executed the Purchase and Sale
Agreement, Gateman misrepresented to Georto that all debris had
been removed from the site.  He did so by providing Georto with
the GEC Phase I Report and the Family Dollar Store Purchase and
Sale Agreement.[28]  For the same reasons that Gateman is liable to

_____

[27] This claim does not add anything to Georto's argument or award, and
was likely meant to be brought in the alternative.

[28] The covenant does not apply "where the defendant has exercised an
express contractual power in good faith, that is, in a manner that comports
with the parties' reasonable expectations as to performance."  Speakman v.
Allmerica Financial Life Ins., 367 F. Supp. 2d 122, 132 (D. Mass. 2005).  See
also Dunkin' Donuts Inc. v. Gav-Stra Donuts Inc., 139 F. Supp. 2d 147, 156 (D.
Mass. 2001) (holding that the covenant cannot override express contract
terms).  The contract between Georto and Gateman stated that Gateman would
provide Georto with both the Phase I Report and the FDS Purchase and Sale

Georto for misrepresentation (discussed in the next section), he is liable to Georto on Count IV for breach of the covenant.[29]

## C.  **Georto's Intentional Misrepresentation Claim**

To make out an intentional misrepresentation claim, a plaintiff must show that the defendant made a false representation about a material fact, with knowledge of its falsity, for the purpose of inducing the plaintiff to act, and that the plaintiff reasonably relied on that representation to his detriment.  See Eureka Broadband Corp. v. Wentworth Leasing Corp., 400 F.3d 62, 68 (1st Cir. 2005).

### 1.  **Falsity**

To provide grounds for an actionable intentional misrepresentation claim, a statement must be false.  See, e.g., Zimmerman v. Kent, 575 N.E.2d 70, 74 (Mass. App. Ct. 1991) ("The first requirement to sustain a claim of misrepresentation is that the representation must be false.").

---

Agreement.  On one theory therefore, Gateman could not have breached the covenant by providing Georto with those documents.

However, Gateman did not act in "good faith" by producing documents with material misrepresentations.  The covenant of good faith and fair dealing does not allow for fraud, deceit, or misrepresentation.  See generally Dunkin' Donuts, 139 F. Supp. 2d at 156 (finding no evidence of "fraud, deceit or misrepresentation by Dunkin' Donuts that would allow a court to find breach of good faith").

[29] Georto also argues that Gateman further breached the covenant of good faith in failing to remove the debris after Georto discovered it, or pay for the removal, and that Gateman breached once more by failing to reimburse Georto for the ta1xes owed under the tax indemnification agreement.  I do not need to reach these issues.

I find that Gateman made the following misrepresentations to Georto: that all demolition debris formerly on the property had been properly disposed of, that the property had been filled to grade with "fill dirt," and that there were no non-acceptable environmental conditions on the property. Gateman made these representations through the warranty in the Purchase and Sale Agreement with Georto, by providing Georto with the GEC Phase I Report, and by providing Georto with the Family Dollar Store Purchase and Sale Agreement.

The warranty in the Purchase and Sale Agreement is discussed thoroughly in Section II.B, supra; I need not belabor its terms here.

Pursuant to their contract, Gateman furnished Georto with the GEC Phase I Report from the Family Dollar sale, adopting the representations in the report. In fact, the statements in the report regarding debris removal were expressly based on Gateman's representations to its author.

The report contained numerous false statements of fact. A representative sampling includes: "All demolition debris is in the process of being removed from the site by Roberts Dismantling and Recycling." Exh. 20 at 20. "Piles of solid waste (demolition debris) were observed throughout the site. Based on conversations with Gateman, observed piles are scheduled to be removed and properly disposed offsite by Roberts

Dismantling and Recycling." Exh. 20 at 24. "The building formerly located at the site has been demolished and disposed of offsite." Exh. 20 at 17. "Currently the former basement areas are being filled to grade." Exh. 20 at 4. "Roberts Dismantling and Recycling is currently transporting "fill dirt" onto the site to fill the former basement areas to even out the grade of the site." Exh. 20 at 24.[30]

### 2. <u>Knowledge</u>

The defendant does not have to have <u>actual</u> knowledge of the falsity of his representation if he acted in <u>reckless disregard</u> of actual facts -- i.e. made representations with reckless disregard as to their truth or falsity. <u>See, e.g.</u>, <u>Kozdras v. Land/Vest Properties Inc.</u>, 413 N.E.2d 1105, 1110 (Mass. 1980). If the representations in question were "contrary to fact yet susceptible of accurate knowledge," then defendant's reckless disregard of actual fact constitutes fraud. <u>Kozdras</u>, 413 N.E.2d at 1107. <u>See also</u> <u>Moran v. Levin</u>, 64 N.E.2d 360, 362 (Mass. 1945) ("[O]ne is liable for . . . representations made of his own knowledge as true concerning matters of fact which are susceptible of actual knowledge and which turn out to be false,

---

[30] Notably, the statements in the Phase I Report were not necessarily "false" at the time Gateman furnished the information to McKinlay in early May of 2002. At that time, Roberts was still engaged in its first round of site work. However, as time progressed, the representations went from misleading and potentially false to outright lies. And as far as brick and concrete were concerned, the statements were always false. At all times, Gateman intended to leave the unprocessed brick and concrete on site.

although when he made them he did not know they were false.");
Zimmerman, 575 N.E.2d 70 at 77 (quoting Acushnet Fed. Credit
Union v. Roderick, 530 N.E.2d at 1244, 1245 & n.1 (1988)); Damon
v. Sun Co., Inc., 87 F.3d 1467, 1485 (1st Cir. 1996); Roadmaster
Industries, Inc. v. Columbia Manufacturing Company, Inc., 893 F.
Supp. 1162 (D. Mass. 1995);[31] Cummings v. HPG International Inc.,
244 F.3d 16, 22 (1st Cir. 2001) ("[p]roof of intent to deceive
is not required so long as there is proof of a false
representation of fact susceptible of the speaker's
knowledge.").[32]

---

[31] "'[T]he charge of fraudulent intent, in an action for deceit, may be maintained by proof of a statement made, as of the party's own knowledge, which is false, provided the thing stated is not merely a matter of opinion, estimate, or judgment, but is susceptible of actual knowledge; and in such case it is *not necessary to make any further proof of an actual intent to deceive*.' In sum, all that must be established to prove defendants' 'knowledge of the falsity of the misrepresentation' is that the representation was false and was susceptible of actual knowledge. No greater showing of intentionality is required." Roadmaster, 893 F. Supp. at 1176 (emphasis in original).

In Roadmaster, defendants warranted to plaintiff, *inter alia*, that releases of hazardous substances into the soil had been remedied so that current levels in the soil and groundwater met federal and state standards, or did not present a danger to public health, the environment, or the value of the property. Defendants also misrepresented that there had never been significant generation or release of any hazardous substance in violation of any environmental law. See Roadmaster, 893 F. Supp. at 1177. The court held "[u]nder the terms of the warranty defendants had an obligation to make sure there were no facts they could reasonably have discovered that would presently show contamination at levels requiring remediation. These determinations were reasonably within the defendants' ascertainable knowledge, had they conducted further sampling of the soil and groundwater." Roadmaster, 893 F. Supp. at 1178. The court reached this conclusion even though the government bodies testing the soil did not determine that environmental laws had been broken until after the agreement between the plaintiff and defendants was signed. The court reasoned that the information was discoverable by the defendants prior to the signing of the agreement, had they done their own investigation.

[32] In Cummings, the First Circuit opined that Massachusetts law on this subject lacks clarity. See Cummings, 244 F.3d at 22. Therefore, the First Circuit used the Restatement (Second) of Torts § 526 test for "knowledge" for the purpose of showing fraud.

Georto contends that Gateman willfully misrepresented the condition of the land; that he knew debris was buried throughout the site, lied to Georto, and hoped he would never be held accountable. Gateman's response separates the debris into two camps. With respect to the brick and concrete, Gateman admits he knew it was buried on site, but argues that those materials were appropriate fill and therefore the representations about debris removal were not false. He also implicitly argues that as long as he believed that brick and concrete were suitable fill, Georto cannot establish that he had knowledge of falsity. With respect to the debris ramp, Gateman maintains that he had no idea it was buried in the site; he believed that Roberts had removed it.[33]

### a.    **Brick and Concrete**

Gateman's brick and concrete arguments are unavailing. Gateman had a responsibility to know what he was selling. <u>Damon v. Sun Company Inc.</u>, 87 F.3d 1467 (1st Cir. 1996), is instructive on this point. <u>Damon</u> involved the sale of a gas station. Several years before Damon had purchased the station

---

A misrepresentation is fraudulent if the maker (a) knows or believes that the matter is not as he represents it to be, (b) does not have the confidence in the accuracy of his representation that he states or implies, or (c) knows that he does not have the basis for his representation that he states or implies.

[33] There is also a third category of debris -- debris excavated from the ramp on the FDS property and dumped into the foundation hole of the Georto property.

from Sun Company, there had been a massive gas leak that was not properly or immediately cleaned.  Two Sun representatives, Laubinger and Bunzell, failed to disclose the spill to Damon in response to his direct questions.  Laubinger had actual knowledge of the spill; Bunzell did not.  The court found that Bunzell made a fraudulent misrepresentation -- a false statement about facts susceptible of actual knowledge.  "[I]ndeed, Bunzell's name was listed on the 'For Sale' sign at the station: presumably, it would have been his responsibility to be informed about the history of the particular station he was selling." Damon, 87 F.3d at 1479.

In fact, Gateman had actual knowledge as to the presence of bricks and concrete in the foundation hole.  The question is if his willful blindness as to whether those materials were "demolition debris" absolves him of responsibility.  Was he reckless in his failure to ascertain that large chunks of bricks and concrete mixed with pieces of burnt wood and ash were debris?  I find that he was.

It is possible that at the time Gateman spoke to McKinlay, he had no inkling that the bricks and concrete were considered debris -- putting aside the fact that Gateman and McKinlay walked the site together and he never once mentioned that <u>any</u> of the piles were going to remain, strongly suggesting that he was trying to mislead McKinlay.  Assuming *arguendo* that they simply

had a miscommunication, Gateman's state of knowledge changed as time passed.

Several weeks later, the Family Dollar Store discovered the debris ramp and the piles of unprocessed brick and concrete, and immediately demanded that Gateman remove them from their portion of the property.  From that point on, Gateman should have been on notice that bricks and concrete were unacceptable.  Ignoring the possibility that unprocessed brick and concrete -- materials that came from the demolition of a building -- would be considered "demolition debris" was unquestionably reckless.  He stated there was no demolition debris on site with no regard for that statement's truth or falsity.

Even if I were to credit Gateman's pleas of ongoing ignorance as to the common-sense definition of demolition debris, the Phase I Report indicates that the basement areas would be filled to grade with "fill dirt," not with brick and concrete.  Gateman knew from the outset that this was false, since he never intended to remove the brick and concrete.[34]

Lastly, the report also stated "[t]he former building has been demolished and removed from the Site."  Exh. 20 at 16.  The

---

[34] It was all the more false with respect to the Georto side as Gateman had the piles of brick and concrete transferred there from the FDS side. Gateman testified at the trial that he understood "fill dirt" to include brick and concrete.  But that is not what is represented in the report.  On McKinlay's tour of the site, she observed the piles of fresh fill dirt trucked in by Loveland Trucking.  Photographs of that fill dirt are included in her report.  The report plainly leads the reader to believe -- as the author believed -- that actual fill dirt would be used to fill the site.

report did not say that the building was removed, except for the
massive amount of bricks and concrete which remain and are
intended to be buried in the foundation hole.

**b.  <u>Debris Ramp</u>**

Then there is the debris ramp.  Gateman claims ignorance.
That is absurd.  Gateman admitted he was aware the debris ramp
existed, knew it was composed of building debris, knew the
extent of it, and was on site almost every day.[35]

After FDS discovered the debris ramp in May 2002, Gateman
effectively ceded control of the site to the Family Dollar Store
geotech to direct the removal project.  However, Gateman
remained sufficiently aware of what was transpiring.  The Family
Dollar Store was the only purchaser with which Gateman had a
relationship at the time.  FDS was not happy that debris
remained on the site, and it had not yet paid Gateman for the
property.  Gateman had every interest in satisfying Family
Dollar, and no immediate interest in the condition of the
property that he would later sell to Georto.  The Family Dollar
geotech, in turn, was only concerned with the site being
purchased by Family Dollar.  The geotech was paying attention to
the FDS property, Gateman was not paying attention to his future

---

[35] Gateman maintains he thought the ramp consisted only of brick and
concrete, but admitted that he never saw anyone -- Turner or Roberts -- go
through the mixed building debris to pick out certain materials to build the
ramp.

interests, and therefore, what would become the Georto side turned into a dump.

### c.  **Dumped Debris**

I likewise concluded in Part II that because the debris composition diagramed by Michaud's test pits did not match the scope of the debris ramp, excess debris from the excavation of the FDS ramp must have been dumped onto the Georto property.  I also found that Gateman either dumped it himself or instructed designees to dump it.  Accordingly, Gateman's "knowledge" with respect to this debris clearly meets the fraud standard.

### d.  **Conclusion**

By June 2003, when Gateman gave the Report to Georto, its representations that all demolition debris had been removed were clearly false.  Gateman could have "discovered" this fact through a "modicum of diligence." Zimmerman, 575 N.E.2d at 74.[36]

Gateman was a marginal operator, trying to do this job on the cheap.  Hiring each subcontractor himself, at the same time FDS had its people on the property, meant the site existed in a state of constant chaos.  Add to that Gateman's exigent

---

[36] Georto also argues that Gateman intentionally concealed the buried debris by covering it with glacial till fill material to make it appear as if all debris had been removed and replaced with fill dirt.  Georto contends that Gateman covered the debris with glacial till in order to make the property appear indistinguishable from the Family Dollar Side, which in fact contained no debris.  It is not necessary for me to find that Gateman used the glacial till as part of an intentional cover-up; it is enough that I conclude, as I do, that he acted with such reckless disregard for the truth of his statements as to constitute intentional misrepresentation.

financial circumstances, and it is no surprise things went awry
and corners were cut.

I find that as to the materials dumped on the site, Gateman
intentionally misrepresented the condition of the property. As
to the brick and concrete and the debris ramp, his
misrepresentation was reckless. It may well be true that by the
time Gateman was contracting with Georto, he had forgotten about
the exact state of the lot in question -- especially given how
little attention he paid in the first place. That is the only
explanation for why he gave the warranties he did and gave
Georto the information and access he did. But he had to have
known he had not taken care to prepare the property and just
hoped that no one would find out. In any case, the false
statements he made involved facts susceptible of actual
knowledge. Whether intentional or reckless, he is liable to
Georto for fraud.

### 3.  **Materiality**

Gateman's misrepresentations were material to Georto's
decision to purchase the property. The misrepresentations
concealed the fact that the site was not suitable for building,
Georto's purpose in buying the property. The existence of the
debris made the property an illegal dump -- a non-acceptable
environmental condition against which the contract specifically
warranted. Moreover, Gateman stipulated that the Phase I Report

contained material representations about the property.  See Exh.
1 ¶11.

### 4.  Inducement

Gateman made the representations in the Phase I Report and
the Purchase and Sale Agreement with the intention that Georto
would rely on them.  The Georto-Gateman Purchase and Sale
Agreement provided that the sale was contingent upon Georto
finding the Phase I Report, among other things, satisfactory.
See Exh. 19.

### 5.  Reasonable Reliance

Georto reasonably relied on Gateman's misrepresentations.
The law does not require that plaintiff conduct an extensive
investigation of every statement made to him.  Kuwaiti Danish
Computer Co. v. Digital Equip. Corp., 781 N.E.2d 787, 795 (Mass.
2003).  However, one may not reasonably rely on a statement "if
he knows that it is false or its falsity is obvious to him."
Id.

Georto relied on the representation made by Gateman on two
fronts.  Hawkins relied on those representations in determining
the expected costs of the building project.[37]  Hawkins also

--------

[37] Hawkins forwarded the Phase I Report to Morin at PM Construction so
that he could calculate the estimate for the building project.  Hawkins
determined at the outset that he was only able to spend $1,000,000 on the
entire project -- property and building combined.  Had he known that the
demolition debris had not been removed from the site, he would not have bought
the property.  Nor would he have entered into the construction contract with
PM or the loan agreements with Key Bank.

relied on Gateman's representations -- to his detriment -- in
determining the scope of his own investigation of the property.
Gateman points to the fact that Georto had GEC conduct a Phase
II Report, using test borings to look for certain chemicals in
the soil, as evidence that Georto did not rely on the Phase I
Report.  In fact, just the opposite is true.  Georto relied on
the representations in the Phase I Report in deciding the
narrowness of the scope of the Phase II investigation.

Georto's reliance was reasonable.  The Phase I Report was a
very detailed report, prepared by GEC, a reputable environmental
consulting firm.  Moreover, Gateman caused GEC to issue a
reliance letter to Georto that specifically stated that Georto
could rely on the report in connection with its due diligence
and financing for the property.  Lastly, the appearance of the
property was entirely consistent with the misrepresentations
made by Gateman; the site looked like a flat piece of dirt --
there was no indication that debris was buried beneath it.[38]
Georto would have had to dig up the site below the frost line to
discover Gateman's misrepresentations.  "[I]t is well
established under Massachusetts law that 'failure to investigate
the veracity of statements does not, as a matter of law, bar
recovery for misrepresentation.'"  <u>Damon</u>, 87 F.3d at 1480.  <u>See</u>

---

[38] In fact, the land looked just like the land on the adjacent property
owned by Family Dollar.  And Hawkins believed, given the FDS contract Gateman
provided him, that all debris had been removed from both the Family Dollar
side of the property, and the Georto side.

<u>also</u> <u>Roadmaster</u>, 893 F. Supp. at 1179 ("Only reliance on 'preposterous or palpably false' representations vitiates a misrepresentation claim.").

Accordingly, I find for Georto on Count II.

**D.    <u>Georto's Negligent Misrepresentation Claim</u>:**

A plaintiff makes out a claim for negligent misrepresentation by showing that the defendant:

> (1) in the course of business, (2) supplied false information for the guidance of others (3) in their business transactions, (4) causing and resulting in pecuniary loss to those others (5) by their justifiable reliance upon the information, (6) that it failed to exercise reasonable care or competence in obtaining or communicating the information.

<u>Cummings v. HPG International, Inc.</u>, 244 F.3d 16, 24 (1st Cir. 2001). This tort essentially shares the same elements as the tort of fraud, the difference being that the defendant need only have acted negligently.

The inquiry here is whether Gateman was "negligent in failing to discover the falsity" of his statements. <u>Cummings</u>, 244 F.3d at 25.[39] Gateman certainly *could* have known, and in fact *should* have known, that the representations he made about the condition of the property were false. If Gateman was not reckless, he was certainly negligent; at a minimum, Gateman

---

[39] "[R]epresentation may be negligent where there is a 'lack of reasonable care in ascertaining the facts, or in the manner of expression, or absence of skill and competence required by a particular business or profession.'" <u>Cummings</u>, 244 F.3d at 25 (internal citations omitted).

failed to use the care a reasonable person would in making representations about whether all debris had been removed from the property.  I find for Georto on Count III in the alternative, for all the reasons stated above.

### E.    Georto's 93A Claim

Massachusetts General Law Chapter 93A, Section 11 provides that any person who engages in trade or commerce and suffers a loss of money or property as the result of any unfair or deceptive act or practice as established by Section 2 of that chapter, shall recover actual damages and reasonable attorneys' fees and costs.  See M.G.L. c. 93A § 11.

"To be held unfair or deceptive under c. 93A, practices involving even worldly-wise business people do not have to attain the antiheroic proportions of immoral, unethical, oppressive, or unscrupulous conduct, but need only be within any recognized or established common law or statutory concept of unfairness." VMark Software, Inc. v. EMC Corp., 642 N.E.2d 587, 595 (Mass. App. Ct. 1994).  Facts making out a fraud claim are generally sufficient to maintain an action under 93A.  See Nickerson v. Matco Tools Corp., 813 F.2d 529 (1st Cir. 1987); Levings v. Forbes & Wallace, 396 N.E.2d 149, 154 (Mass. App. Ct. 1979) ("[a] misrepresentation in the common law sense would . . . be the basis for a c. 93A claim); Datacomm Interface, Inc. v. Computerworld Inc., 489 N.E.2d 185, 197 (Mass. 1986); Vmark

Software, 642 N.E.2d at 595.  This includes reckless

misrepresentation.  See, e.g., Computer Systems Engineering,

Inc. v. Qantel Corp., 571 F. Supp. 1365, 1372-73 (making false

statements with reckless disregard to their truth or falsity is

a violation of 93A § 2).  I find that Gateman violated Chapter

93A by making fraudulent misrepresentations.[40]

Gateman argues that because Hawkins is a businessman,

Gateman's conduct must reach an extreme level of rascality

before being actionable.  He is wrong.  "[I]t is the law of

Massachusetts that even sophisticated businessmen must deal with

each other honestly and may not induce contractual relations by

material misrepresentations."  Vmark Software, 642 N.E.2d 587,

---

[40] In the alternative, I find that Gateman violated 93A on a "negligence plus" theory.  Mere negligence will not sustain a 93A claim.  See Underwood v. Risman, 605 N.E.2d 832, 835 (Mass. 1993).  Courts have recognized, however, that "negligence can provide the basis for Chapter 93A liability, so long as it is paired with an unfair and deceptive act or practice - in other words negligence plus rascality equals liability."  Damon, 87 F.3d at 1484 n.10 (citing Squeri v. McCarrick, 588 N.E.2d 22, 25 (1992) ("A negligent act standing by itself does not give rise to a claim under c. 93A.  There must in addition be evidence that the negligence was or resulted in an unfair and deceptive act or practice.")).  Conduct is deceptive if it has the capacity to deceive.  A practice is deceptive "if it 'could reasonably be found to have caused a person to act differently from the way he [or she] otherwise would have acted.'"  Purity Supreme, Inc. v. Attorney General, 407 N.E.2d 297, 307 (Mass. 1980).  However, intent to deceive is not necessary.  "Neither intent to engage in an unlawful act nor knowledge of its unlawfulness is required in order to establish liability."  Maillet v. ATF-Davidson Co., 552 N.E.2d 95, 100 (Mass. 1990) (internal quotations omitted).  Gateman's dealings with Georto certainly "caused [him] to act differently" than he would have had the misrepresentations not been made; had Gateman not "negligently" represented to Georto that there was no debris on the property, Georto would not have bought it.

Georto also maintains that breach of warranty is per se a violation of 93A, citing 940 CMR 3.08(2).  However, in Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp., 640 N.E.2d 1101 (Mass. 1994), the Supreme Judicial Court held that 940 CMR 3.08(2) was not applicable to suits under § 11.  See Knapp Shoes, 418 Mass. at 1105, 1106.

594 n.11 (citing <u>McEvoy Trave. Bureau Inc. v. Norton Co.</u>, 563 N.E.2d 188 at 194.).[41]  I hold that Gateman induced contractual relations by material misrepresentation; Hawkins' status as a businessman does not absolve Gateman of his liability under the statute.

### F.  **Gateman's Claim Against Roberts**

This case also consisted of a complaint brought by Gateman (as third-party plaintiff) against third-party defendant Roberts, in which he alleges that Roberts breached its contract by failing to remove all demolition debris from the property.  I find for Roberts and against Gateman on this claim.

Gateman argues that Roberts' failure to remove the portion of the debris ramp on the property later sold to Georto is a breach of the Gateman-Roberts contract.[42]  To be sure, that half of the ramp was not removed, but whether Roberts is in breach is a different question.

In order to succeed on a breach of contract claim, sufficient evidence must be provided demonstrating one party's failure to provide "an 'essential and inducing feature of the

---

[41] <u>Compare</u> <u>Anthony's Pier Four, Inc. v. HBC Assoc.</u>, 583 N.E.2d 806, 822 (Mass. 1991), ("[T]here may be 'cases where an act might be unfair if practiced upon a commercial innocent yet would be common practice between two people engaged in business.'  In such circumstances, a claimant would have to show greater 'rascality' than would a less sophisticated party.") (quoting <u>Spence v. Boston Edison Co.</u>, 459 N.E.2d 80, 88 (Mass. 1983).

[42] As discussed at length in Part II, Findings of Fact, "demolition debris" in the Gateman-Roberts contract excluded brick and concrete, which Gateman always intended Roberts to leave on the site.

contract.'" <u>Lease-It, Inc. v. Mass. Port Auth.</u>, 600 N.E.2d 599, 602 (Mass. App. Ct. 1992)(quoting <u>Bucholz v. Green Bros. Co.</u>, 272 Mass. 49, 52 (1930)).  The burden is on the party alleging breach to prove that the other party failed to perform the terms of the contract without legal justification.  <u>Realty Developing Co. v. Wakefield Ready-Mixed Concrete Co.</u>, 100 N.E.2d 28, 30 (Mass. 1951).  If a party has fully performed on the contract, they cannot be held liable for breach.  <u>See</u> <u>Threlfall v. Coffee Roasters Prods.</u>, 28 N.E.2d 445, 447 (Mass. 1940).

A contract is modified when a change is made which presents new elements and negates others, while leaving the general purpose and effect of the agreement intact.  <u>See</u> 17A Am. Jur. 2d <u>Contracts</u> § 507 (2007); <u>Hawkins v. U.S.</u>, 96 U.S. 689 (1877) (parties to a contract may modify the agreement, waive their rights under it, and introduce new terms).  Under Massachusetts law, all parties to a contract must assent to modification. <u>Cochran v. Quest Software Inc.</u>, 328 F.3d 1, 9 (1st Cir. 2003). Such an agreement may be express or implied, <u>see</u> <u>Rogers v. Rogers</u>, 1 N.E. 122 (Mass. 1885), and can by indicated by conduct.  "Mutual agreement on modification of the requirement of a writing may . . . be inferred from the conduct of the parties and from the attendant circumstances of the [particular] case." <u>Cambridgeport Savings Bank v. Boersner</u>, 597 N.E.2d 1017, 1022 (Mass. 1992) (internal quotations omitted).  <u>See</u> <u>also</u>

Schinkel v. Maxi-Holding, Inc., 565 N.E.2d 1219, 1223 (Mass.

App. Ct. 1991), rev. denied, 409 Mass. 1104 (1991).[43]

The best description of what transpired when Roberts was

recalled to the site was that the Gateman-Roberts contract was

modified via the parties conduct.[44]  Just as the Gateman-Roberts

contract was modified when the parties agreed that Wetherbee and

not Roberts would grade and fill the site, (see, e.g., Tr. VII:

33, 86, 88), the contract was modified once again when Gateman

made Wetherbee responsible for ramp excavation, and Roberts

responsible for the removal of the excavated material.  See Tr.

VII: 33-36; Tr. VIII: 125, 130.[45]  Roberts was not even on site

_____

[43] The parties' promises to each other are consideration for the
modification -- no other consideration is needed.  "If the parties to a
bilateral contract agreed to rescind or modify it, there is no difficulty in
regard to consideration.  The promise of one party to forego his rights under
the contract is sufficient consideration for the promise of the other party to
forego his rights."  E. Van Noorden Co. v. Hartford Roofing & Sheet Metal Co.,
147 N.E.2d 749, 751 (Mass. 1958).  See Costonis v. Medford Housing Authority,
176 N.E.2d 25 (Mass. 1961).  In Costonis, a contractor was instructed to apply
a product to foundation walls that could not be applied as was provided by the
contract.  The trial judge found, and the Supreme Judicial Court affirmed,
that the contract had been modified with sufficient consideration.  Id. at 28.

[44] Roberts seeks an alternative approach, asking the Court to hold that
Roberts completed its contractual obligations before it left the site for the
first time in early May of 2002, and that they returned only as a "favor" to
Gateman.

[45] Gateman -- either himself or through the FDS geotech -- instructed
Wetherbee to excavate the debris ramp.  It was the geotech -- with Gateman's
knowledge -- that indicated the portion of the ramp that should be dug up.
The geotech drew a line; Wetherbee followed his instructions.  As Wetherbee
excavated, he "stockpiled" the debris from the ramp.  Gateman and Wetherbee
dealt by oral agreement, not written contract.  Neither of them was able to
produce any invoices or other documentation as to the work done.  See, e.g.,
Tr. VIII: 145-46. In the meantime, Gateman contacted Roberts and asked them to
come back to the site to "take care of" the debris Wetherbee was excavating.

    Gateman's inability to distinguish between instructions that he gave and
instructions that the FDS geotech gave, supports the theory that Gateman
either explicitly or implicitly indicated that the geotech's wishes were his

when the material was being excavated.  They returned to remove it only after it was stockpiled.  See Tr. VIII: 152-53.  Roberts fully performed on the contract as modified, and therefore cannot be held in breach.

That the parties have not produced a written document with changed terms, or an audio tape of an express conversation, does not bar this Court's finding of modification.  Contract law must constantly reckon with the practical realities of business and commerce.  The reality of business at 200 Union Street was that it was a mess.  Under Gateman's mismanagement, the site was operated haphazardly;[46] different assignments being given to different parties from day to day - whatever was most convenient.[47]  When Gateman was asked why he had Wetherbee do the excavation work instead of Roberts, he responded twice over

_____

own.  "I believe I asked Scott Wetherbee to uncover the ramp. . . .  I don't know exactly what words, I don't even know if it was me.  I know either the geotechnical or myself asked Scott Wetherbee to go to a certain location where the ramp was and begin uncovering what is later known to be the ramp."  Tr. VII: 32.  See also Tr. VII: 86 ("I don't know if it was me or the geotech."); Tr. VII: 116 ("I don't know if I told [Wetherbee] or the geotech told me to tell [Wetherbee], but that's how it happened. . . .  Does it really matter, someone said to say it, to have him excavate it.  It was either me or the other guy, but I knew about it.").

[46] Take for example the delivery of the fill to the site.  Gateman was asked who was responsible for directing where the fill was placed.  Gateman responded that he was not responsible, nor was Roberts responsible.  "I don't know if anyone was responsible.  It was just the truck drivers probably asked the operators where they wanted it, and they just put it wherever they told him to."  Tr. VII: 76.  At the end of the day, however, Gateman must be held responsible for what transpired on his site.

[47] Gateman generally oversaw Roberts' ever-evolving set of tasks: for example, originally Roberts was told to leave piles of brick and concrete on the FDS side of the property, later Gateman switched gears and had them move the piles to the Georto side.  See Tr. VII: 88.

"[I]t just wasn't a big deal. . . .  It just wasn't a big deal."
Tr. VII: 35.  Gateman indicated by his behavior that the terms
of the contract with Roberts were ever-changing.  The "big deal"
is that by his conduct, he changed the terms of his agreement
with Roberts -- he cannot do away with that now simply by
wishing.[48]  Regret alone cannot change the legal significance of
his actions.

Gateman also argues that when Roberts removed the
stockpiled debris from the Family Dollar side, they did so
negligently, causing debris to be strewn throughout the Georto
property.  I concluded in Part II that it was Gateman and
Wetherbee that carried piles of excavated debris from the FDS
side and dumped them on the Georto side; or, that if it was
Roberts, they only did so with Gateman's permission.

IV.  **DAMAGES**

A.    **Breach of Contract**

Georto is entitled to the "benefit of the bargain."  Its
damages are the difference between the "what was promised and
what actually came to pass."  Sparks, 294 F.3d at 272.  Because
of Gateman's breach, Georto had to remove the debris and replace
it with appropriate fill.  Those tasks cost Georto $249,171.

---

[48] Roberts' conduct also indicated understanding of the modification,
thereby creating mutual assent.

Gateman argues that Georto had a duty to mitigate the damages, which it did not fulfil.  I find Gateman's suggestion groundless.  The duty to mitigate is a duty to take reasonable measures.  Georto went well beyond that duty, taking significant steps to keep costs low while remedying the situation Gateman created.[49]  Accordingly, I award Georto damages in the amount of $249,171.

### B.    Breach of Tax Indemnification Agreement

Gateman also breached the parties tax indemnification agreement.  See Exh. 27.  Under that agreement, Gateman promised to indemnify Georto for any real estate taxes due on the property with respect to the period that Gateman owned the property.  Georto paid all the outstanding taxes on the property, but Gateman failed to reimburse him for his portion.  Accordingly I award Georto additional damages in the amount of $1,190.

### C.    93A Damages

In Section III.E above, I found that Gateman violated Mass. Gen. L. ch. 93A.  Georto cannot recover the same damages as for

---

[49] Georto consulted various experts to determine whether the debris materials had to be removed or whether the waste could be built upon using pilings.  After it was conclusively determined that the debris could not remain, Georto took bids from several subcontractors and went with the lowest bid that comprehensively addressed the site work.

his contract claim twice over,[50] but under the statute he is entitled to reasonable attorneys' fees and costs. See M.G.L. c. 93A § 11. Where an act or practice is a "willful or knowing" violation of § 2, the Court shall award between two and three times actual damages. Id. I award Georto attorneys fees and costs, but decline to confer double or treble damages for Gateman's actions.

"Liability under Chapter 93A for conduct amounting to intentional misrepresentation does not automatically trigger punitive damages. There must be something more." Cambridge Plating Co., Inc. v. Napco, Inc, 85 F.3d 752, 770. See also Vmark Software Inc., 642 N.E.2d at 595 ("Vmark's misstatements were . . . not made so 'knowingly' as to warrant the punitive sanctions of double damages under c. 93A."); Heller v. Silverbranch, 382 N.E.2d 1065, 1070 (Mass. 1978) (multiple damages should be reserved for only "callous and intentional violations" of 93A). "So knowingly" is an awkward concept. But as the First Circuit explained in Damon, it is the court's attempt to convey that "some quantum" of knowing and willful must be met to qualify for double damages under the statute. See Damon, 87 F.3d at 1485. In other words -- you have to be

---

[50] "Where an injury is incurred because of conduct that comprises the elements of any common law, statutory or regulatory cause of action and is also a violation of the Consumer Protection Act, recovery of cumulative damages under multiple counts is not allowed. Calimlim v. Foreign Car Ctr., Inc., 392 Mass. 228, 235 (1984).

bad just to violate 93A; but you have to be <u>really</u> bad to be
fined twice or thrice over. <u>Compare</u> <u>Computer Systems</u>
<u>Engineering v. Qantel</u>, 740 F.2d 59, 67-68 (1st Cir. 1984)
(upholding district court's ruling that "willful and knowing"
includes reckless misrepresentation).[51]

The question to me is whether Gateman was "misguidedly
insincere but fundamentally well intentioned" or callous and
meretricious. Georto would have me find the latter. As the
plaintiff sees it, Gateman's conduct toward him must be viewed
in light of his conduct toward the Family Dollar Store and the
City of Lynn. According to Georto, Gateman tried to swindle FDS
by leaving the debris ramp and brick and concrete piles on their
property in contravention of their contract. The only reason

---

[51] The First Circuit did not analyze the issue; rather it "accept[ed]
Judge Keeton's comprehensive and scholarly analysis, and affirm[ed] his
interpretation of the language 'willful or knowing violation' on the basis of
his opinion." <u>Computer Systems Engineering</u>, 740 F.2d at 68. Judge Keeton
reasoned: "[T]o prove that the defendant committed a willful violation by
fraud, the plaintiff may prove that agents of the defendant knew that they did
not know whether the fact represented was true or false-that they made the
representation without knowing whether it was true or false and with reckless
disregard for whether it was true or false. Though not the equivalent of
proving the state of mind of knowing the falsity of the fact represented, this
is nevertheless proof of a culpable state of mind-the state of mind of willful
disregard for truth or falsity of the fact represented." <u>Computer Systems
Engineering</u>, 571 F. Supp. at 1375. Under Judge Keeton's formulation though,
it is difficult to conceive of a successful fraud claim that would not result
in multiple damages under § 11. The plaintiff must only prove that the
defendant "knew" that he made a representation, with reckless disregard for
the statement's truth or falsity. That formulation captures all reckless
misrepresentation cases. Consider what would need to happen for an act to
fall outside it. A defendant made a misrepresentation, <u>without</u> knowledge that
he did not know whether the statement he made was true or false – which is, in
effect, negligent misrepresentation. We know, however, from later First
Circuit cases - e.g. <u>Cambridge Plating Co.</u> - that not every successful
intentional misrepresentation claim results in multiple damages under 93A. We
must read the First Circuit's affirmance in <u>Computer Systems Engineering</u>,
therefore, as applicable to the specific facts of that case.

Gateman corrected his wrongs in that instance was because FDS had not yet paid for the property, which explains his intransigence toward cleaning Georto's property when debris was discovered anew.  Similarly, in Georto's view, Gateman callously ignored the City of Lynn's directions to make the property safe for passers-by.

To be sure, Gateman is a "dogged bumbler."  VMark, 642 N.E.2d at 596 ("The inept blend of hopeful dissembling and dogged bumbling displayed by Vmark does not, however, reflect the 'culpable state of mind' required for imposition of § 11's extraordinary damage penalty.").  A marginal operator, he cut corners at every opportunity.  Corner cutting has made him liable for misrepresentation –- intentional, reckless, or negligent –- and for 93A violations, but I find that it does not cross the threshold into multiple damages territory.  The evidence paints a picture of gross recklessness, time and again, more than it does malicious intentionality.  Yes, Gateman was indifferent to the hardship his actions would and did cause Georto.  But there is a difference between thoughtlessness and mendacity.  In my judgment, multiple damages should be reserved for actions made "so knowingly"; dogged bumblers saddled only with actual damages, attorneys fees, and costs.

**V.   CONCLUSION**

Judgment is hereby entered in favor of Georto and against Gateman -- individually and as Trustee of the 200 Union Street Trust -- on all counts.  Georto is awarded $250,361,[52] prejudgment interest at the statutory rate of 12% per year from the date of breach,[53] and reasonable attorneys fees and costs under Chapter 93A.  Plaintiff will file submissions regarding attorneys fees, including a proposed form of judgment, by **August 3, 2007**, with any response due by **August 17, 2007**.


**SO ORDERED.**

**Date:  July 3, 2007**          _/s/Nancy Gertner_
                             **NANCY GERTNER, U.S.D.C.**

---

[52] $249,171 for removal of debris and replacement with fill; $1,190 for payment of real estate taxes.

[53] June 18, 2003, with respect to the breach of warranty in the Purchase and Sale Agreement; September 23, 2004, with respect to the breach of the tax indemnification agreement.